# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-01966-RM-MEH

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 464A,
THE TRUSTEES OF WELFARE AND PENSION FUNDS OF LOCAL 464A – PENSION FUND,
THE TRUSTEES OF RETIREMENT PLAN FOR OFFICERS,
BUSINESS REPRESENTATIVES AND OFFICE EMPLOYEES OF LOCAL 464A,
THE TRUSTEES OF LOCAL 464A FINAST FULL TIME EMPLOYEES PENSION PLAN,
THE TRUSTEES OF LOCAL 464A WELFARE AND PENSION BUILDING INC., and
THE TRUSTEES OF NEW YORK-NEW JERSEY AMALGAMATED PENSION PLAN FOR ACME EMPLOYEES, Individually and on Behalf of All Others Similarly Situated,

       Plaintiffs,

v.

PILGRIM'S PRIDE CORPORATION,
JAYSON J. PENN,
WILLIAM W. LOVETTE, and
FABIO SANDRI,

       Defendants.

---

## LEAD PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ....................................................................................................2

II.    PARTIES ...............................................................................................................6

       A.     Lead Plaintiff ............................................................................................6

       B.     Defendants ................................................................................................7

       C.     Relevant Non-Parties ................................................................................8

              1.     Entity Co-Conspirators ..................................................................8

              2.     Individual Co-Conspirators..........................................................10

III.   JURISDICTION AND VENUE ..........................................................................11

IV.    OVERVIEW OF DEFENDANTS' FRAUD ........................................................12

       A.     Background on Pilgrim's .........................................................................12

       B.     Background on the Broiler Industry ........................................................15

              1.     Consolidation and Concentration..................................................15

              2.     Broiler Pricing Economics............................................................17

              3.     Extensive Commingling Among Broiler Industry Competitors ...............18

       C.     Pilgrim's 2008 Bankruptcy .....................................................................20

       D.     Defendants' Illegal Bid-Rigging Scheme ...............................................21

              1.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's
                     Wings, Dark Meat, and 8-Piece COBs ......................................23

              2.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 3's
                     2014 Frozen 8-Piece COBs and Dark Meat.............................27

              3.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's
                     Dark Meat Supply for 2014 .....................................................29

              4.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 3's
                     Quality Assurance Costs for 2014 ...........................................30

              5.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's
                     2015 8-Piece COB Supply.......................................................31

**Page**

6.   Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 2's Promotional Broiler Products .................................................................40

7.   Pilgrim's and Its Co-Conspirators Illegally Rig Bids Regarding Sysco's Line-of-Credit Term ....................................................................42

8.   Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's 2018 Broiler Products ................................................................................42

9.   Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 2's 8-Piece COB Supply for 2018 and 2019.....................................................44

E.   Defendants Conceal Pilgrim's Illegal Bid-Rigging Scheme From Investors and Lie About the Reasons for Pilgrim's Success ...................................45

F.   The Truth Emerges .............................................................................47

G.   Post-Class Period Events Confirm Defendants' Participation in the Illegal Bid-Rigging Scheme............................................................................48

V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS .....................................49

A.   Defendants' Materially False and Misleading Statements and Omissions............49

1.   Defendants' February 9, 2017 False and Misleading Statements.............50

2.   Defendants' May 4, 2017 False and Misleading Statements.....................55

3.   Defendants' August 3, 2017 False and Misleading Statements.................56

4.   Defendants' November 8, 2017 False and Misleading Statements ...........58

5.   Defendants' February 15, 2018 False and Misleading Statements............59

6.   Defendants' February 16, 2018 False and Misleading Statements............60

7.   Defendants' May 11, 2018 False and Misleading Statements...................60

8.   Defendants' August 2, 2018 False and Misleading Statements.................61

9.   Defendants' November 1, 2018 False and Misleading Statements ...........63

10.  Defendants' February 14, 2019 False and Misleading Statements............64

11.  Defendants' May 2, 2019 False and Misleading Statements.....................66

**Page**

12.  Defendants' August 1, 2019 False and Misleading Statements ................ 67

13.  Defendants' October 31, 2019 False and Misleading Statements ............ 69

14.  Defendants' February 21, 2020 False and Misleading Statements ........... 70

15.  Defendants' April 30, 2020 False and Misleading Statements ................ 73

B.  SOX Certifications Throughout the Class Period ................................... 75

VI.  ADDITIONAL SCIENTER ALLEGATIONS ............................................... 76

A.  The DOJ's Criminal Cases Confirm Defendants' Knowledge of Pilgrim's Illegal Bid-Rigging Scheme ................................................. 76

1.  Defendant Penn ...................................................................... 78

2.  Defendant Lovette .................................................................. 80

3.  Defendant Pilgrim's ................................................................ 80

B.  The Individual Defendants Were Directly Involved in and Aware of Matters Directly Related to Defendants' Fraudulent Scheme and Material Misrepresentations, Which Concerned the Core Operations of Pilgrim's Business ....................................................................................... 81

C.  The Individual Defendants Sold Significant Amounts of Pilgrim's Common Stock During the Class Period, Further Supporting a Strong Inference of Scienter ................................................................. 87

D.  The Departure of Multiple Key Executives Further Supports a Strong Inference of Scienter ................................................................. 88

E.  The Individual Defendants' SOX Certifications Further Support a Strong Inference of Scienter ................................................................. 88

F.  Pilgrim's Is Legally Responsible for the Conduct of Its Senior Employees, Including the Individual Defendants ............................................... 90

VII.  LOSS CAUSATION ............................................................................... 90

VIII.  CLASS ACTION ALLEGATIONS .......................................................... 91

IX.  UNDISCLOSED ADVERSE FACTS ........................................................ 93

4822-9633-9179.v2

**Page**

X.      DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS.................94

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE .................................95

XII.    NO SAFE HARBOR ...........................................................................96

XIII.   COUNTS...........................................................................................98

XIV.    PRAYER FOR RELIEF .....................................................................102

XV.     JURY DEMAND ...............................................................................103

4822-9633-9179.v2

1.      Lead Plaintiff New Mexico State Investment Council ("Lead Plaintiff") brings this action under the federal securities laws, individually and on behalf of all persons or entities (the "Class") that purchased or otherwise acquired the common stock of Pilgrim's Pride Corporation ("Pilgrim's" or the "Company") between February 9, 2017 and June 2, 2020, inclusive (the "Class Period").[1]  This action asserts claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2.      Lead Plaintiff alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based upon the ongoing investigation of its undersigned counsel ("Lead Counsel"), which includes, *inter alia*, review and analysis of: (a) public filings with the SEC made by Pilgrim's and other companies; (b) press releases and other publications disseminated by Pilgrim's; (c) shareholder communications, conference calls, and postings on Pilgrim's website; (d) news articles and public reports; (e) research reports by securities and financial analysts; (f) data reflecting the price of Pilgrim's common stock; (g) interviews with former Pilgrim's employees; (h) publicly available filings in *United States v. Penn, et al.*, No. 1:20-cr-0152 (D. Colo.) (the "DOJ Individual Case") and *United States v. Pilgrim's Pride Corp., et al.*, No. 1:20-cr-0330 (D. Colo.) (the "DOJ Pilgrim's Case"); and (g) other publicly available material and data identified herein.  Lead Counsel's

---

[1]      Excluded from the Class are Pilgrim's, Pilgrim's former President and Chief Executive Officer ("CEO") William W. Lovette ("Lovette"), Pilgrim's former President and CEO Jayson J. Penn ("Penn"), and Pilgrim's former Chief Financial Officer ("CFO") and current President and CEO Fabio Sandri ("Sandri") (collectively, "Defendants"), as well as all present or former executive officers of Pilgrim's and their immediate family members (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)).

4822-9633-9179.v2

investigation of the facts underlying this action is ongoing, and Lead Counsel further believes that relevant facts are known only by Defendants or are exclusively within their custody or control.  Lead Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

3.     On June 3, 2020, the United States Department of Justice ("DOJ") announced that a federal grand jury in the District of Colorado had returned an indictment (the "Initial Indictment") against four executives in the chicken industry – including defendant Penn, former Pilgrim's Vice President ("VP") of Sales Roger Austin, and former Pilgrim's VP of National Accounts Scott Brady – for criminal antitrust violations related to their involvement in "a conspiracy to fix prices and rig bids for broiler chickens."  A little over four months later, on October 6, 2020, the DOJ filed another indictment (the "Superseding Indictment") in the DOJ Individual Case, which added six additional defendants – including defendant Lovette and former Pilgrim's Sales Director Jimmie Little – to the criminal antitrust violations charged in the Initial Indictment.[2]  The Superseding Indictment set forth extensive factual details regarding numerous occasions on which the DOJ Defendants – including defendants Lovette and Penn – exchanged phone calls, text messages and/or emails in furtherance of their illegal bid-rigging conspiracy, which began "at least as early as 2012" and continued "through at least early 2019."  Based on these detailed facts, the Superseding Indictment found that "[t]he combination and conspiracy engaged in by the [DOJ Defendants] and co-conspirators was a *per se*

---

[2]     The ten Defendants in the DOJ Individual Case, who are identified in §II, *infra*, are collectively referred to herein as the "DOJ Defendants."

unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."

4.      Shortly thereafter, on October 13, 2020, the DOJ filed separate criminal charges against Pilgrim's in the DOJ Pilgrim's Case for similarly engaging in "a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1," beginning "at least as early as 2012 and continuing through at least early 2019." On February 23, 2021, ***Pilgrim's pleaded guilty*** to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. §1." The guilty plea was accompanied by a sentence to pay approximately ***$107 million*** in criminal fines. Notably, the February 23, 2021 plea agreement in the DOJ Pilgrim's Case (the "Plea Agreement"), acknowledged that, if the case had gone to trial, the Government ***would have had sufficient evidence to prove***, among other things, that: Pilgrim's "participated in a conspiracy with at least one competitor engaged in the production and sale of broiler chicken products to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States"; and the amount of Pilgrim's sales impacted by the illegal conspiracy totaled ***at least $361 million***.

5.      Throughout the Class Period, Defendants actively concealed the existence of their illegal bid-rigging scheme, which significantly inflated Pilgrim's results through "*per se* unlawful" means.  Instead of disclosing the truth behind the Company's unsustainable financial success, Defendants made numerous materially false and misleading statements to investors attributing Pilgrim's performance to its efficient operations, broad product portfolio and purportedly strong

- 3 -

relationships with its key customers.  Among other things, Defendants repeatedly told investors that Pilgrim's was able to succeed in the "highly competitive" chicken industry because of "competitive strengths," such as its "broad product portfolio," "strong customer relationships," "highly efficient operations," and "corporate culture focused on performance and accountability."  These representations – along with several others made by Defendants during the Class Period – were materially false and misleading because they failed to disclose the truth that Pilgrim's impressive performance was, in fact, being inflated by an illegal bid-rigging scheme.

6.    Moreover, Defendants not only misled investors by falsely boasting about the results of their undisclosed bid-rigging scheme, they also concealed from investors the significant risks associated with the illegal scheme.  Indeed, the consequences for violating the Sherman Act are severe.  They include significant criminal penalties for a corporation – as evidenced by the $107 million fine assessed to Pilgrim's – and up to ten years in prison for an individual.  Pilgrim's fraudulent scheme accordingly exposed the Company to steep criminal fines and the loss of key executives.

7.    The scheme also exposed the Company to significant reputational harm.  As a Company whose performance admittedly depends on "long-term relationships" with its customers, the Company's reputation was and is vital to its sustained success.  Playing to this fact, Defendants repeatedly assured investors throughout the Class Period that they "strive[d] to be the ***best managed*** and ***most respected*** company in our industry," and that they employed a "key customer approach [that] ***promotes trust [and] enhances long-term relationships***."  In addition to directly contradicting these representations, Defendants' illegal bid-rigging scheme jeopardized the success of their operations by exposing the Company to substantial reputational harm that would impact their future

- 4 -

ability to win business.  In their Class Period SEC filings, Defendants acknowledged that "[o]ur business could suffer significant setbacks in revenues and operating income if we lost one or more of our largest customers."  Defendants failed to disclose, however, that they were involved in an illegal scheme that involved deceiving Pilgrim's clients into paying higher prices for the Company's broiler products, thus jeopardizing their chances of both retaining their existing clients and obtaining new clients in the future.

8.      Moreover, Defendants' illegal bid-rigging scheme clearly had a significant impact on the Company's profitability.  As demonstrated by the chart below, the Company's profits were underwhelming – and often non-existent – in the years preceding Defendants' scheme, but steadily increased and reached unprecedented highs once Defendants began rigging bids in 2012, before falling dramatically in 2020, the year in which the scheme was finally revealed:



9. Defendants were legally obligated to disclose to investors that Pilgrim's marked increase in profitability was driven by an unsustainable and illegal bid-rigging scheme, ***not*** by legitimate, sustainable business practices such as a "broad product range," "experienced management team," and "blue chip and diverse customer base."

10. Defendants not only misled investors, but also profited handsomely from the artificially inflated stock prices created by their deception. Indeed, during the Class Period, the three Individual Defendants (defined below) used their possession of material, non-public information regarding Pilgrim's illegal bid-rigging scheme to collectively pocket ***nearly $10 million*** by selling nearly 400,000 shares of Pilgrim's common stock at artificially inflated prices.

11. Defendants' fraudulent scheme finally unraveled on June 3, 2020, when the Initial Indictment revealed the true reason behind Pilgrim's purportedly successful operations. This revelation stunned the market, causing Pilgrim's stock price to tumble all the way down to $18.29 per share – ***a more than 51% decline from its Class Period high of $37.75*** – and causing Lead Plaintiff and other members of the Class to suffer significant damages as a result.

## II. PARTIES

### A. Lead Plaintiff

12. Lead Plaintiff New Mexico State Investment Council is an institutional investment firm that manages New Mexico's $31 billion permanent endowment, as well as investments from 23 other New Mexico state agencies. Lead Plaintiff purchased Pilgrim's common stock on National Association of Securities Dealers Automated Quotations ("NASDAQ") as set forth in its previously filed certification and suffered damages as a result of the federal securities law violations alleged herein. *See* ECF No. 28-2.

- 6 -

4822-9633-9179.v2

### B.   Defendants

13.     Defendant Pilgrim's is one of the nation's largest chicken producers and specializes in the rearing, slaughter, and processing of chickens for human consumption.  The Company is incorporated in the state of Delaware and maintains its principal executive offices at 1770 Promontory Circle, Greeley, Colorado, 80634.  Pilgrim's common stock trades on the NASDAQ under the symbol "PPC."

14.     Defendant Lovette was Pilgrim's President and CEO from January 2011 to March 2019.  From March 2019 to July 2020, he provided "strategic advisory services" to the Company. Lovette was also a member of the Company's Board of Directors (the "Board") from February 2011 to March 2019.  As President, CEO, and Board member, Lovette regularly spoke on Pilgrim's behalf in press releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Lovette signed and certified the Company's SEC Forms 10-K filed with the SEC, as discussed in further detail below.  Lovette is also a named defendant in the DOJ Individual Case.

15.     Defendant Penn was Pilgrim's President and CEO from March 2019 until June 14, 2020, when the Company announced that he was taking a leave of absence.  Before his role as President and CEO, Penn was a Pilgrim's Executive VP from January 2012 to October 2017, and he was President of Pilgrim's USA from October 2017 to March 2019.  In September 2020, Pilgrim's announced that Penn was no longer with the Company.  As President and CEO, defendant Penn regularly spoke on Pilgrim's behalf in press releases, conference calls, and SEC filings.  Pursuant to §906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Penn signed and certified the

Company's SEC Forms 10-K filed with the SEC, as discussed in further detail below. Penn is also a named defendant in the DOJ Individual Case.

16.      Defendant Sandri was Pilgrim's CFO from May 2011 to September 2020. In June 2020, he was appointed as Pilgrim's interim President and CEO, and in September 2020, he became Pilgrim's permanent President and CEO – a position he still holds today. As CFO, defendant Sandri regularly spoke on Pilgrim's behalf in conference calls and SEC filings. Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. §1350, defendant Sandri signed and certified the Company's Forms 10-K filed with the SEC, as discussed in further detail below.

17.      Defendants Penn, Lovette, and Sandri are collectively referred to as the "Individual Defendants." Pilgrim's and the Individual Defendants are collectively referred to as "Defendants."

C.      **Relevant Non-Parties**

18.      Although not defendants in this action, the following entities and individuals were co-conspirators in Defendants' illegal scheme to rig bids submitted to nationwide restaurants and retailers.

1.      **Entity Co-Conspirators**

19.      Tyson Foods ("Tyson") is the nation's largest broiler producer, producing roughly 21% of the nation's broiler chicken supply during the Class Period. It was founded in 1935 and is headquartered in Springdale, Arkansas. Tyson was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

20.      Koch Foods ("Koch") is one of the nation's top five broiler producers, producing roughly 5% of the nation's broiler chicken supply during the Class Period. It was founded in 1973

4822-9633-9179.v2

and is headquartered in Park Ridge, Illinois.  Koch was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

21.    Perdue Farms ("Perdue") is one of the nation's top five broiler producers, producing roughly 7% of the nation's broiler chicken supply during the Class Period.  It was founded in 1920 and is headquartered in Salisbury, Maryland.  Perdue was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

22.    Claxton Poultry ("Claxton") is a broiler producer that was founded in 1949 and is headquartered in Claxton, Georgia.  Claxton was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

23.    Case Foods ("Case Foods") is a broiler producer that was founded in 1986 and is headquartered in Troutman, North Carolina.  Case foods was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

24.    George's, Inc. ("George's") is a broiler producer that was founded in the 1920s and is headquartered in Springdale, Arkansas.  George's was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

25.    Mar-Jac Poultry ("Mar-Jac") is a broiler producer that was founded in 1954 and is headquartered in Gainesville, Georgia.  Mar-Jac was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

26.    Marshall-Durbin Companies ("Marshall-Durbin") is a broiler producer that was founded in 1930 and is headquartered in Birmingham, Alabama.  It was acquired by Mar-Jac in 2014.  Marshall-Durbin was a co-conspirator in Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.

