# EXHIBIT 1

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 29, 2019**
**OR**
☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

Commission File number 1-9273



**PILGRIM'S PRIDE CORPORATION**
(Exact name of registrant as specified in its charter)

| Delaware | 75-1285071 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 1770 Promontory Circle | 80634-9038 |
|---|---|
| Greeley CO | |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(970) 506-8000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | PPC | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
|---|---|---|---|
| Non-accelerated Filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's Common Stock, $0.01 par value, held by non-affiliates of the registrant as of June 30, 2019 was $1,344,353,655. The number of shares of the registrant's Common Stock outstanding as of February 20, 2020 was 249,572,119.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's Proxy Statement for the 2020 Annual Meeting of Stockholders are incorporated by reference into Part III of this annual report.

Table of Contents

**PILGRIM'S PRIDE CORPORATION
FORM 10-K
TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 5 |
| Item 1B. | Unresolved Staff Comments | 15 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Mine Safety Disclosures | 19 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 20 |
| Item 6. | Selected Financial Data | 22 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 25 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 36 |
| Item 8. | Financial Statements and Supplementary Data | 39 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 95 |
| Item 9A. | Controls and Procedures | 95 |
| Item 9B. | Other Information | 99 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 99 |
| Item 11. | Executive Compensation | 99 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 99 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 99 |
| Item 14. | Principal Accountant Fees and Services | 99 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 100 |
| Item 16. | Form 10-K Summary | 103 |
| Signatures | | 103 |

i

Table of Contents

**PART I**

**Forward Looking Statements and Explanatory Note**

This annual report contains, and management may make, certain "forward-looking statements" as defined under the Private Securities Litigation Reform Act of 1995. Statements of our intentions, beliefs, expectations or predictions for the future, denoted by the words "anticipate," "believe," "estimate," "expect," "plan," "project," "imply," "intend," "should," "foresee" and similar expressions, are forward-looking statements that reflect our current views about future events and are subject to risks and uncertainties. Such risks and uncertainties include those described under "Risk Factors" below and elsewhere in this annual report. Actual results could differ materially from those expressed in, or implied or projected by these forward-looking statements as a result of these risks and uncertainties, many of which are difficult to predict and beyond our control. The Company's forward-looking statements speak only as of the date of this report or as of the date they are made, and the Company undertakes no obligation to update its forward-looking statements. The risks described in this annual report are not the only risks we face, and additional risks and uncertainties may impair our business operations. The occurrence of any one or more of the factors described herein or other currently unknown factors could materially adversely affect our business and operating results.

**Item 1. Business**

**Company Overview**

Pilgrim's Pride Corporation (referred to herein as "Pilgrim's," "PPC," "the Company," "we," "us," "our," or similar terms) is primarily engaged in the production, processing, marketing and distribution of fresh, frozen and value-added chicken and pork products to retailers, distributors and foodservice operators. The Company was incorporated in Texas in 1968 and reincorporated in Delaware in 1986, is the successor to a partnership founded in 1946 as a retail feed store. JBS S.A., through its indirect wholly-owned subsidiaries (together, "JBS"), beneficially owns 78.31% of our outstanding common stock.

We market our balanced portfolio of fresh, prepared and value-added meat products to a diverse set of over 6,500 customers across the U.S., the U.K. and Europe, Mexico and in approximately 110 other countries. Our sales efforts are largely targeted towards the foodservice industry, principally chain restaurants and food processors, such as Chick-fil-A® and retail customers, including grocery store chains and wholesale clubs, such as Kroger®, Costco®, Publix® and H-E-B® in the U.S., chain restaurants such as McDonald's® and grocery store chains such as Tesco and Waitrose in the U.K. and Europe, and grocery store chains such as Wal-Mart® in Mexico.

As a vertically integrated company, we control every phase of the production process, which helps us better manage food safety and quality, as well as more effectively control margins and improve customer service. Our plants are strategically located to ensure that customers timely receive fresh products. With our global network of approximately 5,200 growers, 38 feed mills, 49 hatcheries, 39 processing plants, 27 prepared foods cook plants, 24 distribution centers, ten rendering facilities and four pet food plants, we believe we are well-positioned to supply the growing demand for our products.

On October 15, 2019, the Company acquired 100% of the equity of Tulip Limited and its subsidiaries (together, "Tulip") from Danish Crown AmbA for £310.0 million, or $391.5 million for cash. Tulip is a leading integrated prepared pork supplier headquartered in Warwick, U.K. This acquisition solidifies Pilgrim's as a leading European food company, creating one of the largest integrated prepared foods businesses in the U.K. The Tulip operations are included in our U.K. and Europe reportable segment.

In 2017, we acquired (1) Granite Holdings Sàrl and its subsidiaries (together, "Moy Park"), which is one of the top-ten food companies in the U.K., Northern Ireland's largest private sector business and one of Europe's leading poultry producers and (2) JFC LLC and its subsidiaries (together, "GNP"), a vertically integrated poultry business that was based in Saint Cloud, Minnesota. Moy Park is included in our U.K. and Europe reportable segment and GNP is included in our U.S. reportable segment. In 2015, we acquired (3) Provemex Holdings, LLC and its subsidiaries (together, "Tyson Mexico"), a vertically integrated poultry business based in Gómez Palacio, Durango, Mexico. Tyson Mexico is included in our Mexico reportable segment.

We operate on the basis of a 52/53-week fiscal year that ends on the Sunday falling on or before December 31. Any reference we make to a particular year, for example, 2019, applies to our fiscal year and not the calendar year. Fiscal 2019 was a 52-week fiscal year.

**Reportable Segments**

We operate in three reportable segments: U.S., U.K. and Europe, and Mexico. We either produce or purchase for resale chicken and pork products through our operations in the U.S., the U.K and continental Europe, and Mexico. We conduct separate operations in the U.S., the U.K., continental Europe, Puerto Rico and Mexico; however, for geographic reporting purposes, we

1

Table of Contents

include Puerto Rico with our U.S. operations. See "Note 22. Reportable Segments" of our Consolidated and Combined Financial Statements included in this annual report for additional information.

**Products and Markets**

***Fresh Chicken and Pork Overview.*** Our fresh products consist of refrigerated (nonfrozen) whole or cut-up chicken, either pre-marinated or non-marinated, frozen whole chickens, breast fillets, mini breast fillets and prepackaged case-ready chicken, primary pork cuts, added value pork and pork ribs. Our case-ready chicken includes various combinations of freshly refrigerated, whole chickens, chicken parts in trays, bags or other consumer packs labeled and priced ready for the retail grocer's fresh meat counter. Additionally, we are an important player in the live market in Mexico. In 2019, our fresh chicken sales accounted for 58.2%, 8.6%, and 11.7% of our total U.S., U.K. and Europe, and Mexico chicken sales, respectively. In 2019, our fresh pork sales accounted for 47.5% of our total U.K. and Europe pork sales.

***Prepared Chicken and Pork Overview.*** Our prepared chicken products include portion-controlled breast fillets, tenderloins and strips, delicatessen products, salads, formed nuggets and patties and bone-in chicken parts. These products are sold either refrigerated or frozen and may be fully cooked, partially cooked or raw. In addition, these products are breaded or non-breaded and either pre-marinated or non-marinated. Our prepared pork includes processed sausages, bacon, slow cooked, smoked meat, gammon joints, ready-to-cook variety of meat products, pre-packed meats, sandwich and deli counter meats, pulled pork balls, meatballs and coated foods. In 2019, our prepared chicken products sales accounted for 7.9%, 7.7%, and 0.9% of our total U.S., U.K. and Europe, and Mexico chicken sales, respectively. In 2019, our prepared pork products sales accounted for 46.9% of our total U.K. and Europe pork sales.

***Exported Chicken and Pork Overview.*** Exported chicken and pork products primarily consist of whole chickens and chicken parts sold either refrigerated for distributors in the U.S. or frozen for distribution to export markets and primary pork cuts, hog heads and trotters frozen for distribution to export markets. In 2019, our export chicken products sales accounted for 2.6% and 2.5% of our total U.S. and U.K. and Europe chicken sales, respectively. In 2019, our export pork products sales accounted for 5.6% of our total U.K. and Europe pork sales.

***Market Overview.*** Our foodservice market principally consists of chain restaurants, food processors, broad-line distributors and certain other institutions. Our retail market consists primarily of grocery store chains, wholesale clubs and other retail distributors. Our export market consists primarily of customers who purchase for distribution in the U.S., U.K. and continental Europe, or for export to Mexico, the Middle East, Asia, and other international markets.

**Net Sales for Primary Product Lines and Markets**

The following table sets forth, for the periods beginning with 2017, net sales attributable to each of our primary product lines and markets served with those products. We based the table on our internal sales reports and their classification of product types.

