# EXHIBIT 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

(Mark One)

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 30, 2012**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File number 1-9273



**PILGRIM'S PRIDE CORPORATION**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 75-1285071 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1770 Promontory Circle, Greeley, Colorado | 80634-9038 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(970) 506-8000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, Par Value $0.01 | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act. Yes ☐   No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large Accelerated Filer ☐                                                      Accelerated Filer ☒

Non-accelerated Filer ☐                                                       Smaller reporting company ☐

(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☒

The aggregate market value of the Registrant's Common Stock, $0.01 par value, held by non-affiliates of the Registrant as of June 24, 2012, was $459,039,553. For purposes of the foregoing calculation only, all directors, executive officers and greater than 10% beneficial owners have been deemed affiliates. Number of shares of the Registrant's Common Stock outstanding as of February 15, 2013 was 258,999,033.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's Proxy Statement for the 2013 Annual Meeting of Stockholders are incorporated by reference into Part III of this annual report.

Case No. 1:20-cv-01966-RM-MEH    Document 63-3    filed 07/19/21    USDC Colorado
pg 3 of 25

**PILGRIM'S PRIDE CORPORATION**
**FORM 10-K**

**TABLE OF CONTENTS**

| | PART I | Page |
|---|---|---|
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 11 |
| Item 1B. | Unresolved Staff Comments | 17 |
| Item 2. | Properties | 18 |
| Item 3. | Legal Proceedings | 18 |
| Item 4. | Mine Safety Disclosures | 22 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 23 |
| Item 6. | Selected Financial Data | 25 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 28 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 43 |
| Item 8. | Financial Statements and Supplementary Data | 44 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 102 |
| Item 9A. | Controls and Procedures | 102 |
| Item 9B. | Other Information | 105 |
| | **PART III** | |
| Item 10. | Directors and Executive Officers and Corporate Governance | 106 |
| Item 11. | Executive Compensation | 106 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 106 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 106 |
| Item 14. | Principal Accounting Fees and Services | 106 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedule | 107 |
| Signatures | | 110 |

1

**PART I**

**Item 1. Business**

**Company Overview**

Pilgrim's Pride Corporation (referred to herein as "Pilgrim's," "PPC," "the Company," "we," "us," "our," or similar terms), which was incorporated in Texas in 1968 and reincorporated in Delaware in 1986, is the successor to a partnership founded in 1946 as a retail feed store. We are the second-largest chicken producer in the world with operations in the United States ("U.S."), Mexico and Puerto Rico. We are primarily engaged in the production, processing, marketing and distribution of fresh, frozen and value-added chicken products to retailers, distributors and foodservice operators. We employ approximately 38,000 people and have the capacity to process more than 36 million birds per week for a total of more than 9.5 billion pounds of live chicken annually. In 2012, we generated $8.1 billion in total revenue and produced 7.9 billion pounds of chicken products.

The Company operates on the basis of a 52/53-week fiscal year that ends on the Sunday falling on or before December 31. The reader should assume any reference we make to a particular year (for example, 2012) in the notes to these Consolidated Financial Statements applies to our fiscal year and not the calendar year. Fiscal 2012 was a 53-week fiscal year.

We have a broad geographic reach and we offer our diverse customer base a balanced portfolio of fresh and prepared chicken products. We have consistently provided our customers with high quality products and service with a focus on delivering higher-value, higher-quality products. As such, we have become a valuable partner to our customers and a recognized industry leader. Our sales efforts are largely targeted towards the foodservice industry, principally chain restaurants and food processors such as Yum! Brands®, Burger King® and Chick-fil-A®, distributors such as US Foods and Sysco® and retail customers including grocery store chains and wholesale clubs such as Kroger®, Wal-Mart®, Costco®, Publix® and Sam's Club®. We also export products to customers in approximately 100 countries.

Our Mexico operations generated approximately 10.7% of our net sales in 2012. We are the second-largest producer and seller of chicken in Mexico and are one of the lower-cost producers of chicken in the country. While the market for chicken products in Mexico is less developed than in the U.S., with sales attributed to fewer, more basic products, we have been successful in differentiating our products through high-quality client service and product improvements. Additionally, we are an important player in the live market, which accounts for approximately 33% of the chicken sales in Mexico. We believe that Mexican supermarket chains consider us one of the leaders in innovation for fresh products. Our strategy is to capitalize on this trend through our vast U.S. experience in products, quality and our well-known service.

As a vertically integrated company, we control every phase of the production of our products. We believe that vertical integration helps us better manage food safety and quality, as well as more effectively control margins and improve customer service. We currently operate in 12 U.S. states, Puerto Rico and Mexico. Our plants are strategically located to ensure that customers timely receive the freshest products. We operate 25 fresh processing plants, eight prepared foods cook plants, one fresh processing plant in Puerto Rico, three processing plants in Mexico, and 14 distribution centers (one in Puerto Rico and 13 in Mexico). In addition, the Company operates nine rendering facilities (six in the U.S., one in Puerto Rico and two in Mexico) and three pet food plants in the U.S. The Company has four additional processing plants that are currently idle. Combined with our global network of approximately 4,200 growers, 30 feed mills and 37 hatcheries, we believe we are well positioned to keep up with the growing demand for our products.

On December 1, 2008, Pilgrim's and six of its subsidiaries filed voluntary petitions in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), seeking reorganization relief under the provisions of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). We emerged from Chapter 11 bankruptcy proceedings on December 28, 2009. In connection with our emergence from bankruptcy, our common stock outstanding immediately prior to the emergence was cancelled and converted into the right to receive newly-issued shares of common stock of the reorganized Company based on a one-for-one exchange ratio, which constituted 36.0% of the total number of shares of our newly-issued common stock on that date. The remaining shares of our newly-issued common stock, constituting 64.0% of our total issued and outstanding common stock on December 28, 2009, were purchased for $800.0 million by JBS USA Holdings, Inc. ("JBS USA"), a wholly-owned indirect subsidiary of JBS S.A., a Brazil-based meat producer. As the result of subsequent purchases, JBS USA owned 75.5% of our total issued and outstanding common stock on December 30, 2012.

2

**The Industry**

*Industry Overview*

The U.S. consumes more chicken than any other protein (approximately 29.8 billion pounds projected in calendar year 2013), and chicken is the second most consumed protein globally after pork. The U.S. is the world's largest producer of chicken and is projected to produce approximately 36.9 billion pounds of ready-to-cook broiler meat in calendar year 2013, representing 20.0% of the total world production. China and Brazil produce the second and third most broiler meat, with 16.9% and 15.6% of the world market, respectively.

The U.S. is the second-largest exporter of broiler meat behind Brazil. The U.S. is projected to export 7.25 billion pounds in calendar year 2013 which would account for 31.0% of the total world exports and 19.6% of the total U.S. production. The top five exporters control over 87% of the market. The broiler export marketplace has grown at a rapid pace since the early 1990s. The growth has been driven by various geopolitical events such as the collapse of the former Soviet Union as well as changing consumer preferences. Key importers of broilers include Russia, China, the EU, Mexico and Saudi Arabia. Other export markets such as Hong Kong, Vietnam, the Middle East and Africa are projected to increase their imports of U.S. chicken.

The U.S. market is concentrated with four major chicken producers accounting for over 50% of production. The U.S. chicken industry is largely vertically integrated with major producers owning and operating feed mills, processing plants and further processing plants while contracting out breeding and broiler production to thousands of contractually bound chicken farmers. More than 90% of all chickens raised for consumption are produced by farmers under a contract with processing companies. Processing companies provide the growers with chickens, feed, vaccines and medicines required for the production of broilers. The grower supplies all systems and labor required to bring the broilers up to slaughter weight. The grower is then paid based on the weight gain exhibited by the flock.

According to the USDA, chicken production in the U.S. has increased at a compounded annual growth rate of 2.8% over the past 20 years. Similarly, per capita consumption of chicken has increased at a compounded annual growth rate of 2.1%. During this same period of time, per capita beef consumption has declined at a compounded annual growth rate of 0.6% while pork has declined at a compounded annual growth rate of 0.3%. The growth in chicken demand is attributable to (i) relative affordability compared to other proteins such as beef and pork, (ii) the increasingly health conscious nature of U.S. consumers, (iii) chicken's consistent quality and versatility and (iv) its introduction on many foodservice menus. In addition, global protein demand has remained strong, and we believe protein demand will continue to expand consistent with rising standards of living and a growing middle class in developing countries around the world.

We benefit from a shorter production lifecycle of chickens compared to other proteins. While production for beef takes approximately 28 to 30 months from breeding to slaughter and the production for pork takes 11 to 12 months, the production lifecycle for the broiler is only ten weeks. There are three key components of broilers that are sold for consumption: the breast, the wing and the leg quarters. An estimated 88% of broiler production in the U.S. is sold in separate parts, rather than as a whole bird. This is due primarily to an increase in demand associated with the white meat of the breast, as well as demand for boneless breasts and wings.

*Key Industry Dynamics*

**Pricing.** Like other commodities, changes to either the supply or demand components of the market can largely impact the profitability of key players in the industry. Specifically, given the low margins associated with the broiler industry, a change in pricing of commodity chicken products has a significant impact on the income generated by the producer. Items that impact chicken pricing in the U.S. include international demand, changes in production by other broiler exporting countries, input costs and the demand associated with substitute products such as beef and pork. While broiler producers attempt to match supply and demand, a minor change in downstream demand can impact whether the planned supply meets the market need.

**Feed.** Broilers are fed corn and soybean meal as well as certain vitamins and minerals. Corn and soybean meal account for approximately 65% and 24% of the feed, respectively. Broiler production is significantly more efficient from a feed perspective than cattle or hogs. Approximately 1.9 pounds of feed are required for each pound of chicken, as compared to approximately 6.5 and 3.7 pounds for cattle and hogs, respectively.

Prior to 2008, cost of feed had been largely steady, with occasional spikes resulting from externalities. These externalities often took the form of poor weather conditions, such as droughts or excessive rains leading to poor crop yields and increased demand both domestically for ethanol and globally for protein production. More recently, feed prices have been impacted by increased demand both domestically for ethanol and globally for protein production. Market prices for feed ingredients remained at historically high levels throughout 2012 and remain volatile.

