**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-01966-RM-MEH

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 464A,
THE TRUSTEES OF WELFARE AND PENSION FUNDS OF LOCAL 464A – PENSION FUND,
THE TRUSTEES OF RETIREMENT PLAN FOR OFFICERS,
BUSINESS REPRESENTATIVES AND OFFICE EMPLOYEES OF LOCAL 464A,
THE TRUSTEES OF LOCAL 464A FINAST FULL TIME EMPLOYEES PENSION PLAN,
THE TRUSTEES OF LOCAL 464A WELFARE AND PENSION BUILDING INC., and
THE TRUSTEES OF NEW YORK-NEW JERSEY AMALGAMATED PENSION PLAN FOR ACME EMPLOYEES, Individually and on Behalf of All Others Similarly Situated,

       Plaintiffs,

v.

PILGRIM'S PRIDE CORPORATION,
JAYSON J. PENN,
WILLIAM W. LOVETTE, and
FABIO SANDRI,

       Defendants.

---

**LEAD PLAINTIFF'S OMNIBUS OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

---

4836-1622-6040.v1

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  STATEMENT OF FACTS .......................................................................................2

     A.   Background on Pilgrim's and the Broiler Industry..................................2

     B.   Pilgrim's Embarks on an Illegal Bid-Rigging Scheme...........................3

     C.   Defendants' Class Period Misstatements Conceal Their Fraudulent
          Scheme and Attribute Pilgrim's Success to Lawful Business Factors ....................5

     D.   Defendants' Scheme Is Revealed..............................................................6

     E.   Post-Class Period Events Confirm Defendants' Participation in the
          Scheme.......................................................................................................6

III. ARGUMENT............................................................................................................7

     A.   Standard of Review...................................................................................7

     B.   The Complaint Adequately Alleges Falsity..............................................7

          1.   Defendants Falsely Attributed Pilgrim's Success to Legitimate
               Business Factors, While Concealing the Bid-Rigging Scheme ..................8

          2.   Defendants Misrepresented Their Purportedly "Strong"
               Relationships with Key Customers............................................................12

          3.   Defendants Misrepresented the Purportedly "Highly Competitive"
               Nature of the Chicken Industry.................................................................14

          4.   Defendants Falsely Stated that Pilgrim's Was "Committed to a
               Policy of Lawful Competition"..................................................................16

          5.   The Individual Defendants' SOX Certifications Were Materially
               False and Misleading .................................................................................16

          6.   Defendants' Misrepresentations Were Highly Material ............................17

          7.   Defendants' Misrepresentations Are Not Entitled to Protection as
               Forward-Looking Statements.....................................................................19

     C.   The Complaint Adequately Alleges Scienter.........................................21

4836-1622-6040.v1

1.  Defendants' Direct Knowledge of and Participation in the Bid-
    Rigging Scheme Raises a Strong Inference of Scienter..............................22

2.  Defendants' Bid-Rigging Scheme Involved Pilgrim's Core
    Operations, Which Further Supports the Inference of Scienter.................25

3.  Defendants' Insider Trading During the Class Period Further
    Evidences Their Scienter ..........................................................................27

4.  The Departure of Multiple Key Executives Further Supports an
    Inference of Scienter .................................................................................29

5.  The Individual Defendants' False SOX Certifications Support a
    Strong Inference of Scienter .....................................................................30

6.  The Complaint Adequately Alleges Pilgrim's Scienter.............................31

7.  Defendants' Opposing Inference is Neither Cogent nor Compelling........31

D.  The Complaint Adequately Alleges Loss Causation .............................................32

E.  The Complaint Adequately Alleges Scheme Liability ..........................................36

F.  The Complaint States a Claim for Control Person Liability..................................37

IV.  CONCLUSION.................................................................................................................37

4836-1622-6040.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ........................................................................................7

*Anderson v. Spirit AeroSystems Holdings, Inc.*,
  105 F. Supp. 3d 1246 (D. Kan. 2015),
  *aff'd*, 827 F.3d 1229 (10th Cir. 2016).............................................................................21

*Ansell v. Laikin*,
  2011 WL 3274019 (C.D. Cal. Aug. 1, 2011).....................................................................35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................................................7, 11

*Better v. YRC Worldwide Inc.*,
  2012 WL 4433500 (D. Kan. Sep. 25, 2012) ..................................................................17, 18

*Bluestem Advisors LLC v. Eventure Interactive, Inc.*,
  2017 WL 3047895 (C.D. Cal. Apr. 17, 2017) ....................................................................11

*Cats v. Prot. One, Inc.*,
  2001 WL 34070630 (C.D. Cal. June 4, 2001) ...................................................................25

*City of Phila. v. Fleming Cos, Inc.*,
  264 F.3d 1245 (10th Cir. 2001) .......................................................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..............................................................................................12

*Cotter v. Gwyn*,
  2016 WL 4479510 (E.D. La. Aug. 25, 2016) ...................................................................37

*Croker v. Carrier Access Corp.*,
  2006 WL 2038011 (D. Colo. July 18, 2006) ....................................................................30

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)..................................................................................8

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................................32, 36

*Dutton v. D&K Healthcare Res.*,
  No. 4:04CV147SNL, 2006 WL 1778884
  (E.D. Mo. June 23, 2006)..................................................................................................28

4836-1622-6040.v1

*Emps. Ret. Sys. of City of Providence v. Embraer S.A.*,
  2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) .......................................................................9, 25

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).......................................................................................29

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) ................................................................................................21

*Hampton v. root9B Techs., Inc.*,
  897 F.3d 1291 (10th Cir. 2018) ..................................................................................................7

*Heck v. Orion Grp. Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tex. 2020) .......................................................................................10

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ......................................................................... *passim*

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)........................................................................................19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) .......................................................................................36

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
  2005 WL 1869289 (N.D. Cal. Aug. 5, 2005) .............................................................................10

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) .......................................................................................11

*In re Gold Res. Corp Sec. Litig.*,
  776 F.3d 1103 (10th Cir. 2015) ..............................................................................................7, 31

*In re Gold Res. Corp. Sec. Litig.*,
  957 F. Supp. 2d 1284 (D. Colo. 2013),
  *aff'd*, 776 F.3d 1103 (10th Cir. 2015)........................................................................................19

*In re HomeAdvisor, Inc. Litig.*,
  491 F. Supp. 3d 879 (D. Colo. 2020).....................................................................................11, 27

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ............................................................................................31

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ....................................................................................18, 21, 29

- iv -

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................10

*In re MBIA, Inc. Sec. Litig.*,
700 F. Supp. 2d 566 (S.D.N.Y. 2010)......................................................................................34

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016) (Moore, J.)............................................................. *passim*

*In re Morgan Stanley Info. Fund. Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)....................................................................................................17

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ...............................................................8, 9, 14

*In re Myriad Genetics, Inc.*,
2021 WL 977770 (D. Utah Mar. 16, 2021) .............................................................................29

*In re Nash Finch Co.*,
502 F. Supp. 2d 861 (D. Minn. 2007)................................................................................29, 30

*In re Nature's Sunshine Prods. Sec. Litig.*,
486 F. Supp. 2d 1301 (D. Utah 2007)......................................................................................16

*In re Navarre Corp. Sec. Litig.*,
299 F.3d 735 (8th Cir. 2002) ..................................................................................................22

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)........................................................................................30

*In re Overstock Sec. Litig*,
2020 WL 5775845 (D. Utah Sep. 28, 2020) ...........................................................................30

*In re PetroChina Co. Ltd. Sec. Litig.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015)......................................................................................10

*In re Rhythms Secs. Litig.*,
300 F. Supp. 2d 1081 (D. Colo. 2004)..........................................................................11, 34, 35

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................................................28

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) ....................................................................................28

4836-1622-6040.v1

*In re Tyson Food, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017)......................................................................................29

*In re Williams Sec. litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ........................................................................................7, 32

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003).................................................................................21

*Jun Zhang v. LifeVantage Corp.*,
  2017 WL 2599883 (D. Utah June 15, 2017)............................................................................31

*Lapin v. Goldman Sachs Grp., Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006)......................................................................................18

*McNamara v. Pre-Paid Legal Servs., Inc.*,
  189 F. App'x 702 (10th Cir. 2006) ..........................................................................................27

*Medina v. Clovis Oncology, Inc.*,
  215 F. Supp. 3d 1094 (D. Colo. 2017) (Moore, J.).............................................................22, 23

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)......................................................................................12

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .........................................................................10

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) .........................................................................................13, 14

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).....................................................................................................24

*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019)......................................................................................35

*Pelletier v. Endo Int'l PLC*,
  439 F. Supp. 3d 450 (E.D. Pa. 2020) .......................................................................................12

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)..................................................................................14, 23

*Pittman v. Unum Grp.*,
  2021 WL 2646065 (6th Cir. June 28, 2021) .............................................................................25

4836-1622-6040.v1

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..................................................................................26

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
  2013 WL 1831427 (E.D. Mo. Apr. 30, 2013)...........................................................24

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)................................................................15

*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) ..........................................................11

*Smallen v. Western Union Co*,
  2019 WL 1382823 (D. Colo. Mar. 27, 2019),
  *aff'd*, 950 F.3d 1297 (10th Cir. 2020)................................................................19, 24

*Smallen v. The Western Union Co.*,
  950 F.3d 1297 (10th Cir. 2020) ...................................................................21, 24, 25

*Smith v. LifeVantage Corp.*,
  429 F. Supp. 3d 1275 (D. Utah 2019)......................................................................36

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................12

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................21, 32

*United States v. Gordon*,
  710 F.3d 1124 (10th Cir. 2013) ............................................................................8, 13

*Utesch v. Lannett Co., Inc.*,
  385 F. Supp. 3d 408 (E.D. Pa. 2019) .......................................................................35

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
  845 F.3d 384 (8th Cir. 2016) .............................................................................36, 37

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) .........................................................30

4836-1622-6040.v1

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §1.............................................................................................................. *passim*
    §77z-1 ......................................................................................................................19
    §78j(b)..........................................................................................................7, 31, 34, 37
    §78t(a) ......................................................................................................................37
    §7201..........................................................................................................................30

28 U.S.C.
    §1658........................................................................................................................24

Federal Rules of Civil Proedure
    Rule 10b-5...........................................................................................................7, 31
    Rule 12(b)(6).............................................................................................................7

17 C.F.R.
    §240.10b-5 ..........................................................................................................7, 36