## 2.     Individual Co-Conspirators

27.     Roger Austin ("Austin") was Pilgrim's VP of Sales from February 2007 to March 2019.  He worked closely with defendants Penn and Lovette, and he was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.  He is a named defendant in the DOJ Individual Case.

28.     Jimmie Little ("Little") was a Pilgrim's Sales Director from April 2000 to October 2017.  He worked closely with defendants Penn and Lovette, and he was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers.  He is a named defendant in the DOJ Individual Case.

29.     Scott Brady ("Brady") was Pilgrim's VP of National Accounts from June 1999 to July 2012, and he has been Claxton's VP of National Accounts from August 2012 to the present.  Brady was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

30.     Mikell Fries ("Fries") has been Claxton's President from 2016 to the present.  Before he was President, Fries was a Claxton sales manager from 2004 to 2012.  Fries was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

31.     Tim Mulrenin ("Mulrenin") was a Tyson sales executive from 2007 to 2018, and he has been Perdue's Director of National Account Sales from May 2018 to the present.  He was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

- 10 -

32.     William Kantola ("Kantola") has been a Koch sales executive from 2010 to the present.  He was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

33.     Gary Roberts ("Roberts") was VP of Sales and Marketing at Marshall-Durbin from February 2007 to June 2012 and VP of National Accounts at Tyson from June 2012 to November 2016.  He has been Case Foods' VP of Operations from November 2016 to the present and Case Foods' VP and Sales and Marketing from March 2017 to the present.  Roberts was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

34.     Rickie Blake ("Blake") was a George's sales director and manager prior to and during the Class Period.  Blake was an integral part of Defendants' illicit scheme to rig bids submitted to nationwide restaurants and retailers, and he is a named defendant in the DOJ Individual Case.

## III.     JURISDICTION AND VENUE

35.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 CFR §240.10b-5.

36.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States.

37.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as conduct giving rise to the violations of the Exchange Act alleged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this

- 11 -

District.  Defendants reside or transact business within this District, and Pilgrim's maintains its primary office at 1770 Promontory Circle, Greeley, Colorado.

38.    In connection with the acts and conduct complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, the Internet, and the facilities of national securities exchanges.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    Background on Pilgrim's

39.    Pilgrim's is one of the nation's largest chicken producers, accounting for roughly 17% of chicken production in the United States during the Class Period.  Collectively, Pilgrim's and four other companies (Tyson, Sanderson Farms, Inc. ("Sanderson"), Perdue, and Koch) account for over 60% of the nation's ready-to-cook ("RTC") chicken.  The nation's top three chicken producers – Pilgrim's, Tyson, and Sanderson – account for roughly half of the nation's RTC chicken production.

40.    Pilgrim's business focuses on the production and sale of broiler chickens ("broilers"). According to the United States Department of Agriculture ("USDA"), broilers are young chickens that are bred for their meat, and they account for nearly all of the chicken meat that is produced in the United States.  Broilers may be sold in a variety of forms, including fresh or frozen, raw or cooked, whole or in parts, or as a meat ingredient in a value-added product.  Throughout the vast majority of the Class Period, Pilgrim's was a "pure play" broiler producer – one that garnered nearly all of its revenue from sale of broilers – meaning that the Company's  success rose and fell with the success of its broiler business.

- 12 -

41.     Pilgrim's and other dominant broiler producers such as Tyson and Sanderson are highly dependent upon their relationships with large retail grocery stores and restaurants.  During the Class Period, Pilgrim's stated that "[o]ur sales efforts are largely targeted towards the foodservice industry, principally chain restaurants and food processors . . . and retail customers, including grocery store chains," and "[o]ur primary customer markets consist of the foodservice and retail channels."  The Company also attributed its strong market position to its ability to sell to chain grocers and restaurants, stating: "We believe we can maintain this prominent market position as we are one of the few producers in the chicken industry that can fully satisfy the requirements of large retailers and foodservice companies."  Leading up to the Class Period, Pilgrim's boasted Walmart Inc. ("Wal-Mart") and Chick-fil-A as two of its prominent customers.  During the Class Period, however, Wal-Mart was removed from the Company's mentions of prominent United States customers.

42.     During and prior to the Class Period, winning business with a large grocery or restaurant chain was typically achieved through a bidding process in which Pilgrim's and other broiler producers would submit and/or negotiate prices with the retailers.  While some retailers negotiated directly with the broiler producers, others negotiated with the producers through a buying cooperative.  Pilgrim's, Tyson, Sanderson, Koch, and others often submitted bids and negotiated prices with the same large restaurants and grocery chains – supposedly competing for their business.

43.     A common pricing benchmark when submitting bids and negotiating pricing was the 8-piece, bone-in chicken, or "COB" (for "chicken-on-bone").  The 8-piece COB consisted of two breasts, two wings, two thighs, and two drumsticks.  Producers often used a "cost-plus" model when submitting and negotiating prices for 8-piece COBs, which means that they determined pricing by

- 13 -

adding a fixed mark-up percentage to a particular chicken product's cost.  In other words, the broiler producers often determined the pricing for their 8-piece COBs by adding a specific percentage to the amount it cost them to produce that COB.

44.     The price for dark meat was often set at a certain number of cents less than (or "back" from) the 8-piece COB.  Common jargon for dark meat pricing was accordingly ".30 back" or ".31 back," which translated into 30 cents less than the price for an 8-piece COB or 31 cents less than an 8-piece COB.  Because the numbers translated to "cents less than," .30 back was a higher price than .31 back.

45.     While broiler pricing was often set using the 8-piece COB "cost-plus" model, some broiler products were tied to a specific broiler pricing index.  During the Class Period, there were two operative pricing indices: the Urner Barry ("UB") Index and the USDA composite.  For example, cases of wings that were sold in bulk were sometimes priced using the UB price-per-pound (or "market").  Cases of pre-counted wings were sometimes sold at "market-plus," which was the UB price-per-pound plus a specific number of cents.

46.     Another contract item that the broiler producers and their customers often negotiated was the line of credit "term."  Broiler producers sometimes extended their customers lines of credit, which meant that the customers could purchase the broiler products on credit and then pay the producers after a certain number of days.  The number of days that the customers had to pay for the broiler products was referred to as the "term" for the line of credit. A longer term was more favorable to the customers, and a shorter term was more favorable to the broiler producers.

47.     The bidding and negotiating typically occurred at the end of each year and set the price for contracts for the following year.  In some instances, the bidding set the pricing for multiple

years.  In other instances, prices were negotiated throughout the year and set pricing for discrete time periods.

**B.     Background on the Broiler Industry**

**1.     Consolidation and Concentration**

48.     The United States chicken industry was once a small, locally-oriented, and fragmented industry in which the different stages of chicken production were owned and operated by different entities or individuals.  In the 1950s, however, entrepreneurs began to combine the different stages of chicken production into one "vertically integrated" operation – meaning that the producers owned or tightly controlled every aspect of production, from the feed mill to the hatchery to the slaughterhouse.  The broiler industry is now almost entirely vertically integrated, meaning that the broiler producers control almost the entire broiler production process.

49.     With vertical integration came industry consolidation and concentration.  According to the USDA: "55 federally inspected broiler [companies] operated in 1995, compared with 41 [companies] in 2010."  By 2019, there were only 30.  According to a 2013 USDA report, "[d]uring the past 16 years, firms in the Broiler industry continued to decrease in number and grow in size, thereby gaining further economies of scale and scope in processing and marketing."

50.     The chart below demonstrates the consolidation in the chicken industry from 1980-2007:

- 15 -



51.    The chart below demonstrates the market share of the top poultry producers from 2011-2019:



52.    As a result of industry consolidation, the broiler industry is now highly concentrated, meaning that only a few, large, powerful producers control and compete in the market.   As

- 16 -

mentioned above, during the Class Period, the top five broiler producers were responsible for roughly 60% of the nation's broiler production, while the top three accounted for roughly half of the nation's broiler production.

### 2. Broiler Pricing Economics

53.     Broilers are a commodity, which means that the market treats all broilers as equivalent, no matter who produced them.  As defendant Lovette stated in a February 2014 conference call, "our business . . . the chicken business per se is a commodity business."  Because broilers are a commodity, broiler producers cannot unilaterally raise their prices without losing business.  If a broiler producer attempted to unilaterally raise broiler prices, that producer would lose business because the customer would simply purchase broilers from the producer offering the lower price.

54.     Basic supply and demand principles also apply to broilers.  That means that broiler pricing is often determined by changes in supply and demand.  If broiler demand exceeds supply, then the broiler price will increase.  Conversely, when broiler supply exceeds demand, the price will decrease.  Because broilers are a commodity for which there are no substitutes, supply and demand for broilers is inelastic.  Accordingly, even when the price for broilers changes, demand remains relatively stable.

55.     As a result of these dynamics, the broiler industry has historically been subject to a volatile "boom and bust" cycle in which, after periods of high broiler prices and lucrative company profits, broiler companies would ramp up production, which would lead to an oversupply and cause broiler prices – and profits – to plummet.  As industry analyst Kenneth Zaslow of BMO Capital Markets noted in a February 2016 earnings call with Sanderson, "the chicken industry, if you go

back into history, there's always so much volatility year to year that one year you can lose money, another year you can make money." As Pilgrim's has stated in its yearly SEC filings, "the chicken industry is subject to cyclical earnings fluctuations," which create a "challenging operating environment."

### 3.   Extensive Commingling Among Broiler Industry Competitors

56.   Prior to and during the Class Period, broiler industry executives had frequent opportunities to communicate and develop relationships with one another. Among these opportunities were: (1) participation in poultry trade organizations that hosted multiple yearly events where broiler executives had ample opportunity for personal interaction; and (2) a revolving employment door between competing broiler companies.

57.   First, trade organization events afforded Defendants ample opportunities to collude with their competitors. One trade organization, the National Chicken Council (the "NCC"), is the chicken industry's leading lobby organization. According to its website, NCC members include broiler producers and processors that "account for approximately 95 percent of the chickens produced in the United States." The NCC is run by executives from large broiler producing companies, including Defendants. For example, during the relevant antitrust period, the NCC's executive committee and board of directors consisted only of broiler industry executives, and each of the top five broiler companies was consistently represented on the executive committee and board of directors. For example, the NCC's 2012-2015 board members included, among other broiler company executives: (1) Mark Kaminsky of Koch; (2) Bernard Leonard of Tyson; (3) Mike Roberts of Perdue; (4) Joe Sanderson, Jr. of Sanderson; (5) Jerry Wilson of Pilgrim's; and (6) defendant Penn.

58.     The NCC also held roughly a dozen yearly meetings, three of which were annual board of director meetings.  The meetings were attended by the above-mentioned executives, often held at leisurely locations, and provided copious opportunity for industry executives to socialize and discuss broiler business matters.  For example, the 2012 summer board of director meeting was held at the Ritz Carlton in Lake Tahoe, California.  The meetings also scheduled time for personal interaction among high-level executives from competing broiler companies.  The personal time included cocktail receptions, breakfasts, golf tournaments, and dinners.

59.     Another trade organization that provided Defendants the opportunity to communicate and collude in-person with their competitors was the USA Poultry and Egg Export Council ("USAPEEC").  Like the NCC, USAPEEC was run by high-level broiler producer executives.  For example, in 2012, Charles von der Heyde of Pilgrim's was first vice chairman of the board, Herbie Hoover of Sanderson was second vice chairman.  Also like the NCC, USAPEEC held annual meetings at desirable locations such as the Hotel del Coronado in Coronado, California.  These meetings were attended by USAPEEC members such as Charles von der Heyde of Pilgrim's, Mike Little of Mountaire Farms, and Neil Carey of Simmons Foods.

60.     Defendants and their co-conspirators were members and/or leaders of various other poultry trade associations, such as the United States Poultry and Egg Association ("U.S. Poultry"), the Poultry Federation, and the International Poultry Council, all of which were also controlled by high-level broiler producer executives.  For example, U.S. Poultry's 2010 board of directors included, among other top broiler executives, Donnie King of Tyson, Walt Shafer of Pilgrim's, Lyman Campbell of Koch, Lampkin Butts of Sanderson, and Lester Gray of Perdue.  In 2017, U.S. Poultry's Board included, among others, defendant Lovette.

- 19 -

61.     Finally, the revolving employment door between dominant broiler producers provided Defendants and their co-conspirators with contacts at their competitor companies.  For example, before defendant Lovette became Pilgrim's CEO in 2011, he worked for Tyson for 25 years and Case Foods for two years.  Scott Brady – an integral player in the bid-rigging scheme – was a Pilgrim's VP from 1999-2012 and Claxton VP from 2012-Present.  Tim Mulrenin, another bid-rigging participant, was a Tyson Sales Executive from 2007-2018 and Perdue Sales Executive from 2018-Present.  A third bid-rigging participant, Gary Roberts, was a Marshall-Durbin VP from 2007-2012, a Tyson VP from 2012-2016, and a Case Foods VP from 2016-Present.

### C.     Pilgrim's 2008 Bankruptcy

62.     In 2007, the broiler industry entered a particularly low "bust" phase.  Beginning in the first quarter of 2007, corn and soybean prices rose significantly.  Because corn and soybean are broiler producers' main feed ingredients and highest cost, the rising prices ate a significant portion of the producers' margins.  To stay afloat, Pilgrim's needed chicken prices to increase enough to outpace its rising feed costs.  However, oversupply in 2007 kept prices low, and by 2008 oversupply had outpaced demand, causing prices to plummet.  By the end of 2008, Pilgrim's financials had deteriorated so substantially that management told investors, "there is substantial doubt about the Company's ability to continue as a going concern."

63.     On December 1, 2008, faced with the specter of collapse, Pilgrim's filed for bankruptcy.  As it lamented in its press release announcing that the Company had filed for bankruptcy, "[o]ver the past year, Pilgrim's Pride has faced a number of significant challenges including high feed-ingredient costs, an oversupply of chicken, *weak market pricing* and softening demand."  In its 2008 SEC Form 10-K, the Company complained, "*chicken . . . prices did not*

*improve sufficiently to offset the higher costs of feed* ingredients," and "prices have actually declined as the result of . . . a general oversupply of chicken in the US."  On December 28, 2009, Pilgrim's announced that its restructuring was complete, and it was emerging from bankruptcy.  As part of its restructuring plan, Pilgrim's sold a majority 64% stake to the Brazilian meat company JBS SA for $800 million cash.  It also entered into a new $1.75 billion credit facility.

### D.    Defendants' Illegal Bid-Rigging Scheme

64.    Beginning at least as early as 2012 and continuing until at least 2019, Defendants and their co-conspirators colluded to rig bids submitted to their biggest customers: retail grocers, food distributors, and restaurant chains.

65.    According to the Superseding Indictment, which was issued following a federal grand jury investigation in the District of Colorado, Pilgrim's, acting through defendant Penn, defendant Lovette, and other Pilgrim's employees, listed below, actively engaged in a scheme "to *suppress and eliminate competition through rigging bids and fixing prices* and price-related terms for broiler chicken products sold in the United States."[3]

66.    The grand jury investigation uncovered that Penn, Lovette, and other Pilgrim's employees acted through a "continuing network" of suppliers and co-conspirators.  Among the co-conspirators indicted by the Grand Jury were: (1) Jimmie Little: Pilgrim's Sales Director from 2000-2017; (2) Roger Austin: Pilgrim's VP of Fresh Foodservice from 2007 to 2019; (3) Scott Brady: Pilgrim's VP of National Accounts from 1999-2012 and Claxton VP of National Accounts from 2012-Present; (4) Mikell Fries: Claxton Sales manager beginning in 2004, Claxton Board of Directors member starting in 2012, and Claxton President from 2016-Present; (5) Tim Mulrenin:

---

[3]    All allegations in this section are sourced from the Superseding Indictment.

Tyson Sales Executive from 2007-2018 and Perdue Sales Executive from 2018-Present; (6) William Kantola: Koch Sales Executive from 2010-Present; (7) Gary Roberts: Tyson VP of National Accounts from 2012-2016 and Case Foods VP from 2016-Present; and (8) Rickie Blake: George's Director and Manager during relevant time-Present.

67.     The Grand Jury found that the above individuals, along with defendants Penn and Lovette (the "co-conspirators"), used their network of broiler industry executives to:

(a)     reach agreements and understandings to submit aligned (though not necessarily identical) bids and to offer aligned (though not necessarily identical) prices and price-related terms, including discount levels, for broiler chicken products sold in the United States; and

(b)     participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by suppliers and co-conspirators for broiler chicken products sold in the United States.

68.     During the course of its investigation, the Grand Jury found that the co-conspirators communicated via phone call, text, and email to submit aligned bids to the following restaurants, grocers, and food distributors: (1) Golden Corral; (2) KFC Corporation ("KFC"); (3) The Kroger Company ("Kroger"); (4) Popeyes Louisiana Kitchen, Inc.; (5) Wal-Mart; (6) Church's Chicken;

(7) Chick-fil-A; (8) Sysco Corporation ("Sysco Foods"); and (9) J.S. Foods (collectively, the "Organizational Victims").

69.     The Superseding Indictment detailed **numerous instances from 2012-2019** in which the co-conspirators colluded to submit rigged bids to the Organizational Victims.  **Pilgrim's was involved in each instance**.  Although Defendants' illegal collusion began as early as 2012, its effects lasted well into the Class Period because: (1) Pilgrim's, Penn, Lovette, and other Pilgrim's employees engaged in collusive conduct to rig bids during the Class Period; and (2) the impact of multiple illicit contracts that were entered into prior to the Class Period continued to affect Pilgrim's financial performance during the Class Period.  The Grand Jury chronicled numerous instances of collusion, as detailed below.