2

Table of Contents

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
|  |  | (In thousands) |  |
| U.S. chicken: |  |  |  |
| Fresh | $ 6,214,954 | $ 5,959,458 | $ 5,700,503 |
| Prepared | 842,365 | 773,983 | 950,378 |
| Export | 282,791 | 258,732 | 213,595 |
| Total U.S. chicken | 7,340,110 | 6,992,173 | 6,864,476 |
| U.K. and Europe chicken: |  |  |  |
| Fresh | 918,852 | 925,124 | 846,575 |
| Prepared | 817,292 | 865,864 | 792,284 |
| Export | 262,041 | 303,921 | 318,699 |
| Total U.K. and Europe chicken | 1,998,185 | 2,094,909 | 1,957,558 |
| Mexico chicken: |  |  |  |
| Fresh | 1,245,976 | 1,252,403 | 1,245,144 |
| Prepared | 95,733 | 76,860 | 58,512 |
| Total Mexico chicken | 1,341,709 | 1,329,263 | 1,303,656 |
| Total chicken | 10,680,004 | 10,416,345 | 10,125,690 |
| U.K. and Europe pork: |  |  |  |
| Fresh | 135,985 | - | - |
| Prepared | 134,426 | - | - |
| Export | 16,174 | - | - |
| Total U.K. and Europe pork | 286,585 | - | - |
| Other products: |  |  |  |
| U.S. | 296,606 | 433,488 | 578,746 |
| U.K. and Europe | 99,023 | 53,757 | 38,761 |
| Mexico | 47,001 | 34,194 | 24,666 |
| Total other products | 442,630 | 521,439 | 642,173 |
| Total net sales | $ 11,409,219 | $ 10,937,784 | $ 10,767,863 |

**Raw Materials**

*Grains*. The Company utilizes various raw materials in its operations, including corn, soybean meal and wheat, along with various other ingredients from which the Company produces its own formulated feeds. In 2019, corn, soybean meal and wheat accounted for approximately 42.5%, 34.0% and 5.6% of our feed costs, respectively. The production of feed ingredients is positively or negatively affected primarily by the global level of supply inventories, demand for feed ingredients, the agricultural policies of the U.S. and foreign governments and weather patterns throughout the world. We attempt to mitigate the impact of price volatility on our profitability by decreasing the amount of our products that are sold under longer term fixed-price contracts, broadening our product portfolio and expanding the variety of contracts within our book of business. To also manage this risk, we purchase derivative financial instruments. The Company has long standing relationships with its sources of grain and other feed ingredients and expects to have an adequate supply for its present needs.

*Live chicks*. The Company's chicken operations purchase one-day old chicks from a few major breeders. These chicks, when mature, serve as the grandparent and parent stock of the broilers that these operations process for consumption. Should breeder stock from its present suppliers not be available for any reason, the Company believes that it could obtain adequate breeder stock from other suppliers in the regions in which it operates.

*Live pigs*. The Company's pork operations maintain a pig production base that makes up slightly more than 50% of the total number of pigs processed by the Company each year. Additionally, the Company's pork operations procure live pigs for slaughter within a few days of purchase from numerous independent farmers throughout the U.K. Live pigs sourced from independent farmers make up slightly less than 50% of the total number of pigs processed by the Company each year. Although we generally expect adequate supply of live pigs in the U.K., there may be periods of imbalance in supply and demand.

**Trademarks**

3

Table of Contents

We own registered trademarks which are used in connection with our activity in our business. The trademarks are important to the overall marketing and branding of our products. All major trademarks in our business are registered. In part, our success can be attributed to the existence and continued protection of these trademarks. As long as the Company continues to use its trademarks, they are renewed indefinitely. Some of the more significant owned or licensed trademarks used by the Company or its affiliates are Pilgrim's®, Just BARE®, Gold'n Pump®, Gold Kist®, County Pride Chicken®, Pierce Chicken®, Pilgrim's® Mexico, County Post®, Savoro, To-Ricos, Del Dia®, Moy Park, and O'Kane.

**Seasonality**

The demand for our chicken products generally is greatest during the spring and summer months and lowest during the winter months. The demand for our pork products generally is higher during the summer and peaks during the winter primarily due to the holiday season.

**Key Customers**

Our two largest customers accounted for approximately 12.9% and 12.4% of our net sales in 2019 and 2018, respectively. No single customer accounted for ten percent or more of our net sales in either 2019 or 2018.

**Competition**

The chicken and pork industry in the U.S., the U.K., continental Europe and Mexico is highly competitive. The competitive factors in our business include price, product quality, product development, brand identification, breadth of product line and customer service. We believe that being a vertically integrated chicken company and having a fully integrated supply chain in the pork business provides us with long-term cost and quality advantages over non-vertically integrated and other processors. We utilize numerous advertising and marketing techniques to develop and strengthen trade and consumer awareness and increase brand loyalty for consumer products. We believe our efforts to achieve and maintain brand awareness and loyalty help to achieve greater price premiums than would otherwise be the case in certain markets and support and expand our product distribution. We actively seek to identify and address consumer preferences by using sophisticated qualitative and quantitative consumer research techniques in key geographic markets to discover and validate new product ideas, packaging designs and methods. Although poultry and pork are relatively inexpensive in comparison with other meats, we compete indirectly with the producers of other meats and fish, since changes in the relative prices of these foods may alter consumer buying patterns.

**Regulation and Environmental Matters**

The poultry and pork industries are subject to government regulation, particularly in the health, workplace safety and environmental areas, including provisions relating to the discharge of materials into the environment, treatment and disposal of agricultural and food processing wastes, the use and maintenance of refrigeration systems, ammonia-based chillers, noise, odor and dust management, the operation of mechanized processing equipment and other operations, storm water, air emissions, treatment, storage and disposal of wastes, handling of hazardous substances and remediation of contaminated soil, surface water and groundwater, by the Centers for Disease Control, the United States Department of Agriculture ("USDA"), the Food and Drug Administration ("FDA"), the Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration and state and local regulatory authorities in the U.S. and by similar governmental agencies in the U.K., continental Europe and Mexico. Our chicken processing facilities in the U.S. are subject to on-site examination, inspection and regulation by the USDA. The FDA inspects the production of our feed mills in the U.S. Our food processing facilities and feed mills in the U.K., continental Europe and Mexico are subject to on-site examination, inspection and regulation by government agencies that perform functions similar to those performed by the USDA and FDA.

The EPA, environmental authorities in the U.K., continental Europe and Mexico, and/or other U.S. or Mexican state and local authorities may, from time to time, adopt revisions to environmental rules and regulations, and/or changes in the terms and conditions of our environmental permits, with which we must comply. Compliance with existing or new environmental requirements, including more stringent limitations imposed or expected in recently-renewed or soon-to be renewed environmental permits, may require capital expenditures and operating expenses which may be significant.

In the U.K., all Moy Park poultry farms which exceed a threshold size of 40,000 birds placed are required to carry out activities in compliance with their environmental permits and they must use Best Available Techniques in order to achieve a high level of environmental protection. Tulip's sites are independently audited and certified by the British Retail Consortium standard. Many of Tulip's sites are certified by additional and traceability schemes including Royal Society for the Prevention of Cruelty to Animals Assured, Soil Association, Organic Farmers and Growers and Assured Food Standards.

4

Table of Contents

**Employees**

As of December 29, 2019, we employed approximately 31,900 persons in the U.S., approximately 11,000 persons in Mexico and approximately 15,600 persons in the U.K. and continental Europe.

**Available Information**

The Company's Internet website is www.pilgrims.com. The Company makes available, free of charge, through its Internet website, the Company's annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, directors and officers Forms 3, 4 and 5, and amendments to those reports, as soon as reasonably practicable after electronically filing such materials with, or furnishing them to, the SEC. The Company may use its website as a distribution channel of material company information. Financial and other important information regarding the Company is routinely posted on and accessible through the Company's website at http://ir.pilgrims.com. Information contained on the Company's website is not included as part of, or incorporated by reference into, this annual report.

**Information about our Executive Officers**

| Name | Age | Background and Experience | Dates |
|---|---|---|---|
| Jayson J. Penn | 51 | President and Chief Executive Officer | March 2019 to Present |
| | | Executive Vice President | January 2012 to March 2019 |
| | | Senior Vice President of Commercial Business | March 2011 to January 2012 |
| Fabio Sandri | 48 | Chief Financial Officer | June 2011 to Present |

Jayson J. Penn has served as our President and Chief Executive Officer since March 2019. Mr. Penn joined Pilgrim's in March of 2011 as Senior Vice President of the Commercial Business Group, bringing to the Company more than 23 years of experience in the poultry industry, and later served as Executive Vice President and most recently, as President of Pilgrim's USA. Mr. Penn began his career in his family's poultry operations and has held management positions at several leading poultry companies. He has also served on the board of directors and the executive committee of the USA Poultry and Egg Export Council and currently serves on the board and executive committee of the National Chicken Council and the board of directors of The World Poultry Foundation. He is a graduate of Florida State University and the Advanced Management Program at the Harvard Business School.

Fabio Sandri has served as our Chief Financial Officer since June 2011. From April 2010 to June 2011, Mr. Sandri served as the Chief Financial Officer of Estacio Participações, the private post-secondary educational institution in Brazil. From November 2008 until April 2010, he was the Chief Financial Officer of Imbra SA, a provider of dental services based in Sao Paolo, Brazil. Commencing in 2005 through October 2008, he was employed by Braskem S.A., a New York Stock Exchange-listed petrochemical company headquartered in Camaçari, Brazil, first from 2005 to 2007 as its strategy director, then from 2007 until his departure as its corporate controller. He earned his Masters in Business Administration in 2001 from the Wharton School at the University of Pennsylvania and a degree in electrical engineering in 1993 from Escola Politécnica da Universidade de São Paulo.

**Item 1A. Risk Factors**

The following risk factors should be read carefully in connection with evaluating our business and the forward-looking information contained in this annual report on Form 10-K. Any of the following risks could materially adversely affect our business, operations, industry or financial position or our future financial performance. While we believe we have identified and discussed below all risk factors affecting our business that we believe are material, there may be additional risks and uncertainties that are not presently known or that are not currently believed to be significant that may adversely affect our business, operations, industry, financial position and financial performance in the future.