**Competitive Strengths**

We believe that our competitive strengths will enable us to maintain and grow our position as a leading chicken company and to capitalize on future favorable growth opportunities:

*Leading market position in the growing chicken industry.* We are the second-largest chicken producer in the U.S. with a 17.4% market share, based on ready-to-cook production. We believe we can maintain this leading market position as we are one of the few producers in the chicken industry that can fully supply larger retailers and foodservice companies due to our broad product offering and technical capabilities. We are a viable supplier for large integrated customers due to our ability to ensure supply, demonstrate innovation and new product development and provide competitive pricing. Our vertical integration gives us control over our supply of chicken and chicken parts. Further, our processing facilities offer a wide range of capabilities and are particularly suited for the high-volume production as well as low-volume custom production runs necessary to meet both the capacity and quality requirements of our customer base. Finally, we have established a reputation for dependable quality, highly responsive service and excellent technical support.

*Experienced management team.* We have a proven senior management team whose tenure in the chicken industry has spanned numerous market cycles and is among the most experienced in the industry. Our senior management team is led by William W. Lovette, our Chief Executive Officer, who has over 30 years of experience in the chicken industry. Our management team has successfully improved and realigned our business and instilled a corporate culture focused on performance and accountability. Our senior operating executives have backgrounds with leading agribusiness companies, including Tyson Foods, Inc., ConAgra Foods, Inc. and Bunge Limited, among others. We believe that this combination of backgrounds and experience will continue to provide the foundation for a focused business strategy and will enable us to maintain and strengthen long-term relationships with customers and help us grow our business in the future. We also benefit from management ideas, best practices, and talent shared with the seasoned management team at our majority stockholder, JBS USA, and its parent company, JBS S.A., who have over 50 years of combined experience operating protein processing facilities in South America, the U.S. and Australia.

*Leaner, more focused enterprise since emergence from bankruptcy.* Following our restructuring efforts, we are a more efficient and lean organization supported by a market-driven business strategy. Since 2008, we have closed, idled or sold ten plants and 13 distribution centers, reduced or consolidated production at other facilities, streamlined our workforce and reduced administrative and corporate expenses including moving our corporate headquarters and closing satellite headquarters as part of our becoming a majority owned subsidiary of JBS USA. In addition, we continue to make significant production improvements driven by improved yields, labor, cost savings and product mix. In the past two years, these efforts resulted in an approximate $560.0 million annualized run rate improvement in plant-related costs and product yield. As a result of these efforts, we are a financially stronger company with a more conservative balance sheet.

*Blue chip and diverse customer base.* We benefit from strong relationships with leading companies, including Sysco®, US Foods, Yum! Brands®, Chick-fil-A®, Burger King®, Kroger®, Wal-Mart®, Costco®, Publix®, Sam's Club®, ConAgra Foods®, and Nestle®, many of whom have been doing business with us for more than six years. We sell our products to a large and diverse customer base, with over 5,000 customers and no concentrations above 7.0% of net sales except for our largest customer, Wal-Mart Stores, Inc., which accounted for 9.7% of net sales in 2012.

4

*Relationship with JBS USA.* In addition to cost savings through the integration of certain corporate functions and the rationalization of facilities, our relationship with JBS USA allows us to enjoy several advantages given its diversified international operations and strong record in commodity risk management. We seek to leverage JBS USA's international network by expanding into untapped international markets and strengthening our presence in geographies in which we already operate. In addition, JBS USA's expertise in managing the risk associated with volatile commodity inputs will help us to further improve our operations and manage our margins.

**Business Strategy**

Our objectives are to (i) be a valued partner with our key customers, (ii) relentlessly pursue operational excellence and (iii) strategically grow value added exports. To achieve these goals, we plan to continue pursuing the following strategies:

*Valued partner with our key customers*. We are the second-largest producer of chicken products in the world. We have developed and acquired complementary markets, distributor relationships and geographic locations, establishing relationships with broad-line national distributors and retailers which have enabled us to expand our customer base and provide nationwide distribution capabilities for all of our product lines. As a result, we believe we are one of only two U.S. chicken producers that can supply the growing demand for a broad range of price competitive standard and specialized products with well-known brand names on a nationwide basis from a single-source supplier. By having the best in class quality management systems, we plan to further grow our industry position and continue being a valued partner with our key customers.

*Operational excellence*. As production and sales grow, we continue to focus on improving operating efficiencies by focusing on cost reductions, improving processes, training and our total quality management program. In addition, we remain focused on cost control. Specific initiatives include:

- Benchmarking live and plant costs against the industry;
- Striving to be in the top 25% of the industry for yields and costs;
- Driving accountability and ownership deeper in the organization;
- Conducting monthly performance reviews with senior management; and
- Improving sales mix and price.

*Strategically grow value added exports.* We will continue to focus on international opportunities and we plan to further diversify our international markets to complement our U.S. chicken operations and capitalize on attractive export markets. According to the USDA, the export of U.S. chicken products increased at an average annual growth rate of 3.9% from 2000 through 2011. We believe U.S. chicken exports will continue to grow as worldwide demand increases for high-grade, low-cost meat protein sources. Historically, we targeted international markets to generate additional demand for our dark chicken meat, which is a natural by-product of our U.S. operations given our concentration on prepared foods products and the U.S. customers' general preference for white chicken meat. As part of this initiative, we created a significant international distribution network into several markets, including Mexico, which we now utilize not only for dark chicken meat distribution, but also for various higher-margin prepared foods and other poultry products. We employ both a direct international sales force and export brokers. Our key international markets include Mexico, the Far East and countries within the CIS. Our relationship with our majority owner, JBS USA, has improved our access to markets such as Africa, the Middle East and Asia. We believe substantial opportunities exist to expand our sales to these markets by capitalizing on direct international distribution channels supplemented by our existing export broker relationships. We also believe that opportunities exist to sell more profitable products into these markets. Our export sales accounted for approximately 11.9% of our U.S. chicken sales in 2012.

**Reportable Business Segment**

We operate in one reportable business segment, as a producer and seller of chicken products we either produce or purchase for resale in the U.S., Puerto Rico and Mexico. We conduct separate operations in the U.S., Puerto Rico and Mexico; however, for geographic reporting purposes, we include Puerto Rico with our U.S. operations. See "Note 22. Business Segment and Geographic Reporting" of our Consolidated Financial Statements included in this annual report for additional information.

**Narrative Description of Business**

*Products and Markets*

Our primary chicken product types are fresh, prepared and export. We sell our fresh chicken products to the foodservice and retail markets. Our fresh chicken products consist of refrigerated (nonfrozen) whole or cut-up chicken, either pre-marinated or non-marinated and prepackaged case-ready chicken. Our case-ready chicken includes various combinations of freshly refrigerated, whole chickens and chicken parts in trays, bags or other consumer packs labeled and priced ready for the retail grocer's fresh meat counter. Our fresh chicken sales in 2012 accounted for 54.0% of our total U.S. chicken sales.

We also sell prepared chicken products, including portion-controlled breast fillets, tenderloins and strips, delicatessen products, salads, formed nuggets and patties and bone-in chicken parts. These products are sold either refrigerated or frozen and may be fully cooked, partially cooked or raw. In addition, these products are breaded or non-breaded and either pre-marinated or non-marinated. Our prepared chicken products sales in 2012 accounted for 33.7% of our total U.S. chicken sales.

Export and other chicken products primarily consist of whole chickens and chicken parts sold mostly in bulk, non-branded form either refrigerated for distributors in the U.S. or frozen for distribution to export markets. In the U.S., prices of these products are negotiated daily or weekly and are generally related to market prices quoted by the U.S. Department of Agriculture ("USDA") or other public price reporting services. We sell U.S.-produced chicken products for export to Mexico, the Far East, countries within the CIS and other world markets. Our export and other chicken products sales in 2012 accounted for 12.3% of our total U.S. chicken sales.

Our primary customer markets consist of the foodservice and retail channels, as well as selected export and other markets. The foodservice market principally consists of chain restaurants, food processors, broad-line distributors and certain other institutions located throughout the continental U.S. We supply chicken products ranging from portion-controlled refrigerated chicken parts to fully-cooked and frozen, breaded or non-breaded chicken parts or formed products.

Our categories within foodservice include frozen, fresh and corporate accounts. Fresh and frozen chicken products are usually pre-cut to customer specifications and are often marinated to enhance value and product differentiation. Corporate accounts include further-processed and value-added products supplied to select foodservice customers improving their ability to manage product consistency and quality in a cost efficient manner. We believe we are positioned to be the primary or secondary supplier to national and international chain restaurants who require multiple suppliers of chicken products. Additionally, we believe we are well suited to be the sole supplier for many regional chain restaurants. Regional chain restaurants often offer better margin opportunities and a growing base of business. We believe we have operational strengths in terms of full-line product capabilities, high-volume production capacities, research and development expertise and extensive distribution and marketing experience relative to smaller and non-vertically integrated producers. Foodservice growth is anticipated to continue, despite the effects resulting from continued weak economic conditions in the U.S.

The retail market consists primarily of grocery store chains, wholesale clubs and other retail distributors. We concentrate our efforts in this market on sales of branded, prepackaged cut-up and whole chicken and chicken parts to grocery store chains and retail distributors. For many years, we have invested in both trade and retail marketing designed to establish high levels of brand name awareness and consumer preferences. We utilize numerous marketing techniques, including advertising, to develop and strengthen trade and consumer awareness and increase brand loyalty for consumer products marketed under the Pilgrim's Pride® and Pilgrim's® brands. We believe our efforts to achieve and maintain brand awareness and loyalty help to provide more secure distribution for our products. We also believe our efforts at brand awareness generate greater price premiums than would otherwise be the case in certain markets. Additionally, we maintain an active program to identify consumer preferences. The program primarily consists of discovering and validating new product ideas, packaging designs and methods through sophisticated qualitative and quantitative consumer research techniques in key geographic markets.