4836-1622-6040.v1

| Glossary of Defined Terms | |
|---|---|
| **Term** | **Definition** |
| Austin | Roger Austin, Pilgrim's Vice President ("VP") of Sales from February 2007 to March 2019.  ¶27. |
| Brady | Scott Brady, Pilgrim's VP of National Accounts from June 1999 to July 2012, and Claxton Poultry's ("Claxton") VP of National Accounts from August 2012 to the present.  ¶29. |
| Broilers | Young chickens that are bred for their meat and account for nearly all chicken meat produced and consumed in the United States.  ¶40. |
| Class Period | February 9, 2017 through June 2, 2020. ¶1. |
| Complaint | Lead Plaintiff's Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws.  ECF No. 54. |
| Defendants | Pilgrim's, Lovette, Penn, and Sandri.  ¶17. |
| DOJ | United States Department of Justice. |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §78a. |
| Individual Defendants | Lovette, Penn, and Sandri.  ¶17. |
| Initial Indictment | The indictment issued on June 3, 2020, by a federal grand jury in the District of Colorado, asserting criminal charges for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, against four individuals, including Penn, Austin, and Brady.  ¶3. |
| Key Customers | Nationwide grocery stores, restaurants, and distributors.  ¶41. |
| Little | Jimmie Little, Pilgrim's Sales Director from April 2000 to October 2017.  ¶28. |
| Lovette | Defendant William W. Lovette, Pilgrim's President and Chief Executive Officer ("CEO") from January 2011 to March 2019.  ¶14. |
| Lovette Mtn. | William W. Lovette's Motion to Dismiss Lead Plaintiff's Consolidated Amended Class Action Complaint.  ECF No. 64. |
| Motions | Lovette Mtn., Penn Mtn. and Pilgrim's Mtn., collectively. |
| Penn | Defendant Jayson J. Penn, Pilgrim's President and CEO from March 2019 until June 14 2020.  ¶15. |
| Penn Mtn. | Defendant Jayson Penn's Motion to Dismiss Lead Plaintiff's Consolidated Amended Class Action Complaint.  ECF No. 62. |
| Pilgrim's (or Company) | Pilgrim's Pride Corporation.  ¶13. |
| Pilgrim's Mtn. | Defendants Pilgrim's Pride Corporation and Fabio Sandri's Motion to Dismiss Plaintiff's Amended Class Action Complaint and Incorporated Memorandum of Law.  ECF No. 63. |
| Plaintiff | Plaintiff New Mexico State Investment Council. |
| PSLRA | Private Securities Litigation Reform Act of 1995. |
| Sandri | Defendant Fabio Sandri, Pilgrim's Chief Financial Officer ("CFO") from May 2011 to September 2020, current President and CEO.  ¶16. |
| Superseding Indictment | The indictment issued on October 6, 2020, by a federal grand jury in the District of Colorado, asserting criminal charges for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, against ten individuals, including Penn, Austin, Brady, Lovette, and Little.  ¶3. |

4836-1622-6040.v1

Plaintiff respectfully submits this memorandum in opposition to Defendants' Motions.

## I.    INTRODUCTION

The Complaint's extremely detailed factual allegations – which include numerous email, phone, and text message conversations involving Pilgrim's executives, *including defendants Penn and Lovette* – clearly establish that Defendants engaged in an illegal bid-rigging scheme that began in 2012 and continued until at least 2019.  ¶¶3-4, 64-123.[1]  The illegal scheme allowed Defendants to experience unprecedented financial success.  Indeed, despite being forced to file for bankruptcy in 2008, Pilgrim's financial performance remarkably turned around in 2012 – the same year in which Defendants' illegal bid-rigging scheme began – and the Company enjoyed previously unseen levels of success and stability over the next eight years, until the illegal scheme was finally revealed by a federal grand jury indictment announced by the DOJ on June 3, 2020, which asserted criminal antitrust violations against two Pilgrim's executives, including Penn.  ¶¶8, 11.

Immediately following the announcement, Pilgrim's stock price plummeted to $18.29 per share – *a more than 51% decline from its Class Period high of $37.75* – causing massive losses to investors as a result.  ¶11.  Shortly thereafter, Penn was terminated, a superseding indictment including criminal antitrust charges against Lovette – who had already left the Company – was announced, and the DOJ filed separate criminal charges against Pilgrim's.  ¶¶3-4, 245-246.  Pilgrim's would ultimately *plead guilty* to "participating in a conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States, in violation of the Sherman Antitrust Act, 15 U.S.C. §1," and be sentenced to pay approximately *$107 million in criminal fines*.  ¶134.

---

[1]    All "¶_" and "¶¶_" citations herein refer to the Complaint.  Additionally, citations are omitted and emphasis is added unless otherwise stated.

- 1 -

4836-1622-6040.v1

Throughout the Class Period, Defendants concealed their illegal bid-rigging scheme – and its impact on Pilgrim's financial performance – by falsely attributing Pilgrim's financial success to legitimate business factors, such as its "strong relationships with key customers," "[e]xperienced management team," "broad product portfolio," and "operational improvements." *See, e.g.*, ¶¶142, 149, 153, 170, 194.  They also falsely described their "key customer approach" as "***promot[ing] trust***" and "***enhanc[ing] long-term relationships***," and falsely told investors that "Pilgrim's is committed to a ***policy of lawful competition*** based on the merits of our products and services." ¶¶126, 136, 194, 200, 207, 213.  These material misrepresentations – as well as others alleged in the Complaint – artificially inflated Pilgrim's stock price, causing significant losses to investors when the truth was ultimately revealed by the Initial Indictment.  Defendants, on the other hand, profited handsomely from their misrepresentations, pocketing ***nearly $10 million*** from Class Period sales of their own Pilgrim's stock at artificially inflated prices.  ¶243.

Defendants' Motions seek to evade liability for the securities claims clearly alleged in the Complaint by, among other things, arguing that they did not actively participate in the illegal bid-rigging scheme during the Class Period, that the scheme did not have a material impact on Pilgrim's Class Period financials, and that the Initial Indictment did not sufficiently "correct" Defendants' alleged misstatements.  As detailed below, none of Defendants' arguments warrant dismissal of the Complaint.  Thus, Plaintiff respectfully submits the Motions should be denied.

## II.    STATEMENT OF FACTS

### A.    Background on Pilgrim's and the Broiler Industry

Pilgrim's is one of the largest chicken producers in the United States.  ¶39.  Its business centers on the rearing, slaughter, and distribution of broilers. ¶40.  Collectively, Pilgrim's and four of its competitors – Tyson Foods, Sanderson Farms, Perdue Farms, and Koch Foods – account for

- 2 -

over 60% of the nation's broiler chicken production. ¶39. As a leading broiler producer, Pilgrim's business is highly dependent upon its relationships with Key Customers. ¶41. During and before the Class Period, Pilgrim's deals with Key Customers were typically negotiated through a bidding process in which Pilgrim's and other broiler producers submitted and/or negotiated prices either directly with the customer or through a buying cooperative negotiating on the customer's behalf. ¶42. Pilgrim's, Tyson, Sanderson, Koch, and others often submitted bids and negotiated prices with the same Key Customers at or around the same time – supposedly competing for their business. ¶42. To ensure fair and competitive pricing, the bidding process was intended to be blind – *i.e.*, producers were not permitted to discuss the terms of their bids with one another. ¶67.

## B.    Pilgrim's Embarks on an Illegal Bid-Rigging Scheme

Before 2012, the broiler industry was subject to a volatile "boom and bust" pricing cycle that could bolster profits one year and eviscerate them the next. ¶55. As Pilgrim's repeatedly lamented in its annual Securities and Exchange Commission ("SEC") filings, "the chicken industry is subject to cyclical earnings fluctuations," which create a "challenging operating environment." *Id.* In December 2008, the hostile pricing environment forced Pilgrim's – on the brink of collapse – to file for bankruptcy. ¶¶62-63. In 2012, antagonized by the unpredictable and tumultuous pricing environment, Pilgrim's and its competitors embarked on a years-long scheme to stabilize and fix prices by colluding to rig bids submitted to Key Customers. ¶¶64-123.

Indeed, a federal grand jury investigation revealed that, from 2012 until at least 2019, Pilgrim's engaged in an illicit scheme "to suppress and eliminate competition through *rigging bids and fixing prices* and price-related terms for broiler chicken products sold in the United States." ¶65. The illegal scheme was confirmed by two DOJ indictments filed in 2020, which detail numerous email, phone, and text message conversations demonstrating efforts by top Pilgrim's

- 3 -

4836-1622-6040.v1

executives – including defendants Penn and Lovette – to conspire with their supposed competitors to fix increased prices and rig bids submitted to Key Customers. ¶¶64-123.

In one instance, Pilgrim's executives – including Penn and Lovette – conspired to rig bids and raise prices for a Key Customer's yearly chicken supply. ¶¶89-107. The collusive conduct included numerous phone calls, emails, and text messages among Pilgrim's executives – including Penn – and executives of other chicken suppliers regarding their coordinated bid submissions. *Id.* For example, shortly before the initial bids were due, a Pilgrim's sales manager emailed Penn detailed information regarding "the range of the total increases (margin and costs) [Pilgrim's competitors] are going in with," explaining that the information had come from another Pilgrim's executive (Austin), who "did some checking around today." ¶¶92-93. ***Penn responded:*** "***Will review with Bill [Lovette] in am. Will advise***." ¶93. Shortly thereafter, Penn discussed Pilgrim's pricing for the same Key Customer with an executive for one of Pilgrim's competitors, who spoke with Penn for approximately 19 minutes and recorded a handwritten note stating: "***Talked to Jason Penn +8 cost +11 margin***." ¶¶100-101. Ultimately, each of the colluding companies signed agreements for the Key Customer's yearly chicken supply, with each company – including Pilgrim's – securing a significantly higher margin than the prior year. ¶106.

Similarly, in early-2017, Pilgrim's sales executives conspired with their competitors to rig bids submitted to a nationwide restaurant chain for that restaurant's 2018 chicken supply. ¶¶113-116. Early in the negotiations, Austin engaged in at least five separate phone calls with Brady, a former Pilgrim's executive who was at that time an executive for Claxton's (a Pilgrim's competitor), to discuss their proposed pricing for the restaurant. ¶113. Austin then told another Pilgrim's sales executive that "[Claxton] meets with [the restaurant] in Thursday and *i will get a blow by blow* Friday morning. [Koch] meets with [Victim 1] in Friday." ¶114.

- 4 -

On another occasion, Pilgrim's rigged bids submitted for a different Key Customer's 2018 and 2019 chicken supply. ¶¶117-123. The customer sought a discount of $.02/lb-$.05/lb below its 2017 price. ¶¶117-120. On September 5, 2017 – the day the bids were due – a Pilgrim's sales director colluded with Brady and a Tyson sales executive regarding their submissions. *Id.* The same day, Pilgrim's and Claxton each submitted bids with proposed discount rates of $.01/lb – significantly lower than the discount requested by the customer. ¶123.