> **1.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's Wings, Dark Meat, and 8-Piece COBs**

70.     First, in 2012, Pilgrim's and its co-conspirators rigged bids submitted to a centralized buying cooperative ("Cooperative 1") for a nationwide restaurant franchise's ("Victim 1") 2013 supply of dark meat, wings, and 8-piece COBs.

71.     On October 10, 2012, **Austin** submitted **Pilgrim's** bid to Cooperative 1.[4]  He offered to supply Victim 1 with dark meat for calendar year 2013 at .30 back from the 8-piece price.  Also on October 10, 2012, a George's employee ("George's Employee 2") submitted George's bid to Cooperative 1.  He offered to supply Victim 1 with dark meat for calendar year 2013 at .28 back.  Also in October, Brady submitted Claxton's bid to Cooperative 1.  He offered to supply Victim 1 with dark meat for calendar year 2013 at .30 back.

---

[4]     For clarity, all references to Pilgrim's or its employees are italicized and bolded throughout this section.

72.     On October 26, 2012, a Cooperative 1 employee ("Cooperative Employee 1") told *Austin* that because some producers had bid dark meat at .30 back and other producers had bid dark meat at .32 back, Cooperative 1 planned to ask all producers to change their bids to .31 back.

73.     On November 13, 2012, the co-conspirators exchanged the following series of phone calls and text messages regarding their pricing for Victim 1:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 4:17 p.m. | Blake | Brady | Phone Call: Approximately 5 minutes. |
| 4:22 p.m. | Brady | Fries | Text Message: "[George's] is .30 back on dark meat." |
| 4:23 p.m. | *Austin* | Brady | Phone Call: Approximately 13 minutes. |
| 4:34 p.m. (while Brady was on the phone with *Austin*) | Brady | Fries | Text Message: "*Pilgrim's* is .30 back and [Tyson] is 31 back." |
| 4:36 p.m. | Fries | Brady | Text Message: "Ol [Cooperative 1 Employee 1]! He bluffing hard!" |
| 4:37 p.m. | Brady | Fries | Text Message: "I talked to *roger [Austin]* and this month he is .03 higher than us on 8 piece." |
| 4:43 p.m. | Fries | Brady | Text Message: "Hmmm." |
| 4:45 p.m. | Brady | Fries | Text Message: "He [*Austin*] said to raise our prices, on wings he is market and market plus .10." |
| 4:45 p.m. | Fries | Brady | Text Message: "Tell *him* we are trying!" |
| 4:58 p.m. | *Austin* | Cooperative 1 | Email: Bid submission with dark meat at .30 back and bulk wings and pre-counted wings at "UB Mkt previous month average" and "UB Mkt previous month average + .10." |
| 5:00 p.m. | Brady | Fries | Text Message: "Will do." |

- 24 -

74.     The following day, Brady emailed Cooperative 1, "[b]id submission with dark meat at .30 back" and "[o]n the wings we would like to be at market for the bulk packed and market plus .10 on the precounted."  In other words, the day after Brady spoke on the phone with *Austin*, Brady submitted to Cooperative 1 the *same bid* that *Austin* submitted to Cooperative 1.  As a result of the collusion, the bid was higher than it may otherwise have been, as evidenced by Brady's text to Fries, stating: "He [*Austin*] said *to raise our prices*, on wings he is market and market plus .10" and Fries' response: "Tell him we are trying!"

75.     On November 28, 2012, the co-conspirators exchanged another series of phone calls and text messages.  This time, *defendant Penn* and Kantola joined the conversations.  The communications demonstrate *Austin* telling *Penn* that he will have some discussions to "get the pulse" on the co-conspirators' pricing.  Following that exchange, *Austin* engaged in several phone calls with co-conspirators, as well as additional communications with *Penn*, as detailed below:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 10:07 a.m. | *Austin* | *Penn* | Email: "We . . . had the semi-final round call yesterday with [Cooperative 1 Employee 1] and his team . . . . I am going to try and have a one on one with [Cooperative 1 Employee 1] today but he has these calls all day. *I will also be having some other discussions today to get the pulse*." |
| 10:35 a.m. | Blake | *Austin* | Phone Call: Approximately 8 minutes. |
| 2:29 p.m. | *Austin* | Brady | Phone Call: Approximately 15 minutes. |
| 2:44 p.m. | *Austin* | Kantola | Phone Call: Approximately 11 minutes. |
| 5:09 p.m. | *Penn* | *Austin* | Email: "What will we giving |

- 25 -

| | | | |
|---|---|---|---|
| | | | up in dollars on 8 piece and dark YoY if we do lower the pricing to your recommended number?  Can you do a spreadsheet similar to last year?" |
| 9:59 p.m. | *Austin* | *Penn* | Email: "I don't have computer with me but for 1 cent decrease it is 1.5 million on cob pounds. I will call you tomorrow around lunch time I have some better information." |

76.    The next day, on November 29, 2012, the co-conspirators exchanged the following

series of phone calls and text messages explicitly discussing pricing:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 2:31 p.m. | *Pilgrim's Sales Manager beginning in September 2012 ("Pilgrim's Employee 4")* | *Austin* | Email: "This is crude but does it show what we need it to?" and attaching a spreadsheet containing the following table: <table><tr><td>**8 Piece Quotes**</td><td></td></tr><tr><td>Good Guys</td><td>$0.9770</td></tr><tr><td>[George's]</td><td>$0.9632</td></tr><tr><td>[Tyson]</td><td>$0.9620</td></tr><tr><td>[Koch]</td><td>$0.9561</td></tr></table> |
| 1:32 p.m. | *Austin* | *Pilgrim's Employee 4* | Phone Call: Approx. 7 minutes. |
| 4:53 p.m. | *Austin* | *Pilgrim's Employee 4* | Email: "You can put [Marshall-Durbin] in at 96.60 Then send to *Jayson [Penn]*." |

| 9:12 p.m. | *Pilgrim's Employee 4* | *Penn and Austin* | Email: Attaching a spreadsheet containing the following table: |
|---|---|---|---|

| 8 Piece Quotes | |
|---|---|
| Good Guys | $0.9770 |
| [Marshall-Durbin] | $0.9660 |
| [George's] | $0.9632 |
| [Tyson] | $0.9620 |
| [Koch] | $0.9561 |

77.     In December of 2012, *Pilgrim's*, Claxton, and George's all signed agreements with Cooperative 1.  Each agreement settled on a price that was higher than Cooperative 1's originally-requested .31 back.  On December 17, 2012, *Penn* signed a contract with Cooperative 1.  The contract specified that the price of an 8-piece COB would be $.9703/lb., and the price of dark meat would be .30 back in for the calendar year 2013.  Also on December 17, 2012, Brady signed a contract with Cooperative 1.  The contract specified that the price of 8-piece COB would be $.9625/lb. and the price of dark meat would be .305 back in calendar year 2013.  On December 17, 2012, George's Employee 2 signed a contract with Cooperative 1.  The contract specified that the price of 8-piece COB would be $.9622/lb., and the price of dark meat would be .30 back in calendar year 2013.

### 2.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 3's 2014 Frozen 8-Piece COBs and Dark Meat

78.     In 2013, a nationwide restaurant franchise ("Victim 3") that negotiated directly with the co-conspirators, began requiring its suppliers to maintain frozen inventories of 8-piece COBs and dark meat.  With the frozen inventories came a charge for maintaining the frozen inventories, or a "freezing charge."  Pilgrim's and its co-conspirators colluded to set Victim 3's freezing charge.

- 27 -

79.     On May 31, 2013, a Victim 3 employee ("Victim 3 Employee 1") emailed *Little*, stating: "In terms of pricing, traditionally [*Pilgrim's*] has based the frozen dark meat price the same as the fresh dark meat.  Will that still be the case?  Also, what are you thinking in terms of price for the frozen 8pc?"  The same day, Victim 3 Employee 1 also asked a Tyson employee ("Tyson Employee 1") for Tyson's prices for supplying Victim 3 with frozen 8-piece COBs and frozen dark meat, asking "[i]n terms of pricing, what are you thinking on both items?"

80.     The same day, *Pilgrim's* and its co-conspirators exchanged the following communications regarding their pricing for Victim 3's frozen 8-piece COBs and dark meat:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 2:20 p.m. | Tyson Employee 1 | Kantola | Phone Call: Approximately 1 minute. |
| 2:24 p.m. | Tyson Employee 1 | *Little* | Phone Call: Approximately 2 minutes. |
| 2:40 p.m. | Tyson Employee 1 | *Little* | Phone Call: Approximately 8 minutes. |
| 2:49 p.m. (nine minutes after *Little's* phone call with Tyson Employee 1) | *Little* | Victim 3 Employee 1 | Phone Call: *Little* states: "Their [sic] will need to be a freezing charge for both." |

4822-9633-9179.v2

| 3:38 p.m. | Tyson Employee 1 | Mulrenin and Roberts | Email: Forwards Victim 3 Employee 1's request for pricing and states: "***Pilgrim's told me they would be around .025 to .03 on 8pc & dark meat*** and [Koch] told me they were .025 on 8pc and at this time was not charging for dark but would probably change to .025 for next year." |

### 3. Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's Dark Meat Supply for 2014

81. In the fall of 2013, Cooperative 1 negotiated with Pilgrim's and its co-conspirators concerning the price of Victim 1's dark meat for the calendar year 2014. In October 2013, ***Austin*** submitted ***Pilgrim's*** bid to Cooperative 1. The bid proposed to supply Victim 1's dark meat for 2014 at .30 back. Also in October 2013, Brady submitted Claxton's bid to Cooperative 1. The bid proposed to supply Victim 1's dark meat for 2014 at .305 back.

82. On November 19, 2013, ***Pilgrim's*** and its co-conspirators exchanged the following communications regarding their pricing for Victim 1's dark meat for 2014:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 1:27 p.m. | Brady | ***Austin*** | Phone Call: Approximately 3 minutes. |
| 1:31 p.m. | Brady | Fries | Text Message: "Just an FYI last year we were .32 back on dark meat and this year we are 3050 back." Fries responded: "K. Can do .31 if want." |

- 29 -

| 1:31 p.m. (four minutes after Brady's phone call with *Austin*) | Brady | Fries | Test Message: "*Roger [Austin]* is at .30 back and not moving." Fries responded: "Stay .305 then[.]" |
|---|---|---|---|

83.    In December 2013, *Pilgrim's* and Claxton signed agreements with Cooperative 1, and both agreements listed the same price – down to the same tenth of a penny.  *Penn* signed an agreement with Cooperative 1 that provided the price for dark meat for 2014 would be .305 back in 2014.  Brady also signed an agreement with Cooperative 1 that provided the price for dark meat for 2014 would be .305 back.

### 4.    Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 3's Quality Assurance Costs for 2014

84.    In 2013, Victim 3 implemented new quality assurance ("QA") requirements that required broiler producers to take extra steps to ensure that they met enhanced standards.  The standards were to take effect in 2014.  Unhappy about the new requirements, Pilgrim's and its co-conspirators coordinated price increases in response.

85.    On December 20, 2013, an employee of Victim 3 sent Victim 3's "new QA requirements for 2014" to a Tyson employee.  On or around December 23, 2013,  the Victim 3 employee sent the same requirements to Kantola.

86.    On December 21, 2013, the Tyson employee forwarded Victim 3's new QA requirements to Tyson Employee 1, stating: "It would have been nice to have been forewarned.  Wonder how the other suppliers will react?"  Tyson Employee 1 responded by copying Mulrenin and stating: "I would be surprised if they don't say something.  *Might call a couple of them and ask[.]*"  Two days later, Tyson Employee 1 called *Little*, and the two spoke for approximately five minutes.

- 30 -

87.     On December 24, 2018, *Little* and other co-conspirators exchanged the following communications regarding their pricing:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 12:57 p.m. | *Little* | Kantola | Phone Call: Approximately 4 minutes. |
| 1:10 p.m. | Kantola | Koch employee | Email: "here's why [Tyson] is so popular with [Victim 3]" and stating FOB pricing for Tyson, *Pilgrim's*, and Koch. |
| 1:32 p.m. | *Little* | *Pilgrim's Sales Manager from 2012-2015 and VP from 2015-2016 ("Pilgrim's Employee 2")* | Email: "FYI … I did find out [Tyson's] fob price is $0.025 lower than ours in 2014!" |

88.     Two days later, on December 26, 2013, Tyson Employee 1 told Mulrenin and Roberts: "Talked to *Jimmy Little* and he said they were planning on adding to their cost to do this. They also didn't like it just showing up also."  In other words, *Little* told two Tyson employees that *Pilgrim's* was planning on raising its price in response to the new QA requirements.  On January 26, 2014, Tyson Employee 1 sent Tyson's February 2014 pricing to Victim 3 and, like Pilgrim's, raised Tyson's price by including a QA audit cost of $0.0009/lb.

**5.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's 2015 8-Piece COB Supply**

89.     In the summer of 2014, Cooperative 1, Pilgrim's and its co-conspirators negotiated pricing for Victim 1's 2015 8-piece COB supply.  One of the price terms that was negotiated was each co-conspirator's margin increase for 8-piece COB above their respective margins for calendar year 2014.  The co-conspirators' 2014 margins for 8-Piece COBs were as follows:

- 31 -

| Supplier | 2014 Margin |
|---|---|
| *Pilgrim's* | $.1175/lb. |
| Claxton | $.0673/lb. |
| Tyson | $.0750/lb. |
| Case Foods | $.1100/lb. |
| Koch | $.0900/lb. |
| George's | $.0967/lb. |
| Mar-Jac | $.0900/lb. |

90.     Cooperative 1 and the co-conspirators engaged in multiple rounds of negotiations.  In August 2014, a Cooperative 1 employee ("Cooperative 1 Employee 3") instructed the co-conspirators to submit proposed cost-plus pricing models by August 19, 2014.  On August 15, 2014, the co-conspirators engaged in the following series of phone calls:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 11:34 a.m. | Mulrenin | Roberts | Phone Call: Approximately 30 seconds. |
| 11:35 a.m. | Roberts | Brady | Phone Call: Approximately 4 minutes. |
| 11:42 a.m. | Roberts | Mulrenin | Phone Call: Approximately 9 minutes. |
| 3:27 p.m. | Roberts | Mulrenin | Phone Call: Approximately 22 minutes. |
| 3:50 p.m. | Roberts | *Penn* | Phone Call: Approximately 30 seconds. |
| 3:52 p.m. | *Penn* | Roberts | Phone Call: Approximately 16 minutes. |
| 4:11 p.m. | Mulrenin | Roberts | Phone Call: Approximately 2 minutes. |

- 32 -

91.     On August 18, 2014 – the day before the proposed pricing was due to Cooperative 1 – the co-conspirators engaged in the following series of phone calls to coordinate their margin increases:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:41 a.m. | *Little* | Kantola | Phone Call: Approximately 7 minutes. |
| 10:34 a.m. | *Little* | *Austin* | Phone Call: Approximately 6 minutes. |
| 12:04 p.m. | *Austin* | Brady | Phone Call: Approximately 24 minutes. |
| 1:25 p.m. | *Little* | *Austin* | Phone Call: Approximately 11 minutes. |
| 1:52 p.m. | *Austin* | George's | Phone Call: Approximately 2 minutes. |
| 2:03 p.m. | *Penn* | *Austin* | Phone Call: Approximately 6 minutes. |
| 2:41 p.m. | *Little* | Tyson Employee 1 | Phone Call: Approximately 11 minutes. |
| 2:58 p.m. | *Pilgrim's Sales Manager and Director that began working for Pilgrim's in 2006 ("Pilgrim's Employee 6")* | Brady | Phone Call: Approximately 14 minutes. |
| 3:21 p.m. | *Austin* | *Little* | Phone Call: Approximately 17 minutes. |
| 5:56 p.m. | *Pilgrim's Employee 2* | *Austin* | Phone Call: Approximately 2 minute. |

- 33 -

92.     Also on August 18, 2014, at 6:01 p.m. – shortly after the above calls concluded – *Pilgrim's Employee 2* sent an email to *Penn*, which attached a spreadsheet containing the following information regarding Claxton's, Case Foods', Koch's, George's, and Mar-Jac's "current" and "new" margins, with the new margins all being *substantially similar* (and higher than the current margins):

|            | Current M | New Marg   |
|------------|-----------|------------|
| Koch       | 0.09      | 0.22       |
| Case Foods | .11       | 0.22       |
| Claxton    | .0675     | 0.22       |
| George's   |           | .15-.18 inc |
| Mar-Jac    | 0.1       | 0.23       |

93.     45 minutes later, at 6:46 p.m., *Pilgrim's Employee 2* emailed *Penn*, explaining that: "Roger [*Austin*] did some checking around today and I included the below regarding the range of the total increases (margin and costs) folks are going in with."  He then reported the following numbers to *Penn*: Claxton at .14-.16/lb., Case Foods at .13-.15/lb., Koch at .14-.16/lb., George's at .15-.17/lb., and Mar-Jac at .14-.16/lb.  He also stated: "Considering the numbers above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin) which would equate to about $400k in additional revenue on equal volume from this year."  *Penn* responded: "Will review with Bill [*Lovette*] in am.  Will advise."