**Industry cyclicality can affect our earnings, especially due to fluctuations in commodity prices of feed ingredients, chicken and pork.**

Profitability in the chicken and pork industries is materially affected by the commodity prices of feed ingredients and the market prices of chicken and pork, which are determined by supply and demand factors. As a result, the chicken and pork industries are subject to cyclical earnings fluctuations.

The price of feed ingredients is positively or negatively affected primarily by the global level of supply inventories and demand for feed ingredients, the agricultural policies of the U.S. and foreign governments and weather patterns throughout the world. In particular, weather patterns often change agricultural conditions in an unpredictable manner. A significant change in weather patterns could affect supplies of feed ingredients, as well as both the industry's and our ability to obtain feed ingredients, grow chickens and pigs or deliver products. We have recently benefited from low market prices for feed ingredients, but market

Table of Contents

prices for feed ingredients remain volatile. Consequently, there can be no assurance that the price of grains will not rise as a result of, among other things, increasing demand for these products around the world and alternative uses of these products, such as ethanol and biodiesel production.

Volatility in feed ingredient prices has had, and may continue to have, a materially adverse effect on our operating results, which has resulted in, and may continue to result in, additional noncash expenses due to impairment of the carrying amounts of certain of our assets. We periodically seek, to the extent available, to enter into advance purchase commitments or financial derivative contracts for the purchase of feed ingredients in an effort to manage our feed ingredient costs. The use of these instruments may not be successful. In addition, we have not designated the derivative financial instruments that we have purchased to mitigate commodity purchase exposures as cash flow hedges. Therefore, we recognize changes in the fair value of these derivative financial instruments immediately in earnings. Unexpected changes in the fair value of these instruments could adversely affect the results of our operations. Although we attempt to mitigate the impact of feed price volatility on our profitability by decreasing the amount of our products that are sold under longer term fixed-price contracts, these changes will not eliminate the impact of changes in feed ingredient prices on our profitability and would prevent us from profiting on such contracts during times of declining market prices for chicken and/or pork.

**Outbreaks of livestock diseases in general and poultry and pig diseases in particular, including avian influenza and African swine fever, can significantly and adversely affect our ability to conduct our operations and the demand for our products.**

We take precautions designed to ensure that our flocks and herds are healthy and that our processing plants and other facilities operate in a sanitary and environmentally-sound manner. However, events beyond our control, such as the outbreaks of disease, either in our own flocks and herds or elsewhere, could significantly affect the demand for our products or our ability to conduct our operations. Furthermore, an outbreak of disease could result in governmental restrictions on the import and export of our fresh chicken, fresh pork or other products to or from our suppliers, facilities or customers, or require us to destroy one or more of our flocks or herds. This could also result in the cancellation of orders by our customers and create adverse publicity that may have a material adverse effect on our ability to market our products successfully and on our business, reputation and prospects.

There have been recent outbreaks of both high- and low-pathogenic strains of avian influenza in the U.S., and in Mexico outbreaks of both high and low-pathogenic strains of avian influenza are a fairly common occurrence. Historically, the outbreaks of low pathogenic strains of avian influenza have not generated the same level of concern, or received the same level of publicity or been accompanied by the same reduction in demand for poultry products in certain countries as that associated with highly pathogenic strains such as HPAI H5 and H7N3 or highly infectious strains such as H7N9. Even if no further highly pathogenic or highly contagious strains of avian influenza are confirmed in the U.S., the U.K. or Mexico, there can be no assurance that outbreaks of these strains in other countries will not materially adversely affect international demand for poultry produced in our operating countries, and, if any of these strains were to spread to the U.S., the U.K. or Mexico, there can be no assurance that it would not significantly affect our ability to conduct our operations and/or demand for our products, in each case in a manner having a material adverse effect on our business, reputation and/or prospects.

The outbreak of African swine fever in China and its spread across the world has had a significant effect on both the global supply of pork and on pork prices. Given its island status, the U.K. has an element of built-in biosecurity, but there are risks, mainly as a result of human movement of infected meat from the European Union. The National Pig Association and the British Meat Processors Association are pressing the U.K. government to increase the level of communication to travelers of the risks. The Company's own pig production is geographically dispersed. In the event of an outbreak of African Swine Fever in the U.K., we believe the Company's risks are limited to infection. However, there can be no assurance that it would not significantly affect our ability to conduct our operations and/or demand for our products, in each case in a manner having a material adverse effect on our business, reputation and/or prospects.

**If our products become contaminated, we may be subject to product liability claims and product recalls. Such product liability claims or product recalls can adversely affect our business reputation, expose us to increased scrutiny by federal and state regulators and may not be fully covered by insurance.**

Poultry and pork products may be subject to contamination by disease-producing organisms, or pathogens, such as *Listeria monocytogenes*, *Salmonella*, generic *E.coli, Yersinia enterocolitica* and *Staphylococcus aureus*. These pathogens are generally found in the environment, and, as a result, there is a risk that, as a result of food processing, they could be present in our processed poultry products. These pathogens can also be introduced as a result of improper handling at the further processing, foodservice or consumer level. These risks may be controlled, although not eliminated, by adherence to good manufacturing practices and finished product testing. We have little, if any, control over proper handling once the product has been shipped. Illness and death may result if the pathogens are not eliminated at the further processing, foodservice or consumer level. Even an inadvertent shipment of contaminated products is a violation of law and may lead to increased risk of exposure to product liability claims, product recalls and increased scrutiny by federal and state regulatory agencies and may have a material adverse effect on our business, reputation

6

Table of Contents

and prospects. The packaging, marketing and distribution of food products entail an inherent risk of product liability and product recall and the resultant adverse publicity. We may be subject to significant liability if the consumption of any of our products causes injury, illness or death.

We could be required to recall certain products in the event of contamination or damage to the products. In addition to the risks of product liability or product recall due to deficiencies caused by our production or processing operations, we may encounter the same risks if any third party tampers with our products. We cannot assure you that we will not be required to perform product recalls, or that product liability claims will not be asserted against us, in the future. Any claims that may be made may create adverse publicity that would have a material adverse effect on our ability to market our products successfully or on our business, reputation, prospects, financial condition and results of operations. If our products become contaminated, spoiled, are tampered with or are mislabeled, we may be subject to product liability claims and product recalls. A widespread product recall could result in significant losses due to the cost of a recall, the destruction of product inventory and lost sales due to the unavailability of product for a period of time. Such a product recall also could result in adverse publicity, damage to our reputation and a loss of consumer confidence in our products, which could have a material adverse effect on our business results.

We currently maintain insurance with respect to certain of these risks, including product liability insurance, business interruption insurance and general liability insurance, but in many cases such insurance is expensive, difficult to obtain and no assurance can be given that such insurance can be maintained in the future on acceptable terms, or in sufficient amounts to protect us against losses due to any such events, or at all. Moreover, even though our insurance coverage may be designed to protect us from losses attributable to certain events, it may not adequately protect us from liability and expenses we incur in connection with such events.

**Our foreign operations and commerce in international markets pose special risks to our business and operations.**

We have significant operations and assets located in Mexico, the U.K. and continental Europe and may participate in or acquire operations and assets in other foreign countries in the future. Foreign operations are subject to a number of special risks such as currency exchange rate fluctuations, trade barriers, exchange controls, expropriation and changes in laws and policies, including tax laws and laws governing foreign-owned operations. Currency exchange rate fluctuations have adversely affected us in the past. Exchange rate fluctuations or one or more other risks may have a material adverse effect on our business or operations in the future. Our operations in Mexico, the U.K. and continental Europe are conducted through subsidiaries organized under non-U.S. laws. Claims of creditors of our subsidiaries, including trade creditors, will generally have priority as to the assets of our subsidiaries over our claims. Additionally, the ability of these subsidiaries to make payments and distributions to us can be limited by terms of subsidiary financing arrangements and will be subject to, among other things, the laws applicable to these subsidiaries. In the past, these laws have not had a material adverse effect on the ability of these subsidiaries to make these payments and distributions. However, laws such as these may have a material adverse effect on the ability of these subsidiaries to make these payments and distributions in the future.

To conduct our operations, we regularly move data across national borders (including data related to business, financial, marketing and regulatory matters) and must comply with increasingly complex and rigorous regulatory standards enacted to protect business and personal data in the U.S. and elsewhere. For example, in 2018, the European Union (the "EU") recently commenced enforcement of the General Data Protection Regulation (the "GDPR"). The GDPR imposes significant additional compliance obligations on companies regarding the handling of personal data and provides certain individual privacy rights to persons whose data is stored. The GDPR grants enforcement powers to certain EU regulators including extra-territorial powers in some cases. These enforcement powers enable regulators to conduct investigations and dawn raids, to issue penalties up to the greater of €20 million or 4% of worldwide turnover for the most serious violations, and to require changes to the way that organizations (including the Company) use personal data. Due to the geographic scope of our operations, the GDPR may increase our responsibility and liability in relation to personal data that we process, and we may be required to put in place additional mechanisms to minimize the risk of non-compliance with applicable privacy laws and regulations. Compliance with existing, proposed and recently enacted laws and regulations can be costly; any failure to comply with these regulatory standards could subject us to legal and reputational risks including proceedings against the Company by governmental entities or others, fines and penalties, damage to our reputation and credibility and could have a negative impact on our business and results of operations.