The export and other chicken market consists primarily of customers who purchase for distribution in the U.S. or for export to Mexico, the Far East, countries within the CIS and other world markets. Our export and other chicken products, with the exception of our exported prepared chicken products, consist of whole chickens and chicken parts sold primarily in bulk, nonbranded form, either refrigerated or frozen.

Historically, we have targeted international markets to generate additional demand for our dark chicken meat, which is a natural by-product of our U.S. operations given our concentration on prepared chicken products and the U.S. customers' general preference for white chicken meat. We have also begun selling prepared chicken products for export to the international divisions of our U.S. chain restaurant customers. Utilizing the extensive sales network of JBS USA, we believe that we can accelerate the sales of value-added chicken products into international channels. We also believe that the history of our successful export sales and our relationship with JBS USA position us favorably to capitalize on international growth.

6

The following table sets forth, for the periods beginning with 2008, net sales attributable to each of our primary product lines and markets served with those products. We based the table on our internal sales reports and their classification of product types.

| | 2012 | 2011 | 2010 | Transition Period(a) | 2009(a) | 2008(a) |
|---|---|---|---|---|---|---|
| U.S. chicken: | | | (In thousands) | | | |
| Prepared chicken | $ 2,239,289 | $ 2,135,337 | $ 2,262,107 | $ 535,810 | $ 2,294,576 | $ 2,552,065 |
| Fresh chicken | 3,583,854 | 3,160,429 | 2,834,972 | 663,418 | 3,113,062 | 3,591,785 |
| Export and other chicken by-products | 817,723 | 808,038 | 581,303 | 134,976 | 656,276 | 933,197 |
| Total U.S. chicken | 6,640,866 | 6,103,804 | 5,678,382 | 1,334,204 | 6,063,914 | 7,077,047 |
| Mexico chicken | 758,023 | 720,333 | 615,433 | 127,557 | 487,785 | 543,583 |
| Total chicken | 7,398,889 | 6,824,137 | 6,293,815 | 1,461,761 | 6,551,699 | 7,620,630 |
| Other products: | | | | | | |
| U.S. | 608,619 | 674,923 | 558,675 | 132,500 | 505,738 | 863,495 |
| Mexico | 113,874 | 36,638 | 29,139 | 8,473 | 30,618 | 34,632 |
| Total other products | 722,493 | 711,561 | 587,814 | 140,973 | 536,356 | 898,127 |
| Total net sales | $ 8,121,382 | $ 7,535,698 | $ 6,881,629 | $ 1,602,734 | $ 7,088,055 | $ 8,518,757 |

(a)  In December 2009, we changed our fiscal year end from the Saturday nearest September 30 of each year to the last Sunday in December of each year. The change was effective for our 2010 fiscal year, which began December 28, 2009 and ended December 26, 2010 and resulted in an approximate three-month transition period which began September 27, 2009 and ended December 27, 2009.

The following table sets forth, beginning with 2008, the percentage of net U.S. chicken sales attributable to each of our primary product lines and the markets serviced with those products. We based the table and related discussion on our internal sales reports and their classification of product types and customers.

| | 2012 | 2011 | 2010 | Transition Period(a) | 2009(a) | 2008(a) |
|---|---|---|---|---|---|---|
| | | | (Percent) | | | |
| Prepared chicken | 33.7 | 35.0 | 39.9 | 40.2 | 37.9 | 36.1 |
| Fresh chicken | 54.0 | 51.7 | 49.9 | 49.7 | 51.3 | 50.7 |
| Export and other chicken by-products | 12.3 | 13.3 | 10.2 | 10.1 | 10.8 | 13.2 |
| Total U.S. chicken | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

(a)  In December 2009, we changed our fiscal year end from the Saturday nearest September 30 of each year to the last Sunday in December of each year. The change was effective for our 2010 fiscal year, which began December 28, 2009 and ended December 26, 2010 and resulted in an approximate three-month transition period which began September 27, 2009 and ended December 27, 2009.

**United States**

*Product Types*

*Fresh Chicken Overview.* Fresh chicken is an important component of our sales and accounted for $3,583.9 million, or 54.0%, of our total U.S. chicken sales in 2012 and $3,591.8 million, or 50.7%, in 2008. Most fresh chicken products are sold to established customers, based upon certain weekly or monthly market prices reported by the USDA and other public price reporting services, plus a markup, which is dependent upon the customer's location, volume, product specifications and other factors. We believe our practices with respect to sales of fresh chicken are generally consistent with those of our competitors. The majority of these products are sold pursuant to agreements with varying terms that set a price according to formulas based on underlying chicken price markets, subject in many cases to minimum and maximum prices.

7

*Prepared Chicken Overview.* In 2012, $2,239.3 million, or 33.7%, of our U.S. chicken sales were in prepared chicken products to foodservice customers and retail distributors, as compared to $2,552.1 million, or 36.1%, in 2008. The production and sale in the U.S. of prepared chicken products reduce the impact of the costs of feed ingredients on our profitability. Feed ingredient costs are the single largest component of our U.S. cost of sales, representing approximately 46.1% of our U.S. cost of sales in 2012. The production of feed ingredients is positively or negatively affected primarily by the global level of supply inventories, demand for feed ingredients, the agricultural policies of the U.S. and foreign governments and weather patterns throughout the world. As further processing is performed, feed ingredient costs become a decreasing percentage of a product's total production cost, thereby reducing their impact on our profitability. Products sold in this form enable us to charge a premium, reduce the impact of feed ingredient costs on our profitability and improve and stabilize our profit margins.

We establish prices for our prepared chicken products based primarily upon perceived value to the customer, production costs and prices of competing products. The majority of these products are sold pursuant to agreements with varying terms that either set a fixed price for short-term periods or set a price according to formulas based on an underlying commodity market such as corn and chicken price forecasts, subject in many cases to minimum and maximum prices. Many times, these prices are dependent upon the customer's location, volume, product specifications and other factors.

*Export and Other Chicken Products Overview.* Our export and other products consist of whole chickens and chicken parts sold primarily in bulk, nonbranded form, either refrigerated to distributors in the U.S. or frozen for distribution to export markets, and branded and nonbranded prepared chicken products for distribution to export markets. In 2012, approximately $817.7 million, or 12.3%, of our total U.S. chicken sales were attributable to U.S. chicken export and other products, as compared to $933.2 million, or 13.2%, in 2008.

*Markets for Other Products*

Presently, this category includes chicken by-products, which we convert into protein products and sell primarily to manufacturers of pet foods. Until November 2011, this category also included products sold through our distribution centers. In 2011, we had regional distribution centers located in Arizona, Texas and Utah that were primarily focused on distributing our own chicken products. In November 2011, we sold the distribution centers to JBS Trading International, Inc., a wholly owned subsidiary of JBS USA. See "Note 16. Related Party Transactions" of our Consolidated Financial Statements included in this annual report for additional information on the sale of the distribution centers. In addition, we marketed fresh eggs under private labels, in various sizes of cartons and flats to U.S. retail grocery and institutional foodservice customers located primarily in Texas through August 2012. In August 2012, we sold our commercial egg operation to Cal-Maine Foods, Inc. Many of our U.S. feed mills produce and sell some livestock feeds to local dairy farmers and livestock producers.

**Mexico**

*Background*

Our Mexico operations generated approximately 10.7% of our net sales in 2012. We are the second-largest producer and seller of chicken in Mexico. We believe that we are one of the lower-cost producers of chicken in Mexico.

*Product Types*

While the market for chicken products in Mexico is less developed than in the U.S., with sales attributed to fewer, more basic products, we have been successful in differentiating our products through high-quality client service and product improvements. Additionally, we are an important player in the live market, which accounts for approximately 33% of the chicken sales in Mexico.

*Markets*

We sell our chicken products primarily to wholesalers, large restaurant chains, fast food accounts, supermarket chains and direct retail distribution in selected markets. Our largest presence is by far in the central states of the country where we have been able to gain market share. Our presence in Mexico reaches 76.5% of the population.

*Foreign Operations Risks*

Our foreign operations pose special risks to our business and operations. A discussion of foreign operations risks is included in "Item 1A. Risk Factors."

**General**

*Competitive Conditions*

The chicken industry is highly competitive. We are the second-largest producer in the world and we believe our relationship with JBS USA enhances our competitive position. In the U.S. and Mexico, we compete principally with other vertically integrated poultry companies.

In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the primary bases of competition. In the foodservice market, competition is based on consistent quality, product development, service and price. There is some competition with non-vertically integrated further processors in the U.S. prepared chicken business. We believe vertical integration generally provides significant, long-term cost and quality advantages over non-vertically integrated further processors.

In Mexico, where product differentiation has traditionally been limited, we believe product quality and price have been the most critical competitive factors.

*Restructuring Efforts*

Since January 2010, we implemented significant operational changes to reduce costs and operate more efficiently, as well as realized substantial benefits through synergies following the JBS USA acquisition. We reduced our production footprint to mitigate capacity utilization and efficiency issues created by previously enacted across-the-board production cuts. In addition, we continue to evaluate our noncore businesses, which has resulted in the sale of certain noncore businesses. Exit and disposal activities from January 2010 to present have eliminated approximately 1,500 positions and recognized net pre-tax charges totaling $96.4 million.

We continue to review and evaluate various restructuring and other alternatives to streamline our operations, improve efficiencies and reduce costs. Such initiatives may include selling assets, consolidating operations and functions and voluntary and involuntary employee separation programs. Any such actions may require us to obtain the pre-approval of our lenders under our credit facilities. In addition, such actions will subject the Company to additional short-term costs, which may include asset impairment charges, lease commitment costs, employee retention and severance costs and other costs. Certain of these activities may have a disproportionate impact on our income relative to the cost savings in a particular period.

*Key Customers*

Our two largest customers accounted for approximately 15.7% of our net sales in 2012, and our largest customer, Wal-Mart Stores Inc., accounted for 9.7% of our net sales in 2012.