Multiple other instances of similarly collusive (and illegal) conduct detailed in the Complaint illustrate a deliberate and persistent scheme to artificially inflate Pilgrim's profits through illicit means. ¶¶64-123. And indeed, the scheme was effective. Beginning in 2012, Pilgrim's net income and stock price stabilized and steadily increased. ¶¶8, 124-126. To the unknowing public, it appeared that Pilgrim's had solved the pricing issues that bankrupted the Company in 2008. *Id.*

**C.    Defendants' Class Period Misstatements Conceal Their Fraudulent Scheme and Attribute Pilgrim's Success to Lawful Business Factors**

Throughout the Class Period, Defendants actively concealed their illegal bid-rigging conduct – and its impact on Pilgrim's financial success – by weaving a false narrative of purported operational excellence and legitimate competitive advantages. Specifically, Defendants attributed Pilgrim's unprecedented success to its "strong relationships with key customers," "[e]xperienced management team," "broad product portfolio," and "operational improvements." *See, e.g.*, ¶¶142, 149, 153, 170, 194. Defendants even went so far as to state that their "key customer approach . . . *promotes trust, enhances long-term relationships* and strengthens our margin structure," and that "Pilgrim's is committed to a *policy of lawful competition* based on the merits of our products and services." *See, e.g.*, ¶¶126, 136, 194, 200, 207, 213.

In reality, the Company's success was driven by Defendants' illegal bid-rigging scheme, which constituted anything but "a policy of lawful competition based on the merits of [Pilgrim's]

- 5 -

4836-1622-6040.v1

products and services." ¶¶136-137.  Instead of promoting "trust" and "long-term relationships" with Pilgrim's Key Customers, the scheme involved duping those customers into paying higher prices for Pilgrim's products, thereby compromising the trust and longevity of those relationships, which were vital to the Company's continued success.  ¶¶154, 193, 195, 201, 206, 208, 210, 214.

### D.    Defendants' Scheme Is Revealed

Defendants managed to conceal their illegal scheme for nearly a decade until the DOJ announced, on June 3, 2020, that a federal grand jury in the District of Colorado had indicted defendant Penn and fellow Pilgrim's executive Austin (along with two executives from other chicken producers) on criminal antitrust violations for "enter[ing] into and engag[ing] in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids and fixing prices and other price-related terms for broiler chicken products sold in the United States." ¶¶127-128.  The Initial Indictment was replete with transcripts of conversations in which Pilgrim's executives conspired with their competitors to rig bids and fix prices.  *Id.*  On this news, Pilgrim's stock price fell $2.58 per share, or 12.4%, from a close of $20.87 per share on June 2, 2020, to close at $18.29 per share on June 3, 2020.  ¶129.

### E.    Post-Class Period Events Confirm Defendants' Participation in the Scheme

On October 6, 2020, the DOJ announced that the federal grand jury had issued a Superseding Indictment, which recounted the charges in the Initial Indictment, but also added six additional defendants, including defendant Lovette and former Pilgrim's executive Little.  ¶132.  It also extended the time period of the scheme through *at least 2019*, and chronicled multiple additional instances of bid-rigging continuing into 2018 and 2019.  *Id.*  On October 13, 2020, the DOJ filed criminal charges against Pilgrim's for its participation in the scheme from 2012 through at least 2019. ¶133. On February 23, 2021, *Pilgrim's pleaded guilty* to participating in the scheme, and was

- 6 -

ultimately sentenced to pay approximately $107 million in criminal fines.  ¶134.

### III.    ARGUMENT

#### A.    Standard of Review

In assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts "'must consider [a] complaint in its entirety, . . . accept all . . . well-pleaded allegations . . . as true," and construe those allegations "'*in the light most favorable to the plaintiff*.'"  *In re Gold Res. Corp Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015); *accord In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1001 (D. Colo. 2016) (Moore, J.).  A complaint must simply contain "sufficient factual matter, *accepted as true*, to state a claim to relief that is plausible on its face."  *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1298 (10th Cir. 2018).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In order to state a claim under §10(b) of the Exchange Act, a complaint must allege that:

> (1) [I]n connection with the purchase or sale of a security; (2) [defendants] made an untrue statement of material fact [and] failed to state a material fact; (3) with scienter; (4) that plaintiff relied on the misrepresentation; (5) that the plaintiff suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss.

*Molycorp*, 157 F. Supp. 3d at 1001 (citing *In re Williams Sec. litig.-WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009)).  Here, the Complaint adequately does so, as set forth below.

#### B.    The Complaint Adequately Alleges Falsity

Rule 10b-5 makes it unlawful "'to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'"  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003) (quoting 17 C.F.R. §240.10b-5)).  This element is satisfied where, as here, a

- 7 -

plaintiff specifies: "(1) each statement alleged to have been misleading; [and] (2) why the statement is misleading." *Molycorp*, 157 F. Supp. 3d at 1002. If "a reasonable person would find the defendant's statements to be false or misleading, 'the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements.'" *Id.* at 1003.

### 1. Defendants Falsely Attributed Pilgrim's Success to Legitimate Business Factors, While Concealing the Bid-Rigging Scheme

"[A] company's statements become actionable if the company attributes its success to a particular cause without also disclosing the unlawful activity that contributed to that success." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018); *see also In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) ("'where a company puts at issue the cause of its financial success, it may mislead investors if the company fails to disclose that a material source of its success is the use of improper or illegal business practices'"). Further, "'where a party . . . *elects* to disclose material facts, [it] must speak fully and truthfully, and provide complete and non-misleading information.'" *United States v. Gordon*, 710 F.3d 1124, 1142 (10th Cir. 2013) (emphasis in original).

During the Class Period, Pilgrim's enjoyed unprecedented financial success and stability, escaping the notorious "boom and bust" cycle that had bankrupted the Company in 2008. ¶¶8, 55, 62, 63. Throughout the Class Period, Defendants repeatedly celebrated this success and discussed their "purported competitive advantages," which they attributed to *legitimate business factors*, such as Pilgrim's "strong relationships with key customers," "[e]xperienced management team," "broad product portfolio," and "operational improvements." *See, e.g.*, ¶¶142, 149, 153, 170, 194.

Unbeknownst to investors, however, Pilgrim's success was driven by Defendants' illicit bid-rigging scheme, which artificially and improperly bolstered the Company's Class Period earnings. Through this scheme – which began in 2012 and continued until at least 2019 – Defendants

- 8 -

conspired with their supposed competitors to illegally rig bids and fix prices, thereby securing deals that caused Pilgrim's Key Customer to pay higher prices for its products, which allowed Defendants to generate additional revenue and drove the Company's success. ¶¶106, 123.

Faced with extraordinarily detailed allegations of undisclosed illegal conduct that bolstered their Class Period success, Defendants attempt to sew confusion by asserting that the Complaint fails to allege that they engaged in illegal bid-rigging conduct during the Class Period. Pilgrim's Mtn. at 11-13; Lovette Mtn. at 6; Penn Mtn. at 3-6. This argument fails for multiple reasons.

First, the Complaint *does* allege that Defendants rigged bids during the Class Period, expressly claiming that Defendants were indicted for bid-rigging conduct that extended through "*at least 2019*." ¶¶64-69. As noted above, the Complaint details a specific example from the Class Period in which Pilgrim's executives conspired to rig bids for a nationwide restaurant's 2018 and 2019 broiler supply. ¶¶113-123. Like the other examples of illegal bid-rigging set forth in the Complaint, the allegations regarding Defendants' conduct in connection with this instance are based on detailed facts concerning multiple collusive communications involving Pilgrim's executives. As such, these allegations are more than sufficient to allege that Defendants' illegal bid-rigging conduct continued into the Class Period. *See Mylan*, 2018 WL 1595985, at \*2, \*7 (holding price-fixing scheme was adequately pled where complaint referenced anti-competitive agreements and DOJ investigations); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at \*6 (D.N.J. Aug. 6, 2019) ("[P]laintiffs point to communications between executives of different companies regarding price increases, at least two of whom pleaded guilty to violating antitrust laws. . . . At this stage, no more is required.").[2]

---

[2]    Defendants' cases are inapposite because, unlike here, each involved complaints that alleged *no* illegal conduct during the class period. *See Emps. Ret. Sys. of City of Providence v. Embraer S.A.*, 2018 WL 1725574, at \*1 (S.D.N.Y. Mar. 30, 2018) ("*All of the referenced [underlying] violations*

- 9 -

4836-1622-6040.v1

Moreover, Defendants' argument is misguided, as the relevant inquiry here is *not* whether the actual bid-rigging conduct, itself, occurred during the Class Period (as explained above, it did). Rather, the relevant inquiry is whether Defendants misled investors during the Class Period by concealing the *impact* that conduct had on Pilgrim's financial success. The Complaint provides specific examples of how the bid-rigging contributed to Pilgrim's financial success and impacted investors' perception of the Company during the Class Period. For example, the Complaint alleges that in January 2017 – just before the start of the Class Period – Austin and another Pilgrim's sales executive conspired to rig bids submitted to a nationwide restaurant for its 2018 broiler products. ¶¶113-116. In addition, as described above, Pilgrim's conspired to rig bids and fix prices for a separate restaurant chain's 2018 *and* 2019 broiler supply. ¶¶117-123. And in Pilgrim's guilty plea, the Company admitted that it rigged bids and fixed prices for a contract with KFC that was effective *through 2017*. ¶134.[3] As such, Plaintiff's detailed allegations identify *at least three major Class Period contracts* that were impacted by Defendants' illegal bid-rigging scheme.

The above allegations are more than sufficient to "plead[] factual content that allows the court to draw the reasonable inference" that Defendants' undisclosed illegal bid-rigging conduct both occurred during the Class Period *and* impacted Pilgrim's financial results during the Class

*occurred before the Class Period.*") (emphasis in original); *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at \*10, \*15 (S.D.N.Y. Mar. 30, 2021) ("illegal conduct" that occurred "several years before the [c]lass [p]eriod" ); *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 357-58 (S.D.N.Y. 2015) (dismissing complaint that alleged conduct occurring after the class period and zero conduct occurring at the relevant time); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014) (dismissing complaint that alleged quality control problems that "occurred *well before* the Class Period").

[3]   Defendants' cases on this point are again inapposite because, unlike here, they involved complaints that did "not contain *any* allegations" explaining why the earlier revenue statements were false. *Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 848 (S.D. Tex. 2020); *see also In re Exodus Commc'ns, Inc. Sec. Litig.*, 2005 WL 1869289, at \*15 (N.D. Cal. Aug. 5, 2005) (plaintiffs did not "*in any fashion*" attempt to explain how revenue was overstated).