94.     The next day, on August 19, 2014, the co-conspirators submitted their bids while also communicating over the phone.  At 11:55 a.m., Kantola submitted Koch's bid to Cooperative 1.  At

4:48 p.m., Brady submitted Claxton's bid to Cooperative 1.  In the five hours between the bid submissions, *Austin*, Brady, and Kantola engaged in the following series of phone calls to discuss their pricing:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 2:18 p.m. | *Austin* | Brady | Phone Call: Approximately 4 minutes. |
| 2:33 p.m. | Brady | Kantola | Phone Call: Approximately 15 seconds. |
| 2:34 p.m. | Brady | Kantola | Phone Call: Approximately 30 seconds. |
| 3:22 p.m. | Kantola | Brady | Phone Call: Approximately 20 minutes. |

95.     Two days later, on August 20, 2014, the co-conspirators submitted the following cost-plus pricing models, which had all substantially increased, to Cooperative 1:

| Co-Conspirator | 2014 Model | Proposed Margin |
|---|---|---|
| *Pilgrim's* | *$.1175/lb.* | *$.2175/lb.* |
| Claxton | $.0673/lb. | $.2200/lb. |
| Tyson | $.0750/lb. | $.1600/lb. |
| Case Foods | $.1100/lb. | -- |
| Koch | $.0900/lb. | $.2200/lb. |
| George's | $.0967/lb. | $.2070-$.2174/lb. |
| Mar-Jac | $.0900/lb. | $.2300/lb. |

96.     The same day – August 20, 2014 – *Austin* and *Pilgrim's Employee 2* exchanged the following emails regarding Cooperative 1's surprise about the co-conspirators' universally higher margins:

- 35 -

| Email Initiator | Email Recipient | Email Content |
|---|---|---|
| *Pilgrim's Employee 2* | *Austin* | "Any word from them on our proposal?" |
| *Austin* | *Pilgrim's Employee 2* | "I heard they made a couple of calls and were surprised." |
| *Pilgrim's Employee 2* | *Austin* | "Surprised like how much higher everyone was?" |
| *Austin* | *Pilgrim's Employee 2* | "Yes." |

97.     Shortly thereafter, Cooperative 1, surprised by the significant price increases, asked Pilgrim's and its co-conspirators to decrease their prices.  Pilgrim's and its co-conspirators then discussed and agreed that they should not lower their prices.  Specifically, on August 26, 2014, at 9:31 a.m., *Austin* emailed *Penn* and explained that a Cooperative 1 employee ("Cooperative 1 Employee 2") had asked *Pilgrim's* to reduce its proposed price increase by approximately one half. *Austin* also said he planned to call Cooperative 1 to hold firm on the increase.  *Penn* responded that he agreed with *Austin's* plan.

98.     That afternoon, *Austin* received a phone call from Cooperative 1, after which the co-conspirators exchanged the following series of communications:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 1:31 p.m. | Cooperative 1 | *Austin* | Phone Call: Approximately 17 minutes. |
| 1:48 p.m. | *Austin* | *Penn* | Phone Call: Approximately 2 minutes. |
| 1:58 p.m. | *Lovette* | *Austin* | Phone Call: Approximately 15 minutes. |
| 2:52 p.m. | *Austin* | Brady | Phone Call: Approximately 14 minutes. |

- 36 -

| | | | |
|---|---|---|---|
| 5: 11 p.m. (two hours after *Austin's* conversation with Brady) | Brady | Fries | Email: "I talked to *roger [Austin]* about [Victim 1] and Greeley[, Colorado] *told him not to come down on price*. He called [Cooperative 1 Employee 3] today and told him." |
| 5:31 p.m. | Fries | Brady | Email: "Wow!" |

99.    The next day, on August 27, 2014, the co-conspirators exchanged the following communications regarding their agreement not to lower prices:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:46 a.m. | Fries | Mar-Jac employee ("Mar-Jac Employee 2") | Phone Call: Approximately 2 minutes. |
| 10:02 a.m. | Brady | Fries | Test Message: "[Koch] is not moving either." |
| 10:34 a.m. | Fries | Brady | Text Message: [Mar-Jac] is [meeting with Cooperative 1] [today]. They are agreeing to anything today, just listening." |

100.    Two days later, on August 29, 2014, the co-conspirators engaged in the following phone conversations:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 9:50 a.m. | Mar-Jac | *Penn* | Phone Call: Approximately 19 minutes. |
| 10:39 a.m. | Fries | Mar-Jac employee ("Mar-Jac Employee 1") | Phone Call: Approximately 19 minutes. |

101.    On a piece of paper with a handwritten notation "8-29-14", Mar Jac Employee 1 took the following handwritten notes, confirming that *Penn* had told him *Pilgrim's* margin:

- 37 -

(a)     "Talked to [Case Foods Employee 1].  They are up .19 & holding.";

(b)     "[Tyson] 1.0976 per [Mar-Jac Employee 4]";

(c)     ***"Talked to Jason Penn +8 cost +11 margin"***; and

(d)     "[Claxton] 1.1099 up 18.35."

102.    On August 29, 2014, Cooperative 1 Employee 3 sent an email to the co-conspirators requesting that they submit their final bids by September 2 or 3, 2014.

103.    On September 3, 2014, Cooperative 1 Employee 2  sent Roberts a telephonic meeting invitation for later that day at 1:30 p.m.  The invitation's subject line was "COB Tyson" and included an "Agenda" with the following five items:

(a)     "[Tyson] wants a ridiculous price for COB";

(b)     "[Cooperative 1] says NO";

(c)     "[Cooperative 1] shamefully tells [Tyson] that we have bought poultry at ridiculous price from others";

(d)     "[Tyson] informs [Cooperative 1] – Really, YOU ARE SCREWED"; and

(e)     "GO from there."

104.    On September 3, 2014, the co-conspirators exchanged the following phone *29* calls:

| Approximate Time (EST) | Initiator | Recipient | Phone Call Duration (minutes) |
|---|---|---|---|
| 9:38 a.m. | Brady | Cooperative 1 Employee 3 | 2 |
| 9:41 a.m. | Brady | Kantola | 1 |
| 9:42 a.m. | Brady | ***Austin*** | 16 |
| 10:00 a.m. | Brady | Kantola | 1 |
| 10:02 a.m. | Kantola | Brady | 11 |
| 10:17 a.m. | Brady | Fries | 1 |
| 10:22 a.m. | Fries | Brady | 7 |
| 11:10 a.m. | Brady | Cooperative 1 Employee 3 | 2 |

- 38 -

| 11:24 a.m. | Cooperative 1 | Brady | 5 |
| 11:37 a.m. | Brady | Mulrenin | 2 |
| 11:45 a.m. | Brady | Mulrenin | 2 |
| 1:15 p.m. | Brady | Mulrenin | 17 |
| 1:31 p.m. | Brady | *Austin* | 19 |
| 2:01 p.m. | Blake | *Austin* | 8 |
| 2:03 p.m. | Brady | Kantola | 7 |
| 2:10 p.m. | Brady | Fries | 20 |
| 3:39 p.m. | Brady | Cooperative 1 Employee 3 | 15 |
| 4:25 p.m. | *Austin* | Brady | 8 |
| 4:54 p.m. | Brady | Kantola | 4 |

105.    Roughly 20 minutes after the series of phone calls ended, at 5:15 p.m., Brady sent

Fries the following text message confirming that *Austin* had told him *Pilgrim's* was not going to

move its price: "Told [Cooperative 1 Employee 3] we would go down .02 he said someone moved

down .04 it has to be [George's] or he is bluffing.  *Roger [Austin]* and bill [Kantola] are not

moving."

106.    The collusion had its intended effect.  By December 25, 2014, the co-conspirators had

signed pricing agreements with Cooperative 1 for 2015, and each ended with a significantly higher

margin than they had the previous year.  See below:

| Co-Conspirator | 2014 Margin | 2015 Proposed Margin | 2015 Margin |
|---|---|---|---|
| *Pilgrim's* | *$.1175/lb.* | *$.2175/lb.* | *$.2175/lb.* |
| Claxton | $.0673/lb. | $.2200/lb. | $.1940/lb. |
| Tyson | $.0750/lb. | $.1600/lb. | $.1931/lb. |
| Case Foods | $.1100/lb. | -- | $.2161/lb. |
| Koch | $.0900/lb. | $.2200/lb. | $.2200/lb. |
| George's | $.0967/lb. | $.2070-$.2174/lb. | $.1798/lb. |
| Mar-Jac | $.0900/lb. | $.2300/lb. | $.2300/lb. |

107.    Throughout 2015, until as late as December 26, 2015, Pilgrim's sold and accepted

payment for 8-piece COB through a distributor to Victim 1's franchisees in the United States at a

margin of $.2175.

- 39 -

### 6.   Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 2's Promotional Broiler Products

108.   In 2015, Pilgrim's and its co-conspirators also colluded to rig bids submitted to yet another nationwide restaurant franchise ("Victim 2"), which negotiated with the co-conspirators through its centralized buying cooperative ("Cooperative 2").   Specifically, it was Victim 2's practice to periodically offer promotional pricing to its customers on certain broiler chicken products for limited periods of time, often for a particular month, such as September.   On March 25, 2015, a Cooperative 2 employee ("Cooperative 2 Employee 1") asked **Pilgrim's** and its co-conspirators if Victim 2 could get "some type of discount" for a promotion that it was planning to offer in September 2015.

109.   The next day, on March 26, 2015, the co-conspirators exchanged the following communications to coordinate their pricing for the promotional discount:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 1:41 p.m. | Tyson Employee 1 | Brady | Phone Call: Approximately 2 minutes. |
| 1:43 p.m. | Tyson Employee 1 | Blake | Phone Call: Approximately 30 seconds. |
| 1:45 p.m. | Tyson Employee 1 | ***Pilgrim's Employee 4*** | Phone Call: Approximately 30 seconds. |

- 40 -

| 8:22 p.m. | Tyson Employee 1 | Tyson Sales Manager and Director ("Tyson Employee 2") | Email: Forwarded Cooperative 2's request for a discount and stated: "I have talked to a couple company's [sic] and they are thinking .02lb for September" and "[o]nly bad thing is everyone else does it, it will be hard not to do it." |

110.     The following day, on March 27, 2015, the co-conspirators exchanged the following communications:

| Approximate Time (EST) | Initiator | Recipient | Communication |
| --- | --- | --- | --- |
| 10:30 a.m. | Tyson Employee 2 | Tyson Employee 1 | "We discussed this morning, and we agree to offer the $0.02/lb. for the month of September." |
| 10:40 a.m. | Tyson Employee 1 | Brady | Test Message |
| 10:42 a.m. | Blake | Tyson Employee 1 | Phone Call: Approximately 3 minutes. |
| Day of March 27, 2015 | Cooperative 2 Employee 1 | ***Pilgrim's Employee 6*** | "[Tyson], [George's], [Case Foods] and [Claxton] all $.02[.] I'm waiting on you[,] [Koch] and [Mar-Jac]." |

111.     On March 31, 2015, a ***Pilgrim's Sales Manager and Director beginning in 2010 ("Pilgrim's Employee 3")*** told ***Penn***: "[Victim 2] is looking to get a $0.02/lb discount from all suppliers for a September promotion. [Tyson], [Koch], [Case Foods], [Mar-Jac], [Georges'], and

Claxton have already agreed to the discount."  On April 1, 2015, at 12:22 p.m., Kantola emailed

Cooperative 2 Employee 1 and said Koch would give a $0.02/lb. discount.  That same day, *Penn*

also approved providing Victim 2 with a $.02/lb. discount.

### 7.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids Regarding Sysco's Line-of-Credit Term

112.     In 2016, Sysco contacted *Pilgrim's* and Koch individually to negotiate longer terms

for its respective lines of credit.  On May 1, 2016, defendant *Lovette* and a Koch Owner ("Koch

Employee 1") exchanged the following emails agreeing that they would both refuse Distributor 1's

request:

| Initiator | Recipient | Communication |
|---|---|---|
| Koch Employee 1 | *Lovette* | Email: "Have you herd [sic] that [Distributor-1] is going to 65 day terms with their supplies?" |
| *Lovette* | Koch Employee 1 | Email: "Yes, we told them NO!" |
| Koch Employee 1 | *Lovette* | Email: "Ok. Then I am 100 percent on board. If that changes can you please tell me?" |
| *Lovette* | Koch Employee 1 | Email: "Will do, they must be following [Grocer- 2]. Told them same." |
| Koch Employee 1 | *Lovette* | Email: "Somebody must have written this as an MBA class project. We are getting there [sic] request from various customers including people like [another customer]." |

### 8.     Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 1's 2018 Broiler Products

113.     In January of 2017, Cooperative 1 began negotiating with the co-conspirators for

Victim 1's 2018 broiler products.  On January 16, 2017, between approximately 2:40 p.m. (EST) and

4:51 p.m. (EST), Brady and *Austin* exchanged roughly five phone calls to discuss 2018 pricing for

Victim 1.  They spoke for a total of around 15 minutes.

114.    On Tuesday, January 17, 2017, while the co-conspirators were negotiating with Cooperative 1, the co-conspirators exchanged the following communications:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 10:11 a.m. | *Austin* | Brady | Phone Call: Approximately 2 minutes. |
| 12:54 p.m. | *Austin* | *Pilgrim's Employee 4* | Conversation: "[Claxton] meets with [Cooperative 1] in Thursday *and i will get a blow by blow Friday morning*. [Koch] meets with [Cooperative 1] in Friday." |

115.    The above communications establish that, while negotiating pricing for a contract concerning Victim 1's 2018 broiler products, *Austin* called and spoke with a Claxton executive about pricing and negotiations with Cooperative 1.  He then called *Pilgrim's Employee 4* and told him when Claxton and Koch were meeting with Cooperative 1, and that he expected to get a "blow by blow" of at least Claxton's meeting.

116.    The next day, on January 18, 2017, *Austin* again called Brady to discuss pricing.  The conversation lasted approximately one minute.  Then, on January 19, 2017, Claxton met with Cooperative 1.  On Friday, January 20, 2017 – the day after Claxton met with Cooperative 1 and the day that *Austin* said he would get a "blow by blow" about the meeting – *Austin* again called Brady to discuss pricing and the negotiations with Cooperative 1.  They spoke for roughly seven minutes.  One week later, Pilgrim's met with Cooperative 1 to negotiate the pricing for Victim 1's 2018 broiler products.

- 43 -

9. **Pilgrim's and Its Co-Conspirators Illegally Rig Bids for Victim 2's 8-Piece COB Supply for 2018 and 2019**

117.    In the summer of 2017, Cooperative 2 Employee 1 was negotiating prices for Victim 2's 2018 and 2019 supply of 8-Piece COBs with *Pilgrim's* and its co-conspirators.  Cooperative 2 also sought to lower the price for 8-Piece COBs that Victim 2 paid in 2017.

118.    On August 16, 2017, Cooperative 2 Employee 1 sent an email to various co-conspirators, including at least Tyson, George's, and Mar-Jac.  In the email, the employee asked the co-conspirators to submit their bids by September 5, 2017, and told the co-conspirators:

> I am aware of what went on with Brand X and in fact the change took place during the current agreement year.  I would also like you to keep that in mind while submitting your bid.  Instead of a big cut next year I would entertain a two year price. Let me see what you can come up with.

119.    The same day, on August 16, 2017, Tyson Employee 1 forwarded the email to Mulrenin, asking: "[Did] [y]ou get this?"  Mulrenin responded: "Ouch. I did not.  Definitely appears he's under the impression we all dropped prices more than we did."

120.    Two days later, on August 18, 2017, Tyson Employee 1 told Mulrenin: "[Cooperative 2 Employee 1] heard as much as .05lb.  I told them that was probably because they were so far out of line now with pricing they had to do something to get close. I think realistically he is thinking .02-.03."

121.    Four days later, on August 22, 2017, Mulrenin told Tyson Employee 2: "He's aware suppliers came down for [Victim 1] and expecting some movement from us."  In other words, the co-conspirators had lowered their prices for Victim 1 in 2017, and Cooperative 2 was now requesting they lower their prices for Victim 2.

- 44 -

122.    On September 5, 2017 – the day the bids were due – **Pilgrim's** entered the conversation, and the following phone calls occurred to coordinate the co-conspirators' pricing for Victim 2's 2018 and 2019 supply of 8-Piece COBs:

| Approximate Time (EST) | Initiator | Recipient | Communication |
|---|---|---|---|
| 10:27 a.m. | **Pilgrim's Employee 6** | Brady | Phone Call: Approximately 11 minutes. |
| 11:32 a.m. | Tyson Employee 1 | Brady | Phone Call: Approximately 10 minutes. |
| 2:30 p.m. | **Pilgrim's Employee 6** | Brady | Phone Call: Approximately 4 minutes. |

123.    The same day, the co-conspirators submitted their bids. **Pilgrim's Employee 6** sent Cooperative 2 Employee 1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. and the 2019 price of 8-piece COB by $.01/lb.  A George's employee sent an email to Cooperative 2 Employee proposing to reduce the 2018 8-piece COB by $.0075/lb. and the 2019 price of 8-piece COB by $.0150/lb.  Brady, on behalf of Claxton, sent Cooperative 2 Employee 1 a proposal to reduce the 2018 price of 8-piece COB by $.01/lb. – the same price decrease as **Pilgrim's**.  In other words, Cooperative 2 asked the co-conspirators for a price cut for 2018.  The day the bids were due, a **Pilgrim's** employee spoke on the phone with Brady (a Claxton executive), and then **Pilgrim's** and Claxton submitted identical proposed price cuts later that day.

### E.    Defendants Conceal Pilgrim's Illegal Bid-Rigging Scheme From Investors and Lie About the Reasons for Pilgrim's Success

124.    As demonstrated by the numerous inter-competitor emails, phone calls, text messages, and aligned (and increased) bid submissions, Defendants and their co-conspirators were engaged in an illegal scheme to rig bids prior to and during the Class Period.  However, Defendants

- 45 -

actively concealed this scheme from investors, and in fact told them the exact opposite.  For example, in the Company's Forms 10-K filed with the SEC during the Class Period, Defendants claimed that the United States broiler market was "highly competitive," and that "[i]n . . . the U.S. . . . we primarily compete with other vertically integrated chicken companies."  The Company also attributed its unprecedentedly stable success during the Class Period to a "broad product range," "experienced management team," and "blue chip and diverse customer base," while concealing that the real reason the Company had been able to escape the broiler industry's notorious boom and bust cycle was that it was engaged in an illegal scheme to rig bids for its contracts with its biggest customers.