Historically, we have targeted international markets to generate additional demand for our products. In particular, given the general preference for white chicken meat by U.S. and U.K. consumers, we have targeted international markets for the sale of dark chicken meat and parts, such as chicken paws, which are generally not consumed in the U.S. or U.K. We have also targeted international markets for excess primary pork cuts and parts, such as hog heads and trotters, which are generally not consumed in the U.K. As part of this initiative, we have created a significant international distribution network into several markets in Mexico, the Middle East and Asia. Our success in these markets may be, and our success in recent periods has been, adversely affected by disruptions in export markets. A significant risk is disruption due to import restrictions and tariffs, other trade protection measures, and import or export licensing requirements regarding food products imposed by foreign countries. Significant political or regulatory

7

Table of Contents

developments in the jurisdictions in which we sell our products, such as those stemming from the presidential administration in the United States, are difficult to predict and may have a material adverse effect on us. For example, in the United States, the presidential administration has imposed tariffs on imports from China, Mexico, Canada and other countries, and has expressed support for greater restrictions on free trade and increase tariffs on goods imported into the United States. In addition, disruptions may be caused by outbreaks of diseases, either in our flocks and herds or elsewhere in the world, and resulting changes in consumer preferences. One or more of these or other disruptions in the international markets and distribution channels could adversely affect our business.

**Competition in the chicken and pork industries with other vertically integrated chicken or pork companies may make us unable to compete successfully in this industry, which could adversely affect our business.**

Both the chicken and pork industries are highly competitive. In the U.S., Mexico, the U.K. and continental Europe, we primarily compete with other vertically integrated chicken and pork companies. In general, the competitive factors in these industries include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the foodservice market, competition is based on consistent quality, product development, service and price. In the U.S. retail market, competition is based on product quality, brand awareness, customer service and price. Further, there is some competition with non-vertically integrated further processors in the prepared chicken business. In the Mexico retail and foodservice markets, where product differentiation has traditionally been limited, product quality and price have been the most critical competitive factors. In the U.K. and continental Europe retail and food service markets, key competitive factors include price, delivering consistent levels of the highest quality, service level and delivering strong innovation. The fresh U.K. and continental Europe market is almost exclusively retailer private label. The U.K. fresh market is almost exclusively sourced from within the U.K., making vertical integration a prerequisite for operating in that market. The U.K. prepared foods market is less exclusively sourced from within the U.K. so vertical integration is less of a consideration and competition is opened up to other processors, some of whom produce or source from abroad. Our success depends in part on our ability to manage costs and be efficient in the highly competitive poultry and pork industries.

**Media campaigns related to food production and regulatory and customer focus on environmental, social and governance responsibility could expose us to additional costs or risks.**

Individuals or organizations can use social media platforms to publicize inappropriate or inaccurate stories or perceptions about the food production industry or our company. Such practices could cause damage to the reputations of our company and/or the food production industry in general. This damage could adversely affect our financial results. In addition, regulators, stockholders, customers and other interested parties have focused increasingly on the environmental, social and governance practices of companies. This has led to an increase in regulations and may continue to cause us to be subject to additional regulations in the future. Our customers or other interested parties may also require us to implement certain environmental, social or governance procedures or standards before doing or continuing to do business with us. This increased attention on environmental, social and governance practices could cause us to incur additional compliance costs, divert management attention from operating our business, impair our access to capital among certain investors and subject us to litigation risk for disclosures we make and practices we adopt regarding these issues. This in turn could have a material adverse effect on our business, financial condition and results of operations.

**We are increasingly dependent on information technology, and our business and reputation could suffer if we are unable to protect our information technology systems against, or effectively respond to, cyber-attacks, other cyber incidents or security breaches or if our information technology systems are otherwise disrupted.**

The proper functioning of our information systems is critical to the successful operation of our business. We rely on information technology networks and systems, including the Internet, to process, transmit, and store electronic and financial information, to manage a variety of business processes and activities, and to comply with regulatory, legal, and tax requirements. We also depend on our information technology infrastructure for digital marketing activities and for electronic communications among our locations, personnel, customers, and suppliers. Although our information systems are protected with robust backup systems, including physical and software safeguards and remote processing capabilities, information systems are still vulnerable to cyber-attacks, natural disasters, power losses, unauthorized access, telecommunication failures, and other problems. In addition, certain software used by us is licensed from, and certain services related to our information systems are provided by, third parties who could choose to discontinue their relationship with us. If critical information systems fail or these systems or related software or services are otherwise unavailable, our ability to process orders, maintain proper levels of inventories, collect accounts receivable, pay expenses, and maintain the security of Company and customer data could be adversely affected. Cyber-attacks and other cyber incidents are occurring more frequently and are constantly evolving in nature and sophistication. We have experienced and expect to continue to experience actual or attempted cyber-attacks of our information technology systems or networks. However, none of these actual or attempted cyber-attacks has had a material effect on our operations or financial condition. Our failure to maintain our cyber-security measures and keep abreast of new and evolving threats may make our systems vulnerable. The potential

8

Table of Contents

consequences of a material cyber-security incident include reputational damage, litigation with third parties, regulatory actions, disruption of plant operations, and increased cyber-security protection and remediation costs. There can be no assurance that we will be able to prevent all of the rapidly evolving forms of increasingly sophisticated and frequent cyber-attacks. Moreover, our efforts to address network security vulnerabilities may not be successful, resulting potentially in the theft, loss, destruction or corruption of information we store electronically, as well as unexpected interruptions, delays or cessation of service, any of which would cause harm to our business operations. The vulnerability of our systems and our failure to identify or respond timely to cyber incidents could have an adverse effect on our operations and reputation and expose us to liability or regulatory enforcement actions.

**Our operations are subject to general risks of litigation.**

We are involved on an ongoing basis in litigation relating to alleged antitrust violations or arising in the ordinary course of business or otherwise. For example, between September 2, 2016 and October 13, 2016, a series of purported class action lawsuits were brought against Pilgrim's and 13 other producers by and on behalf of direct and indirect purchasers of broiler chickens. The complaints, which were filed with the U.S. District Court for the Northern District of Illinois, seek, among other relief, treble damages for an alleged conspiracy among defendants to reduce output and increase prices of broiler chickens from the period of January 2008 to the present. For additional information, see "Item 3. Legal Proceedings." Trends in litigation may include class actions involving consumers, shareholders, employees or injured persons, and claims relating to commercial, labor, employment, antitrust, securities or environmental matters. Litigation trends and the outcome of litigation cannot be predicted with certainty, and adverse litigation trends and outcomes could result in material damages, which could adversely affect our financial condition and results of operations.

**Regulation, present and future, is a constant factor affecting our business.**

Our operations will continue to be subject to or otherwise affected by federal, state and local governmental legislation and regulation, including in the health, safety and environmental areas. Changes in laws or regulations or the application thereof regarding areas such as wage and hour and environmental compliance may lead to government enforcement actions and resulting litigation by private litigants. In addition, unknown matters, new laws and regulations, or stricter interpretations of existing laws or regulations may also materially affect our business or operations in the future.

*Immigration*

Immigration reform continues to attract significant attention in the public arena and the U.S. Congress. Despite our past and continuing efforts to hire only U.S. citizens and/or persons legally authorized to work in the U.S., we may be unable to ensure that all of our employees are U.S. citizens and/or persons legally authorized to work in the U.S. No assurances can be given that enforcement efforts by governmental authorities will not disrupt a portion of our workforce or operations at one or more facilities, thereby negatively impacting our business. Also, no assurance can be given that further enforcement efforts by governmental authorities will not result in the assessment of fines that could adversely affect our financial position, operating results or cash flows.

*Environmental, Health and Safety*

Our operations are subject to extensive and increasingly stringent federal, state, local and foreign laws and regulations pertaining to the protection of the environment, including those relating to the discharge of materials into the environment, the handling, treatment and disposal of wastes and remediation of soil and groundwater contamination. Failure to comply with these requirements could have serious consequences for us, including criminal as well as civil and administrative penalties, claims for property damage, personal injury and damage to natural resources and negative publicity. Compliance with existing or changing environmental requirements, including more stringent limitations imposed or expected to be imposed in recently-renewed or soon-to be renewed environmental permits, will require capital expenditures for installation of new or upgraded pollution control equipment at some of our facilities.

Operations at many of our facilities require the treatment and disposal of wastewater, stormwater and agricultural and food processing wastes, the use and maintenance of refrigeration systems, including ammonia-based chillers, noise, odor and dust management, the operation of mechanized processing equipment, and other operations that potentially could affect the environment, health and safety. Some of our facilities have been operating for many years, and were built before current environmental standards were imposed, and/or in areas that recently have become subject to residential and commercial development pressures. Failure to comply with current and future environmental, health and safety standards could result in the imposition of fines and penalties, and we have been subject to such sanctions from time to time. We are upgrading wastewater treatment facilities at a number of these locations, either pursuant to consent agreements with regulatory authorities or on a voluntary basis in anticipation of future permit requirements.

9

Table of Contents

In the past, we have acquired businesses with operations such as pesticide and fertilizer production that involved greater use of hazardous materials and generation of more hazardous wastes than our current operations. While many of those operations have been sold or closed, some environmental laws impose strict and, in certain circumstances, joint and several liability for costs of investigation and remediation of contaminated sites on current and former owners and operators of the sites, and on persons who arranged for disposal of wastes at such sites. In addition, current owners or operators of such contaminated sites may seek to recover cleanup costs from us based on past operations or contractual indemnifications.

Additionally, we have from time to time had incidents at our plants involving worker health and safety. These have included ammonia releases due to mechanical failures in chiller systems and worker injuries and fatalities involving processing equipment and vehicle accidents. We have taken preventive measures in response; however, we can make no assurance that similar incidents will not arise in the future. New environmental, health and safety requirements, stricter interpretations of existing requirements, or obligations related to the investigation or clean-up of contaminated sites, may materially affect our business or operations in the future.