*Regulation and Environmental Matters*

The chicken industry is subject to government regulation, particularly in the health and environmental areas, including provisions relating to the discharge of materials into the environment, by the Centers for Disease Control, the USDA, the Food and Drug Administration ("FDA") and the Environmental Protection Agency ("EPA") in the U.S. and by similar governmental agencies in Mexico. Our chicken processing facilities in the U.S. are subject to on-site examination, inspection and regulation by the USDA. The FDA inspects the production of our feed mills in the U.S. Our Mexican food processing facilities and feed mills are subject to on-site examination, inspection and regulation by a Mexican governmental agency that performs functions similar to those performed by the USDA and FDA. We believe that we are in substantial compliance with all applicable laws and regulations relating to the operations of our facilities.

Our operations are subject to extensive regulation by the EPA and other state and local authorities relating to handling and discharge of waste water, storm water, air emissions, treatment, storage and disposal of wastes, handling of hazardous substances and remediation of contaminated soil, surface water and groundwater. Our Mexican operations also are subject to extensive regulation by Mexican environmental authorities. The EPA and/or other U.S. or Mexican state and local authorities may, from time to time, adopt revisions to environmental rules and regulations, and/or changes in the terms and conditions of our environmental permits, with which we must comply. Compliance with existing or new environmental requirements, including more stringent limitations imposed or expected in recently-renewed or soon-to be renewed environmental permits, may require capital expenditures and operating expenses which may be significant.

Some of our properties have been impacted by contamination from spills or other releases, and we have incurred costs to remediate such contamination. In addition, in the past we acquired businesses with operations such as pesticide and fertilizer production that involved greater use of hazardous materials and generation of more hazardous wastes than our current operations. While many of those operations have been sold or closed, some environmental laws impose strict and, in certain circumstances, joint and several liability for costs of investigation and remediation of contaminated sites on current and former owners and operators of the sites, and on persons who arranged for disposal of wastes at such sites. In addition, current owners or operators of such contaminated sites may seek to recover cleanup costs from us based on past operations or contractual indemnifications. See "Item 1A. Risk Factors" for risks associated with compliance with existing or changing environmental requirement.

We anticipate increased regulation by the USDA concerning food safety, by the FDA concerning the use of medications in feed and by the EPA and various other state agencies concerning discharges to the environment. Although we do not anticipate any regulations having a material adverse effect upon us, a material adverse effect may occur.

*Employees*

As of December 30, 2012, we employed approximately 33,000 persons in the U.S. and approximately 5,000 persons in Mexico. Approximately 36.3% of the Company's employees were covered under collective bargaining agreements. Substantially all employees covered under collective bargaining agreements are covered under agreements that expired in 2011 or 2012 and remain open or will expire in 2013. We have not experienced any labor-related work stoppage at any location in over eight years. We believe our relationship with our employees and union leadership is satisfactory. At any given time, we will be in some stage of contract negotiations with various collective bargaining units. The Company is currently in negotiations with union locals in 11 locations, and there is no assurance that agreement will be reached. While unlikely, we may be subject to labor disruption at any of these locations.

*Financial Information about Foreign Operations*

Our foreign operations are in Mexico. Geographic financial information is set forth in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Available Information*

The Company's Internet website is www.pilgrims.com. The Company makes available, free of charge, through its Internet website, the Company's annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, Directors and Officers Forms 3, 4 and 5, and amendments to those reports, as soon as reasonably practicable after electronically filing such materials with, or furnishing them to, the Securities and Exchange Commission. The public may read and copy any materials that the Company files with the Securities and Exchange Commission at its Public Reference Room at 100 F Street, NE, Washington, DC 20549 and may obtain information about the operation of the Public Information Room by calling the Securities and Exchange Commission at 1-800-SEC-0330.

In addition, the Company makes available, through its Internet website, the Company's Business Code of Conduct and Ethics, Corporate Governance Guidelines and the written charter of the Audit Committee, each of which is available in print to any stockholder who requests it by contacting the Secretary of the Company at 1770 Promontory Circle, Greeley, Colorado 80634-9038. Information contained on the Company's website is not included as part of, or incorporated by reference into, this annual report.

*Executive Officers*

Set forth below is certain information relating to our current executive officers:

| Name | Age | Positions |
|---|---|---|
| Wesley Mendonça Batista | 42 | Chairman of the Board |
| William W. Lovette | 53 | President and Chief Executive Officer |
| Fabio Sandri | 41 | Chief Financial Officer |

*Wesley Mendonça Batista*, 42, currently serves as Chairman of the Board of Pilgrim's Pride Corporation. Mr. Batista became President and Chief Executive Officer of JBS S.A. in February 2011. Mr. Batista previously served as President and Chief Executive Officer of JBS USA for approximately four years. Mr. Batista also serves as Chairman of the Board of JBS USA and is the Vice President of JBS S.A.'s board of directors. Mr. Batista has served in various capacities at JBS S.A. since 1987. Mr. Batista is the brother of Joesley Mendonça Batista, Chairman of the Board of JBS S.A., and José Batista Júnior, a Director of the Company and a Director of JBS S.A., and is the son of José Batista Sobrinho, the founder of JBS S.A. and a member of its board of directors. Mr. Batista brings to our board significant senior leadership and industry experience. Mr. Batista has long been one of the most respected executives in Brazil's protein industry, and his reputation is now firmly established worldwide. Mr. Batista grew up in the protein industry, and it is his strategic insight and entrepreneurial spirit that has facilitated the growth of JBS S.A. through numerous acquisitions, expanding its reach across the globe. As Chairman of the Board, Mr. Batista has direct responsibility for Pilgrim's Pride's strategy and operations.

*William W. Lovette*, 53, joined Pilgrim's as President and Chief Executive Officer on January 3, 2011. He brings more than 30 years of industry leadership experience to Pilgrim's. He previously served two years as President and Chief Operating Officer of Case Foods, Inc. Before joining Case Foods, Inc., Mr. Lovette spent 25 years with Tyson Foods in various roles in senior management, including President of its International Business Unit, President of its Foodservice Business Unit and Senior Group Vice President of Poultry and Prepared Foods. Mr. Lovette earned a B.S. degree from Texas A&M University. In addition, he is a graduate of Harvard Business School's Advanced Management Program.

*Fabio Sandri*, 41, has served as the Chief Financial Officer for Pilgrim's since June 2011. He previously served as the Chief Financial Officer of Estacio Participações, the private post-secondary educational institution in Brazil since April 2010. From November 2008 until April 2010, he was the Chief Financial Officer of Imbra SA, a provider of dental services based in Sao Paolo, Brazil. Commencing in 2005 through October 2008, he was employed by Braskem S.A., a New York Stock Exchange-listed petrochemical company headquartered in Camaçari, Brazil, first from 2005 to 2007 as its strategy director and from 2007 until his departure as its corporate controller. He earned his Masters in Business Administration in 2001 from the Wharton School at the University of Pennsylvania and a degree in electrical engineering in 1993 from Escola Politécnica da Universidade de São Paulo.

**Item 1A. Risk Factors**

**Forward Looking Statements**

Certain written and oral statements made by our Company and subsidiaries of our Company may constitute "forward-looking statements" as defined under the Private Securities Litigation Reform Act of 1995. This includes statements made herein, in our other filings with the SEC, in press releases, and in certain other oral and written presentations.

Statements of our intentions, beliefs, expectations or predictions for the future, denoted by the words "anticipate," "believe," "estimate," "expect," "plan," "project," "imply," "intend," "foresee" and similar expressions, are forward-looking statements that reflect our current views about future events and are subject to risks, uncertainties and assumptions. Such risks, uncertainties and assumptions include those described under "Risk Factors" below and elsewhere in this annual report.

Actual results could differ materially from those projected in these forward-looking statements as a result of these factors, among others, many of which are beyond our control.

In making these statements, we are not undertaking, and specifically decline to undertake, any obligation to address or update each or any factor in future filings or communications regarding our business or results, and we are not undertaking to address how any of these factors may have caused changes in information contained in previous filings or communications. The risks described below are not the only risks we face, and additional risks and uncertainties may also impair our business operations. The occurrence of any one or more of the following or other currently unknown factors could materially adversely affect our business and operating results.

**Risk Factors**

The following risk factors should be read carefully in connection with evaluating our business and the forward-looking information contained in this annual report on Form 10-K. Any of the following risks could materially adversely affect our business, operations, industry or financial position or our future financial performance. While we believe we have identified and discussed below all risk factors affecting our business that we believe are material, there may be additional risks and uncertainties that are not presently known or that are not currently believed to be significant that may adversely affect our business, operations, industry, financial position and financial performance in the future.

**Industry cyclicality can affect our earnings, especially due to fluctuations in commodity prices of feed ingredients and chicken.**

Profitability in the chicken industry is materially affected by the commodity prices of feed ingredients and chicken, which are determined by supply and demand factors. As a result, the chicken industry is subject to cyclical earnings fluctuations.

11

The production of feed ingredients is positively or negatively affected primarily by the global level of supply inventories and demand for feed ingredients, the agricultural policies of the U.S. and foreign governments and weather patterns throughout the world. In particular, weather patterns often change agricultural conditions in an unpredictable manner. A significant change in weather patterns could affect supplies of feed ingredients, as well as both the industry's and our ability to obtain feed ingredients, grow chickens or deliver products. More recently, feed prices have been impacted by increased demand both domestically for ethanol and globally for protein production.

Market prices for feed ingredients remained at historically high levels throughout 2012. Market prices for feed ingredients remain volatile. Consequently, there can be no assurance that the price of corn or soybean meal will not continue to rise as a result of, among other things, increasing demand for these products around the world and alternative uses of these products, such as ethanol and biodiesel production.

High feed ingredient prices have had, and may continue to have, a materially adverse effect on our operating results, which has resulted in, and may continue to result in, additional noncash expenses due to impairment of the carrying amounts of certain of our assets. We periodically seek, to the extent available, to enter into advance purchase commitments or financial derivative contracts for the purchase of feed ingredients in an effort to manage our feed ingredient costs. The use of these instruments may not be successful. In addition, we have not designated the derivative financial instruments that we have purchased to mitigate commodity purchase exposures as cash flow hedges. Therefore, we recognize changes in the fair value of these derivative financial instruments immediately in earnings. Unexpected changes in the fair value of these instruments could adversely affect the results of our operations.