- 10 -

Period. *Iqbal*, 556 U.S. at 678. At this stage, nothing more is required to allege that Defendants misled investors by touting the purported reasons for their success, while concealing the contributions of their illicit bid-rigging conduct. *See, e.g.*, *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at \*16 (S.D.N.Y. Mar. 29, 2021) ("courts have sustained [allegations] where a company reports positive sales results without disclosing that those results were due, *even if in part*, to bribery, antitrust violations, or some other illegal conduct"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013) ("[t]he Court has no doubt that information relating to [Defendants'] purported [illegal conduct], *even if only accounting for a small percentage of [its] actual profits*," was material).[4]

Defendants focus on extraneous facts to argue that the effect of their bid-rigging conduct was a "miniscule blip" on Pilgrim's Class Period financial results. Pilgrim's Mtn. at 13-14. As an initial matter, this argument impermissibly seeks to establish intensely factual disputes in Defendants' favor at the pleadings stage. *See, e.g.*, *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 902 n.18 (D. Colo. 2020) ("this is a factual argument unsuited for a motion to dismiss").[5] More importantly, Defendants' argument lacks facial plausibility. As noted above, the Complaint's detailed factual allegations establish that Defendants were engaged in a long-running bid-rigging scheme that affected *at least three* Class Period contracts with Key Customers. ¶¶113-123; 134. As Pilgrim's disclosed in its annual filings, its top two Key Customers accounted for *as much as 14% of its*

---

[4]    *See also Molycorp*, 157 F. Supp. 3d at 1002 ("[T]he Tenth Circuit evaluates 'the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading.'").

[5]    *See also In re Rhythms Secs. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) ("Defendants' arguments . . . turn on competing factual assertions not appropriate for weighing at this stage of the proceedings."); *Bluestem Advisors LLC v. Eventure Interactive, Inc.*, 2017 WL 3047895, at \*1 (C.D. Cal. Apr. 17, 2017) ("Simply put, this Court won't consider improper extraneous facts in deciding the motion to dismiss.").

- 11 -

*yearly revenue*. ¶237. As such, Plaintiff's allegations are clearly sufficient to support a reasonable

belief that Defendants' illegal bid-rigging conduct materially affected Pilgrim's Class Period results.

Defendants also attempt to avoid liability by arguing that they had no absolute "duty to

disclose uncharged, unadjudicated wrongdoing." Pilgrim's Mtn. at 14; Lovette Mtn. at 6; Penn Mtn.

at 4. Again, Defendants' argument misses the point. Plaintiff does not allege that Defendants

violated a duty to disclose unadjudicated wrongdoing. Rather, Plaintiff alleges that Defendants were

required to disclose their illegal scheme because it was necessary to do so in order to prevent their

statements to investors from being misleading. *See, e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307,

319 (S.D.N.Y. 2016) ("While it is true that there is no general duty to disclose illegal conduct, 'a

duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a

corporation's statements are not misleading.'"); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F.

Supp. 3d 568, 581 (S.D.N.Y. 2016) ("a corporation may be compelled to disclose uncharged

wrongdoing if its statements are or become materially misleading in the absence of disclosure").[6]

### 2. Defendants Misrepresented Their Purportedly "Strong" Relationships with Key Customers

Pilgrim's success depended upon its relationships with its Key Customers. ¶7. Playing to

this fact, the Defendants repeatedly stated that "[o]ur . . . *strong customer relationships* . . . help

drive attractive and we believe *sustainable margins*," and that the Company's was "a valued partner

with [its] key customers." ¶¶142, 144. Defendant Penn also frequently emphasized in conference

calls that "[b]eyond driving growth, our key customer approach also *promotes trust*, *enhances long-*

---

[6]    Defendants' cases are consistent with Plaintiff's position that, while there is no absolute duty to disclose illegal conduct, the duty arises when disclosure is necessary to make other statements not misleading. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (holding there is no *absolute* duty to disclose illegal conduct); *Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 466 (E.D. Pa. 2020) (denying claim based on an absolute duty to disclose, but upholding claims based on "sources of revenue").

4836-1622-6040.v1

*term relationships* and strengthens our margin structure," and that the Company was "becoming a more valued partner with key customers,"  ¶¶194, 200, 207, 209, 211-213.  In addition, defendant Lovette told investors: "We price our retail products and our food service products *based on the value that we deliver to our key customers*," while defendant Sandri similarly stated: "*[W]e price our projects according to the value creation and the partnerships that we have*."  ¶155.

In truth, however, Defendants did *not* price their products based on "the value [they] deliver[ed] to [their] key customers" or the "partnerships" they had with those customers.  Instead, Defendants conspired to fix prices and rig bids for their Key Customers through an illegal scheme that did anything *but* "promote[] trust" and "enhance[] long-term relationships. ¶¶64-123.  Indeed, Defendants even encouraged their competitors to raise prices submitted to Pilgrim's Key Customers, in order to facilitate Defendants' efforts to raise their own prices.  *See, e.g.*, ¶73 (in a text between two Claxton employees, one of the employees wrote: "He [Austin] said to *raise our prices*").  ¶¶84-88 (describing Defendants' efforts to conspire with their competitors to impose a charge for new "quality assurance" procedures that one customer had implemented).

Once Defendants elected to speak about their relationships with their Key Customers, they were obligated to speak fully and truthfully about those relationships.  *Gordon*, 710 F.3d at 1142. But they clearly failed to do so.  In light of Defendants' efforts to deceive their Key Customers, their statements that Pilgrim's "key customer approach . . . promote[d] trust [and] enhance[d] long-term relationships" were plainly "inconsistent with the facts on the ground.'" *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1148 (10th Cir. 2015); ¶¶194, 200, 207, 213.  Moreover, Defendants' representations that they priced their products based on "the value [they] deliver[ed] to [their] key customers" and their "partnerships" with those customers, and that Pilgrim's "[b]usiness will have the ability to outperform, given our . . . strong relationships with Key Customers" gave investors a materially false

- 13 -

4836-1622-6040.v1

and misleading impression as to the merits and sustainability of Defendants' relationships with its most important customers – relationships that had been significantly compromised by Defendants' fraudulent scheme to deceive those customers.  ¶¶144, 149, 155, 159, 165.

### 3. Defendants Misrepresented the Purportedly "Highly Competitive" Nature of the Chicken Industry

Throughout the Class Period, Defendants consistently told investors the chicken industry was "**highly competitive**," and listed the competitive factors within the industry, stating: "In the U.S. retail market, we believe that product quality, brand awareness, customer service and price are the **primary bases of competition**.  In the foodservice market, competition is based on consistent quality, product development, service and price."  ¶¶140, 203.  These statements were false.  While Defendants routinely assured investors that the chicken industry was "highly competitive" and was subject to legitimate bases of competition, they were in fact engaged in an illegal and anticompetitive scheme with their supposed competitors that involved **working together** to rig bids and fix prices.  ¶¶64-123.  The Complaint details numerous instances of Pilgrim's and its "competitors" discussing their pricing with one another, sharing thoughts on raising prices, coaxing one another to raise prices, and working in unison to submit aligned and higher-priced bids to their customers.  *Id.*  Far from "highly competitive," the chicken industry was literally **rigged**.

By failing to disclose the truth about their collusive conduct, Defendants violated their duty to speak fully and truthfully once they elected to discuss the competitiveness of their industry.  *See, e.g.*, *Mylan*, 2018 WL 1595985, at *7 (holding that statements characterizing the market as "'very competitive'" [were] "misleading in the absence of a disclosure of [alleged] anticompetitive conduct"); *Ont. Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 161 (D. Conn. 2019) ("'To the extent that [defendants] engaged in a price-fixing conspiracy with their competitors, statements that the industry was, for example, "intensely competitive," are "misleading

- 14 -

in the absence of a disclosure of that anticompetitive conduct.""").[7]

Similarly, Defendants' description of pricing in the chicken industry was false and misleading. Throughout the Class Period, Defendants attributed chicken pricing to legitimate factors such as "international demand, changes in production by other broiler producing countries, input [and] costs" and stated "[m]ost fresh chicken products are sold to established customers based upon certain weekly or monthly market prices reported by the USDA." ¶146. As noted above, defendant Sandri told investors that "we price our projects according to the value creation and the partnerships that we have" and "[i]n the small bird segment, there is some components of cost plus and comps and components of grade markets." ¶¶155, 196. Lovette also chimed in throughout the Class Period, stating, for example: "Demand has been extremely strong at retail through late spring . . . *That's what's driven pricing*." ¶161.

Unbeknownst to investors, however, Pilgrim's pricing was actually being driven by Defendants' illegal bid-rigging scheme which enabled them to extract higher prices from their largest customers. ¶¶64-123, 147, 156, 162, 197. As such, Defendants' representations that pricing was determined by, for example, supply and demand, production levels, or "value" provided to customers were false and misleading. *See Allergan*, 2019 WL 3562134, at *4, *11 (holding that statements "attribut[ing] pricing increases to 'supply and demand' influences" were false and misleading when the pricing increases were actually due to an illicit price-fixing agreement).

---

[7]   Defendants argue they cannot be liable for statements about the "industry as a whole" because such statements do not concern Pilgrim's alone. Pilgrim's Mtn. at 12 n.23; *see also* Penn Mtn. at 6. This argument is misplaced, as the falsity of Defendants' misstatements is based on *their own actions*, not those of the industry generally. Courts have routinely found such statements to be actionable. *See, e.g.*, *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) (holding that defendants' statements regarding the competitiveness in the market were actionable where an underlying price-fixing scheme was sufficiently pleaded).

- 15 -

### 4. Defendants Falsely Stated that Pilgrim's Was "Committed to a Policy of Lawful Competition"

During the Class Period, Pilgrim's published a "Code of Conduct and Ethics," which was referenced in its SEC filings and available on its website. ¶126. The Code of Conduct and Ethics unequivocally stated that "Pilgrim's is *committed to a policy of lawful competition based on the merits of our products and services*." *Id*. These statements were materially false, as Defendants were in fact engaged in a years-long illegal bid-rigging scheme, as detailed in the Complaint. *See* ¶¶64-123. *See also Allergan*, 2019 WL 3562134, at \*11 (holding that statements in a code of conduct that prohibited employees from engaging in anticompetitive conduct were materially false and misleading when "[p]laintiffs . . . effectively pleaded anti-competitive conduct"). Notably, Defendants' Motions *do not contest* the falsity of these statements, thereby conceding that issue.