125.    When the alleged scheme began (in around 2012), the Company's stock began to steadily increase as Defendants reported increasing and unprecedentedly stable net income and margins.  Before the scheme began, Pilgrim's common stock was trading at roughly $4.87 per share.  As the scheme persisted into the Class Period, it allowed Pilgrim's to continue reporting record profits and enjoy record prices per share.  By December 26, 2019, the Company's stock had reached a Class Period high of $33.67 – more than ***600% higher*** than it traded at before Defendants began their illegal bid-rigging scheme in 2012.

126.    Significantly, Defendants unequivocally and falsely asserted in Pilgrim's "Code of Conduct and Ethics," which was referenced in the Company's Class Period SEC filings and available on its website, that: "Pilgrim's is committed to a policy of lawful competition based on the merits of our products and services.  We seek to satisfy our customers' needs rather than limit our competitors' opportunities."

- 46 -

F.      **The Truth Emerges**

127.    Despite Defendants' misrepresentations and attempts to conceal their illegal bid-rigging scheme, Defendants' conduct caught the government's ire.  On June 3, 2020, the DOJ announced that a federal grand jury in the District of Colorado had indicted four executives in the chicken industry with criminal antitrust violations.  The individuals that were initially indicted were: defendant Penn; former Pilgrim's VPs Austin and Brady; and non-party Claxton employee Fries (collectively, the "Initial DOJ Defendants").[5]

128.    The Initial Indictment detailed how the Initial DOJ Defendants, together with their co-conspirators, "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."  The Initial Indictment chronicled numerous specific instances in which the Initial DOJ Defendants and their co-conspirators illegally rigged bids submitted to nationwide restaurant franchises and nationwide grocery chains.  The Initial Indictment also detailed numerous collusive conversations between Pilgrim's employees and Pilgrim's competitors.

129.    On this news, Pilgrim's stock fell $2.58 per share, or 12.4%, from a close of $20.87 per share on June 2, 2020, to close at $18.29 per share on June 3, 2020.

130.    The revelation of Defendants' fraudulent scheme also caused significant harm to Pilgrim's reputation and eliminated its ability to bolster revenues through illegal bid rigging.  As a

---

[5]    As detailed below, the DOJ subsequently filed a Superseding Indictment, which indicted additional Defendants, including defendant Lovette and former Pilgrim's Sales Director Little.

result, the Company's profits fell dramatically, from $456,536,000 in 2019 to $95,070,000 in 2020 – a **nearly 80% decline**.

### G. Post-Class Period Events Confirm Defendants' Participation in the Illegal Bid-Rigging Scheme

131.    A series of post-Class Period events confirm Defendants' participation in the illegal scheme and provide further detail regarding the true extent of the scheme.

132.    First, on October 6, 2020, The DOJ filed the Superseding Indictment, further confirming Pilgrim's participation in the illegal bid-rigging scheme and providing more detail about the true extent of the scheme.  Among other things, the Superseding Indictment added six additional defendants, including defendant Lovette and former Pilgrim's Sales Director Little, who served as a Pilgrim's sales executive from 2000-October 2017.  The Superseding Indictment also extended the time period for the illegal bid-rigging scheme to include conduct continuing through **at least 2019**.

133.    Second, on October 13, 2020, the DOJ filed formal charges (the "Information") against Pilgrim's for its participation in the illicit bid-rigging scheme.  The Information stated that beginning in at least as early as 2012 and continuing through at least 2019, Pilgrim's and its co-conspirators "entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."  The Information also stated that: "The combination and conspiracy engaged in by Defendant and its co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1."

134.    On February 23, 2021, **Pilgrim's pleaded guilty** to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms

- 48 -

for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. §1." Notably, the Plea Agreement was accompanied by a sentence to pay approximately *$107 million* in criminal fines and stated that, if the case had gone to trial, the Government *would have had sufficient evidence to prove that*:

       (a)    From 2012 to 2017, Pilgrim's "participated in a conspiracy with at least one competitor engaged in the production and sale of broiler chicken products to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States";

       (b)    Pilgrim's participation in the conspiracy affected sales of broiler chicken products to KFC, including: (1) Pilgrim's contract to supply KFC with dark meat and wings in 2013; (2) Pilgrim's contract to supply KFC with dark meat in 2014; and (3) Pilgrim's contract to supply KFC with 8-piece-COBs in 2015 through 2017; and

       (c)    Pilgrim's affected sales of broiler chicken products totaled *at least $361 million*.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    Defendants' Materially False and Misleading Statements and Omissions

135.    Defendants made materially false and misleading statements and omitted material facts during the Class Period in violation of §§10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. Throughout the Class Period, Defendants made material misstatements and/or omissions in press releases, investor presentations, and public filings with the SEC by concealing Defendants' illegal bid-rigging scheme, thereby providing investors with an

- 49 -

incomplete and inaccurate understanding of Pilgrim's operations, profitability, and future financial prospects.

136.     In their statements, Defendants repeatedly emphasized Pilgrim's relationships with its key customers, competitive advantages, diversified portfolio, and small-bird segment, which purportedly differentiated the Company from its competitors.  Defendants also repeatedly and consistently reassured investors that Pilgrim's operated in an extremely competitive environment and adhered to a stringent "Code of Conduct and Ethics" that purportedly codified Defendants' commitment to "a policy of lawful competition based on the merits of our products and services."

137.     Defendants' statements were materially false and misleading.  In reality, Pilgrim's purportedly strong results were artificially inflated by Defendants' illegal bid-rigging scheme.  Indeed, Pilgrim's was not engaging in "competitive pricing," but was instead deliberately and actively colluding to rig bids submitted to its key customers in a concerted effort to extort profits at the expense of smaller broiler producers, consumers, and Pilgrim's key customers.

138.     Defendants' material misstatements and omissions thus created in the market an unrealistically positive assessment of Pilgrim's business, operational status, profitability, and future growth prospects, as the Company's purported success was in fact the result of business practices that Defendants knew to be improper, unlawful and unsustainable.

### 1.     Defendants' February 9, 2017 False and Misleading Statements

139.     Before the market opened on February 9, 2017, the first day of the Class Period, Defendants filed with the SEC Pilgrim's Form 10-K for the fiscal year ending December 31, 2016 ("2016 Form 10-K").  The 2016 Form 10-K contained certifications signed by defendants Lovette and Sandri.

- 50 -

140.    The 2016 Form 10-K described the chicken industry as "***highly competitive***" and listed the "competitive factors" in the U.S. chicken industry. In relevant part, Defendants stated:

> ***The chicken industry is highly competitive***.  We are one of the largest chicken producers in the world and we believe our relationship with JBS enhances our competitive position.  In the U.S. and Mexico, ***we compete principally with other vertically integrated poultry companies***.
>
> *        *        *
>
> In general, ***the competitive factors*** in the U.S. chicken industry include ***price, product quality, product development, brand identification, breadth of product line and customer service***.  Competitive factors vary by major market.  In the U.S. retail market, we believe that ***product quality, brand awareness, customer service and price*** are the primary bases of competition.  In the foodservice market, competition is based on ***consistent quality, product development, service and price***.

141.    The statements in ¶140 were materially false and misleading when made because Pilgrim's market was ***not*** "highly competitive," but had instead been rigged by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

142.    The 2016 Form 10-K also claimed that Pilgrim's enjoyed a number of "***competitive strengths***" that "enable us to maintain and grow our position as a leading chicken company and to capitalize on future favorable growth opportunities."  Among its competitive strengths, Defendants listed the following:

> ***Leading market position in the growing chicken industry***.  We are one of the largest chicken producers globally and a leading chicken producer in the U.S. with an approximate 17.0% market share, based on ready-to-cook production in 2014, according to WATTPoultryUSA magazine.  We believe we can maintain this prominent market position as we are one of the few producers in the chicken industry that can fully satisfy the requirements of large retailers and foodservice companies due to our broad product range, national distribution, vertically integrated operations and technical capabilities. . . .

- 51 -

*Broad product portfolio*.  We have a diversified product portfolio ranging from large to small birds and from fresh to cooked to processed chicken.  In addition, our prepared foods business is focused on our most profitable product lines.  We believe we are well positioned to be the primary chicken supplier for large customers due to our ability to provide consistent supply, innovate and develop new products to address consumer desires and *provide competitive pricing across a diverse product portfolio*.  Our balanced portfolio of fresh, prepared and value-added chicken products yields a diversified sales mix, mitigating supply and market volatility and creating *more consistent gross margins*.

*Blue chip and diverse customer base across all industry segments*.  We benefit from strong relationships with leading companies in every customer segment, including Chick-fil-A®, Sysco®, US Foods, Yum! Brands®, Kroger®, Wal-Mart®, Costco®, Publix®, Albertson®, [and] H-E-B®, . . . most of whom have been doing business with us for more than five years.

\*        \*        \*

*Robust cash flow generation with disciplined capital allocation*.  *Our leading market position, strong customer relationships and highly efficient operations help drive attractive and we believe sustainable margins*.  We also have a proven track record of disciplined capital allocation. . . .

*Experienced management team and results-oriented corporate culture*.  We have a proven senior management team whose tenure in the chicken industry has spanned numerous market cycles and is among the most experienced in the industry.  Our senior management team is led by William W. Lovette, our Chief Executive Officer, who has over 30 years of experience in the chicken industry.  *Our management team has successfully improved and realigned our business and instilled a corporate culture focused on performance and accountability*.

143.    The statements in ¶142 regarding Pilgrim's purported "competitive strengths" were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive strength: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

144.    In the 2016 Form 10-K, Defendants also stated that their business strategy consisted of being "*a valued partner with our key customers*," the "*relentless pursuit of operational*

*excellence*," and "***accountability and ownership culture***."  In describing its business strategy, Defendants emphasized accountability, stating in relevant part:

> Our employee accountability has further increased as we have de-layered the organization through our recent restructuring and cost improvement initiatives.  In addition, we continue to invest in developing our talent internally. As a result, ***we have a strong accountability and ownership culture.  We strive to be the best managed and most respected company in our industry***.

145.    The statements in ¶144 regarding Pilgrim's purported business were materially false and misleading when made because they concealed the truth that Pilgrim's actual business strategy included the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which did ***not*** treat Pilgrim's customers as "valued partner[s]," was ***not*** consistent with an "accountability and ownership culture," and artificially inflated Pilgrim's profits while exposing the Company to substantial criminal penalties and reputational harm.

146.    Finally, the 2016 Form 10-K falsely discussed how Pilgrim's pricing was determined, stating in relevant part:

> ***Items that influence chicken pricing in the U.S. include international demand, changes in production by other broiler producing countries, input costs and the demand associated with substitute products such as beef and pork***.  We believe our focus on sales mix enables us to adapt to changing supply demand dynamics by adjusting our production to maximize value.
>
> *                 *                 *
>
> Most fresh chicken products are sold to established customers, ***based upon certain weekly or monthly market prices reported by the USDA and other public price reporting services***, plus a markup, which is dependent upon the customer's location, volume, product specifications and other factors.  We believe our practices with respect to sales of fresh chicken are generally consistent with those of our competitors.  The majority of these products are sold pursuant to agreements with varying terms that ***set a price according to formulas based on underlying chicken price markets***, subject in many cases to minimum and maximum prices.

147.    The statements in ¶146 regarding the factors that purportedly influenced Pilgrim's pricing determinations were materially false and misleading when made because they concealed the truth regarding the impact that the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, had on Pilgrim's pricing.

148.    Before the market opened on February 9, 2017, defendants Lovette and Sandri also hosted a conference call with analysts and investors to discuss Pilgrim's earnings for the fiscal year ending December 31, 2016 and fourth quarter of 2016.  On the call, defendant Lovette emphasized Pilgrim's competitive edge, stating: "***We continue to be very, very competitive***, if not one of the best in our tray-pack or case-ready operations as well as small-bird.  We have leading positions in both," and "[o]ur-case ready and small bird operations continue to deliver strong performance, and our leadership in these markets is giving us an ***edge over the competition***."

149.    Defendant Lovette also assured analysts and investors that the Company's broad portfolio and strong relationship with key customers would allow it to continue to outperform the market, stating: "[W]e remain convinced that ***our Business will have the ability to outperform, given our broad portfolio and presence in all bird categories, as well as strong relationships with key customers***."

150.    The statements in ¶¶148-149 regarding Pilgrim's purported competitive advantages were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

4822-9633-9179.v2

### 2.      Defendants' May 4, 2017 False and Misleading Statements

151.    On May 4, 2017, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing Pilgrim's financial results for the first quarter of 2017.   In the press release, defendant Lovette stated that the Company had a "'*sustainable competitive advantage* in the upper Midwest.'"

152.    The statement in ¶151 regarding Pilgrim's purportedly "sustainable competitive advantage" was materially false and misleading when made because it concealed Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm, and was, thus, *not* sustainable.

153.    Also on May 4, 2017, before the market opened, defendants Lovette and Sandri hosted a conference call with investors and analysts to discuss the Company's performance for the first quarter of 2017.  On the call, defendant Lovette again emphasized the Company's competitive edge, stating: "Demand for our case-ready and small bird continues to be strong and our leadership in these markets is proving to be an *advantage over competitors*," and "*our business will have the ability to outperform given our broad portfolio and presence in all bird categories as well as strong relationships with key customers*."

154.    The statements in ¶153 regarding Pilgrim's purported competitive advantages were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which undermined the Company's purportedly "strong

relationships with key customers," and artificially inflated Pilgrim's profits while exposing the Company to substantial criminal penalties and reputational harm.

155.    Also on the call, defendants Lovette and Sandri discussed how the Company determined its prices.  Defendant Lovette stated that: "We price our retail products and our food service products ***based on the value that we deliver to our key customers*** and we have various mechanisms for doing that."  Defendant Sandri stated that, "we ***price our projects according to the value creation and the partnerships that we have***."

156.    The statements in ¶155 regarding the factors that purportedly influenced Pilgrim's pricing determinations were materially false and misleading when made because they concealed the truth that Pilgrim's pricing determinations were in fact determined by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 3.    Defendants' August 3, 2017 False and Misleading Statements

157.    On August 3, 2017, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial performance for the second quarter of 2017.  In the press release, defendant Lovette stated: "'This [differentiated] portfolio approach is working well and is what ***fundamentally differentiates us from the competition***, giving us the potential to ***reduce volatility and generate higher margins*** over time.'"

158.    The statements in ¶157 were materially false and misleading when made.  In truth, what "'fundamentally differentiate[d]'" Pilgrim's from its competition and allowed the Company to "'reduce volatility and generate higher margins'" was the illegal bid-rigging scheme orchestrated by

- 56 -

Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

159.    Also on August 3, 2017, before the market opened, defendants hosted a conference call with investors and analysts to discuss the Company's results for the second quarter of 2017.  On the call, defendant Lovette again highlighted the Company's competitive advantages, stating: "Our small bird and case-ready operations have continued to generate ***healthy margins*** and our leadership in these markets has continued to prove to be ***an advantage relative to our peers***."

160.    The statements in ¶159 regarding Pilgrim's purported competitive advantages were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

161.    Defendant Lovette also discussed drivers of pricing for the second quarter of 2017, and attributed strong prices to rising demand, specifically stating: "Demand has been extremely strong at retail through late spring and all the way through to now, and we think that even beyond it's going to continue to be strong. ***That's what's driven pricing***."  Defendant Lovette further stated, in relevant part:

> And of course, we – ***our strategy in – with our key customers is to price our product portfolio based on that which really meets their needs*** . . . we treat each of our customers based on their own portfolio and the value that our products represent to their customers.  And we have the ability to change those prices as needed based on the input costs as we experience.  So ***we're very excited about our pricing strategy***. We're very excited about the fact that demand for chicken remains extremely robust at retail, and we think we've got the right solutions for our key customers to bring consumers increasingly into their stores.

- 57 -

162.     The statements in ¶161 regarding the factors purportedly driving Pilgrim's pricing and Pilgrim's purported "pricing strategy" were materially false and misleading when made because they concealed the truth that Pilgrim's pricing strategy was actually driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 4.     Defendants' November 8, 2017 False and Misleading Statements

163.     On November 8, 2017, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial results for the third quarter of 2017.   In the press release, defendant Lovette stated: "'The results once again demonstrated the strength and diversity of our portfolio of bird sizes, and is what ***fundamentally differentiates us from the competition***, giving us the potential to ***reduce volatility and generate higher margins*** over time.'"

164.     The statements in ¶163 were materially false and misleading when made.  In truth, what "'fundamentally differentiate[d]" Pilgrim's from its competition and allowed the Company to "reduce volatility and generate higher margins'" was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

165.     Also on November 8, 2017, before the market opened, defendants Lovette and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the third quarter of 2017.  On the call, defendant Lovette again discussed Pilgrim's purported competitive

- 58 -

advantages and assured investors of the Company's ability to continue to outperform, stating in relevant part:

> We believe the industry growth over the next few years will continue to be well supportive of a balanced supply-demand environment, and ***we're confident our business will have the ability to outperform given our broad portfolio and presence in all bird categories as well as strong relationships with key customers***.

166.    The statements in ¶165 regarding Pilgrim's purported competitive advantages were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 5.    Defendants' February 15, 2018 False and Misleading Statements

167.    On February 15, 2018, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial results for the fiscal year ending December 31, 2017 and the fourth quarter of 2017.  In the press release, defendant Lovette stated: "'The performance once again demonstrated the strength and diversity of our portfolio of bird sizes, and is what ***fundamentally differentiates us from the competition***, giving us the potential to ***reduce volatility and generate higher margins*** over time.'"