*Anti-Corruption*

We are subject to a number of anti-corruption laws, including the U.S. Foreign Corrupt Practices Act ("FCPA") and the UK Bribery Act. The FCPA and similar anti-bribery laws generally prohibit companies and their intermediaries from making improper payments or improperly providing anything of value to foreign officials, directly or indirectly, for the purpose of obtaining or keeping business and/or other benefits. Some of these laws have legal effect outside the jurisdictions in which they are adopted under certain circumstances. The FCPA also requires maintenance of adequate record-keeping and internal accounting practices to accurately reflect transactions. Under the FCPA, companies operating in the United States may be held liable for actions taken by their strategic or local partners or representatives. The UK Bribery Act is broader in scope than the FCPA in that it directly prohibits commercial bribery (i.e. bribing others than government officials) in addition to bribery of government officials and it does not recognize certain exceptions, notably for facilitation payments, that are permitted by the FCPA. The UK Bribery Act also has wide jurisdiction. It covers any offense committed in the United Kingdom, but proceedings can also be brought if a person who has a close connection with the United Kingdom commits the relevant acts or omissions outside the United Kingdom. The UK Bribery Act defines a person with a close connection to include British citizens, individuals ordinarily resident in the United Kingdom and bodies incorporated in the United Kingdom. The UK Bribery Act also provides that any organization that conducts part of its business in the United Kingdom, even if it is not incorporated in the United Kingdom, can be prosecuted for the corporate offense of failing to prevent bribery by an associated person, even if the bribery took place entirely outside the United Kingdom and the associated person had no connection with the United Kingdom. Other jurisdictions in which we operate have adopted similar anti-corruption, anti-bribery and anti-kickback laws to which we are subject. Civil and criminal penalties may be imposed for violations of these laws.

Although the code of ethics and standards of conduct adopted by JBS S.A. in late 2015 requires our employees to comply with the FCPA, the UK Bribery Act and other applicable anti-corruption laws, we are still implementing measures to enhance our compliance programs, including to prevent and detect bribery and corruption. We operate in some countries, such as Mexico, which are viewed as high risk for corruption. Despite our ongoing efforts to ensure compliance with the FCPA, the UK Bribery Act and similar laws, there can be no assurance that our directors, officers, employees, agents, third-party intermediaries and the companies to which we outsource certain of our business operations, have previously complied or will comply with those laws and our anti-corruption policies or that our compliance program will be sufficient to prevent or detect bribery, and we may be ultimately held responsible for any such non-compliance. If we or our directors or officers violate anti-corruption laws or other laws governing the conduct of business with government entities (including local laws), we or our directors or officers may be subject to criminal and civil penalties or other remedial measures, which could harm our reputation and have a material adverse impact on our business, financial condition, results of operations and prospects. Any actual or alleged violations of such laws could also harm our reputation or have an adverse impact on our business, financial condition, results of operations and prospects.

**We may not be able to successfully integrate the operations of companies we acquire or benefit from growth opportunities.**

We continue to pursue selective acquisitions of complementary businesses, such as Tulip, which we acquired in 2019. Inherent in any future acquisitions are certain risks such as increasing leverage and debt service requirements and combining company cultures and facilities, which could have a material adverse effect on our operating results, particularly during the period immediately following such acquisitions. Additional debt or equity capital may be required to complete future acquisitions, and there can be no assurance that we will be able to raise the required capital. These opportunities may expose us to successor liability relating to actions involving any acquired entities, their respective management or contingent liabilities incurred prior to our involvement and will expose us to liabilities associated with ongoing operations, in particular to the extent we are unable to adequately and safely manage such acquired operations. A material liability associated with these types of opportunities, or our failure to successfully integrate any acquired entities into our business, could adversely affect our reputation and have a material adverse effect on us.

Table of Contents

We may not be able to successfully integrate any growth opportunities we may undertake in the future or successfully implement appropriate operational, financial and administrative systems and controls to achieve the benefits that we expect to result therefrom. These risks include: (1) failure of the acquired entities to achieve expected results; (2) possible inability to retain or hire key personnel of the acquired entities; and (3) possible inability to achieve expected synergies and/or economies of scale. In addition, the process of integrating businesses could cause interruption of, or loss of momentum in, the activities of our existing business. The diversion of our management's attention, the lack of experience in operating in the geographical market of the acquired business and any delays or difficulties encountered in connection with the integration of these businesses could adversely affect our business, results of operations and prospects.

**The consolidation of customers and/or the loss of one or more of our largest customers could adversely affect our business.**

Our customers, such as supermarkets, warehouse clubs and food distributors, have consolidated in recent years, and consolidation is expected to continue throughout the U.S. and in other major markets. These consolidations have produced large, sophisticated customers with increased buying power who are more capable of operating with reduced inventories, opposing price increases, and demanding lower pricing, increased promotional programs and specifically tailored products. These customers also may use shelf space currently used for our products for their own private label products. Because of these trends, our volume growth could slow or we may need to lower prices or increase promotional spending for our products, any of which could adversely affect our financial results.

Our two largest customers accounted for approximately 12.9% of our net sales in 2019. Our business could suffer significant setbacks in revenues and operating income if we lost one or more of our largest customers, or if our customers' plans and/or markets should change significantly.

**Our performance depends on favorable labor relations with our employees and our compliance with labor laws. Any deterioration of those relations or increase in labor costs due to our compliance with labor laws could adversely affect our business.**

As of December 29, 2019, we employed approximately 31,900 persons in the U.S., approximately 11,000 persons in Mexico and approximately 15,600 persons in the U.K. and Europe. Approximately 35.8% of the Company's employees were covered under collective bargaining agreements. Substantially all employees covered under collective bargaining agreements are covered under agreements that expire in 2020 or later. We have not experienced any labor-related work stoppage at any location in over ten years. We believe our relationship with our employees and union leadership is satisfactory. At any given time, we will likely be in some stage of contract negotiations with various collective bargaining units. In the absence of agreements, we may become subject to labor disruption at one or more of these locations, which could have an adverse effect on our financial results.

**Loss of essential employees or material increase in employee turnover could have a significant negative impact on our business.**

Our success is largely dependent on the skills, experience, and efforts of our management and other employees. The loss of the services of one or more members of our senior management or of numerous employees with essential skills could have a negative effect on our business, financial condition and results of operations. If we are not able to retain or attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect our ability to achieve our business objectives.

We also rely on an adequate supply of skilled employees at our processing and food facilities. Trained and experienced personnel in our industry are in high demand, and we have experienced high turnover and difficulty retaining employees with appropriate training and skills. We cannot predict whether we will be able to attract, motivate and maintain an adequate skilled workforce necessary to operate our existing and future facilities efficiently, or that labor expenses will not increase as a result of a shortage in the supply of skilled personnel, thereby adversely impacting our financial performance. While our industry generally operates with high employee turnover, any material increases in employee turnover rates or any widespread employee dissatisfaction could also have a material adverse effect on our business, financial condition and results of operations.

**We depend on contract growers and independent producers to supply us with livestock.**

We contract primarily with independent contract growers to raise the live chickens and pigs processed in our operations. If we do not attract and maintain contracts with growers or maintain marketing and purchasing relationships with independent producers, our production operations could be negatively affected.

**Changes in consumer preference could negatively impact our business.**

The food industry in general is subject to changing consumer trends, demands and preferences. Trends within the food industry change often, and failure to identify and react to changes in these trends could lead to, among other things, reduced demand

11

Table of Contents

and price reductions for our products, and could have an adverse effect on our financial results. For example, consumer concerns related to human health, climate change, resource conservation and animal welfare of animal-based protein sources have driven consumer interest in plant-based protein sources. Because we primarily produce chicken and pork products, we may be limited in our ability to respond to changes in consumer preferences towards other animal-based proteins or away from animal-based proteins entirely.

**Our future financial and operating flexibility may be adversely affected by significant leverage.**

On a consolidated basis, as of December 29, 2019, we had approximately $478.1 million in secured indebtedness, $1.8 billion of unsecured indebtedness and had the ability to borrow approximately $929.9 million under our credit agreements. Significant amounts of cash flow will be necessary to make payments of interest and repay the principal amount of such indebtedness. The degree to which we are leveraged could have important consequences because (1) it could affect our ability to satisfy our obligations under our credit agreements, (2) a substantial portion of our cash flow from operations is required to be dedicated to interest and principal payments and may not be available for operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes, (3) our ability to obtain additional financing and to fund working capital, capital expenditures and other general corporate requirements in the future may be impaired; (4) we may be more highly leveraged than some of our competitors, which may place us at a competitive disadvantage, (5) our flexibility in planning for, or reacting to, changes in our business may be limited, (6) it may limit our ability to pursue acquisitions and sell assets and (7) it may make us more vulnerable in the event of a continued or new downturn in our business or the economy in general.

Our ability to make payments on and to refinance our debt, including our credit facilities, will depend on our ability to generate cash in the future. This, to a certain extent, is subject to various business factors (including, among others, the commodity prices of feed ingredients, chicken and pork) and general economic, financial, competitive, legislative, regulatory, and other factors that are beyond our control.

There can be no assurance that we will be able to generate sufficient cash flow from operations or that future borrowings will be available under our credit facilities in an amount sufficient to enable us to pay our debt obligations, including obligations under our credit facilities, or to fund our other liquidity needs. We may need to refinance all or a portion of their debt on or before maturity. There can be no assurance that we will be able to refinance any of their debt on commercially reasonable terms or at all.