**Outbreaks of livestock diseases in general and poultry diseases in particular, including avian influenza, can significantly affect our ability to conduct our operations and demand for our products.**

We take precautions designed to ensure that our flocks are healthy and that our processing plants and other facilities operate in a sanitary and environmentally-sound manner. However, events beyond our control, such as the outbreaks of disease, either in our own flocks or elsewhere, could significantly affect demand for our products or our ability to conduct our operations. Furthermore, an outbreak of disease could result in governmental restrictions on the import and export of our fresh chicken or other products to or from our suppliers, facilities or customers, or require us to destroy one or more of our flocks. This could also result in the cancellation of orders by our customers and create adverse publicity that may have a material adverse effect on our ability to market our products successfully and on our business, reputation and prospects.

During the first half of 2006, there was substantial publicity regarding a highly pathogenic strain of avian influenza, known as H5N1, which has been affecting Asia since 2002 and which has also been found in Europe and Africa. It is widely believed that H5N1 is being spread by migratory birds, such as ducks and geese. There have also been some cases where H5N1 is believed to have passed from birds to humans as humans came into contact with live birds that were infected with the disease.

Although highly pathogenic H5N1 has not been identified in North America, there have been outbreaks of low pathogenic strains of avian influenza in North America, and in Mexico outbreaks of both high and low-pathogenic strains of avian influenza are a fairly common occurrence. Historically, the outbreaks of low pathogenic avian influenza have not generated the same level of concern, or received the same level of publicity or been accompanied by the same reduction in demand for poultry products in certain countries as that associated with the highly pathogenic H5N1 strain. Accordingly, even if the highly pathogenic H5N1 strain does not spread to North or Central America, there can be no assurance that it will not materially adversely affect demand for North or Central American produced poultry internationally and/or domestically, and, if it were to spread to North or Central America, there can be no assurance that it would not significantly affect our ability to conduct our operations and/or demand for our products, in each case in a manner having a material adverse effect on our business, reputation and/or prospects.

**If our poultry products become contaminated, we may be subject to product liability claims and product recalls.**

Poultry products may be subject to contamination by disease-producing organisms, or pathogens, such as *Listeria monocytogenes*, *Salmonella* and generic *E.coli*. These pathogens are generally found in the environment, and, as a result, there is a risk that they, as a result of food processing, could be present in our processed poultry products. These pathogens can also be introduced as a result of improper handling at the further processing, foodservice or consumer level. These risks may be controlled, although not eliminated, by adherence to good manufacturing practices and finished product testing. We have little, if any, control over proper handling once the product has been shipped. Illness and death may result if the pathogens are not eliminated at the further processing, foodservice or consumer level. Even an inadvertent shipment of contaminated products is a violation of law and may lead to increased risk of exposure to product liability claims, product recalls and increased scrutiny by federal and state regulatory agencies and may have a material adverse effect on our business, reputation and prospects.

12

**Product liability claims or product recalls can adversely affect our business reputation, expose us to increased scrutiny by federal and state regulators and may not be fully covered by insurance.**

The packaging, marketing and distribution of food products entail an inherent risk of product liability and product recall and the resultant adverse publicity. We may be subject to significant liability if the consumption of any of our products causes injury, illness or death. We could be required to recall certain products in the event of contamination or damage to the products. In addition to the risks of product liability or product recall due to deficiencies caused by our production or processing operations, we may encounter the same risks if any third party tampers with our products. We cannot assure you that we will not be required to perform product recalls, or that product liability claims will not be asserted against us, in the future. Any claims that may be made may create adverse publicity that would have a material adverse effect on our ability to market our products successfully or on our business, reputation, prospects, financial condition and results of operations.

If our poultry products become contaminated, we may be subject to product liability claims and product recalls. There can be no assurance that any litigation or reputational injury associated with product recalls will not have a material adverse effect on our ability to market our products successfully or on our business, reputation, prospects, financial condition and results of operations.

We currently maintain insurance with respect to certain of these risks, including product liability insurance, property insurance, workers compensation insurance, business interruption insurance and general liability insurance, but in many cases such insurance is expensive, difficult to obtain and no assurance can be given that such insurance can be maintained in the future on acceptable terms, or in sufficient amounts to protect us against losses due to any such events, or at all. Moreover, even though our insurance coverage may be designed to protect us from losses attributable to certain events, it may not adequately protect us from liability and expenses we incur in connection with such events. Additionally, in the past, two of our insurers encountered financial difficulties and were unable to fulfill their obligations under the insurance policies as anticipated and, separately, two of our other insurers contested coverage with respect to claims covered under policies purchased, forcing us to litigate the issue of coverage before we were able to collect under these policies.

**Competition in the chicken industry with other vertically integrated poultry companies may make us unable to compete successfully in these industries, which could adversely affect our business.**

The chicken industry is highly competitive. In both the U.S. and Mexico, we primarily compete with other vertically integrated chicken companies.

In general, the competitive factors in the U.S. chicken industry include price, product quality, product development, brand identification, breadth of product line and customer service. Competitive factors vary by major market. In the foodservice market, competition is based on consistent quality, product development, service and price. In the U.S. retail market, we believe that competition is based on product quality, brand awareness, customer service and price. Further, there is some competition with non-vertically integrated further processors in the prepared chicken business. In Mexico, where product differentiation has traditionally been limited, we believe product quality and price have been the most critical competitive factors.

**The loss of one or more of our largest customers could adversely affect our business.**

Our two largest customers accounted for approximately 15.7% of our net sales in 2012, and our largest customer, Wal-Mart Stores, Inc., accounted for 9.7% of our net sales in 2012. Our business could suffer significant setbacks in revenues and operating income if we lost one or more of our largest customers, or if our customers' plans and/or markets should change significantly.

**Our foreign operations pose special risks to our business and operations.**

We have significant operations and assets located in Mexico and may participate in or acquire operations and assets in other foreign countries in the future. Foreign operations are subject to a number of special risks such as currency exchange rate fluctuations, trade barriers, exchange controls, expropriation and changes in laws and policies, including tax laws and laws governing foreign-owned operations.

Currency exchange rate fluctuations have adversely affected us in the past. Exchange rate fluctuations or one or more other risks may have a material adverse effect on our business or operations in the future.

Our operations in Mexico are conducted through subsidiaries organized under the laws of Mexico. Claims of creditors of our subsidiaries, including trade creditors, will generally have priority as to the assets of our subsidiaries over our claims. Additionally, the ability of our Mexican subsidiaries to make payments and distributions to us may be limited by the terms of our Mexico credit facility and will be subject to, among other things, Mexican law. In the past, these laws have not had a material adverse effect on the ability of our Mexican subsidiaries to make these payments and distributions. However, laws such as these may have a material adverse effect on the ability of our Mexican subsidiaries to make these payments and distributions in the future.

13

**Disruptions in international markets and distribution channels could adversely affect our business.**

Historically, we have targeted international markets to generate additional demand for our products. In particular, given U.S. customers' general preference for white meat, we have targeted international markets for the sale of dark chicken meat, specifically leg quarters, which are a natural by-product of our U.S. operations' concentration on prepared chicken products. As part of this initiative, we have created a significant international distribution network into several markets in Mexico, the Far East and countries within the CIS. Our success in these markets may be, and our success in recent periods has been, adversely affected by disruptions in chicken export markets. For example, China imposed anti-dumping and countervailing duties on the U.S. chicken producers in 2010 which can be expected to deter Chinese importers from purchases of U.S.-origin chicken products. Additionally, from time to time Russia has restricted the importation of U.S. poultry products for the protection of their domestic poultry producers and in cases of allegations of consumer health issues.

A significant risk is disruption due to import restrictions and tariffs, other trade protection measures, and import or export licensing requirements. In addition, disruptions may be caused by outbreaks of disease such as avian influenza, either in our flocks or elsewhere in the world, and resulting changes in consumer preferences.

One or more of these or other disruptions in the international markets and distribution channels could adversely affect our business.

**Regulation, present and future, is a constant factor affecting our business.**

Our operations will continue to be subject to federal, state and local governmental regulation, including in the health, safety and environmental areas. We anticipate increased regulation by various agencies concerning food safety, the use of medication in feed formulations and the disposal of chicken by-products and wastewater discharges. Also, changes in laws or regulations or the application thereof may lead to government enforcement actions and the resulting litigation by private litigants, such as various wage and hour and environmental issues.

On December 8, 2011, the USDA's Grain Inspection, Packers and Stockyards Administration issued new regulations under the Packers and Stockyards Act that would apply to all stages of a live poultry dealer's poultry grow-out. The new regulations significantly impact the relationship between integrated poultry processors, like us, and their independent growers. Among other things, the new regulations substantially limit our and our independent contract growers' freedom of contract, and affect the way we pay our independent contract growers. Many of the new regulations are, in our view, unclear, vague and will likely require litigation to determine their scope and impact. Such litigation could be costly to our industry and us. The new regulations could also lead to increased enforcement activity and private litigation against integrated poultry producers that could have a material adverse effect on our operations and financial operating results. Additionally, the new regulations could increase the cost of doing business or change the way in which we do business.

In addition, unknown matters, new laws and regulations, or stricter interpretations of existing laws or regulations may also materially affect our business or operations in the future.

**New immigration legislation or increased enforcement efforts in connection with existing immigration legislation could cause the costs of doing business to increase, cause us to change the way we conduct our business or otherwise disrupt our operations.**

Immigration reform continues to attract significant attention in the public arena and the U.S. Congress. If new federal immigration legislation is enacted or if states in which we do business enact immigration laws, such laws may contain provisions that could make it more difficult or costly for us to hire U.S. citizens and/or legal immigrant workers. In such case, we may incur additional costs to run our business or may have to change the way we conduct our operations, either of which could have a material adverse effect on our business, operating results and financial condition. Also, despite our past and continuing efforts to hire only U.S. citizens and/or persons legally authorized to work in the U.S., we may be unable to ensure that all of our employees are U.S. citizens and/or persons legally authorized to work in the U.S. For example, U.S. Immigration and Customs Enforcement has investigated identity theft within our workforce. With our cooperation, during 2008 U.S. Immigration and Customs Enforcement arrested approximately 300 employees believed to have engaged in identity theft at five of our facilities. No assurances can be given that further enforcement efforts by governmental authorities will not disrupt a portion of our workforce or operations at one or more facilities, thereby negatively impacting our business. Also, no assurance can be given that further enforcement efforts by governmental authorities will not result in the assessment of fines that could adversely affect our financial position, operating results or cash flows.