### 5. The Individual Defendants' SOX Certifications Were Materially False and Misleading

Defendants also fail to challenge the falsity of their SOX certifications. With each SEC Form 10-K filed during the Class Period, defendants Sandri, Penn, and/or Lovette certified that the filings did not contain any omissions or false statements of material fact, while knowingly concealing that the Company was engaged in a highly material antitrust conspiracy. ¶¶215-218. As detailed above and in the Complaint, this material omission rendered several of the statements in Defendants' SEC Forms 10-K materially false and misleading, thus rendering Defendants' SOX certifications materially false and misleading as well. *See In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (holding that, because plaintiffs alleged that a defendant was aware of and involved in fraud concerning a defendant company, "a reasonable person would believe that [his] statements in the . . . SOX certifications were false or misleading").

- 16 -

### 6. Defendants' Misrepresentations Were Highly Material

"[B]ecause the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund. Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). Nevertheless, Defendants cherry-pick the following statements, take them out of context, and argue they are immaterial puffery: (1) reasons for Pilgrim's success; (2) strong Key Customer relationships; and (3) Pilgrim's competitive edge. Pilgrim's Mtn. at 15; Penn Mtn. at 6; Lovette Mtn. at 6.[8] When taken in context – as required – it is clear that these misstatements were highly material and not mere puffery. *See Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *6 (D. Kan. Sep. 25, 2012) ("The materiality of an optimistic statement, however, must be evaluated in light of the 'total mix' of information available to the market.").

First, Defendants' statements regarding the lawful drivers of their success and competitive edge – including their "operational excellence," "experienced management team," "broad product portfolio" and "operational improvements" – were highly material to investors. *See, e.g.*, ¶¶142, 170, 180. As detailed above and in the Complaint, Pilgrim's had been subject to a hostile pricing environment that caused it to file for bankruptcy in 2008. ¶¶53-55, 62-63. When the Company began rigging bids and fixing prices in 2012, it experienced a period of unprecedented stability and success that continued into the Class Period. ¶8. The reasons behind this stark turnaround would undeniably be material to any investor contemplating an investment in Pilgrim's – particularly when those reasons involved ***illegal conduct***.

Indeed, it is difficult to imagine anything more material than whether a company's financial success and stability are attributable to lawful business operations or unsustainable, illegal schemes.

---

[8]    Defendants ***do not challenge*** – and thus concede – the materiality of misstatements concerning: (1) competitiveness in the chicken industry; (2) broiler pricing factors; (3) Pilgrim's Code of Conduct and Ethics; and (4) Defendants' SOX certifications.

4836-1622-6040.v1

*See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("'if [a defendant] puts the topic of the cause of its financial success at issue, then it is "obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information"'"); *Allergan*, 2019 WL 3562134, at \*10 (holding that "statements attributing [a] business's revenue, growth, and pricing strategy to legitimate business factors and conditions" when they were in fact due to an illicit price-fixing conspiracy, "fall outside the bounds of mere puffery and are actionable").

Pilgrim's statements regarding its "strong" relationships with its Key Customers were also highly material to investors. As alleged in the Complaint, investors understood that Pilgrim's success was dependent upon its relationships with Key Customers. ¶41. As such, the fact that Defendants compromised those critical relationships by illegally rigging bids they submitted to Key Customers is obviously something any investor would want to know. ¶¶64-123. Moreover, because the truth about Defendants' illegal bid-rigging scheme directly undermined their statements about Pilgrim's purportedly "strong" customer relationships based on "trust," those statements cannot be dismissed as puffery. *See Better*, 2012 WL 4433500, at \*6 (noting that puffery is actionable when "material, nondisclosed information undermines their truth").

Defendants' authority is not instructive. For example, in *Level 3*, the court held that statements regarding "ensuring" the company's "excellent reputation," were immaterial. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012). But the context in *Level 3* is distinct from the context here. The *Level 3* defendants issued their statements in the context of ensuring the company maintained its operational excellence in the ***future***. *Id.* Here, on the other hand, Defendants attributed their ***current success*** to their operational excellence and listed specific

- 18 -

criteria in support of those statements.  ¶¶180, 190, 209, 211.[9]

### 7.  Defendants' Misrepresentations Are Not Entitled to Protection as Forward-Looking Statements

Defendants claim that a number of their misstatements are entitled to protection under the PSLRA's safe harbor for "forward-looking" statements.  Pilgrim's Mtn. at 15; Penn Mtn. at 7; Lovette Mtn. at 7.  Specifically, defendant Penn urges that "every single statement" challenged in the Complaint is forward-looking, and Pilgrim's and Lovette argue that the statement, "this portfolio approach is working well and is . . . giving us the potential to reduce volatility and generate higher margins over time," is forward-looking.  Pilgrim's Mtn. at 15; Penn Mtn. at 6; Lovette Mtn. at 6. Defendants' argument fails for two reasons.

First, "'[i]t is well recognized that even when [a] . . . statement "has both a forward-looking aspect and an aspect that encompasses a representation of present fact," the safe harbor provision of the PSLRA *does not apply*.""  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 222-23 (S.D.N.Y. 2004).[10]

Here, each statement Defendants highlight contains assertions of present fact.  For example, the statement that Pilgrim's "portfolio approach *is working well* and *is . . . giving us* the potential to

---

[9]   *Smallen* is similarly inapposite because, although it did involve statements about the company "protecting [its] customers," the context there involved faulty "risk management [procedures]," which themselves are inherently vague.  *Smallen v. Western Union Co*, 2019 WL 1382823, at *7, *10 (D. Colo. Mar. 27, 2019), *aff'd*, 950 F.3d 1297 (10th Cir. 2020).  Here, by contrast, Defendants repeatedly emphasized to investors the critical importance of their relationships with Key Customers as a key factor of the Company's success, which attached heightened significance to Defendants' statements about the "trust" and strength of the Company's "long-term relationships" with its Key Customers – statements that were rendered patently false by Defendants' long-running scheme to intentionally deceive those same customers.  ¶¶193, 195, 201, 208.

[10]   *See also In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1295 (D. Colo. 2013) ("'The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.'"), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

4836-1622-6040.v1

reduce volatility and generate higher margins over time" asserted that the portfolio approach *was* working well and *was* providing tangible benefits to the Company *at the time the statement was made*. ¶157. Each of Penn's statements also contain assertions of present fact. ¶¶189, 190, 198, 200, 209, 211, 213. For example, Penn challenges the following statement: "We believe our key customer approach *is strategic* and *creates a basis* to further accelerate growth in important categories *by providing* more customized, higher quality innovative products to give us a clear competitive advantage." *See* Penn Mtn. at 7 n.3 (citing ¶189). This statement speaks directly to the Key Customer approach Pilgrim's was purportedly employing *at that time*, while omitting that the Company's actual approach to its Key Customer relationships was, *at that time*, significantly compromising those relationships by intentionally deceiving customers. Penn also challenges the statements attributing Pilgrim's *current* financial success to its "'vision to become the best and most respected company,'" and its effort to "*continue to leverage* our key customer strategy to earn more business." Penn Mtn. at 7 n.3 (citing ¶¶200, 209). These false statements are similarly mixed with present assertions of fact, as they concern reasons for the Company's *current success* and discuss actions that Defendants were purportedly undertaking *at that time* – not actions Defendants were considering undertaking in the future. *See* ¶¶7, 144, 170, 209-211.

Second, Defendants' statements are not entitled to Safe Harbor protection because they were not accompanied by *meaningful* cautionary language. Indeed, the only "cautionary" language accompanying Defendants' statements were boilerplate statements, such as: "Today's call may contain certain forward-looking statements that represent our outlook and current expectations as of the day of this release. Other additional factors not anticipated by management may cause actual results to differ materially from those projected in these forward-looking statements." Such statements – which say nothing about the *specific factors* that could affect the accuracy of a forward-

- 20 -

looking projection – are insufficient to bring a statement within the Safe Harbor. *See, e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) ("'cautionary statements must be *substantive and tailored to the specific future projections, estimates or opinions*'").[11]

### C. The Complaint Adequately Alleges Scienter

Scienter is ""'a mental state embracing intent to deceive, manipulate, or defraud.""" *Molycorp*, 157 F. Supp. 3d at 1007 (quoting *City of Phila. v. Fleming Cos, Inc.*, 264 F.3d 1245, 1258 (10th Cir. 2001)). In the Tenth Circuit, scienter includes "'[r]ecklessness, defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Fleming*, 264 F.3d at 1258. Allegations of "motive and opportunity" are not required, but can further support the scienter inference. *See id.* at 1263.

"An inference of scienter 'need not be irrefutable, i.e., of the "smoking-gun' genre."'" *Level 3*, 667 F.3d 1331 at 1343 (quoting *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Rather, "'courts must consider the complaint in its entirety . . . in order to determine whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter.'" *Molycorp*, 157 F. Supp. 3d at 1006-07 (citing *Tellabs*, 551 U.S. at 322-23); *see also Tellabs*, 551 U.S. at 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). The inference of scienter need only be "'*at least as compelling* as any plausible . . . inference one could draw from the facts alleged.'" *Smallen v. The Western Union Co.*, 950 F.3d 1297, 1311 (10th Cir. 2020) (quoting *Tellabs* 551 U.S. at 324). "In other words, *a tie goes to the plaintiff*." *Anderson v. Spirit AeroSystems Holdings, Inc.*, 105 F. Supp. 3d 1246, 1262 (D.

---

[11] *Accord In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1230-31 (N.D. Okla. 2003) ("meaningful cautionary statements [must] identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement").

Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016).

### 1. Defendants' Direct Knowledge of and Participation in the Bid-Rigging Scheme Raises a Strong Inference of Scienter

"One 'classic' fact pattern giving rise to a strong inference of scienter is that defendants made statements when they knew or had access to information suggesting [the] public statements to be materially inaccurate." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 746 (8th Cir. 2002); *accord Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1126 (D. Colo. 2017) (Moore, J.) (noting that if "[d]efendants knew of this [adverse and undisclosed] information, then this could be a strong factor in favor of scienter, i.e. that the . . . Defendants knowingly misled plaintiffs"). Here, Defendants were ***directly involved in and aware of*** the bid-rigging scheme, and thus undoubtedly knew or recklessly disregarded that their misstatements were false or misleading when made.

As alleged in the Complaint, Penn and Lovette directly participated in the illegal bid-rigging scheme. ¶¶64-123. In fact, each was indicted by a federal grand jury for his involvement in the scheme "***through at least 2019***." ¶3. During negotiations with one customer, Penn directly engaged in ***multiple*** collusive conversations with a competitor and received an email from a Pilgrim's executive detailing each of Pilgrim's competitors' proposed bids for the customer. ¶¶90, 92. Penn was informed the proposed bids had been obtained by another Pilgrim's employee who had done "some checking around today," in direct violation of antitrust laws. ¶93. In response to this information, Penn stated: "***Will review with Bill [Lovette] in am. Will advise***." ¶93. On another occasion, Penn himself ***disclosed Pilgrim's pricing*** to another broiler executive that was bidding on the same customer's business, again in direct violation of antitrust laws. ¶¶100-101.