168.    The statements in ¶167 were materially false and misleading when made.  In truth, what "'fundamentally differentiate[d]'" Pilgrim's from its competition and allowed the Company to "'reduce volatility and generate higher margins'" was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

- 59 -

### 6. Defendants' February 16, 2018 False and Misleading Statements

169.    On February 16, 2018, after the market closed, Defendants filed a Form 10-K with the SEC for the fiscal year ending December 31, 2017 ("2017 Form 10-K"). The 2017 Form 10-K contained certifications signed by defendants Lovette and Sandri. In the Company's 2017 Form 10-K, Defendants made the same misrepresentations as those alleged in ¶¶140-146, *supra*, regarding the 2016 Form 10-K. These statements continued to be materially false and misleading for the same reasons described above in ¶¶141-147, *supra*.

### 7. Defendants' May 11, 2018 False and Misleading Statements

170.    On May 11, 2018, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial results for the first quarter of 2018. In the press release, defendant Lovette touted the Company's consistent results, stating in relevant part:

> "Despite some headwinds in feed, labor and logistics, the ***investments*** we made over the past few years, together with the recent ***acquisitions*** and our capture of ***operational improvements***, helped us to ***generate consistent results*** and continued to contribute to the evolution of our portfolio in supporting our vision to become the best and most respected company in our industry."

171.    The statements in ¶170 were materially false and misleading when made. In truth, Pilgrim's "'consistent results'" were ***not*** attributable to the Company's "'investments,'" "'acquisitions,'" or "'operational improvements,'" but rather, to the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

- 60 -

172.    Also on May 11, 2018, before the market opened, defendants Lovette and Sandri

hosted a conference call with analysts and investors to discuss the Company's results for the first

quarter of 2018.   On the call, defendant Lovette again touted the reasons for the Company's

purported success, stating in relevant part:

> **The results are a testament to the breadth and diversity of our portfolio**, which is
> designed to generate **more consistent, higher margins** over time; and give the
> potential to capture market upside while absorbing extreme conditions within the
> different segments.   In addition, **our key customer focus has continued to bring
> growth beyond the average market conditions**.   Though we were pleased with the
> progress, we're not satisfied.   And then we'll continue to refine our portfolio strategy,
> which we believe will **differentiate us from the competition**.
>
> \*         \*         \*
>
> We believe our strategy of developing more customized solutions with each bird size
> and working with our key customers to support their growth expectations is
> **generating great results** and continue to enhance our **margin profile** and providing
> **more consistent performance** despite market fluctuations.

173.    The statements in ¶172 regarding Pilgrim's purported competitive advantages and

reasons for success were materially false and misleading when made.   In truth, the Company's

primary competitive advantage and the real reason for Pilgrim's success was the illegal bid-rigging

scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had

artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and

reputational harm.

**8.      Defendants' August 2, 2018 False and Misleading Statements**

174.    On August 2, 2018, before the market opened, Defendants filed a Form 8-K with the

SEC, accompanied by a press release discussing the Company's financial results for the second

quarter of 2018.   In the release, defendant Lovette again touted the purported reasons for the

Company's success, stating in relevant part:

4822-9633-9179.v2

"Despite some volatility in feed and less than ideal market conditions in the commodity chicken sector, the *investments* we made over the past few years, the recent *acquisitions* and our capture of *operational improvements*, and the strength of our small bird and case-ready businesses helped us to offset some of the impact from the commodity markets and contribute to the evolution of our portfolio in supporting our vision to become the best and most respected company in our industry."

175.   The statements in ¶174 were materially false and misleading when made.  In truth, Pilgrim's success was *not* attributable to the Company's "'investments,'" "'acquisitions,'" or "'operational improvements,'" but rather, to the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

176.   Also on August 2, 2018, before the market opened, defendants Lovette and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the second quarter of 2018.  On the call, defendant Lovette again touted Company's purported competitive advantage, stating in relevant part: "'Customer demand and margins within our small bird and case-ready operations have remained strong, and our leading share in these markets have continued to give us a *competitive advantage relative to our peers* with a more narrow market approach.'"

177.   The statements in ¶176 regarding Pilgrim's purported competitive advantages were materially false and misleading when made because they concealed the truth regarding Pilgrim's primary competitive advantage: the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

4822-9633-9179.v2

**9.     Defendants' November 1, 2018 False and Misleading Statements**

178.    On November 1, 2018, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial results for the third quarter of 2018.   In the press release, defendant Lovette touted the Company's "'resilient performance,'" stating in relevant part:

> "Despite challenging market conditions in commodity chicken, the ***investments*** we made over the past few years, the recent ***acquisitions*** and our capture of ***operational improvements***, are adding diversification and differentiation to the evolution of our portfolio to deliver more ***resilient performance*** regardless of specific market conditions."

179.    The statements in ¶178 were materially false and misleading when made.  In truth, Pilgrim's "'resilient performance'" was ***not*** attributable to the Company's "'investments,'" "'acquisitions,'" or "'operational improvements,'" but rather, to the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

180.    Also on November 1, 2018, before the market opened, defendants Lovette and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the third quarter of 2018.  On the call, defendant Lovette again touted the Company's purported competitive advantages and reasons for success, stating in relevant part:

> Our performance during Q3 is a testament to the ***breadth and diversity of our portfolio, which is structured to be a more resilient compared to our peers*** by having a much more balanced performance across all market conditions, while still giving us the opportunity to capture any upside.

*     *     *

- 63 -

The result is evident in all 3 geographic regions in which we operate, and it magnifies our relentless pursuit of ***operational excellence*** and presence in diverse and differentiated business models, segments and channels. ***For the long term, we expect this competitive advantage to persist***.

181.    The statements in ¶180 regarding Pilgrim's purported competitive advantages and reasons for success were materially false and misleading when made. In truth, the Company's primary competitive advantage and the real reason for Pilgrim's success was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 10.    Defendants' February 14, 2019 False and Misleading Statements

182.    On February 14, 2019, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's results for the fiscal year ending December 31, 2018 and the fourth quarter of 2018. In the press release, defendant Lovette again touted the Company's purported competitive advantages and reasons for success, stating in relevant part:

> "The diversity of our portfolio of bird sizes, geographical market exposure, our culture and our people, are what ***fundamentally differentiate us from the competition***, giving us the potential to ***reduce volatility and generate higher margins*** over time, and the results for 2018 represented the power of ***that strategy***."

183.    The statements in ¶182 regarding Pilgrim's purported strategy, competitive advantages and reasons for success were materially false and misleading when made. In truth, the Company's primary strategy, competitive advantage and reason for success was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*,

- 64 -

which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

184.     Also on February 14, 2019, before the market opened, Defendants filed a Form 10-K with the SEC for the fiscal year ending December 31, 2018 ("2018 Form 10-K").  The 2018 Form 10-K contained certifications signed by defendants Lovette and Sandri.  In the Company's 2018 Form 10-K, Defendants made the same misrepresentations as those alleged in ¶¶140-146, 169, *supra*, regarding the 2016 and 2017 Forms 10-K.  These statements continued to be materially false and misleading for the same reasons described above in ¶¶141-147, *supra*.

185.     Also on February 14, 2019, before the market opened, Defendants Lovette and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the fiscal year ending December 31, 2018 and the fourth quarter of 2018.  On the call, defendant Lovette again touted the Company's purported competitive advantages and reasons for success, stating in relevant part:

> ***We believe this performance is a validation of our team, the effectiveness of our diversified portfolio strategy and our proven methodology in extracting operational improvements over the years***.
>
> \*       \*       \*
>
> Our diverse portfolio of differentiated product and key customer strategy, in conjunction with our geographic footprint, will continue to generate a ***more consistent performance*** and minimize ***margin volatility*** compared to peers despite specific market conditions.

186.     The statements in ¶185 regarding Pilgrim's purported strategy, competitive advantages and reasons for success were materially false and misleading when made.  In truth, the Company's primary strategy, competitive advantage and reason for success was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*,

- 65 -

which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 11.   Defendants' May 2, 2019 False and Misleading Statements

187.   On May 2, 2019, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial results for the first quarter of 2019.   In the press release, defendant Penn attributed the Company's success to "'heavily investing in *further differentiating our portfolio* to increase our capacities and capabilities to meet customer expectations,'" while also stating that, "'the *investments in the operations* and the focus of our people have yielded an *increase in performance*.'"

188.   The statements in ¶187 regarding the purported reasons for Pilgrim's success were materially false and misleading when made because they concealed the fact that Pilgrim's success was being driven by the illegal bid-rigging scheme orchestrated by defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

189.   Also on May 2, 2019, before the market opened, defendants Penn and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the first quarter of 2019.   On the call, defendant Penn touted the Company's purported competitive advantages and reasons for success, stating in relevant part: "We have materially improved our *competitive position* with a *diversified portfolio* of on-trend products and brands," while also telling investors: "We believe our *key customer approach* is strategic and creates a basis to further accelerate growth in important categories by providing more customized, higher quality innovative products to give us a *clear competitive advantage*."

4822-9633-9179.v2

190.    Defendant Penn further stated on the call:

Our portfolio is specifically designed to minimize the impact from the cyclicality of specific market segments.  The changes we initiated 8 years ago have made a tangible difference.  The result is evident in all 3 geographic regions in which we operate.  ***It magnifies our relentless pursuit of operational excellence and presence in diverse and differentiated business models, segments and channels.  For the long term, we're dedicated to continue extending our competitive advantage by increasing the emphasis on investments in our people and innovation, while improving the overall quality of our products***.

191.    The statements in ¶¶189-190 regarding Pilgrim's purported strategy, competitive advantages and reasons for success were materially false and misleading when made.  In truth, the Company's primary strategy, competitive advantage and reason for success was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 12.    Defendants' August 1, 2019 False and Misleading Statements

192.    On August 1, 2019, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial performance for the second quarter of 2019.  In the press release, defendant Penn discussed the Company's key customer strategy, noting that "'***revenues from Key Customers have more than doubled over the last eight years***, reducing our relative dependency on pure commodity sales and reducing volatility.'"  He also noted that the ***key*** customer strategy was "'***relevant to [Pilgrim's] growth***.'"

193.    The statements in ¶192 regarding the success and significance of Pilgrim's key customer strategy were materially false and misleading when made because they concealed the fact that the success of Pilgrim's key customer strategy was being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had

- 67 -

artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

194.    Also on August 1, 2019, before the market opened, defendants Penn and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the second quarter of 2019.    On the call, defendant Penn again emphasized the Company's "strong" relationships with its key customers, stating that the relationships "promote[] trust," contributed to the Company's success, and provided a long-term competitive advantage:

> Our **key customer approach** is strategic and creates a basis to further accelerate growth in important categories by providing more customized, high-quality innovative products to give us a **clear long-term competitive advantage.**
>
> *            *            *
>
> The commitment to our key customer strategy remains relevant to our growth. **Revenues from key customers more than doubled over the last 8 years**, reducing our relative dependency on pure commodity sales. **Our strong relationships with key customers have continued to contribute to the out-performance in our case-ready business**. We will leverage our key customer strategy to earn more business and accelerate growth beyond just the underlying market conditions. Beyond driving growth, our key customer approach also **promotes trust**, enhances long-term relationships and **strengthens our margin structure**.

195.    The statements in ¶194 regarding the success and significance of Pilgrim's key customer strategy were materially false and misleading when made because they concealed the fact that the success of Pilgrim's success was being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which built neither "trust" nor "strong relationships," but had artificially inflated Pilgrim's profits while exposing the Company to substantial criminal penalties and reputational harm.

196.    Also on the call, defendant Sandri responded to a question from Morningstar Research analyst Rebecca Scheuneman about pricing, stating in relevant part:

- 68 -

[W]e have a very broad portfolio of pricing. So it depends on the segment.  On the spot market or a big bird, there's a lot of prices that are connected to contracts.  On the tray pack, we have the [3] partnerships, where we have discussion about, how can we help our customers to grow.  So the pricing there is more of negotiated.  In the small bird segment, there is some components of cost plus and comps and components of grade markets.

197.    The statements in ¶196 regarding the factors that purportedly influenced Pilgrim's pricing determinations were materially false and misleading when made because they concealed the truth that Pilgrim's pricing determinations were in fact determined by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

### 13.    Defendants' October 31, 2019 False and Misleading Statements

198.    On October 31, 2019, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial performance for the third quarter of 2019.   In the release, Defendant Penn again attributed Pilgrim's growth to relationships with key customers, stating:

> "We remain committed to our ***Key Customer strategy***, which is the ***basis for our growth***.  Revenues from Key Customers have ***more than doubled over the past eight years***, and we will continue to support their growth."

199.    The statements in ¶198 regarding the success and significance of Pilgrim's key customer strategy were materially false and misleading when made because they concealed the truth that the real basis for Pilgrim's growth was the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

200.     Also on October 31, 2019, before the market opened, defendants Penn and Sandri

hosted a conference call with investors and analysts to discuss the Company's results for the third

quarter of 2019.  On the call, defendant Penn again ensured investors that Pilgrim's relationships

with its key customers provided a long-term competitive advantage and promoted trust, stating:

> Our **key customer approach** is strategic and creates a basis to further
> accelerate growth in important categories by providing a more customized, high-
> quality, innovative products that **give us a clear, long-term competitive advantage**.
>
> *         *         *
>
> We continue to leverage our key customer strategy to earn more business to
> accelerate growth beyond just the underlying market conditions.  Beyond driving
> growth, **our key customer approach also promotes trust, enhances long-term
> relationships** and strengthens our margin structure.

201.     The statements in ¶200 regarding the success and significance of Pilgrim's key

customer strategy were materially false and misleading when made because they concealed the truth

that Pilgrim's success was being driven by the illegal bid-rigging scheme orchestrated by Defendants

and their co-conspirators, as detailed in §IV.D, *supra*, which neither "promote[d] trust" nor

"enhance[d] long-term relationships," but had artificially inflated Pilgrim's profits and exposed the

Company to substantial criminal penalties and reputational harm.

**14.     Defendants' February 21, 2020 False and Misleading
Statements**

202.     On February 21, 2020, before the market opened, Defendants filed a Form 10-K with

the SEC for the fiscal year ending December 31, 2019 ("2019 Form 10-K").  The 2019 Form 10-K

contained certifications signed by defendants Penn and Sandri.

203.     In the 2019 Form 10-K, Defendants removed the list of Pilgrim's competitive

advantages, the discussion of the Company's business strategy and emphasis on a culture of

ownership and accountability, and all mentions of pricing determination.  However, the 2019 Form

10-K did continue to emphasize that the U.S. chicken industry is "highly competitive," and discussed

the competitive factors within the chicken industry:

> *The chicken . . . industry in the U.S. . . . is highly competitive.  The competitive factors in our business include price, product quality, product development, brand identification, breadth of product line and customer service*.

204.     The statements in ¶203 were materially false and misleading when made because

Pilgrim's market was ***not*** "highly competitive," but had instead been rigged by the illegal bid-rigging

scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had

artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and

reputational harm.

205.     Also on February 21, 2020, before the market opened, defendants filed a Form 8-K

with the SEC, accompanied by a press release discussing the Company's financial performance for

the fiscal year ending December 31, 2019 and the fourth quarter of 2019.  In the press release,

defendant Penn again attributed the Company's success to Pilgrim's relationships with its key

customers, stating in relevant part:

> *"We maintain our approach to the successful Key Customer strategy, which is the basis for our strong growth*."

*     *     *

> "In Q4, ***our operating performance in the U.S. has continued to improve, driven by our partnership with Key customers*** and the relentless focus on executing and delivering the best results possible despite changes in market conditions."

206.     The statements in ¶205 regarding the purported reasons for Pilgrim's success were

materially false and misleading when made.  In truth, the Company's "'strong growth'" and

"'operating performance'" were ***not*** being driving by its "'partnership'" with key customers, but

- 71 -

rather, by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

207.    Also on February 21, 2020, before the market opened, defendants Penn and Sandri hosted a conference call with investors and analysts to discuss Pilgrim's results for the fiscal year ending December 31, 2019 and the fourth quarter of 2019.  On the call, defendant Penn again emphasized the strength and quality of Pilgrim's relationships with its key customers, stating: "***Beyond driving growth, our key customer approach also promotes trust, enhances long-term relationships and strengthens our margin structure***."

208.    The statements in ¶207 regarding the success and significance of Pilgrim's key customer approach were materially false and misleading when made because they concealed the fact that the success of Pilgrim's key customer strategy was being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which neither "promote[d] trust" nor "enhance[d] long-term relationships," but had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

209.    During the call, defendant Penn also touted the Company's purported "strategy" and reasons for success during fiscal year 2019, stating in relevant part:

> ***Our results have remained well balanced and are the result of our vision to become the best and most respected company***, creating the opportunity of a better future for our team members.  To support our vision, we are continuing our ***strategy*** of developing a unique portfolio of diverse complementary business models, continuing to relentlessly pursue ***operational excellence*** and becoming a more ***valued partner with key customers*** and creating an environment for ***safe people, safe products and healthy attitudes***.

210.    The statements in ¶209 regarding Pilgrim's purported strategy and reasons for success were materially false and misleading when made.  In truth, the Company's strategy and results were **not** being driven by Defendants' "vision to become the best and most respected company," pursuit of "operational excellence," or maintenance of "valued partner[ships] with key customers."  Instead, the Company's strategy and results were being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and created anything ***but*** "an environment for safe people, safe products and healthy attitudes," while also exposing the Company to substantial criminal penalties and reputational harm.

### 15.    Defendants' April 30, 2020 False and Misleading Statements

211.    On April 29, 2020, before the market opened, Defendants filed a Form 8-K with the SEC, accompanied by a press release discussing the Company's financial performance for the first quarter of 2020.  In the press release, defendant Penn again touted the Company's purported "strategy" and reasons for success during fiscal year 2019, stating in relevant part:

> In spite of the difficult global macro conditions, our ***results have remained well-balanced***, and are the ***result of our vision to become the best and most respected company***, creating the opportunity of a better future for our team members.  To support our vision, we are continuing our ***strategy*** of developing a unique portfolio of diverse, complementary business models, continuing to relentlessly pursue ***operational excellence***, becoming a more ***valued partner with Key Customers***, and creating an environment for ***safe people, safe products and healthy attitudes***.