**The interest rates of our credit facilities are priced using a spread over LIBOR.**

The London Interbank Offered Rate ("LIBOR"), is the basic rate of interest used in lending between banks on the London interbank market and is widely used as a reference for setting the interest rate on loans globally. We typically use LIBOR as a reference rate in our term loans such that the interest due to our creditors pursuant to a term loan extended to us is calculated using LIBOR. Some of our term loan agreements and revolving credit facilities contain a stated minimum value for LIBOR, and as of December 31, 2019, the Company had $450.0 million in outstanding indebtedness tied to LIBOR.

In 2017, the U.K.'s Financial Conduct Authority, which regulates LIBOR, announced that it intends to phase out LIBOR by the end of 2021. It is unclear if at that time whether or not LIBOR will cease to exist, or if new methods of calculating LIBOR will be established such that it continues to exist after 2021 or if replacement conventions will be developed. The U.S. Federal Reserve, in conjunction with the Alternative Reference Rates Committee, a steering committee comprised of large U.S. financial institutions, is considering replacing U.S. dollar LIBOR with a new index calculated by short-term repurchase agreements, backed by Treasury securities ("SOFR"). SOFR is observed and backward-looking, which stands in contrast with LIBOR under the current methodology, which is an estimated forward-looking rate and relies, to some degree, on the expert judgment of submitting panel members. Given that SOFR is a secured rate backed by government securities, it will be a rate that does not take into account bank credit risk (as is the case with LIBOR). Whether or not SOFR attains market traction as a LIBOR replacement tool remains in question. As such, the future of LIBOR at this time is uncertain. At this time, due to a lack of consensus existing as to what rate or rates may become accepted alternatives to LIBOR, it is impossible to predict the effect of any such alternatives on our liquidity. However, if LIBOR ceases to exist, we may need to renegotiate our credit agreements that utilize LIBOR as a factor in determining the interest rate to replace LIBOR with the new standard that is established. Additionally, these changes may have an adverse impact on the value of or interest earned on any LIBOR-based marketable securities, loans and derivatives that are included in our financial assets and liabilities.

**Impairment in the carrying value of goodwill could negatively affect our operating results.**

We have a significant amount of goodwill on our Consolidated Balance Sheets. Under the accounting principles generally accepted in the U.S. ("U.S. GAAP"), goodwill must be evaluated for impairment annually or more frequently if events indicate it is warranted. If the carrying value of our reporting units exceeds their current fair value as determined based on the discounted future cash flows of the related business, the goodwill is considered impaired and is reduced to fair value by a non-cash charge to earnings. Events and conditions that could result in impairment in the value of our goodwill include changes in the industry in

Table of Contents

which we operate, particularly the impact of a downturn in the global economy or the economies of geographic regions or countries in which we operate, as well as competition, adverse changes in the regulatory environment, or other factors leading to reduction in expected long-term sales or profitability.

**Extreme weather, natural disasters or other events beyond our control could negatively impact our business.**

Bioterrorism, fire, pandemic, extreme weather or natural disasters, including droughts, floods, excessive cold or heat, hurricanes or other storms, could impair the health or growth of our flocks, production or availability of feed ingredients, or interfere with our operations due to power outages, fuel shortages, damage to our production and processing facilities or disruption of transportation channels, among other things. Any of these factors could have an adverse effect on our financial results. Moreover, climate change, including the impact of global warming, has resulted in risks that include changes in weather conditions, extreme weather events and adverse impacts on agricultural production, as well as potential regulatory compliance risks, all of which could have a material adverse effect on our results of operations, financial condition and liquidity.

**Our operations may be adversely impacted by the U.K.'s recent exit from the European Union.**

The U.K.'s June 2016 referendum, in which voters approved an exit from the European Union (commonly referred to as "Brexit"), and subsequent negotiations related to Brexit have caused and may continue to cause volatility in the global stock markets, currency exchange rate fluctuations and global economic uncertainty, which could adversely affect our ability to transact business in the U.K. and in countries in the EU. On January 31, 2020 , the U.K. formally ceased to be part of the EU. Although the U.K. has passed legislation regarding the immediate impact of the U.K.'s withdrawal from the EU, it is still unclear what terms, if any, may be agreed within the U.K. and between the U.K. and other countries on many aspects of fiscal policy, cross-border trade and international relations, both in the final outcome and for any transitional period. Because this is an unprecedented event, it is also unclear what long-term economic, financial, trade and legal implications the withdrawal of the U.K. from the EU would have and how such withdrawal would affect our customers and our operations in the U.K. and Europe. If the U.K. were to significantly alter its regulations affecting the food industry, we could face significant new costs. It may also be time-consuming and expensive for us to alter our internal operations in order to comply with new regulations. Additionally, results of operations for our U.K. and Europe reportable segment may be adversely affected if the U.K. is unable to secure replacement trade agreements and arrangements on terms as favorable as those currently enjoyed by the U.K. Any of the effects of Brexit could adversely affect our business, business opportunities, results of operations, financial condition and cash flows. In addition, the U.K.'s withdrawal from the European Union will result in changes to the interactions that the Company has with regulators, as the U.K.'s domestic regulators will no longer participate in the EU's regulatory enforcement structure. This may affect relationships that the Company has developed with its regulators to date.

**JBS USA beneficially owns a majority of our common stock and has the ability to control the vote on most matters brought before the holders of our common stock.**

JBS USA beneficially owns a majority of the shares and voting power of our common stock and is entitled to appoint a majority of the members of our Board of Directors. As a result, subject to restrictions on its voting power and actions in a stockholders agreement between JBS USA and us and our organization documents, JBS USA has and will have the ability to control our management, policies and financing decisions, elect a majority of the members of our Board of Directors at the annual meeting and control the vote on most matters coming before the holders of our common stock. Under the stockholders agreement between JBS USA and us, JBS USA has the ability to elect up to six members of our Board of Directors and the other holders of our common stock have the ability to elect up to three members of our Board of Directors. If the percentage of our outstanding common stock owned by JBS USA exceeds 80%, then JBS USA will have the ability to elect one additional member of our Board of Directors while the other holders of our common stock will have the ability to elect one less member of our Board of Directors.

JBS USA may have interests that are different from other shareholders and may vote in a way that may be adverse to our other shareholders' interests. JBS USA's concentration of ownership could also have the effect of delaying or preventing a change in control or otherwise discouraging a potential acquirer from attempting to obtain control of us, which could cause the market price of our common stock to decline or prevent our shareholders from realizing a premium over the market price for their common stock.

**J&F has entered into a Leniency Agreement with Brazilian authorities whereby it assumed the obligation to establish independent investigations in Brazil in connection with admissions of illicit conduct to Brazilian governmental authorities, and the outcome of these investigations, as well as related investigations by Brazilian and U.S. governmental authorities, could have a material adverse effect on us.**

On May 3, 2017, certain officers of J&F Investimentos S.A. ("J&F," and together with the companies controlled by J&F, the "J&F Group"), a company organized in Brazil and an indirect controlling stockholder of the Company, including a former senior executive and former board members of the Company, entered into cooperation agreements (*acordos de colaboração*)

13

Table of Contents

(collectively, the "Cooperation Agreements") with the Office of the Prosecutor General (*Procuradoria-Geral da República*), or PGR, in connection with certain illicit conduct by J&F and such individuals acting in their capacity as J&F executives. The details of such illicit conduct are set forth in separate annexes to the Cooperation Agreements, and include admissions of improper payments to politicians and political parties in Brazil during a ten-year period in exchange for receiving, or attempting to receive, favorable treatment for certain J&F Group companies in Brazil.

On June 5, 2017, J&F, for itself and as the controlling shareholder of the J&F Group companies, entered into a leniency agreement (the "Leniency Agreement") with the Federal Prosecution Service (Ministério Público Federal), or MPF, whereby J&F assumed responsibility for the conduct that was described in the annexes to the Cooperation Agreements. In connection with the Leniency Agreement, J&F has agreed to pay a fine of 10.3 billion Brazilian *reais* (R$), adjusted for inflation, over a 25-year period. J&F has made five R$50.0 million payments, representing R$250.0 million of the total fine, which payments have been accepted by the MPF. Various proceedings by Brazilian governmental authorities remain pending against J&F and certain of its former or current officers seeking to invalidate the Cooperation Agreements and impose more severe penalties for additional alleged illicit conduct that was not disclosed in the annexes to the Cooperation Agreements.

On December 11, 2017, the PGR requested to the STF the termination of the Cooperation Agreements executed by Joesley Mendonça Batista and a former executive of J&F alleging, among others, that they received improper support by a member of the PGR on the negotiation of their Cooperation Agreements. On May 17, 2018, the PGR requested to the Federal Supreme Court (*Supremo Tribunal Federal*), or STF, the termination of the Cooperation Agreements executed by Wesley Mendonça Batista and another J&F executive on the same grounds. Within such proceedings, on December 17, 2018, the STF issued a ruling that there is no necessary link between the termination of the Cooperation Agreements, on the one hand, and the Leniency Agreement on the other hand and that the termination of the Cooperation Agreements would not automatically invalidate the Leniency Agreement. However, a final decision by the STF on the termination of the Cooperation Agreements may change such ruling and directly impact the Leniency Agreement. On April 30, 2019, in connection with an administrative proceeding relating to the Leniency Agreement, the MPF argued that if the STF terminated the Cooperation Agreements, such termination could have repercussions with respect to the Leniency Agreement. According to the MPF, such repercussions could include termination of the Leniency Agreement and the inclusion of additional fines or other obligations that would be payable by J&F.