14

**Loss of essential employees could have a significant negative impact on our business.**

Our success is largely dependent on the skills, experience, and efforts of our management and other employees. The loss of the services of one or more members of our senior management or of numerous employees with essential skills could have a negative effect on our business, financial condition and results of operations. If we are not able to retain or attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect our ability to achieve our business objectives.

**Our performance depends on favorable labor relations with our employees and our compliance with labor laws. Any deterioration of those relations or increase in labor costs due to our compliance with labor laws could adversely affect our business.**

As of December 30, 2012, we employed approximately 33,000 persons in the U.S. and approximately 5,000 persons in Mexico. Approximately 36.3% of the Company's employees were covered under collective bargaining agreements. Substantially all employees covered under collective bargaining agreements are covered under agreements that expired in 2011 or 2012 and remain subject to ongoing negotiations or will expire in 2013. We have not experienced any labor-related work stoppage at any location in over eight years. We believe our relationship with our employees and union leadership is satisfactory. At any given time, we will be in some stage of contract negotiations with various collective bargaining units. The Company is currently in negotiations with union locals in 11 locations, and there is no assurance that agreement will be reached or, if reached, will be on the terms that are favorable to the Company. In the absence of an agreement, we may become subject to labor disruption at any of these locations, which could have an adverse effect on our financial results.

**Extreme weather, natural disasters or other events beyond our control could negatively impact our business.**

Bioterrorism, fire, pandemic, extreme weather or natural disasters, including droughts, floods, excessive cold or heat, hurricanes or other storms, could impair the health or growth of our flocks, production or availability of feed ingredients, or interfere with our operations due to power outages, fuel shortages, damage to our production and processing facilities or disruption of transportation channels, among other things. Any of these factors could have an adverse effect on our financial results.

**We may face significant costs for compliance with existing or changing environmental requirements and for potential environmental obligations relating to current or discontinued operations.**

Compliance with existing or changing environmental requirements, including more stringent limitations imposed or expected to be imposed in recently-renewed or soon-to be renewed environmental permits, will require capital expenditures for installation of new or upgraded pollution control equipment at some of our facilities.

In the past, we have acquired businesses with operations such as pesticide and fertilizer production that involved greater use of hazardous materials and generation of more hazardous wastes than our current operations. While many of those operations have been sold or closed, some environmental laws impose strict and, in certain circumstances, joint and several liability for costs of investigation and remediation of contaminated sites on current and former owners and operators of the sites, and on persons who arranged for disposal of wastes at such sites. In addition, current owners or operators of such contaminated sites may seek to recover cleanup costs from us based on past operations or contractual indemnifications.

New environmental requirements, stricter interpretations of existing environmental requirements, or obligations related to the investigation or clean-up of contaminated sites, may materially affect our business or operations in the future.

**JBS USA holds a majority of our common stock and has the ability to control the vote on most matters brought before the holders of our common stock.**

JBS USA holds a majority of the shares and voting power of our common stock and is entitled to appoint a majority of the members of our board of directors. As a result, JBS USA will, subject to restrictions on its voting power and actions in a stockholders agreement between us and JBS USA and our organization documents, have the ability to control our management, policies and financing decisions, elect a majority of the members of our board of directors at the annual meeting and control the vote on most matters coming before the holders of our common stock.

Under the stockholders agreement between us and JBS USA, JBS USA has the ability to elect up to six members of our board of directors and the other holders of our common stock have the ability to elect up to two members of our board of directors. If the percentage of our outstanding common stock owned by JBS USA exceeds 80%, then JBS USA would have the ability to elect one additional member of our board of directors while the other holders of our common stock would have the ability to elect one less member of our board of directors.

15

**Our operations are subject to general risks of litigation.**

We are involved on an on-going basis in litigation with our independent contract growers or arising in the ordinary course of business or otherwise. Trends in litigation may include class actions involving consumers, shareholders, employees or injured persons, and claims relating to commercial, labor, employment, antitrust, securities or environmental matters. Litigation trends and the outcome of litigation cannot be predicted with certainty and adverse litigation trends and outcomes could adversely affect our financial results.

**We depend on contract growers and independent producers to supply us with livestock.**

We contract primarily with independent contract growers to raise the live chickens processed in our poultry operations. If we do not attract and maintain contracts with growers or maintain marketing and purchasing relationships with independent producers, our production operations could be negatively affected.

**Changes in consumer preference could negatively impact our business.**

The food industry in general is subject to changing consumer trends, demands and preferences. Trends within the food industry change often, and failure to identify and react to changes in these trends could lead to, among other things, reduced demand and price reductions for our products, and could have an adverse effect on our financial results.

**The consolidation of customers could negatively impact our business.**

Our customers, such as supermarkets, warehouse clubs and food distributors, have consolidated in recent years, and consolidation is expected to continue throughout the U.S. and in other major markets. These consolidations have produced large, sophisticated customers with increased buying power who are more capable of operating with reduced inventories, opposing price increases, and demanding lower pricing, increased promotional programs and specifically tailored products. These customers also may use shelf space currently used for our products for their own private label products. Because of these trends, our volume growth could slow or we may need to lower prices or increase promotional spending for our products, any of which would adversely affect our financial results.

**Our future financial and operating flexibility may be adversely affected by our significant leverage.**

We have substantial indebtedness, which could adversely affect our financial condition. On a consolidated basis, as of December 30, 2012, we had approximately $667.5 million in secured indebtedness, $497.3 million of unsecured indebtedness and had the ability to borrow approximately $529.9 million under our credit agreements. Significant amounts of cash flow will be necessary to make payments of interest and repay the principal amount of such indebtedness.

The degree to which we are leveraged could have important consequences because:

- It could affect our ability to satisfy our obligations under our credit agreements;

- A substantial portion of our cash flow from operations is required to be dedicated to interest and principal payments and may not be available for operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- Our ability to obtain additional financing and to fund working capital, capital expenditures and other general corporate requirements in the future may be impaired;

- We may be more highly leveraged than some of our competitors, which may place us at a competitive disadvantage;

- Our flexibility in planning for, or reacting to, changes in our business may be limited;

- It may limit our ability to pursue acquisitions and sell assets; and

- It may make us more vulnerable in the event of a continued or new downturn in our business or the economy in general.

Our ability to make payments on and to refinance our debt, including our credit facilities, will depend on our ability to generate cash in the future. This, to a certain extent, is subject to various business factors (including, among others, the commodity prices of feed ingredients and chicken) and general economic, financial, competitive, legislative, regulatory, and other factors that are beyond our control.

16

There can be no assurance that we will be able to generate sufficient cash flow from operations or that future borrowings will be available under our credit facilities in an amount sufficient to enable us to pay our debt obligations, including obligations under our credit facilities, or to fund our other liquidity needs. We may need to refinance all or a portion of their debt on or before maturity. There can be no assurance that we will be able to refinance any of their debt on commercially reasonable terms or at all.

**Media campaigns related to food production present risks.**

Individuals or organizations can use new social media platforms to publicize inappropriate or inaccurate stories or perceptions about the food production industry or our Company. Such practices could cause damage to the reputations of the Company and/or the food production industry in general. This damage could adversely affect our financial results.

**Item 1B. Unresolved Staff Comments**

None.

17

**Item 2. Properties**

*Operating Facilities*

Our main operating facilities are as follows:

| | Operating | Idled | Capacity[(a)(b)] | Average Capacity Utilization[(b)] |
|---|---|---|---|---|
| **U.S. Chicken Facilities** | | | | |
| Fresh processing plants | 25 | 4 | 32.8 million head | 91.5% |
| Prepared foods cook plants | 8 | — | 18.9 million pounds | 94% |
| Feed mills | 25 | 2 | 11.9 million tons | 76.0% |
| Hatcheries | 30 | 4 | 2,285.6 million eggs | 83.5% |
| Rendering | 6 | 1 | 9,000 tons | 57.1% |
| Pet food processing | 3 | — | 1,500 tons | 56.0% |
| **Puerto Rico Facilities** | | | | |
| Fresh processing plant | 1 | — | 350,000 head | 94.3% |
| Feed mill | 1 | — | 112,000 tons | 71.5% |
| Hatcheries | 1 | — | 27.0 million eggs | 78.9% |
| Rendering | 1 | — | 84 tons | 79.1% |
| Distribution centers | 1 | — | N/A | N/A |
| **Mexico Facilities** | | | | |
| Processing plants | 3 | — | 2.7 million head | 85.2% |
| Feed mills | 4 | — | 1.15 million tons | 76.0% |
| Hatcheries | 6 | — | 240.3 million eggs | 94.0% |
| Rendering | 2 | — | 26,000 tons | 64.2% |
| Distribution centers | 13 | — | N/A | N/A |

(a)    Capacity is based on a five day week.

(b)    Capacity and utilization numbers do not include idled facilities.

*Other Facilities and Information*

Our corporate offices share a building with JBS USA in Greeley, Colorado. We own a partially automated distribution freezer located outside of Pittsburg, Texas, which includes 125,000 square feet of storage area. We own a building in Richardson, Texas, which houses our computer data center; and an office building in Broadway, Virginia, which houses additional sales and marketing, research and development, and support activities. We own an office building in Mexico City, which houses our Mexican marketing office and we lease an office building in Querétaro, Mexico, which houses our Mexican administrative functions. In addition, we own administrative office buildings in Pittsburg, Texas and Atlanta, Georgia that we are currently marketing for sale.

Most of our domestic property, plant and equipment are pledged as collateral on our long-term debt and credit facilities. See "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations."