Lovette also actively participated in the scheme. As detailed above, on one occasion he and Penn discussed detailed information regarding their competitors' pricing for a Key Customer before submitting their bids to the same customer. ¶93. On another occasion, Lovette told a competitor to

- 22 -

4836-1622-6040.v1

decline two customers' requests for extensions of their lines of credit.   ¶112.   During the conversation, the competitor – the owner of Koch – asked if Lovette had heard about one of the customers' requests, and  Lovette responded: "***Yes, we told them NO!***"  *Id.*  The Koch owner then stated that Koch was "100 percent on board" and asked Lovette to tell him if anything changed, to which Lovette responded: "***Will do***, they must be following [Grocer- 2]. ***Told them same***."  *Id.*

Penn's and Lovette's personal involvement in the illegal bid-rigging scheme unequivocally establish that they had direct knowledge of the concealed facts that rendered Defendants' Class Period statements materially false and misleading.  *See Ont. Tchrs.'*, 432 F. Supp. 3d at 170-71 (D. Conn. 2019) (holding that "the plaintiffs have adequately pled strong circumstantial evidence of conscious misbehavior or recklessness by [defendants], all of whom . . . were . . . aware of the [anticompetitive] price-hike strategy . . . [but] repeatedly spoke publicly in ways that contradicted the concealed knowledge"); *Allergan*, 2019 WL 3562134, at \*12 (holding scienter adequately alleged and noting that "ongoing investigations into anticompetitive pricing in the market" represented a "significant piece of the puzzle").

Defendants' argument that the Complaint fails to allege they were involved in the scheme during the Class Period fails.  Pilgrim's Mtn. at 16; Penn Mtn. at 8-9; Lovette Mtn. at 7-10.  As set forth above, the Complaint details specific instances where Penn and Lovette were directly involved in the scheme, and it establishes that the scheme – and its financial impacts – persisted during the Class Period.  Defendants offer no competing non-fraudulent explanation for how an illegal scheme that they were ***directly involved in*** could have continued throughout the Class Period – during a time in which they continued to serve as Pilgrim's top executives and regularly spoke to investors about

- 23 -

4836-1622-6040.v1

Pilgrim's operations and reasons for success – without their knowledge. [12]  They do not argue that they undertook any efforts to ensure that the illegal scheme they actively participated in had ceased by the time they made their alleged misstatements – nor could they, because the scheme persisted until *at least 2019* and continued to impact Pilgrim's financial results throughout the Class Period.[13] Viewed holistically, these allegations are more than sufficient to raise a strong inference that Defendants were aware of the scheme's persistence and its ongoing impact at the time they made material misstatements to investors during the Class Period.[14]

Defendants cite to *Smallen* to argue that knowledge of wrongdoing before the Class Period does not evidence knowledge of wrongdoing during the Class Period.  950 F.3d 1297; Penn Mtn. at 8; Lovette Mtn. at 8.  But *Smallen* is distinguishable.  The plaintiff in *Smallen* alleged that a defendant knew a lower-level employee committed certain legal violations before the class period, so the defendant must have known the violations continued into the class period.  *Smallen*, 950 F.3d at 1314.  But unlike here, the defendant in *Smallen* was not alleged to have *actively participated* in the legal violations himself.  Moreover, the employee responsible for the pre-class period legal violations was fired before the Class Period even began.  *Id.*  Accordingly, the defendant in *Smallen*

---

[12]  *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at \*2 (E.D. Mo. Apr. 30, 2013) ("the ongoing fraudulent scheme could not have been perpetrated over a substantial period of time without the knowledge, participation, and complicity of the executives at the highest level of the company").

[13]  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (noting an inference of scienter can be supported by ""'an egregious refusal to see the obvious, or to investigate the doubtful"'").

[14]  Lovette further argues that any claim based on a conversation that he had in 2014 is barred by the statute of repose.  Lovette Mtn. at 9.  But Lovette provides no support for the unfounded contention that factual allegations pre-dating the repose period cannot be used to establish an inference of scienter for actionable violations committed *during* the repose period – because no such support exists.  Because Plaintiff does not attempt to hold Lovette liable for securities violations in 2014, his argument is misplaced.  *See* 28 USC §1658 (an action under the securities laws cannot be brought more than five years after the securities "*violation*").

- 24 -

had no reason to believe that the violations continued.  *Id.*  Here, by contrast, Defendants offer no

viable argument that they had reason to believe the illegal scheme – *in which they actively*

*participated* – did not persist and continue to impact Pilgrim's financial results at the time they made

material misrepresentations to investors during the Class Period.[15]

### 2.    Defendants' Bid-Rigging Scheme Involved Pilgrim's Core Operations, Which Further Supports the Inference of Scienter

"Core-operations refer to instances where the nature of the relevant facts allegedly known

and not disclosed by defendants was 'of such prominence that it would be "*absurd*" to suggest that

management was *without knowledge* of the matter.'  In such instances, plaintiffs may sufficiently

plead core-operations allegations without accompanying particularized allegations." *Molycorp*, 157

F. Supp. 3d at 1011.

As alleged in the Complaint, Defendants' illegal bid-rigging scheme concerned Pilgrim's

pricing for its core product: broilers.  ¶232.  Indeed, throughout the vast majority of the Class Period,

broilers were Pilgrim's *only* product, meaning management was *exclusively* focused on broilers.

¶233.  Indeed, defendants Lovette, Penn, and Sandri consistently represented that they monitored

broiler pricing, regularly commenting on its strength or weakness to investors, and routinely

discussed their intimate knowledge of and involvement in Pilgrim's pricing strategy:

- "Demand has been extremely strong . . . . That's what's driven pricing. . . . And we have the ability to change those prices as needed based on the input costs as we experience. So we're very excited about our pricing strategy."  (Defendant Lovette, ¶235);

---

[15]    Defendants' remaining cases are similarly misplaced, as each involved underlying misconduct that completely halted before the class period began.  *See Embraer*, 2018 WL 1725574, at *1 ("*All* of the referenced [underlying] violations occurred before the Class Period.") (emphasis in original); *Cats v. Prot. One, Inc.*, 2001 WL 34070630, at *15 (C.D. Cal. June 4, 2001) (discussing alleged wrongdoing "occurring prior to the Class Period"); *Pittman v. Unum Grp.*, 2021 WL 2646065, at *4 (6th Cir. June 28, 2021) (discussing violations that "ended before the class period in this suit even began").

4836-1622-6040.v1

- "While lower wheat costs certainly presented less of a headwind during Q2, increased implementation of our key customer strategy also enabled us to better work through some of the input cost increases by adjusting price models compared to previously."  (Defendant Penn, ¶235);

- "[W]e have a very broad portfolio of pricing.  So it depends on the segment. On the spot market or a big bird, there's a lot of prices that are connected to contracts. On the tray pack, we have the [3] partnerships, where we have discussion about, how can we help our customers to grow. So the pricing there is more of negotiated. In the small bird segment, there is some components of cost plus and comps and components of grade markets." (Defendant Sandri, ¶235).

Defendants' scheme also implicated sales to Pilgrim's Key Customers, which Defendants repeatedly described as crucial to the Company's success.  ¶237.  For example, in the Company's annual filings, Defendants disclosed that Key Customers drove a material portion of Pilgrim's revenue, specifically noting that the Company's top two customers accounted for as much as 14% of Defendants' revenue.  *Id.*  Penn also repeatedly stated that he was ***directly involved*** in the Company's execution of the Key Customer strategy, stating, for example: "I was part of the team that formed and executed our current strategy.  It's the one in which we still employ today" and "[a]s part of the management team that originally developed this strategy, I'm deeply committed to continue executing this methodology as a base for our future growth."  ¶239.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (holding that core operations is sufficiently stated where a plaintiff pleads "admissions by one or more corporate executives of detailed involvement" in the operation).

Given the Individual Defendants' roles as Pilgrim's top executives and their admitted involvement in the specific matters at the heart of their illegal bid-rigging scheme – which concerned the core operations of Pilgrim's business – the core-operations doctrine further supports the Complaint's strong inference of scienter.  *See Molycorp*, 157 F. Supp. 3d at 1011.

- 26 -

4836-1622-6040.v1

### 3.    Defendants' Insider Trading During the Class Period Further Evidences Their Scienter

Allegations of motive and opportunity can further support a strong inference of scienter where the "'defendant benefitted from the alleged fraud in some concrete and personal way, "as when the defendants made material misrepresentations to maintain a high stock price and then *sold their own shares at a profit*.'"" *Molycorp*, 157 F. Supp. 3d at 1008-09.[16]  Here, defendants Lovette, Sandri, and Penn each sold a significant number of their shares during the Class Period, collectively raking in *nearly $10 million* in proceeds at their shareholders' expense. ¶243.  Specifically, Lovette sold 234,735 Pilgrim's shares during the Class Period for total proceeds of $5,288,512, while Sandri sold 107,110 Pilgrim's shares for total proceeds of $2,780,140, and Penn sold 55,210 Pilgrim's shares for total proceeds of $1,528,043. *Id.*  Each Individual Defendant's trading also stands in stark contrast to his pre-Class Period trading because, for the two years leading up to the Class Period, *none* of them sold a *single share* of Pilgrim's stock.  ¶244.  Meanwhile, Plaintiff and members of the Class purchased Pilgrim's stock at artificially inflated prices. ¶243.  Nonetheless, the Individual Defendants argue their opportunistic trading should be ignored.[17]

---

[16]  *See also McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 715 (10th Cir. 2006) ("insider trading may support a finding of bad faith if such trading is conducted in amounts 'dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information'").

[17]  Both Lovette and Sandri argue that their sales do not contribute to an inference of scienter because they purportedly sold either pursuant to a pattern or in the "ordinary course, entirely consistent with . . . usual practices."  Pilgrim's Mtn. at 18; *see also* Lovette Mtn. at 14.  But the extraneous facts offered by Lovette and Sandri fail to establish that their sales were made pursuant to an established "pattern." *Id.*  More importantly, neither defendant refutes the fact that he sold zero shares in the two years preceding the Class Period, before selling substantial amounts of shares during the Class Period.  At best, defendants' arguments raise a fact question not suitable for determination at the pleadings stage. *See HomeAdvisor*, 491 F. Supp. 3d at 902 n.18 ("this is a factual argument unsuited for a motion to dismiss").