212.    The statements in ¶211 regarding Pilgrim's purported strategy and reasons for success were materially false and misleading when made.  In truth, the Company's strategy and results were **not** being driven by Defendants' "vision to become the best and most respected company," pursuit of "operational excellence," or maintenance of "valued partner[ships] with key customers."  Instead,

- 73 -

the Company's strategy and results were being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which had artificially inflated Pilgrim's profits and created anything **but** "an environment for safe people, safe products and healthy attitudes," while also exposing the Company to substantial criminal penalties and reputational harm.

213.    Also on April 30, 2020, before the market opened, Defendants Penn and Sandri hosted a conference call with investors and analysts to discuss the Company's results for the first quarter of 2020.  On the call, defendant Penn again attributed the Company's success to Pilgrim's relationships with its key customers, stating in relevant part:

> Our **key customer approach** . . . creates a basis to further accelerate growth in important categories by providing more customized high-quality innovative products **to give a clear, long-term, sustainable competitive advantage**.

> *       *       *

> Beyond driving pure growth, **our key customer strategy also promotes trust, enhances long-term relationships and strengthens our margin structure**.

214.    The statements in ¶213 regarding the success and significance of Pilgrim's key customer approach were materially false and misleading when made because they concealed the fact that the success of Pilgrim's key customer approach was being driven by the illegal bid-rigging scheme orchestrated by Defendants and their co-conspirators, as detailed in §IV.D, *supra*, which neither created a "long-term, sustainable competitive advantage," "promote[d] trust" nor "enhance[d] long-term relationships," but had artificially inflated Pilgrim's profits and exposed the Company to substantial criminal penalties and reputational harm.

- 74 -

**B.**     **SOX Certifications Throughout the Class Period**

215.     In connection with each annual report Defendants filed with the SEC during the Class Period, defendants Sandri, Lovette, and/or Penn signed certifications pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX Certifications").  Pursuant to §302 of SOX, and also covered by §§304 and 906 of SOX, defendants Sandri, Lovette, and/or Penn certified that the annual filings did not contain any omissions or false statements of material fact.  For example, in connection with the 2017 Form 10-K filed by the Company on February 16, 2018, defendants Lovette and Sandri certified, in relevant part, that:

> 1.  I have reviewed this annual report on Form 10-K for the year ended December 31, 2017, of Pilgrim's Pride Corporation;

> 2. Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

> 3. Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report* . . . .

216.     Defendants Sandri, Lovette, and/or Penn filed certifications similar to those in ¶215 in connections with every other Form 10-K filed by Pilgrim's during the Class Period.

217.     The SOX Certifications signed by defendants Sandri, Lovette, and Penn during the Class Period were materially false and misleading when made because the Company failed to disclose that Pilgrim's enjoyed the profits and success that it did because the Company and its competitors were engaged in an illegal scheme to rig bids submitted to Pilgrim's key customers.

218.     Additionally, each of the SOX Certifications signed during the Class Period was materially false and misleading because, contrary to the representation that Pilgrim's SEC filings did

- 75 -

"***not contain any untrue statement of a material fact***" or omission, the SEC filings to which the certifications were appended contained numerous false and misleading statements and omissions, as set forth in §V.A, *supra*.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

219.    As detailed above, throughout the Class Period Defendants engaged in a scheme to defraud investors by repeatedly touting Pilgrim's purportedly successful business strategies, customer relationships and legitimate competitive advantages, while at the same time knowingly concealing from investors that the Company's success was in fact being driven by an illegal bid-rigging scheme that Defendants had orchestrated since at least 2012.

220.    The facts alleged in §§IV-V, *supra*, plainly establish that, at all relevant times, Defendants were aware or recklessly disregarded that their representations to investors were materially false and misleading and/or omitted material information necessary to evaluate Pilgrim's past performance and future prospects.  Additional facts further evidencing Defendants' scienter are set forth below.

### A.    The DOJ's Criminal Cases Confirm Defendants' Knowledge of Pilgrim's Illegal Bid-Rigging Scheme

221.    As detailed in §IV, *supra*, the DOJ's cases against Pilgrim's and the DOJ Defendants revealed numerous detailed facts conclusively establishing that defendants Penn, Lovette, and Pilgrim's were active participants in the Company's illegal bid-rigging scheme, and thus were explicitly and undeniably aware that their representations to investors during the Class Period were materially false and misleading.

222.    Specifically, the Superseding Indictment found that Penn and Lovette, acting with other Pilgrim's employees as well as co-conspirators from other companies:

- 76 -

(a)      reached agreements and understandings to submit aligned (though not necessarily identical) bids and to offer aligned (though not necessarily identical) prices and price-related terms, including discount levels, for broiler chicken products sold in the United States;

(b)      participated in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States, with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by suppliers and co-conspirators for broiler chicken products sold in the United States; and

(c)      monitored bids submitted by, and prices and price-related terms, including discount levels, offered by suppliers and co-conspirators for broiler chicken products sold in the United States.

223.     The Superseding Indictment detailed numerous instances from 2012-2019 in which the DOJ Defendants colluded to submit rigged bids to the Organizational Victims. ***Pilgrim's employees were involved in each such instance***, several of which are detailed in §IV.D, *supra*. Facts from the Superseding Indictment regarding the specific actions of defendants Penn and Lovette are summarized below.

224.     Additionally, the DOJ filed formal charges against Pilgrim's through an Information filed on October 13, 2020, which charged Pilgrim's with engaging in "a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman

Act, 15 U.S.C. §1," through its engagement in "a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States." As further detailed below, ***Pilgrim's pled guilty*** to these charges on February 23, 2021, and was sentenced to pay approximately ***$107 million*** in criminal fines as a result.

### 1.   Defendant Penn

225.    The Superseding Indictment detailed multiple instances in which defendant Penn was directly involved in illegal bid-rigging activity. First, in November 2012, Penn actively participated in communications regarding Pilgrim's efforts to illegally rig bids for Victim 1's 2013 supply of dark meat, wings, and 8-piece COBs. Specifically, Penn was involved in numerous email communications regarding Pilgrim's efforts to coordinate bids with its co-conspirators. These communications included: (1) an email from Austin informing Penn that he would be having discussions with other co-conspirators "to get the pulse"; (2) an email from Penn to Austin requesting "a spreadsheet similar to last year"; and (3) an email from a Pilgrim's employee to Penn and Austin attaching a spreadsheet containing quote information for five of Pilgrim's "competitors." Shortly thereafter, Penn signed a contract for Victim 1's 2013 supply of dark meat and 8-piece COBs. *See* §IV.D.1, *supra*.

226.    Second, in August 2014, Penn actively participated in communications regarding Pilgrim's efforts to illegally rig bids for Victim 1's 2015 8-piece COB supply. Specifically, in the days before Pilgrim's initial cost-plus pricing model was due to Cooperative 1 on August 19, 2014, Penn was involved in multiple phone conversations and emails with co-conspirators, including an email he received from a Pilgrim's employee at 6:01 p.m. on August 18, 2014, which attached a

4822-9633-9179.v2

spreadsheet containing information regarding Claxton's, Case Foods', Koch's, George's, and Mar-Jac's "current" and "new" margins.  Penn also received another email from that same Pilgrim's employee at 6:46 p.m., which explained that: "Roger [Austin] did some checking around today" and set forth additional information regarding "the range of the total increases (margin and costs) [that Pilgrim's competitors] are going in with."  Penn responded to the email: "Will review with Bill [Lovette] in am.  Will advise."  Shortly thereafter, Pilgrim's received a request from Cooperative 1 to decrease its prices.  In the days that followed, Penn engaged in multiple communications with co-conspirators, including an August 29, 2014 phone call with a Mar-Jac employee, who wrote on a piece of paper with a handwritten notation "8-29-14" that he had "[t]alked to Jason [sic] Penn +8 cost +11 margin."  Ultimately, Pilgrim's signed an agreement for Victim 1's 2015 8-piece COB supply at a significantly higher margin than it had the previous year.  *See* §IV.D.5, *supra*.

227.    Third, in March 2015, Penn actively participated in communications regarding Pilgrim's efforts to illegally collude with its co-conspirators regarding Victim 2's request for "some type of discount" in connection with a promotion it was planning to offer in September 2015.  Specifically, on March 31, 2015, following extensive exchanges of communications among the co-conspirators regarding their coordinated responses to Victim 2's request, a Pilgrim's employee told Penn that: "[Victim 2] is looking to get a $0.02/lb discount from all suppliers for a September promotion. [Tyson], [Koch], [Case Foods], [Mar-Jac], [George's], and [Claxton] have already agreed to the discount."  On April 1, 2015, Koch approved a $0.02/lb discount, and so did Penn.  *See* §IV.D.6, *supra*.

### 2.   Defendant Lovette

228.   The Superseding Indictment also detailed multiple instances in which defendant Lovette was directly involved in illegal bid-rigging activity.  First, like Penn, Lovette actively participated in communications regarding Pilgrim's efforts to illegally rig bids for Victim 1's 2015 8-piece COB supply.  Specifically, as further detailed above, after receiving an email from a Pilgrim's employee containing information regarding "the range of the total increases (margin and costs) [that Pilgrim's competitors] are going in with," Penn responded: "Will review with Bill [Lovette] in am.  Will advise."  Lovette also engaged in a 15 minute phone conversation with Austin after Austin received a request from Cooperative 1 to decrease Pilgrim's prices for Victim 1's 2015 8-piece COB supply.  Shortly thereafter, Austin informed Brady (a Claxton executive) that Pilgrim's would not be lowering its prices.  *See* §IV.D.5, *supra*.

229.   Second, in May 2016, Lovette actively participated in communications regarding Pilgrim's efforts to illegally collude with Koch regarding Distributor 1's attempt to negotiate longer terms for its respective lines of credit.  Specifically, on May 1, 2016, Lovette exchanged multiple emails with a Koch employee, during which Lovette and the Koch employee both agreed to refuse Distributor 1's request, with Lovette expressly agreeing to tell the Koch employee if Pilgrim's decided to change its position.  *See* §IV.D.7, *supra*.

### 3.   Defendant Pilgrim's

230.   As noted above, on February 23, 2021, ***Pilgrim's pleaded guilty*** to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman

Antitrust Act, 15 U.S.C. §1." The guilty plea was accompanied by a sentence to pay approximately ***$107 million*** in criminal fines.

231.     Notably, the Plea Agreement stated that, if the case had gone to trial, the Government ***would have had sufficient evidence to prove*** that:

(a)     From 2012 to 2017, Pilgrim's "participated in a conspiracy with at least one competitor engaged in the production and sale of broiler chicken products to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for certain broiler chicken products sold in the United States";

(b)     Pilgrim's participation in the conspiracy affected sales of broiler chicken products to KFC, including: (1) Pilgrim's contract to supply KFC with dark meat and wings in 2013; (2) Pilgrim's contract to supply KFC with dark meat in 2014; and (3) Pilgrim's contract to supply KFC with 8-piece-COBs in 2015 through 2017; and

(c)     Pilgrim's affected sales of broiler chicken products totaled ***at least $361 million***.

**B.     The Individual Defendants Were Directly Involved in and Aware of Matters Directly Related to Defendants' Fraudulent Scheme and Material Misrepresentations, Which Concerned the Core Operations of Pilgrim's Business**

232.     Defendants' fraudulent scheme and material misrepresentations concerned Pilgrim's core business and ***sole product*** throughout most of the Class Period – broiler chicken. Specifically, the scheme and material misrepresentations involved broiler pricing, which was a key factor that controlled Pilgrim's success and had previously caused the Company to file for bankruptcy in 2008. The scheme and misrepresentations also involved Pilgrim's key customers, which Defendants repeatedly touted as the reason for the Company's sustained profitability and competitive edge.

- 81 -

233.     Throughout the vast majority of the Class Period, Pilgrim's was a pure play chicken producer, meaning that its sole product was broiler chicken, and nearly all of its revenue was generated by broiler sales.  Unlike Tyson and other Pilgrim's competitors, Pilgrim's, until late-2019, was not involved in the sale of any other meat products, which allowed the Company and management to focus exclusively on the broiler industry and broiler sales.

234.     Because broiler sales were Pilgrim's principal revenue source, strong broiler pricing was crucial to Pilgrim's success, and weak broiler pricing was an existential threat.  When the Company filed for bankruptcy in 2008, it repeatedly emphasized that weak broiler pricing caused the Company's downfall.  For example, in its press release announcing that it was filing for bankruptcy, the Company noted that it had "faced a number of significant challenges including . . . *weak market pricing*."  Similarly, in Pilgrim's 2008 Form 10-K, management bemoaned that the Company had "faced an extremely challenging business environment," stating "[chicken] *prices did not improve* sufficiently to offset the higher costs of feed ingredients," and "*prices have actually declined* as the result of weak demand for breast meat and a general oversupply of chicken in the US."

235.     Defendants were accordingly laser-focused on broiler pricing throughout the Class Period, given that weak pricing could – as it had in the past – bring the Company to financial collapse, and the Company's financial stability hinged on broiler pricing stability.  Throughout the Class Period, defendants Lovette, Penn, and Sandri consistently monitored broiler pricing, reported its strength or weakness to investors, fielded analyst questions regarding pricing, and discussed their intimate knowledge of and involvement in Pilgrim's pricing strategy:

- "We price our retail products and our food service products based on the value that we deliver to our key customers and we have various mechanisms for doing that." – Defendant Lovette, first quarter 2017 conference call;

- "Demand has been extremely strong at retail through late spring and all the way through to now, and we think that even beyond it's going to continue to be strong. *That's what's driven pricing. . . .  And we have the ability to change those prices as needed based on the input costs as we experience.  So we're very excited about our pricing strategy*." – Defendant Lovette, second quarter 2017 conference call;

- "For us, nothing has changed in our strategy or our practice in terms of pricing." – Defendant Lovette, fiscal year 2016 conference call;

- "So small bird pricing is very solid.  Supply and demand for those small birds is such that we continue to see increasing demand, both at retail and foodservice.  And given a supply that's really not growing, that continues to give us a lot of price courage for those products." – Defendant Lovette, fiscal year 2017 conference call;

- "*We're encouraged by our pricing in our tray pack operations*.  As we've been saying for several years now, Heather, our strategy may be a little bit different from other participants in that all of our tray pack product goes to our key customers.  And we have an arrangement with those key customers based on quality, based on service, largely based on selling their brands, and we have a mutual agreement where we're going to keep them competitive in their marketplace. *And so that allows us to move pricing when it's needed, whether it's up or down, and it's proven to be really good for our key customers and obviously, very good for us*." – Defendant Lovette, fiscal year 2017 conference call;

- "While lower wheat costs certainly presented less of a headwind during Q2, increased *implementation of our key customer strategy also enabled us to better work through some of the input cost increases by adjusting price models compared to previously*." – Defendant Penn, second quarter 2019 conference call; and

- "List pricing?  I think we mentioned, we have a very broad portfolio of pricing.  So it depends on the segment.  On the spot market or a big bird, there's a lot of prices that are connected to contracts.  On the tray pack, we have the [3] partnerships, where we have discussion about, how can we help our customers to grow.  So the pricing there is more of negotiated. In the small bird segment, there is some components of cost plus and comps and components of grade markets.  So – on the prepared food, just like we mentioned and Jayson mentioned, they are more CPG type or mixed price.  So I think, what we try to do in our portfolio, not only in products, but also in prices is to mitigate any risk in any specific segment." – Defendant Sandri second quarter 2019 conference call.

236.    The Company's 2016, 2017, and 2018 SEC Forms 10-K, signed by defendants Lovette and Sandri, also provided a detailed description of pricing for different broiler products:

Most fresh chicken products are sold to established customers, based upon certain weekly or monthly market prices reported by the USDA and other public price reporting services, plus a markup, which is dependent upon the customer's location, volume, product specifications and other factors.  We believe our practices with respect to sales of fresh chicken are generally consistent with those of our competitors.  The majority of these products are sold pursuant to agreements with varying terms that set a price according to formulas based on underlying chicken price markets, subject in many cases to minimum and maximum prices.

\*      \*      \*

We establish prices for our prepared chicken products based primarily upon perceived value to the customer, production costs and prices of competing products.  The majority of these products are sold pursuant to agreements with varying terms that either set a fixed price for short-term periods or set a price according to formulas based on an underlying commodity market such as corn and chicken price forecasts, subject in many cases to minimum and maximum prices.  Many times, these prices are dependent upon the customer's location, volume, product specifications and other factors.

237.    The Class Period bid-rigging scheme and material misrepresentations also directly involved Pilgrim's key customers, which were integral to the Company's success.  For example, in each of the Company's Forms 10-K filed during the Class Period, Pilgrim's touted the importance of its customer relationships by listing them as intangible assets worth hundreds of millions of dollars. In its SEC Forms 10-K for 2016, 2017, 2018, and 2019, Pilgrim's valued its customer relationships between *$151 million* and *$293 million*, which accounted for roughly half the total value of Pilgrim's intangible assets during the Class Period.  Pilgrim's key customers also accounted for a material portion of the Company's revenue throughout the Class Period.  Pilgrim's reported that its top two customers alone accounted for between 11% and 14% of the Company's sales during the Class Period.