We cannot assure you that the Leniency Agreement will not be impacted by the termination of any of the Cooperation Agreements or that the MPF will not continue to argue to the STF that the termination of the Cooperation Agreements by the STF should affect the Leniency Agreement. If the Leniency Agreement is terminated or nullified, the facts included therein could be exposed to potential proceedings and sanctions by Brazilian governmental authorities, which could have a material adverse effect on our business, reputation and financial condition.

In accordance with the terms of the Leniency Agreement, J&F is conducting internal investigations and has engaged outside advisors to assist in conducting these investigations, which are ongoing, and with which we are fully cooperating. In addition, JBS S.A., JBS USA and the Company have (i) conducted an independent investigation in connection with matters disclosed in the Leniency Agreement and the Cooperation Agreements; and (ii) communicated with relevant U.S. authorities, including the Department of Justice and the Securities and Exchange Commission, regarding the factual findings of these investigations. Additionally, JBS S.A. and the Company have taken, and are continuing to take, measures to enhance their compliance programs, including to prevent and detect bribery and corruption.

We cannot predict when these investigations will be completed or the results of such investigations, including whether any litigation will be brought against us or the outcome or impact of any resulting litigation, nor can we predict any potential actions that may be taken by such relevant U.S. authorities, which could include substantial fines and penalties, violations that impact our disclosure, and which could also result in litigations by shareholders against us.

In addition, we cannot guarantee that the investigations will not uncover other instances of prior illicit conduct by any of the parties to the Leniency Agreement or any of the Cooperation Agreements, or by other parties affiliated with us (including, without limitation, any of our shareholders, directors, officers, employees, agents or third parties acting in our name) which are not party to the Leniency Agreement or the Cooperation Agreements. It is possible that other facts not covered by the Leniency Agreement or the Cooperation Agreements will be discovered in the future. If that occurs, Brazilian authorities may bring proceedings and impose sanctions, fines or other penalties in relation to any such additional uncovered facts and may seek to use such discoveries to invalidate or terminate the Leniency Agreement or the Cooperation Agreements.

Separately, Joesley Mendonça Batista and Wesley Mendonça Batista (who equally and indirectly own 100% of the equity interests in J&F), JBS S.A. and other defendants are party to administrative proceedings and/or sanctioning administrative proceedings initiated by the CVM. The matters under investigation with respect to Joesley Mendonça Batista and Wesley Mendonça Batista include possible violations of Brazilian laws regarding the following: insider trading in regulated market transactions, management due diligence obligations in connection with internal controls, misuse of JBS S.A.'s assets and conflicts of interest

14

Table of Contents

in approving management accounts. On September 25, 2018, the Board of Commissioners of the CVM rejected the settlement proposal submitted jointly by Joesley Mendonça Batista and Wesley Mendonça Batista, JBS S.A. and the other defendants to end the administrative proceedings related to insider trading in regulated market transactions and management due diligence obligations in connection with internal controls. On December 3, 2019, the Board of Commissioners of the CVM rejected their settlement proposal to close the sanctioning administrative proceeding regarding the misuse of JBS S.A.'s assets. These proceedings in Brazil are ongoing and their results cannot be predicted.

Any further adverse developments in these, or other, matters involving Joesley Mendonça Batista and Wesley Mendonça Batista or other parties affiliated with us (including, without limitation, any of our shareholders, directors, officers, employees, agents or third parties acting in our name), could subject us to potential fines or penalties set forth under applicable law, materially adversely affect our public perception or reputation and could have a material adverse effect on us, including: (1) threatening our ability to obtain new financing, which could impair our ability to operate our business; and (2) shifting management's focus to these matters, which could harm our ability to meet our strategic objectives. Additionally, while we have taken, and are continuing to take, measures to enhance our compliance programs, which are intended to assist us in detecting and prevent bribery and corruption, there can be no assurance that these efforts will enable us to detect or prevent all such activities.

We will monitor the results of the investigations and J&F will continue to engage in dialogue with the relevant U.S. authorities. Any proceedings that require us to make substantial payments, affect our reputation or otherwise interfere with our business operations could have a material adverse effect on our business, financial condition and operating results.

**Item 1B. Unresolved Staff Comments**

None.

15

Table of Contents

**Item 3. Legal Proceedings**

*Tax Claims and Proceedings*

During 2014 and 2015 the Mexican Tax Authorities opened a review of Avícola Pilgrim's Pride de Mexico, S.A. de C.V. ("APPM") in regards to tax years 2009 and 2010, respectively. In both instances, the Mexican Tax Authorities claim that controlled company status did not exist for certain subsidiaries because APPM did not own 50% of the shares in voting rights of Incubadora Hidalgo, S. de R.L de C.V. and Commercializadora de Carnes de México S. de R.L de C.V. (both in 2009) and Pilgrim's Pride, S. de R. L. de C.V. (in 2010). As a result, APPM should have considered dividends paid out of these subsidiaries partially taxable since a portion of the dividend amount was not paid from the net tax profit account (CUFIN). APPM is currently appealing. Amounts under appeal are $24.3 million and $16.1 million for tax years 2009 and 2010, respectively. No loss has been recorded for these amounts at this time.

*Other Claims and Proceedings*

Between September 2, 2016 and October 13, 2016, a series of purported federal class action lawsuits styled as *In re Broiler Chicken Antitrust Litigation,* Case No. 1:16-cv-08637 were filed with the U.S. District Court for the Northern District of Illinois against PPC and 13 other producers by and on behalf of direct and indirect purchasers of broiler chickens alleging violations of federal and state antitrust and unfair competition laws. The complaints seek, among other relief, treble damages for an alleged conspiracy among defendants to reduce output and increase prices of broiler chickens from the period of January 2008 to the present. The class plaintiffs have filed three consolidated amended complaints: one on behalf of direct purchasers and two on behalf of distinct groups of indirect purchasers. Between December 8, 2017 and October 22, 2019, 32 individual direct action complaints *(Affiliated Foods, Inc., et al. v. Claxton Poultry Farms, Inc., et al.,* Case No. 1:17-cv-08850; *Sysco Corp. v. Tyson Foods Inc., et al.,* Case No. 1:18-cv-00700; *U.S. Foods Inc. v. Tyson Foods Inc., et al.,* Case No. 1:18-cv-00702; *Action Meat Distributors, Inc., et al. v. Claxton Poultry Farms, Inc., et al.,* Case No. 1:18-cv-03471; *Jetro Holdings, LLC v. Tyson Foods, Inc., et al.,* Case No. 1:18-cv-04000; *Associated Grocers of the South, Inc., et al. v. Tyson Foods, Inc., et al.,* Case No. 1:18-cv-4616; *The Kroger Co., et al. v. Tyson Foods, Inc., et al.,* Case No. 1:18-cv-04534; *Ahold Delhaize USA, Inc. v. Koch Foods, Inc., et al.,* Case No. 1:18-cv-05351; *Samuels as Trustee In Bankruptcy for Central Grocers, Inc. et al., v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. et al.,* Case No. 1:18-cv-05341; *W. Lee Flowers & Company, Inc. v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, Inc. et al.,* Case No. 1:18-cv-05345; *BJ's Wholesale Club, Inc. v. Tyson Foods, Inc., et al.,* Case No. 1:18-cv-05877; *United Supermarkets LLC, et al. v. Tyson Foods Inc., et al.,* Case No. 1:18-cv-06693; *Associated Wholesale Grocers, Inc. v. Koch Foods, Inc., et al.,* Case No. 1:18-cv-06316 (transferred from the U.S. District Court for the District of Kansas on September 17, 2018, following Defendants' successful motion to transfer); *Shamrock Foods Company, et al. v. Tyson Foods, Inc., et al.,* Case No. 1:18-cv-7284; *Winn-Dixie Stores, Inc., et al. v. Koch Foods, Inc., et al.,* Case No. 1:18-cv-00245; *Quirch Foods, LLC, f/k/a Quirch Foods Co. v. Koch Foods, Inc., et al.,* Case No. 1:18-cv-08511; *Sherwood Food Distributors, L.L.C., et al. v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-00354, *Hooters of America, LLC v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-00390, *Darden Restaurants, Inc. v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-00530; *Associated Grocers, Inc., et al. v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, et al.,* Case No. 1:19-cv-00638; *Checkers Drive-In Restaurants, Inc. v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-01283; *Conagra Brands, Inc., et al. v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-02190, *Giant Eagle, Inc. v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, et al.,* Case No. 1:19-cv-02758; *Save Mart Supermarkets v. Tyson Foods, Inc., et al.,* Case No. 1:19-cv-02805; *Walmart Inc., et al. v. Pilgrim's Pride Corporation, et al.,* Case No. 1:19-cv-03915 (transferred from the U.S. District Court for the Western District of Arkansas on June 11, 2019, following Plaintiffs' unopposed motion to transfer); *Services Group of America, Inc. v. Tyson Food, Inc., et al.,* Case No. 1:19-cv-04194; *Restaurants of America, Inc., et al. v. Tyson Foods, Inc., et al.,* No. 19-cv-04824; *Anaheim Wings, d/b/a Hooters of Anaheim, et al. v. Tyson Foods, Inc., et al.,* No. 19-cv-05229; *Amigos Meat Distributors, LP, et al. v. Tyson Foods, Inc., et al.,* No. 19-cv-05424; *PJ Food Service, Inc. v. Tyson Foods, Inc., et al.,* No. 19-cv-6141; *The Golub Corporation, et al. v. Norman W. Fries, Inc., d/b/a Claxton Poultry Farms, et al.,* Case No. 19-cv-06955; and *Commonwealth of Puerto Rico v. Koch Foods, Inc., et al.,* Case No. 3:19-cv-01605 (transferred from the U.S. District Court for the District of Puerto Rico)) were filed with the U.S. District Court for the Northern District of Illinois by individual direct purchaser entities naming PPC as a defendant, the allegations of which largely mirror those in the class action complaints. The Court has ordered the parties to coordinate scheduling of the direct action complaints with the class complaints with any necessary modifications to reflect time of filing. Discovery will be consolidated. On June 21, 2019, the DOJ filed a motion to intervene and stay discovery in the *In re Broiler Chicken Antitrust Litigation* for a period of six months. Following a hearing on June 27, 2019, on June 28, 2019, the Court granted the government's motion to intervene, ordering a limited stay first until September 27, 2019, and then, following a subsequent request for an extension by the DOJ, to June 27, 2020. On July 1, 2019, the DOJ issued a subpoena to PPC in connection with its investigation. PPC is currently in the process of complying with the subpoena. On December 18, 2019, the Court reset the date for the lifting of the stay to March 31, 2020. On January 29, 2020, the Court issued a scheduling order through trial, which contemplates class certification briefing and related expert reports proceeding from June 18, 2020 to November 25, 2020, the close of all merits fact discovery on December 18, 2020, and summary judgment briefing and related expert reports proceeding from January 15, 2021 to August 10, 2021. The Court has set a trial date of April 4, 2022.