**Item 3. Legal Proceedings**

*Grower Claims and Proceedings*

*Ricky Arnold et al. v. Pilgrim's Pride Corp., et al.* On September 10, 2008, a lawsuit styled "Ricky Arnold, et al. v. Pilgrim's Pride Corp., et al." was filed against our Company and two of its representatives. In this lawsuit, filed in the Circuit Court of Van Buren County, Arkansas, nearly 100 contract poultry growers and their spouses assert claims of fraud and deceit, constructive fraud, fraud in the inducement, promissory estoppel, and violations of the Arkansas Livestock and Poultry Contract Protection Act relating to the idling of our Clinton, Arkansas processing plant. The total amount of damages sought by the contract poultry growers is unliquidated and unknown at this time. We filed a Notice of Suggestion of Bankruptcy. The Court has not issued an order in response to it. The plaintiffs filed proofs of claim in the Bankruptcy Court, and we filed objections to the proofs of claim. The plaintiffs in the Arnold case, and a number of other growers from the Clinton, Arkansas facility filed proofs of claim in the bankruptcy case. We anticipate that the Arnold case will be resolved as a part of the claim resolution process in the Bankruptcy Court. We express no opinion as to the likelihood of an unfavorable outcome or the amount or range of any possible loss to us.

18

*Sheila Adams, et al. v. Pilgrim's Pride Corporation.* On June 1, 2009, approximately 555 former and current independent contract broiler growers, their spouses and poultry farms filed an adversary proceeding against us in the Bankruptcy Court styled "Sheila Adams, et al. v. Pilgrim's Pride Corporation." In the adversary proceeding, the plaintiffs assert claims against us for: (i) violations of Sections 202(a), (b) and (e), 7 US C. § 192 of the Packers and Stockyards Act of 1921 (the "PSA"); (ii) intentional infliction of emotional distress; (iii) violations of the Texas Deceptive Trade Practices Act ("DTPA"); (iv) promissory estoppel; (v) simple fraud; and (vi) fraud by nondisclosure. The case relates to our Farmerville, Louisiana; Nacogdoches, Texas; and the De Queen and Batesville, Arkansas complexes. The plaintiffs also filed a motion to withdraw the reference of the adversary proceeding from the Bankruptcy Court to the U.S District for the Eastern Court of Texas ("Marshall Court"). The motion was filed with the U.S. District Court for the Northern District of Texas-Fort Worth Division (the "Fort Worth Court"). The Bankruptcy Court recommended the reference be withdrawn, but that the Fort Worth Court retain venue over the action to ensure against forum shopping. The Fort Worth Court granted the motion to withdraw the reference and consolidated this action with the City of Clinton proceeding described below. We filed a motion to dismiss the plaintiffs' claims. The Fort Worth Court granted in part and denied in part our motion, dismissing the following claims and ordering the plaintiffs to file a motion to amend their lawsuit and re-plead their claims with further specificity or the claims would be dismissed with prejudice: (i) intentional infliction of emotional distress; (ii) promissory estoppel; (iii) simple fraud and fraudulent nondisclosure; and (iv) DTPA claims with respect to growers from Oklahoma, Arkansas, and Louisiana. The plaintiffs filed a motion for leave to amend on October 7, 2009. Plaintiffs' motion for leave was granted and the plaintiffs filed their Amended Complaint on December 7, 2009. Subsequent to the Fort Worth Court granting in part and denying in part our motion to dismiss, the plaintiffs filed a motion to transfer venue of the proceeding from the Fort Worth Court to the Marshall Court. We filed a response to the motion, but the motion to transfer was granted on December 17, 2009. On December 29, 2009, we filed our answer to plaintiffs' Amended Complaint with the Marshall Court. A bench trial commenced on June 16, 2011. The trial concluded as to the El Dorado growers on August 25, 2011. On September 30, 2011, the Marshall Court issued its Findings of Facts and Conclusions of Law and Judgment finding in favor of the Company on each of the grower claims with exception of claims under 7 U.S.C. §192(e), and awarding damages to plaintiffs in the aggregate of approximately $25.8 million. Afterward, the Company filed post-judgment motions attacking the trial court's findings of fact and conclusions of law, which, on December 28, 2011, were granted in part and resulted in a reduction of the damages award from $25.8 million to $25.6 million. On January 19, 2012, the Company appealed the findings of fact and conclusions of law and decision concerning the post-judgment motions to the United States Fifth Circuit Court of Appeals. Oral argument occurred on December 3, 2012. The appeal has been submitted for a decision, but there is no deadline set for the Fifth Circuit Court of Appeals to issue a decision. As for the remaining claims, the bench trials relating to the allegations asserted by the plaintiffs from the Farmerville, Louisiana complex began on July 16, 2012. That bench trial concluded on August 2, 2012. The Marshall Court has not issued a decision. Additionally, the bench trials relating to the claims asserted by the plaintiffs from the Nacogdoches, Texas complex began on September 12, 2012. The trial has not concluded. However, at this time, the Nacogdoches, Texas bench trial is scheduled to resume on April 22, 2013. The remaining bench trial for the plaintiffs from the De Queen and Batesville, Arkansas complexes was scheduled for October 29, 2012, but that trial date was canceled. The Marshall Court has not scheduled new dates for that bench trial. The Company intends to vigorously pursue its appellate rights and defend against the underlying judgment. While the outstanding judgment is reasonably possible, the Company has recorded an estimated probable loss that is less than the outstanding judgment. The Company intends to vigorously defend against these claims. Although the likelihood of financial loss related to the remaining growers' claims is reasonably possible, an estimate of potential loss cannot be determined at this time because of now conflicting legal authority, the factual nature of the various growers' individual claims, and a new judge who will preside over the remaining bench trials. There can be no assurances that other similar claims may not be brought against the Company.

*Grower Proofs of Claim.* Approximately 161 former independent contract broiler growers, their spouses and poultry farms filed proofs of claim against us relating to the idling of the Company's El Dorado, Arkansas; Douglas, Georgia; Siler City and Sanford, North Carolina; and Athens, Alabama processing facilities. Eight of the growers also filed administrative claims against us. The growers' claims include: (i) fraud; (ii) fraudulent inducement; (iii) violations of the Packers & Stockyards Act; (iv) breach of fiduciary duty; (v) promissory estoppel; (vi) equitable estoppel; (vii) restitution; and (viii) deceptive trade practices. The claims relate to the growers' allegations that they were required to spend significant amounts improving their poultry farms in order to continue their contractual relationship with our Company and predecessor companies. On December 17, 2009, we filed objections to the proofs of claim and administrative claims. The parties have engaged in discovery. Since discovery commenced, we announced that we are reopening the Douglas, Georgia complex. Consequently, we circulated new poultry grower contracts with releases to those growers that own and/or operate poultry farms within or near Douglas, Georgia. Because numerous growers signed the poultry grower agreement that contained the release of their claims, approximately 133 of the 161 growers in this consolidated claims administration proceeding withdrew their proofs of claim and motions for administrative expense claims. There are currently approximately 48 growers in this proceeding. After engaging in discovery motion practice and a trial, the majority of the 48 growers' claims were dismissed. The Company subsequently settled the remaining claims.

19

Numerous former independent contract growers located in our Clinton, Arkansas complex filed proofs of claim against us relating to the Arnold litigation referenced above. The claims include: (i) fraud and deceit; (ii) constructive fraud; (iii) fraud in the inducement; (iv) promissory estoppel; (v) a request for declaratory relief; and (vi) violations of the Arkansas Livestock and Poultry Contract Protection Act, and relate to the growers' allegations that they were required to spend significant amounts improving their poultry farms in order to continue their contractual relationship with our Company and predecessor companies prior to us idling our Clinton processing facility. Most of the growers in this consolidated claims administration proceeding were named plaintiffs in the case styled, "Ricky Arnold, et al. v. Pilgrim's Pride Corporation, et al." discussed above. On November 30, 2009, we filed objections to the proofs of claim. On August 2, 2010, we filed numerous motions for summary judgment requesting the Bankruptcy Court to dismiss each grower's causes of action against our Company. In response to the dispositive motions, the growers conceded that their numerous fraud and statutory claims lacked merit; consequently, the parties recently submitted agreed orders dismissing these claims with prejudice. The sole remaining cause of action alleged by the growers against us is promissory estoppel. The hearing on our motions for summary judgment with respect to the promissory estoppel claims occurred on October 19, 2010. On December 15, 2010, the Bankruptcy Court granted the Company's summary judgment motion on 106 of the 107 growers' promissory estoppel claims. The Company settled with the grower whose claims were not dismissed for an immaterial amount. The growers whose claims were dismissed appealed the decision to the District Court, which, on December 19, 2011, affirmed the Bankruptcy Court's decision. On January 17, 2012, the growers appealed the District Court's decision to the United States Fifth Circuit of Court of Appeals. The parties submitted appellate briefs and are awaiting a decision. The appeal has been submitted for a decision without oral argument, but there is no deadline set for the Fifth Circuit Court of Appeals to issue a decision. The Company intends to defend vigorously against the merits of the growers' appeal. We express no opinion as to the likelihood of an unfavorable outcome or the amount or range of any possible loss to us.

*Securities Litigation*

On October 29, 2008, Ronald Acaldo filed suit in the U.S. District Court for the Eastern District of Texas, Marshall Division, against us and individual defendants Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, J. Clinton Rivers, Richard A. Cogdill and Clifford E. Butler. The Complaint alleged that our Company and the individual defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder.

On November 13, 2008, Chad Howes filed suit in the U.S. District Court for the Eastern District of Texas, Marshall Division, against us and individual defendants Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, J. Clinton Rivers, Richard A. Cogdill and Clifford E. Butler. The allegations in the Howes Complaint are identical to those in the Acaldo Complaint, as are the class allegations and relief sought. The defendants were never served with the Howes Complaint.