4836-1622-6040.v1

Sandri argues that his insider trading is not suspicious because he sold his stock after false positive earnings announcements, and because the Complaint fails to provide meaningful trading history. Pilgrim's Mtn. at 18, 18 n.30. But the Complaint does provide meaningful trading history by noting Sandri sold *not one share* for the *entire* two years preceding the Class Period. ¶244. Further, Sandri's argument that selling stock immediately after false positive earnings announcements is misplaced. The Company repeatedly disseminated misleading and falsely positive announcements, and Sandri – while aware of the undisclosed bid-rigging scheme – took advantage of the undisclosed information by selling after those false announcements were made. Pilgrim's at 18. This is the exact sort of "suspicious" timing that gives rise to the scienter inference. *See Dutton v. D&K Healthcare Res.*, No. 4:04CV147SNL, 2006 WL 1778884, at *10 (E.D. Mo. June 23, 2006) (holding stock sales supported a scienter inference because they were made "on the heels of false positive financial statements").

Lovette argues that his insider trading does not establish scienter because he did not sell a large enough portion of his stock during the Class Period. Lovette Mtn. at 13-14. However, Lovette dumped 15% of his shares on unknowing shareholders during the Class Period. *Id.* Courts have routinely found similar and *lower* percentages to support the scienter inference. *See Molycorp*, 157 F. Supp. 3d at 1009-1010 (holding that sale of 21% of stock during the class period supported scienter); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (holding sale of 11% of shares supported scienter); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (holding sale of 7.6% of shares supported scienter).

Additionally, Penn and Lovette each introduce extraneous facts to argue that they wound up with more stock at the end of the Class Period – due to vesting stock options. Lovette Mtn. at 14-15; Penn Mtn. at 10. This argument has been repeatedly rejected – that Defendants acquired shares *at*

- 28 -

*no cost* to them, and with *no risk*, does not negate the scienter inference. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) ("[defendant] acquired shares at no cost to him, which does not demonstrate lack of scienter"); *In re Tyson Food, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017) ("[t]hat Defendants acquired much (and perhaps all) of their retained shares through performance awards and other employment benefits, rather than on the open market, reduces . . . the significance of those holdings").[18]

### 4.    The Departure of Multiple Key Executives Further Supports an Inference of Scienter

Multiple key Pilgrim's executives involved in the bid-rigging scheme left the Company under suspicious circumstances. ¶¶245-246. These departures support a strong inference of scienter because they "'were "numerous," "uncharacteristic" . . . [and] were accompanied by "suspicious circumstances."'" *In re Myriad Genetics, Inc.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021).

Defendant Penn's departure was extremely suspicious. ¶245. On June 14, 2020 – *less than two weeks after Penn was indicted* – Pilgrim's announced that he was taking a paid leave of absence, effective immediately, with no immediate successor identified. *Id.* Shortly thereafter, Pilgrim's announced that Penn had been fired and was "no longer with the Company." *Id.* These circumstances strongly indicate that Penn knew about the illegal bid-rigging scheme. *See Myriad Genetics*, 2021 WL 977770, at *22 (holding departure evidenced scienter because the "[defendant's] resignation was unusual in that it was *effective immediately* with *no successor identified*"); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 882 (D. Minn. 2007) (finding strong inference of scienter

---

[18] *Level 3* is distinguishable. 667 F.3d 1346. First, it is unclear from the opinion whether the shares the *Level 3* defendants retained were due to vesting stock options or to actual acquisitions. *Id.* at 1346. Second, the retained shares were not the only factor the court considered, as the court also emphasized that the sales were made pursuant to "automatic transactions" and that they were made to pay withholding taxes as they became due – neither of which is present here. *Id.*

4836-1622-6040.v1

based, in part, on the "unexpected resignations . . . and the SEC's investigation").

Defendant Lovette's departure was also highly unusual. ¶246.  As alleged in the Complaint, both Lovette and Austin were heavily involved in the bid-rigging scheme for years.  *Id.*  In March 2019 – over seven years into the bid-rigging scheme and roughly one year before the Initial Indictment – Pilgrim's let go of both Lovette and Austin.  *Id.*  Each had been with the Company for over ten years, and each departed in the same month, suddenly and with little explanation.  *Id.*  These extremely suspicious departures further evidence scienter.  *See Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (finding an executive's departure "noteworthy" because "many allegations of falsity rest[ed] on [that particular executive's] mismanagement" and another defendant "resigned a few months later in the wake of [a] DOJ investigation"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632 (S.D.N.Y. 2014) ("The circumstances and timing of the resignations suggest that both defendants were 'terminated in relation to the undisclosed . . . issue.'").[19]

### 5. The Individual Defendants' False SOX Certifications Support a Strong Inference of Scienter

"The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge . . . .  In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of [SOX], which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5."  Kourtney T. Cowart, *The Sarbanes-Oxley Act: How a Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004).  Accordingly, SOX certifications "constitute one factor . . . that courts may consider, in the totality of the circumstances, to evaluate scient[er]."  *Croker v. Carrier*

---

[19]   Because the alleged facts detailed above explain the suspicious nature of Lovette's departure, Lovette's own authority belies his argument.  *See In re Overstock Sec. Litig*, 2020 WL 5775845, at *9 (D. Utah Sep. 28, 2020) ("Plaintiff *never* addresses why [defendant] resigned and its statement that his departure was suspicious is not based on *any* supporting facts.").

*Access Corp.*, 2006 WL 2038011, at \*11 (D. Colo. July 18, 2006).

The Complaint alleges each Individual Defendant signed SOX certifications attached to Pilgrim's Class Period annual reports, despite knowing that Defendants' concealment of their bid-rigging scheme rendered several statements in those reports materially false and misleading. ¶¶221-241, 247-249. These false certifications further evidence Defendants' scienter. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 356 (D.N.J. 2007) ("allegations based on SOX certifications can establish the requisite strong inference of scienter . . . if the complaint asserts facts indicating that, at the time of certification, defendants *actually knew* – or, at the – very least, *turned a 'blind eye'* to the information indicating – that their SOX certification was erroneous").[20]

### 6.    The Complaint Adequately Alleges Pilgrim's Scienter

Because the Complaint adequately alleges each Individual Defendant's scienter, it adequately alleges Pilgrim's scienter as well. *See, e.g.*, *Molycorp*, 157 F. Supp. 3d at 1011 ("The scienter of senior controlling officers of a corporation may be attributed to a corporation itself to establish liability as a primary violator of Section 10(b) and Rule 10b-5 . . . .").

### 7.    Defendants' Opposing Inference is Neither Cogent nor Compelling

The Complaint clearly establishes that Defendants were deeply involved in a years-long bid-rigging scheme that they actively concealed from investors. ¶¶64-123. Despite the fact that the illegal scheme drove Defendants' revenues and undermined its relationships with Key Customers, Defendants repeatedly told investors that their revenues were attributable to legitimate business

---

[20]   Each of Defendants' cases is inapposite because, unlike here, the plaintiffs in those cases failed to allege that defendants knew their certifications were false. *See, e.g.*, *Gold Res*, 776 F.3d at 1116 (discussing "'bare'" allegation SOX certifications were false); *Jun Zhang v. LifeVantage Corp.*, 2017 WL 2599883, at \*8 (D. Utah June 15, 2017) (holding SOX certifications did not support scienter only because plaintiffs had not alleged defendants knew their statements were false).

- 31 -

factors. ¶9. Meanwhile, as their stock remained artificially inflated, Defendants pocketed *nearly $10 million* in insider trading proceeds – at shareholders' expense. ¶10.

Nonetheless, Defendants claim that the "more compelling" inference is that they intended to accurately describe the Company's financial performance while keeping investors fully apprised of the "ongoing antitrust litigations." Pilgrim's Mtn. at 17; Lovette Mtn. at 10. This argument itself is damning in its intent to mislead. The Complaint clearly lays out a *bid-rigging* scheme in which Defendants illegally conspired to rig bids and fix prices submitted to their largest customers. ¶¶64-123. Defendants happened to be engaged in *other* alleged antitrust violations (such as slaughtering breeders and breaking eggs to manipulate supply and demand dynamics). A number of private plaintiffs sued based on those allegations, and those allegations were reported in the news. Although Defendants disclosed the existence of *those* allegations, they never once disclosed the bid-rigging scheme before the Initial Indictment was announced. In fact, the bid-rigging scheme had never once been publicly mentioned *anywhere* before the Initial Indictment was announced.

Defendants offer no other argument supporting an inference that they acted in good faith. Accordingly, Plaintiff's extensive factual allegations support an inference of scienter that is "cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

### D.     The Complaint Adequately Alleges Loss Causation

Loss causation is simply the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). In the Tenth Circuit, the PSLRA's heightened pleading requirements *do not apply* to the element of loss causation. *See Molycorp*, 157 F. Supp. 3d at 1002. Accordingly, Plaintiff need only provide a short and plain statement "that corrective information was revealed and that this revelation caused the resulting decline in price." *Id.* at 1012 (citing *Williams*, 558 F.3d at 1140)).

- 32 -

4836-1622-6040.v1

Plaintiff here has adequately pleaded loss causation based upon the announcement of the Initial Indictment. ¶¶252-257. As detailed in the Complaint, the Initial Indictment revealed – for the first time – that Pilgrim's executives, including Penn, had violated criminal antitrust laws by engaging in "a continuing combination and conspiracy to suppress and eliminate competition by ***rigging bids and fixing prices*** and other price-related terms for broiler chicken products sold in the United States." ¶256. The market reacted swiftly and severely to the disclosure, causing Pilgrim's stock price to drop by 12.4% the ***same day*** the Initial Indictment was announced. ¶257. These allegations are more than sufficient to adequately allege loss causation.

Defendants' argument that the Initial Indictment "did not concern, much less 'correct' any of the challenged statements" is wrong. Pilgrim's Mtn. at 20; *see also* Penn Mtn. 11. As an initial matter, "the disclosure ***need not*** precisely mirror the earlier misrepresentation." *Molycorp*, 157 F. Supp. 3d at 1012. Instead, the disclosure need only "relate back to the misrepresentation." *Id.* Here, the Initial Indictment did just that, by informing the public that Pilgrim's financial results had been improperly inflated by undisclosed, illegal conduct that involved colluding with Pilgrim's supposed competitors in order to deceive the Company's Key Customers into paying higher prices for Pilgrim's products. ¶256. As such, this information clearly "relate[d] back" to Defendants' misrepresentations – which, as described above, concerned Pilgrim's reasons for financial success, its purportedly "strong" Key Customers relationships based on "trust," the supposedly "highly competitive" nature of the chicken industry, and Pilgrim's purported "commit[ment] to a policy of lawful competition." *See* §§III.B.1-4, *supra*.