238.    Throughout the Class Period, Defendants also discussed the central role that key customers played in the Company's operations.  On each conference call held during the Class

- 84 -

Period, Defendants stated repeatedly that their unprecedented growth, stability, success, margin profile, and competitive edge were attributable to the Company's key customers, stating, for example:

- "[O]ur Business will have the ability to outperform, given our . . . strong relationships with key customers." – Defendant Lovette, multiple conference calls during 2016 and 2017;

- "[K]ey customers will continue to enhance our margin profile and provide more consistent results despite market fluctuations." – Defendant Lovette, multiple conference calls during 2017 and 2018;

- "[O]ur key customer focus has continued to bring growth beyond the average market conditions." – Defendant Lovette, first quarter 2018 conference call;

- "[O]ur key customer approach . . . creates a basis to further accelerate growth in important categories by providing a more customized and innovative products to give us a clear competitive advantage." – Defendant Lovette, multiple conference calls during 2018, and defendant Penn, first quarter 2019 conference call;

- "The commitment to our key customer strategy remains relevant to our growth. Revenues from key customers more than doubled over the last 8 years, reducing our relative dependency on pure commodity sales. Our strong relationships with key customers have continued to contribute to the out-performance in our case-ready business." – Defendant Penn, multiple conference calls during 2019; and

- "[W]ith our key customer strategy, we will maintain our lead in relative results to the industry." – Defendant Sandri, second quarter 2019 conference call.

239.   Further, defendant Penn admitted during the Company's first quarter 2019 conference call that he was ***directly involved*** in the formation and execution of the Company's key customer strategy, stating:

- "We will focus on people, food safety and quality, relentless pursuit of operational excellence, emphasis on ***key customers*** and optimizing a mix of our portfolio. ***As part of the management team that originally developed this strategy, I'm deeply committed to continue executing this methodology***

- 85 -

*as a base for our future growth.  Our key customer approach has been success, and we'll continue evolving to be even a more valuable partner*.";
and

- "*I was part of the team that formed and executed our current strategy.  It's the one in which we still employ today*, and just to remind you, that strategy centers around people and food safety, operational excellence.  It's really the fundamentals of our business, having an optimized mix in portfolio, and of course, *our key customer strategy*, which we have been speaking of over the last 8 years."

240.    Defendants' SEC Forms 10-K, filed throughout the Class Period and signed by defendants Penn, Lovette, and Sandri, also emphasized the importance of the Company's key customers.  For example, the SEC Forms 10-K filed for the years 2016, 2017, and 2018 each listed key customers as a fundamental aspect of the Company's business strategy.

241.    Defendants' numerous statements before and throughout the Class Period concerning Pilgrim's broiler pricing strategy and key customers demonstrate the Individual Defendants were actively involved with and intimately knowledgeable about, the specific operational factors implicated in Defendants' illegal bid-rigging scheme and fraudulent misrepresentations.  The Individual Defendants' direct knowledge of and involvement in these operations is supported by the other facts alleged herein, including those regarding defendants Penn's and Lovette's active participation in the illegal scheme to rig bids submitted to key customers (*see* §IV.D, *supra*).  Accordingly, these statements strongly support a cogent and compelling inference that the Individual Defendants either had direct knowledge about the Company's fraudulent scheme and misrepresentations or were severely reckless in disregarding them.

C.   **The Individual Defendants Sold Significant Amounts of Pilgrim's Common Stock During the Class Period, Further Supporting a Strong Inference of Scienter**

242.   Defendants' strong inference of scienter is further supported by the fact that, during the Class Period, each of the Individual Defendants profited handsomely from their possession of material, non-public information regarding Pilgrim's illegal bid-rigging scheme by selling significant amounts of Pilgrim's common stock at artificially inflated prices.

243.   Defendant Lovette, for example, sold 234,735 Pilgrim's shares during the Class Period for total proceeds of $5,288,512.  During that same time, defendant Sandri sold 107,110 Pilgrim's shares for total proceeds of $2,780,140, while defendant Penn sold 55,210 Pilgrim's shares for total proceeds of $1,528,043.  In total, the three Individual Defendants used their possession of material, non-public information regarding Pilgrim's illegal bid-rigging scheme to pocket ***nearly $10 million*** from sales of Pilgrim's common stock during the Class Period, while Lead Plaintiff and members of the Class, on the other hand, purchased shares of Pilgrim's common stock at artificially inflated prices.

244.   Moreover, the Individual Defendants' Class Period stock sales stand in stark contrast to their pre-Class Period activity.  Indeed, from February 24, 2015, through February 17, 2017, ***none*** of the Individual Defendants sold a ***single share*** of Pilgrim's common stock, further evidencing their intention to profit from Defendants' fraud at shareholders' expense by selling significant amounts of shares at artificially inflated prices during the Class Period, while in possession of material, non-public information regarding Pilgrim's illegal bid-rigging scheme.

4822-9633-9179.v2

**D.      The Departure of Multiple Key Executives Further Supports a Strong Inference of Scienter**

245.     On June 14, 2020 – less than two weeks after Penn was indicted – Pilgrim's announced that he was taking a paid leave of absence, effective immediately, because he intended to "focus on his defense of the recently disclosed indictment against him."  On September 23, 2020, Pilgrim's announced that Penn had officially been fired and was "no longer with the Company." Penn's sudden termination – under highly suspicious circumstances – raises a strong inference that he knew about and participated in the Company's illegal bid-rigging scheme during the Class Period.

246.     Defendant Lovette and bid-rigging co-conspirator Austin also left the Company under suspicious circumstances.  In March 2019 – over seven years into the bid-rigging conspiracy and roughly one year before the Initial DOJ Indictment – Pilgrim's management let go of both Lovette and Austin.  Each had been with the Company for over ten years, and each departed in the same month, suddenly and with little explanation.  Their sudden and unexplained departures – under highly suspicious circumstances – further support a strong inference that they knew about and participated in the collusive bid-rigging scheme.

**E.      The Individual Defendants' SOX Certifications Further Support a Strong Inference of Scienter**

247.     As discussed above (*see* §V.B, *supra*), defendants Sandri, Penn, and/or Lovette signed the Company's SOX Certifications throughout the Class Period, further supporting a strong inference of scienter.  The certification requirements set forth in SOX were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch.  The SEC has expressly warned corporate officers that "a false

certification potentially could be subject to . . . both Commission and private actions for violating

Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."

248.    As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports.  In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5.

Kourtney T. Cowart, *The Sarbanes-Oxley Act: How a Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004).

249.    During the Class Period, Pilgrim's SEC Forms 10-K referenced herein included

materially false and misleading SOX Certifications signed by defendants Sandri, Penn, and/or

Lovette.  *See* §V.B, *supra*.  Defendants Sandri, Penn, and/or Lovette, as signatories to the SOX

Certifications in question, represented, among other things, that they had reviewed the respective

annual report for which they supplied the certification, and, further, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

250.    The SOX Certifications signed by defendants Sandri, Penn, and/or Lovette were

materially false and misleading because, at the time they were executed, the Individual Defendants

were aware of, or recklessly disregarded, the facts described herein.  As such, defendants Sandri's,

Penn's, and/or Lovette's SOX Certifications provide additional evidence of scienter.

     **F.**    **Pilgrim's Is Legally Responsible for the Conduct of Its Senior Employees, Including the Individual Defendants**

251.    Pilgrim's acted with scienter because the knowledge of its most senior executives, which includes each of the Individual Defendants, is imputed to Pilgrim's. Indeed, the cumulative knowledge of all members of Pilgrim's management team regarding these matters is properly imputed to the corporate defendant – Pilgrim's. Defendants Penn and Lovette were the CEO and/or Chairman of the Board during different times in the Class Period. Defendant Sandri was the CFO throughout the Class Period. The Individual Defendants' scienter, as detailed herein, is indisputably imputed to the Company.

**VII.**    **LOSS CAUSATION**

252.    As described above, during the Class Period, Defendants concealed their involvement in an illegal bid-rigging scheme and issued a series of materially false and misleading statements. As a result of Defendants' fraudulent scheme and material misrepresentations, the price of Pilgrim's common stock was artificially inflated throughout the Class Period. As detailed below, the truth was revealed through a June 3, 2020 corrective disclosure, causing Lead Plaintiff and the Class to suffer significant damages as a result.

253.    Lead Plaintiff and members of the Class purchased Pilgrim's common stock at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations, Lead Plaintiff and members of the Class would not have purchased Pilgrim's common stock at artificially inflated prices.

254.    When Defendants' material misrepresentations were revealed to the market, the price of Pilgrim's common stock declined significantly.

255.    Lead Plaintiff and the Class suffered economic losses as the price of Pilgrim's common stock fell in response to the corrective disclosure, as demonstrated below.  The disclosure described below, however, does not necessarily represent the only stock price decline attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case have not yet begun. Lead Plaintiff expressly reserves the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

256.    As noted above, the truth regarding Defendants' fraudulent scheme and material misrepresentations was revealed through a June 3, 2020 corrective disclosure.  On that date, the DOJ announced that a federal grand jury in the District of Colorado had indicted the four Initial DOJ Defendants on criminal antitrust violations related to their involvement in, "a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States."  The Initial Indictment chronicled numerous specific instances in which the Initial DOJ Defendants and their co-conspirators illegally rigged bids submitted to nationwide restaurant franchises and nationwide grocery chains.  The Initial Indictment also detailed numerous collusive actions and communications between Pilgrim's employees and Pilgrim's competitors.

257.    On this news, Pilgrim's stock declined $2.58 per share, or 12.4%, from a close of $20.87 per share on June 2, 2020, to close at $18.29 per share on June 3, 2020, causing Lead Plaintiff and the Class to suffer significant damages as a result.

## VIII.   CLASS ACTION ALLEGATIONS

258.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants and their

4822-9633-9179.v2

families, the officers and directors of Pilgrim's, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

259.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Pilgrim's common stock was actively traded on the NASDAQ.  While the exact number of Class members can only be discovered by appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. During the Class Period, there were more than 245 million shares of Pilgrim's common stock outstanding and the average daily trading volume was 1,157,166 shares.  Record owners and other members of the Class may be identified from records maintained by Pilgrim's or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

260.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(e)    whether the price of Pilgrim's common stock was artificially inflated during the Class Period; and

(f)    to what extent the members of the Class have sustained damages and the proper measure of damages.

261.    Lead Plaintiff's claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' unlawful conduct alleged herein.

262.    Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in securities and class action litigation.  Lead Plaintiff has no interests which conflict with those of the Class.

263.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX.    UNDISCLOSED ADVERSE FACTS

264.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Pilgrim's common stock and maintaining inflation in the stock price, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to

- 93 -

make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, as well as its business and operations, as alleged herein.

## X.    DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS

265.    During the Class Period, Defendants had actual knowledge of their undisclosed illegal bid-rigging scheme and the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on Lead Plaintiff and other purchasers of Pilgrim's common stock during the Class Period.

266.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Pilgrim's business, operations, and financial prospects.

267.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's stock price to be overvalued and artificially inflated and/or maintained at artificially inflated levels at all relevant times.  Defendants' materially false and misleading statements made during the Class Period resulted in Lead Plaintiff and the other members

of the Class purchasing the Company's stock at artificially inflated prices, thus causing the damages complained of herein.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE

268.   At all relevant times, the market for Pilgrim's common stock was an efficient market for the following reasons, among others:

(a)     Pilgrim's met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Pilgrim's filed periodic public reports with the SEC and NASDAQ;

(c)     Pilgrim's regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Pilgrim's was followed by multiple securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.   These reports were publicly available and entered the public market.

269.   As a result of the foregoing, the market for Pilgrim's common stock promptly digested statements and information regarding Pilgrim's from publicly available sources and reflected such statements and information in the price of the stock.   Under these circumstances, all purchasers of Pilgrim's common stock during the Class Period suffered similar injury through their

purchases of the stock at artificially inflated prices and the fraud-on-the-market presumption of reliance applies.

270.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact, which Defendants had a duty to disclose.  Because this action involves Defendants' failure to disclose material, adverse information regarding Pilgrim's illegal anticompetitive scheme – material information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.   NO SAFE HARBOR

271.    The statements alleged herein to be false and misleading are not subject to the protections of the Private Securities Litigation Reform Act of 1995's ("PSLRA") Safe Harbor for forward-looking statements because: (a) they are not forward-looking; (b) they are subject to an exclusion; and (c) even if purportedly forward-looking, Defendants cannot meet the requirements necessary for invoking the protection, *i.e.*, identifying the statements as forward-looking and demonstrating that the statements were accompanied by meaningful cautionary language.  Many of the statements were also misleading in light of omissions of present or historical facts and cannot be considered forward-looking as a result.

272.     Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is: (a) identified as such; and (b) "accompanied by meaningful cautionary statements."   15 U.S.C. §78u-5(c)(1)(A)(i).   An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially, and that additional information concerning risk factors is contained in a readily available written document.  In addition, the oral statement must: (a) identify the written document, or portion thereof, that contains such risk factor; and (b) the referenced written documents must contain meaningful cautionary language.  15 U.S.C. §78u-5(c)(2)(B).

273.     All alleged misstatements set forth in §V, *supra*, concerning matters of historical fact, current condition, or a mixture thereof are not forward-looking and are not protected by the Safe Harbor.

274.     To the extent any of statements are identified as forward-looking, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those purportedly forward-looking statements.  A warning that identifies potential risk, but implies that such risks had not materialized, *i.e.*, states that something might occur but does not state that that something has actually already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

275.     Meaningful risk disclosures must be substantive and tailored to the forward-looking statement they accompany.  Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized prior to the start of the Class Period and continued throughout, which was material to the reasonable

- 97 -

investor.  Defendants' risk disclosures were therefore neither substantive nor tailored to the statement and do not satisfy the requirement of the Safe Harbor.

276.     Accordingly, Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis when made.  Defendants are liable for those false forward-looking statements because, at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or was authorized and/or approved by an executive of Pilgrim's who knew that those statements were false or misleading when made.

## XIII.   COUNTS

### COUNT I

#### For Violations of §10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)

277.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

278.     This Count is asserted on behalf of all members of the Class against all Defendants for violations of §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

279.     During the Class Period, Defendants engaged in and concealed a scheme to defraud investors and disseminated or approved the materially false and misleading statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

280.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Pilgrim's common stock during the Class Period.

281.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Pilgrim's common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the other members of the Class, regarding, among other things, Pilgrim's business and operations; (b) artificially inflate and maintain the market price of Pilgrim's common stock; and (c) cause Lead Plaintiff and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

282.    Defendants are liable for their deceptive and fraudulent conduct and all materially false and misleading statements made during the Class Period, as alleged above.

283.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with the intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers of Pilgrim's common stock, were either known to Defendants or were so obvious that Defendants should have been aware of them.

284.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Pilgrim's common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Pilgrim's common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

285.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Pilgrim's common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### (Against the Individual Defendants)

286.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

287.    This Count is asserted on behalf of all members of the Class against the Individual Defendants for violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

288.     The Individual Defendants were and acted as controlling persons of Pilgrim's within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did actually influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Lead Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

289.     In their capacities as senior corporate officers and/or directors of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company. The Individual Defendants signed the Company's SEC filings during the Class Period, and/or were directly involved in providing false information and certifying and approving the false statements disseminated by Pilgrim's during the Class Period.  As a result of the foregoing, the Individual Defendants as a group, and individually, were controlling persons of Pilgrim's within the meaning of §20(a) of the Exchange Act.

290.     As set forth above, Pilgrim's violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.

291.     By virtue of their controlling positions of Pilgrim's and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange

Act, jointly and severally with, and to the same extent as Pilgrim's is liable under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Pilgrim's common stock. Moreover, as detailed above, each of the Individual Defendants culpably participated in the material misstatements and omissions alleged herein.

292.   As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

A.   Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.   Awarding Lead Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.   Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.   Awarding such other relief as this Court deems appropriate.

## XV.  JURY DEMAND

Lead Plaintiff hereby demands a trial by jury on all triable issues.

DATED:  May 26, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL
NICOLE Q. GILLILAND


s/ NATHAN R. LINDELL
NATHAN R. LINDELL

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ngilliland@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

SHUMAN, GLENN & STECKER
RUSTY E. GLENN
600 17th Street, Suite 2800 South
Denver, CO  80202
Telephone:  303/861-3003
303/536-7849 (fax)
rusty@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiff*

OFFICE OF THE NEW MEXICO
  ATTORNEY GENERAL
HECTOR BALDERAS, Attorney General
P. CHOLLA KHOURY, Assistant Attorney General
Director, Consumer and Environmental Protection
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone: 505/490-4052
ckhoury@nmag.gov

*Additional Counsel for Lead Plaintiff*

- 103 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 26, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ NATHAN R. LINDELL
NATHAN R. LINDELL

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  nlindell@rgrdlaw.com

## Mailing Information for a Case 1:20-cv-01966-RM-MEH United Food and Commercial Workers International Union Local 464A et al v. Pilgrim's Pride Corporation et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon Amjed**
  namjed@ktmc.com,rdegnan@ktmc.com,ksauder@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com

- **Seth Alben Aronson**
  saronson@omm.com,mlippincott@omm.com,apletcher@omm.com,seth-aronson-9209@ecf.pacerpro.com,mtubach@omm.com

- **Andrew Joseph Cauchi**
  Andrew.Cauchi@weil.com

- **John Anderson Fagg , Jr**
  johnfagg@mvalaw.com,myishaaldridge@mvalaw.com,aishaahreed@mvalaw.com,lindamelin@mvalaw.com

- **Nicole Gilliland**
  ngilliland@rgrdlaw.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,nate.lindell@gmail.com,E_File_SD@rgrdlaw.com,AGonzales@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Tania Christina Matsuoka**
  tania.matsuoka@weil.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Mark A. Nebrig**
  marknebrig@mvalaw.com,kellybowling@mvalaw.com

- **Joel S. Neckers**
  neckers@wtotrial.com,allen@wtotrial.com,mchenry@wtotrial.com

- **Nicole E. Schiavo**
  nicoleschiavo@mvalaw.com,janetkoronkiewicz@mvalaw.com

- **Michael Frederick Tubach**
  mtubach@omm.com,michael-tubach-9759@ecf.pacerpro.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)