Table of Contents

On October 10, 2016, Patrick Hogan, acting on behalf of himself and a putative class of persons who purchased shares of PPC's stock between February 21, 2014 and October 6, 2016, filed a class action complaint in the U.S. District Court for the District of Colorado against PPC and its named executive officers. The complaint alleges, among other things, that PPC's SEC filings contained statements that were rendered materially false and misleading by PPC's failure to disclose that (1) PPC colluded with several of its industry peers to fix prices in the broiler-chicken market as alleged in the *In re Broiler Chicken Antitrust Litigation,* (2) its conduct constituted a violation of federal antitrust laws, (3) PPC's revenues during the class period were the result of illegal conduct and (4) that PPC lacked effective internal control over financial reporting. The complaint also states that PPC's industry was anticompetitive and seeks compensatory damages. On April 4, 2017, the Court appointed another stockholder, George James Fuller, as lead plaintiff. On May 11, 2017, the plaintiff filed an amended complaint, which extended the end date of the putative class period to November 17, 2017. PPC and the other defendants moved to dismiss on June 12, 2017, and the plaintiff filed its opposition on July 12, 2017. PPC and the other defendants filed their reply on August 1, 2017. On March 14, 2018, the Court dismissed the plaintiff's complaint without prejudice and issued final judgment in favor of PPC and the other defendants. On April 11, 2018, the plaintiff moved for reconsideration of the Court's decision and for permission to file a Second Amended Complaint. PPC and the other defendants filed a response to the plaintiff's motion on April 25, 2018. On November 19, 2018, the Court denied the plaintiff's motion for reconsideration and granted plaintiff leave to file a Second Amended Complaint. As of the date of these financial statements, the plaintiff has not yet filed a Second Amended Complaint.

On January 27, 2017, a purported class action on behalf of broiler chicken farmers was brought against PPC and four other producers in the Eastern District of Oklahoma, alleging, among other things, a conspiracy to reduce competition for grower services and depress the price paid to growers. Plaintiffs allege violations of the Sherman Act and the Packers and Stockyards Act and seek, among other relief, treble damages. The complaint was consolidated with a subsequently filed consolidated amended class action complaint styled as *In re Broiler Chicken Grower Litigation,* Case No. CIV-17-033-RJS (the *"Grower Litigation"*). The defendants (including PPC) jointly moved to dismiss the consolidated amended complaint on September 9, 2017. The Court initially held oral argument on January 19, 2018, during which it considered and granted only certain other defendants' motions challenging jurisdiction. Oral argument on the remaining pending motions in the Oklahoma court occurred on April 20, 2018. In addition, on March 12, 2018, the Northern District of Texas, Fort Worth Division ("Bankruptcy Court") enjoined the plaintiffs from litigating the *Grower Litigation* complaint as pled against PPC because allegations in the consolidated complaint violate the confirmation order relating to PPC's bankruptcy proceedings in 2008 and 2009. Specifically, the 2009 bankruptcy confirmation order bars any claims against PPC based on conduct occurring before December 28, 2009. On March 13, 2018, PPC notified the trial court of the Bankruptcy Court's injunction. On January 6, 2020, the Court held a motion hearing and denied the pending Rule 12 motion and lifted the stay on discovery. The Court also set a briefing schedule for the plaintiffs to file a motion seeking leave to amend their complaint in light of the Bankruptcy Court's injunction. Plaintiffs' Motion for Leave to Amend is due on January 27, 2020, and Defendants' response is due on February 18, 2020. A status conference is set for April 6, 2020.

On March 9, 2017, a stockholder derivative action styled as *DiSalvio v. Lovette, et al.,* No. 2017 cv. 30207, was brought against all of PPC's directors and its Chief Financial Officer, Fabio Sandri, in the District Court for the County of Weld in Colorado. The complaint alleges, among other things, that the named defendants breached their fiduciary duties by failing to prevent PPC and its officers from engaging in an antitrust conspiracy as alleged in the *In re Broiler Chicken Antitrust Litigation,* and issuing false and misleading statements as alleged in the Hogan class action litigation. On April 17, 2017, a related stockholder derivative action styled *Brima v. Lovette, et al.,* No. 2017 cv. 30308, was brought against all of PPC's directors and its Chief Financial Officer in the District Court for the County of Weld in Colorado. The Brima complaint contains largely the same allegations as the DiSalvio complaint. On May 4, 2017, the plaintiffs in both the DiSalvio and Brima actions moved to (1) consolidate the two stockholder derivative cases, (2) stay the consolidated action until the resolution of the motion to dismiss in the Hogan putative securities class action, and (3) appoint co-lead counsel. The Court granted the motion on May 8, 2017, staying the proceedings pending resolution of the motion to dismiss in the Hogan action.

On January 24, 2018 a stockholder derivative action styled as *Sciabacucchi v. JBS S.A. et al.* was brought against all of PPC's directors, JBS S.A., JBS USA Holdings and several members of the Batista family, in the Court of Chancery of the State of Delaware (the "Chancery Court"). The complaint alleges, among other things, that the named defendants breached their fiduciary duties arising out of PPC's acquisition of Moy Park. On May 24, 2018, Employees Retirement System of the City of St. Louis filed a derivative complaint, which was virtually identical to the Sciabacucchi complaint. Both complaints sought compensatory damages. On July 2, 2018, the Chancery Court granted a stipulation consolidating the cases and making the first complaint (Sciabacucchi) the operative complaint. Also by stipulation, various defendants have been voluntarily dismissed from the case without prejudice. The remaining defendants are JBS S.A., JBS USA Holding, and directors Lovette, Nogueira de Souza, Tomazoni, and Molina. PPC also remains in the case as a nominal defendant. On March 15, 2019, the Chancery Court denied the non-PPC defendants' motion to dismiss. As a result, the case proceeded to discovery, and trial was scheduled to commence in November 2020. On October 3, 2019, the parties entered into a stipulation agreeing to settle the dispute for (1) a cash payment to PPC by the non-PPC defendants of $42.5 million less any fees and expenses awarded to the plaintiffs' counsel, as well as any applicable

18

Table of Contents

taxes, and (2) corporate governance changes to be implemented by PPC. No portion of the settlement amount will be paid by PPC to the non-PPC defendants. The settlement was approved by the Court of Chancery on January 28, 2020.

Between August 30, 2019 and October 16, 2019, four purported class action lawsuits were filed in the U.S. District Court for the District of Maryland against PPC and a number of other chicken producers, as well as WMS (Webber, Meng, Sahl and Company) and Agri Stats. The plaintiffs seek to represent a nationwide class of processing plant production and maintenance workers ("Plant Workers"). They allege that the defendants conspired to fix and depress the compensation paid to Plant Workers in violation of the Sherman Act and seek damages from January 1, 2009 to the present. The four cases are *Jien v. Perdue Farms, Inc.,* Case No. 19-cv-2521; *Earnest v. Perdue Farms, Inc. et al.,* Case No. 19-cv-02680; *Robinson v. Tyson Foods, Inc. et al.,* Case No. 19-cv-02960; and *Avila v. Perdue Farms, Inc., et al.,* Case No. 19-cv-03018 (together, the "Wages Litigation"). On November 12, 2019, the Court ordered the consolidation of the four cases for pretrial purposes. The defendants (including PPC) jointly moved to dismiss the consolidated complaint on November 22, 2019. Shortly thereafter, the plaintiffs informed the defendants and the Court they would be amending their complaint, which they did on December 20, 2019. The consolidated amended complaint asserts largely similar allegations to the pleadings in the consolidated complaint extended to include more class members and turkey processors as well as chicken. The defendants' motions to dismiss the consolidated amended complaint are due on March 2, 2020, with oppositions due on April 24, 2020 and replies on May 21, 2020.

PPC believes it has strong defenses in each of the above litigations and intends to contest them vigorously. PPC cannot predict the outcome of these actions nor when they will be resolved. If the plaintiffs were to prevail in any of these litigations, PPC could be liable for damages, which could be material and could adversely affect its financial condition or results of operations.

**Item 4. Mine Safety Disclosures**

None.