On May 14, 2009, the Court consolidated the Acaldo and Howes cases and renamed the style of the case, "In re: Pilgrim's Pride Corporation Securities Litigation." On May 21, 2009, the Court granted the Pennsylvania Public Fund Group's Motion for Appointment of Lead Plaintiff. Thereafter, on June 26, 2009, the lead plaintiff filed a Consolidated (and amended) Complaint. The Consolidated Complaint dismissed the Company and Clifford E. Butler as Defendants. In addition, the Consolidated Complaint added the following directors as Defendants: Charles L. Black, Key Coker, Blake D. Lovette, Vance C. Miller, James G. Vetter, Jr., Donald L. Wass, Linda Chavez, and Keith W. Hughes. The Consolidated Complaint alleges four causes of action: violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, as amended, and Rule 10b-5 promulgated thereunder solely against Lonnie "Bo" Pilgrim, Clint Rivers, and Richard A. Cogdill (the "Officer Defendants"). Those claims assert that, during the Class Period of May 5, 2008 through October 28, 2008, the defendants, through various financial statements, press releases and conference calls, made material misstatements of fact and/or omitted to disclose material facts by purportedly failing to completely impair the goodwill associated with the Gold Kist acquisition. The Consolidated Complaint also asserts claims under Section 11 of the Securities Act of 1933 against all defendants, asserting that, statements made in a registration statement in connection with the May 14, 2008 secondary offering of our common stock were materially false and misleading for their failure to completely impair the goodwill associated with the Gold Kist acquisition. Finally, the Consolidated Complaint asserts a violation of Section 15 of the Securities Act of 1933 against the Officer Defendants only, claiming that the Officer Defendants were controlling persons of the Company and the other defendants in connection with the Section 11 violation. By the Consolidated Complaint, the lead plaintiff seeks certification of the Class, undisclosed damages, and costs and attorneys' fees.

On July 27, 2009, defendants filed a Motion to Dismiss the Consolidated Complaint for its failure to adequately plead, as to the Sections 10(b) and 20(a) claims, scienter and loss causation and, as to the Sections 11 and 15 claims, for its failure to adequately plead misrepresentations and omissions. Defendants requested that the Consolidated Complaint be dismissed with prejudice.

On August 17, 2010, the Court issued its Memorandum Opinion and Order on the motion to dismiss, granting in part and denying in part, the defendants' motion. The Court dismissed without prejudice the plaintiffs' claims alleging securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 and for controlling person liability under Section 20(a) of the Exchange Act. The Court denied defendants' motion to dismiss with respect to the plaintiffs' claim for negligent misrepresentation under Section 11 of the Securities Act and for controlling person liability under Section 15 of the Securities Act. The plaintiffs were granted leave to amend their complaint but elected not to do so. The defendants filed their Original Answer to the Complaint on November 15, 2010.

On May 9, 2011, the Court issued an Order setting a class certification hearing for February 7, 2012 and ordering the parties to confer and file a Docket Control Order by May 26, 2011. Thereafter, as per the Court's Order, the parties negotiated a proposed Docket Control Order, which was signed by the Court on May 31, 2011.

The parties reached an agreement to settle this matter for $1.5 million, subject to Court approval. A Stipulation of Settlement was filed on November 14, 2011. On January 23, 2012, the Court issued an order Preliminarily Approving Settlement, in which the Court set a hearing date for the final approval of settlement for May 1, 2012. On May 2, 2012 the Court issued an order of final approval of the settlement and dismissed the case with prejudice in accordance with the terms of the settlement agreement.

*ERISA Claims and Proceedings*

On December 17, 2008, Kenneth Patterson filed suit in the U.S. District Court for the Eastern District of Texas, Marshall Division, against Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, Clifford E. Butler, J. Clinton Rivers, Richard A. Cogdill, Renee N. DeBar, our Compensation Committee and other unnamed defendants (the "Patterson action"). On January 2, 2009, a nearly identical suit was filed by Denise M. Smalls in the same court against the same defendants (the "Smalls action"). The complaints in both actions, brought pursuant to section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 US C. § 1132, alleged that the individual defendants breached fiduciary duties to participants and beneficiaries of the Pilgrim's Pride Stock Investment Plan (the "Stock Plan"), as administered through the Pilgrim's Pride Retirement Savings Plan (the "RSP"), and the To-Ricos, Inc. Employee Savings and Retirement Plan (the "To-Ricos Plan") (collectively, the "Plans") by failing to sell the common stock held by the Plans before it declined in value in late 2008, based on factual allegations similar to the allegation made in the Acaldo securities case discussed above. Patterson and Smalls further alleged that they purported to represent a class of all persons or entities who were participants in or beneficiaries of the Plans at any time between May 5, 2008 through the present and whose accounts held our common stock or units in our common stock. Both complaints sought actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts as benefits due in proportion to the accounts' diminution in value, attorneys' fees, an order for equitable restitution and the imposition of constructive trust, and a declaration that each of the defendants have breached their fiduciary duties to the Plans' participants.

On July 20, 2009, the Court entered an order consolidating the Smalls and Patterson actions. On August 12, 2009, the Court ordered that the consolidated case will proceed under the caption "In re Pilgrim's Pride Stock Investment Plan ERISA Litigation, No. 2:08-cv-472-TJW."

Patterson and Smalls filed a consolidated amended complaint ("Amended Complaint") on March 2, 2010. The Amended Complaint names as defendants the Pilgrim's Pride Board of Directors, Lonnie "Bo" Pilgrim, Lonnie Ken Pilgrim, Charles L. Black, Linda Chavez, S. Key Coker, Keith W. Hughes, Blake D. Lovette, Vance C. Miller, James G. Vetter, Jr., Donald L. Wass, J. Clinton Rivers, Richard A. Cogdill, the Pilgrim's Pride Pension Committee, Robert A. Wright, Jane Brookshire, Renee N. DeBar, the Pilgrim's Pride Administrative Committee, Gerry Evenwel, Stacey Evans, Evelyn Boyden, and "John Does 1-10." The Amended Complaint purports to assert claims on behalf of persons who were participants in or beneficiaries of the RSP or the To-Ricos Plan at any time between January 29, 2008 through December 1, 2008 ("the alleged class period"), and whose accounts included investments in the Company's common stock.

Like the original Patterson and Smalls complaints, the Amended Complaint alleges that the defendants breached ERISA fiduciary duties to participants and beneficiaries of the RSP and To-Ricos Plan by permitting both Plans to continue investing in the Company's common stock during the alleged class period. The Amended Complaint also alleges that certain defendants were "appointing" fiduciaries who failed to monitor the performance of the defendant-fiduciaries they appointed. Further, the Amended Complaint alleges that all defendants are liable as co-fiduciaries for one another's alleged breaches. Plaintiffs seek actual damages in the amount of any losses the RSP and To-Ricos Plan attributable to the decline in the value of the common stock held by the Plans, to be allocated among the participants' individual accounts as benefits due in proportion to the accounts' alleged diminution in value, costs and attorneys' fees, an order for equitable restitution and the imposition of constructive trust, and a declaration that each of the defendants have breached their ERISA fiduciary duties to the RSP and To-Ricos Plan's participants.

The defendants filed a motion to dismiss the Amended Complaint on May 3, 2010. The plaintiffs responded to that motion on July 2, 2010, dropping plaintiff Smalls from the case and adding an additional plaintiff, Stanley Sylvestros. On December 20, 2011, the case was reassigned to Judge Rodney Gilstrap, and on January 25, 2012, Judge Gilstrap referred the proceedings to Magistrate Roy S. Payne. The court has not yet ruled on the motion to dismiss. The was subsequently reassigned to District Judge Folsom, but remained assigned to Magistrate Payne for pretrial proceedings. On August 9, 2012, the Magistrate issued a Report and Recommendation denying the motion to dismiss without ruling on the merits. The Report and Recommendation was subsequently adopted by the District Court. The Magistrate scheduled briefing on class certification, which has been completed, and a hearing is scheduled for February 28, 2013. Defendants oppose class certification.

21

*Tax Claims and Proceedings*

The United States Department of Treasury, Internal Revenue Service ("IRS") filed an amended proof of claim in the Bankruptcy Court pursuant to which the IRS asserted claims that total $74.7 million. We filed in the Bankruptcy Court (i) an objection to the IRS' amended proof of claim and (ii) a motion requesting the Bankruptcy Court to determine our U.S. federal tax liability pursuant to Sections 105 and 505 of the Bankruptcy Code. The objection and motion asserted that the Company has no liability for the additional U.S. federal taxes that have been asserted for pre-petition periods by the IRS. The IRS responded in opposition to our objection and motion. On July 8, 2010, the Bankruptcy Court granted our unopposed motion requesting that the Bankruptcy Court abstain from determining our federal tax liability. As a result, we have worked with the IRS through the normal processes and procedures that are available to all taxpayers outside of bankruptcy (including the United States Tax Court ("Tax Court") proceedings discussed below) to resolve the IRS' amended proof of claim. On December 12, 2012 we entered into two Stipulation of Settled Issues ("Stipulation" or "Stipulations") with the IRS. The first Stipulation relates to the Company's 2003, 2005, and 2007 tax years and resolves all of the material issues in the case. The second Stipulation relates to the Company as the successor in interest to Gold Kist's for the tax years ended June 30, 2005 and September 30, 2005, and resolves all substantive issues in the case. These Stipulations account for approximately $29.3 million of the amended proof of claim and should result in no additional tax due.

In connection with the amended proof of claim, on May 26, 2010, we filed a petition in Tax Court in response to a Notice of Deficiency that was issued to the Company as the successor in interest to Gold Kist. The Notice of Deficiency and the Tax Court proceeding relate to a loss that Gold Kist claimed for its tax year ended June 30, 2004. This proceeding accounts for approximately $45.4 million of the amended proof of claim and the Company is still working with the IRS through the normal processes and procedures to resolve this portion of the IRS' amended proof of claim.

We express no opinion as to the likelihood of an unfavorable outcome or the amount or range of any possible loss to us related to the above Tax Court case related to Gold Kist's tax year ended June 30, 2004. If adversely determined, the outcome could have a material effect on the Company's operating results and financial position.

*Other Claims and Proceedings*

We are subject to various other legal proceedings and claims, which arise in the ordinary course of our business. In the opinion of management, the amount of ultimate liability with respect to these actions will not materially affect our financial condition, results of operations or cash flows.

**Item 4. Mine Safety Disclosures**

None.

22