Defendants' assertion that the Initial Indictment could not have corrected any of their Class Period misstatements because "the vast majority of the conduct described in the Initial Indictment occurred before 2017" also fails. Pilgrim's Mtn. at 20. Indeed, Defendants' own exhibit expressly

- 33 -

contradicts their argument, as the Initial Indictment asserts that the illegal conduct described therein continued "through *at least* early 2017, *the exact dates being unknown*," and details collusive conduct related to "negotiat[ions] with Suppliers *for 2018 broiler chicken products*." *See* ECF No. 63-9, ¶¶1, 71. Consistent with the allegations describe above, these facts from the Initial Indictment disclosed to the public that Defendants' illegal bid-rigging conduct both persisted into the Class Period and impacted Pilgrim's Class Period financials. *See* §III.B.1, *supra*. Defendants' argument to the contrary – which asks the Court to resolve intensely-factual matters in their favor at the pleading stage – is both factually and procedurally misplaced. *See Rhythms*, 300 F. Supp. 2d at 1092 ("[d]efendants' arguments speak to the merits of the case and turn on competing factual assertions not appropriate for weighing at this stage of the proceedings").[21]

Defendants also incorrectly argue the Initial Indictment did not reveal any new information to the market. Pilgrim's Mtn. at 22-23. At base, this is a fact-intensive truth-on-the market defense that is incapable of decision on a motion to dismiss. *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) (noting the "'truth-on-the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint'"). More importantly, it is patently untrue. As discussed above, the public was *not* aware of the bid-rigging scheme before the Initial Indictment was announced. Defendants' attempt to argue otherwise rests on civil allegations and news reports concerning *completely unrelated* misconduct – the manipulation of broiler supply and reporting of falsely inflated prices to a pricing index – that is *not alleged* in the Complaint. Pilgrim's

---

[21] Faced with clear allegations of a corrective disclosure, Defendants build a strawman attack, focusing on Pilgrim's stock price reaction to the Superseding Indictment and Pilgrim's guilty plea, both of which occurred months *after* the corrective disclosure alleged in the Complaint. Pilgrim's Mtn. at 21. Those announcements are wholly irrelevant to whether the *Initial Indictment* – which constituted the first public disclosure of Defendants' illegal bid-rigging scheme – operated as a corrective disclosure. As alleged in the Complaint, Pilgrim's stock price plummeted after this disclosure, causing significant losses to investors as a result. ¶257.

4836-1622-6040.v1

Mtn. at 22-23. Indeed, the lawsuits and reports cited by Defendants ***never once*** mentioned the bid-rigging scheme alleged in the Complaint. ¶¶252, 256. Thus, Defendants' assertion that these sources apprised the market of the risks associated with the material misrepresentations alleged in the Complaint and disclosed by the Initial Indictment is completely baseless.

Finally, Defendants' argument that the Initial Indictment cannot constitute a disclosure of fraudulent conduct because it was merely an "announcement" of a federal investigation is incorrect. Pilgrim's Mtn. at 22-23. The Initial Indictment did much more than announce a federal investigation. In fact, it detailed the ***results*** of an extensive investigation undertaken by a federal grand jury and revealed ***numerous specific instances of anticompetitive communications and conduct***. ¶¶127-128. It is well-settled that indictments materially differ from investigations, especially where, as here, the indictment chronicles explicit instances of fraud. *See, e.g.*, *Ansell v. Laikin*, 2011 WL 3274019, at *5 (C.D. Cal. Aug. 1, 2011) ("[T]he corrective disclosure took the form of a criminal indictment. . . . Unlike an investigation which is meant to gather information ascertaining whether wrongdoing exists, a criminal indictment detailing Defendant's fraudulent practices indicates more than a 'risk' or 'potential' that the alleged conduct occurred."); *Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 425 (E.D. Pa. 2019) ("'much more [than] simply an investigation is alleged here[,]' including . . . criminal charges").[22]

At bottom, Defendants' arguments seek to fully litigate the merits of Plaintiff's loss causation claims at the motion to dismiss stage, but "[i]t is not plaintiffs' burden to prove loss causation in the pleadings." *Rhythms*, 300 F. Supp. 2d at 1092. All that is required at this stage is that Plaintiff give

---

[22] The only case Defendants cite in support of their argument is *Davita*, which held that the "'announcement of an investigation, without more, is insufficient to establish loss causation.'" *Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1155 (D. Colo. 2019). *Davita* is inapposite because the Initial Indictment here does offer "more," given that it actually exposed numerous detailed facts regarding specific instances of fraud.

- 35 -

4836-1622-6040.v1

Defendants "*some* indication of the loss and the causal connection that the Plaintiff has in mind," and the Complaint more than adequately does so. *Dura*, 544 U.S. at 337.

###    E.    The Complaint Adequately Alleges Scheme Liability

Section 10(b)'s scheme liability provision "prohibits the employment of 'any device, scheme, or artifice to defraud' as well as 'any act, practice, or *course of business* which operates or would operate as a fraud or deceit upon any person'" in connection with the purchase or sale of a security. *Smith v. LifeVantage Corp.*, 429 F. Supp. 3d 1275, 1283 (D. Utah 2019) (quoting 17 C.F.R. §240.10b-5). To adequately plead scheme liability, a plaintiff must allege "some conduct other than a misrepresentation," but courts "do not hold that the alleged scheme can never involve . . . misrepresentation[s]." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 (8th Cir. 2016).

Defendants' argument that the Complaint does not allege conduct distinct from misstatements and omissions is wrong. Pilgrim's Mtn. at 23. As detailed above, in addition to issuing false and misleading statements during the Class Period, Defendants also engaged in a years-long conspiracy and fraudulent *course of business* in which they routinely fixed prices and rigged bids submitted to Key Customers. ¶¶64-123, 265-267. Because the scheme allowed Defendants to extract higher prices from their Key Customers, it stabilized and significantly increased their historically volatile net income. ¶8. In turn, Pilgrim's stock price, which investors relied upon, remained artificially inflated during the Class Period, and the Individual Defendants capitalized on the artificially inflated price by selling nearly $10 million of their stock during the Class Period. ¶¶10, 242-244. This is the exact type of conduct that establishes scheme liability. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 579 (S.D. Tex. 2002) ("engaging in manipulative schemes such as a scheme to artificially inflate or deflate stock prices . . . do[es] not

- 36 -

fall within the category of misleading statements and omissions"). Although the conduct overlapped with Defendants' misrepresentations, courts "do not hold that the alleged scheme can never involve any misrepresentations." *Medtronic*, 845 F.3d at 393. Further, scheme allegations are permitted to overlap with omissions allegations. *See Cotter v. Gwyn*, 2016 WL 4479510 at *7-*8 (E.D. La. Aug. 25, 2016) (sustaining a scheme liability claim where plaintiff alleged that defendant company facilitated self-interested transactions in addition to failing to report them).[23]

### F.    The Complaint States a Claim for Control Person Liability

Defendants do not challenge Plaintiff's control person allegations. Thus, because the Complaint states a claim under §10(b) of the Exchange Act, it also adequately states a §20(a) claim for control person liability. *See Molycorp*, 157 F. Supp. 3d at 1014 ("Because the Court has found that Plaintiffs adequately pled a Section 10(b) claim against Defendants . . . the Court finds that Plaintiffs have adequately pled a violation under Section 20(a) . . . against these Defendants.").

## IV.    CONCLUSION

For the reasons above, Plaintiff respectfully requests the Court deny Defendants' Motions.

DATED: September 1, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
NATHAN R. LINDELL
NICOLE Q. GILLILAND


s/ NATHAN R. LINDELL
NATHAN R. LINDELL

---

[23]    Defendants also argue that the statute of repose bars scheme liability claims for conduct occurring more than five years before the initial complaint was filed. Pilgrim's Mtn. at 23-24. This argument is a red herring, because Plaintiff does not assert any claims that pre-date the Class Period. Instead, its scheme liability claims are based upon the illegal bid-rigging conduct and related financial impacts that occurred during the Class Period. *See* ¶¶279-282.

- 37 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
nlindell@rgrdlaw.com
ngilliland@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

SHUMAN, GLENN & STECKER
RUSTY E. GLENN
600 17th Street, Suite 2800 South
Denver, CO  80202
Telephone:  303/861-3003
303/536-7849 (fax)
rusty@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiff*

OFFICE OF THE NEW MEXICO
   ATTORNEY GENERAL
HECTOR BALDERAS, Attorney General
P. CHOLLA KHOURY, Assistant Attorney General
Director, Consumer and Environmental Protection
Post Office Drawer 1508
Santa Fe, NM  87504-1508
Telephone: 505/490-4052
ckhoury@nmag.gov

*Additional Counsel for Lead Plaintiff*

- 38 -

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 1, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ NATHAN R. LINDELL
NATHAN R. LINDELL

ROBBINS GELLER RUDMAN
    & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  nlindell@rgrdlaw.com

4836-1622-6040.v1

# Mailing Information for a Case 1:20-cv-01966-RM-MEH United Food and Commercial Workers International Union Local 464A et al v. Pilgrim's Pride Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Naumon Amjed**
  namjed@ktmc.com,rdegnan@ktmc.com,ksauder@ktmc.com,hpaffas@ktmc.com,iyeates@ktmc.com

- **Seth Alben Aronson**
  saronson@omm.com,mlippincott@omm.com,apletcher@omm.com,seth-aronson-9209@ecf.pacerpro.com,mtubach@omm.com

- **Christopher Patrick Burke**
  cburke@omm.com,christopher-burke-5473@ecf.pacerpro.com

- **Andrew Joseph Cauchi**
  Andrew.Cauchi@weil.com

- **John Anderson Fagg , Jr**
  johnfagg@mvalaw.com,myishaaldridge@mvalaw.com,aishaahreed@mvalaw.com,lindamelin@mvalaw.com

- **Nicole Gilliland**
  ngilliland@rgrdlaw.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com

- **Nathan R. Lindell**
  nlindell@rgrdlaw.com,nate.lindell@gmail.com,E_File_SD@rgrdlaw.com,AGonzales@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com

- **Tania Christina Matsuoka**
  tania.matsuoka@weil.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Mark A. Nebrig**
  marknebrig@mvalaw.com,kellybowling@mvalaw.com

- **Joel S. Neckers**
  neckers@wtotrial.com,allen@wtotrial.com,mchenry@wtotrial.com

- **Nicole E. Schiavo**
  nicoleschiavo@mvalaw.com,janetkoronkiewicz@mvalaw.com

- **Michael Frederick Tubach**
  mtubach@omm.com,michael-tubach-9759@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)