**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-CV-01966-RM-MEH

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 464A, THE TRUSTEES OF WELFARE AND PENSION FUNDS OF LOCAL 464A – PENSION FUND, THE TRUSTEES OF RETIREMENT PLAN FOR OFFICERS, BUSINESS REPRESENTATIVES AND OFFICE EMPLOYEES OF LOCAL 464A, THE TRUSTEES OF LOCAL 464A FINAST FULL TIME EMPLOYEES PENSION PLAN, THE TRUSTEES OF LOCAL 464A WELFARE AND PENSION BUILDING INC., and THE TRUSTEES OF NEW YORK-NEW JERSEY AMALGAMATED PENSION PLAN FOR ACME EMPLOYEES, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs,

           v.

PILGRIM'S PRIDE CORPORATION, JAYSON J. PENN, WILLIAM W. LOVETTE, and FABIO SANDRI

        Defendants.

---

**Defendant Jayson Penn's Reply in Support of His
Motion to Dismiss the Amended Class Action Complaint**

---

As Jayson Penn demonstrated in his moving brief, Lead Plaintiff has failed to plead a Section 10(b) claim against him because the Amended Complaint is devoid of: (i) specific facts demonstrating that any of Penn's challenged statements were false when made; (ii) specific facts showing Penn knew of or recklessly disregarded contemporaneous information demonstrating the falsity of his statements; and (iii) facts showing that a corrective disclosure revealed the falsity of Penn's statements and caused a decline in Pilgrim's stock price.[1]

---

[1] On September 30, 2021, The Court granted Penn's request for an extension of the page limit in this brief to 20 pages. *See* 9/30/2021 Minute Order.

1

Plaintiff offers no meaningful response to these fatal flaws. Instead, Plaintiff repeatedly points to charges of alleged bid-rigging by Penn and others that *pre-date* Penn's challenged statements *by years*. That is what Plaintiff's entire case against Penn boils down to: that he is liable under the securities laws for statements he made in 2019 and 2020 because the government has charged him and others with committing wrongs in 2015 or 2014 or even 2012—long before the Class Period here. Plaintiff's claim is temporally and logically insufficient. The securities laws require Plaintiff to plead specific facts demonstrating *contemporaneous* wrongdoing, or knowledge or reckless disregard of that wrongdoing, by Penn at the time he made each of his challenged statements. Whether charged in an indictment or not, bare allegations about conduct *years before Penn's challenged statements* are insufficient to show the statements were knowingly false when made. Whatever claims the government is pursuing, Plaintiff is seeking to pursue a federal securities action—and it must meet the pleading burdens the securities laws impose. Because Plaintiff has failed to do so, the Amended Complaint should be dismissed as to Penn.

## I.     PLAINTIFF HAS FAILED TO PLEAD THAT ANY OF PENN'S STATEMENTS WERE FALSE WHEN MADE.

Plaintiff has failed to plead falsity for any of Penn's Class Period statements, all of which were made between May 2019 and April 2020 and reflect his optimism about Pilgrim's growth strategy and strong customer relationships:

| May 2, 2019 | |
|---|---|
| Form 8-K (AC ¶ 187) | • We are "heavily investing in ***further differentiating our portfolio*** to increase our capacities and capabilities to meet customer expectations"<br>• "the i***nvestments in the operations*** and the focus of our people have yielded an ***increase in performance***." |
| Earnings Call (AC ¶ 189) | • "We have materially improved our ***competitive position*** with a ***diversified portfolio*** of on-trend products and brands" |

| | |
|---|---|
| | • "We believe our **key customer approach** is strategic and creates a basis to further accelerate growth in important categories by providing more customized, higher quality innovative products to give us a **clear competitive advantage**." |
| Earnings Call (AC ¶ 190) | • "Our portfolio is specifically designed to minimize the impact from the cyclicality of specific market segments. The changes we initiated 8 years ago have made a tangible difference. The result is evident in all 3 geographic regions in which we operate. ***It magnifies our relentless pursuit of operational excellence and presence in diverse and differentiated business models, segments and channels. For the long term, we're dedicated to continue extending our competitive advantage by increasing the emphasis on investments in our people and innovation, while improving the overall quality of our products***." |
| August 1, 2019 | |
| Press Release (AC ¶ 192) | • "***revenues from Key Customers have more than doubled over the last eight years***, reducing our relative dependency on pure commodity sales and reducing volatility"<br>• "**key** customer strategy" is "'***relevant to [Pilgrim's] growth***.'" |
| Earnings Call (AC ¶ 194) | • "Our **key customer approach** is strategic and creates a basis to further accelerate growth in important categories by providing more customized, high quality innovative products to give us a **clear long-term competitive advantage**. The commitment to our key customer strategy remains relevant to our growth. ***Revenues from key customers more than doubled over the last 8 years***, reducing our relative dependency on pure commodity sales. ***Our strong relationships with key customers have continued to contribute to the out-performance in our case-ready business***. We will leverage our key customer strategy to earn more business and accelerate growth beyond just the underlying market conditions. Beyond driving growth, our key customer approach also ***promotes trust***, enhances long-term relationships and ***strengthens our margin structure***." |
| October 31, 2019 | |
| Press Release (AC ¶ 198) | • "We remain committed to our **Key Customer strategy**, which is the **basis for our growth**. Revenues from Key Customers have **more than doubled over the past eight years**, and we will continue to support their growth." |
| Earnings Call (AC ¶ 200) | • "Our **key customer approach** is strategic and creates a basis to further accelerate growth in important categories by providing a more customized, high quality, innovative products that **give us a clear, long-term competitive advantage**…We continue to leverage our key customer strategy to earn more business to accelerate growth beyond just the underlying market conditions. Beyond driving growth, ***our key customer approach also promotes trust, enhances long-term relationships*** and strengthens our margin structure." |
| February 21, 2020 | |
| Form 10-K (AC ¶ 203) | • "***The chicken . . . industry in the U.S. . . . is highly competitive. The competitive factors in our business include price, product quality, product development, brand identification, breadth of product line and customer service***." |
| Press Release (AC ¶ 205) | • "***We maintain our approach to the successful Key Customer strategy, which is the basis for our strong growth***… In Q4, ***our operating performance in the U.S. has continued to improve, driven by our partnership with Key customers*** and the |

| | |
|---|---|
| | relentless focus on executing and delivering the best results possible despite changes in market conditions." |
| Earnings Call (AC ¶ 207) | • "*Beyond driving growth, our key customer approach also promotes trust, enhances long-term relationships and strengthens our margin structure*." |
| Earnings Call (AC ¶ 209) | • "*Our results have remained well balanced and are the result of our vision to become the best and most respected company*, creating the opportunity of a better future for our team members. To support our vision, we are continuing our strategy of developing a unique portfolio of diverse complementary business models, continuing to relentlessly pursue *operational excellence* and becoming a more *valued partner with key customers* and creating an environment for *safe people, safe products and healthy attitudes*." |
| April 30, 2020 | |
| Press Release (AC ¶ 211) | • "In spite of the difficult global macro conditions, our *results have remained well balanced*, and are the *result of our vision to become the best and most respected company*, creating the opportunity of a better future for our team members. To support our vision, we are continuing our *strategy* of developing a unique portfolio of diverse, complementary business models, continuing to relentlessly pursue *operational excellence*, becoming a more *valued partner with Key Customers*, and creating an environment for s*afe people, safe products and healthy attitudes*." |
| Earnings Call (AC ¶ 213) | • "Our *key customer approach*…creates a basis to further accelerate growth in important categories by providing more customized, high quality innovative products *to give us a clear long-term competitive advantage*. Beyond driving pure growth, *our key customer strategy also promotes trust, enhances long-term relationships and strengthens our margin structure*." |

Plaintiff must allege specific facts showing these statements were false *at the time they were made*. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). Where, as here, a plaintiff alleges that the defendant engaged in an illegal antitrust conspiracy, the nondisclosure of which rendered his statements false, plaintiff must plead the alleged illegal acts with particularity and explain how that conduct rendered the challenged statements false when made. *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019). Plaintiff has failed to meet that burden as to Penn.

A.    **Plaintiff's Bid-Rigging Allegations Do Not Plead Falsity as to Penn.**

Plaintiff has not alleged a single fact demonstrating how any purportedly illegal acts rendered Penn's statements false when made. Plaintiff contends Penn's Class Period statements were false "(1) because Pilgrim's, Penn, Lovette, and other Pilgrim's employees engaged in

4

collusive conduct to rig bids during the Class Period; and (2) the impact of multiple illicit contracts that were entered into prior to the Class Period continued to affect Pilgrim's financial performance during the Class Period." (AC ¶ 69; *see also* Opp. at 9-11.) Those arguments fail.

The Amended Complaint is devoid of any facts demonstrating that Penn engaged in bid-rigging during the 2017-2020 Class Period. The last time Plaintiff alleges any bid-rigging by Penn is in *April 2015* (AC ¶ 227), more than *five years* before Plaintiff filed its original complaint in this action, *four years* before Penn made any of his challenged statements, and *nearly two years* before the start of the Class Period. Even if Penn's purported bid-rigging could have supported a Section 10(b) claim at one time, that time has come and gone. By Plaintiff's own admission, Penn's alleged conduct occurred beyond the five-year statute of repose and even further beyond the two-year statute of limitations for a Section 10(b) claim. *See* 28 U.S.C. § 1658(b).[2] It is, therefore, no surprise that Plaintiff has failed to tie any of Penn's Class Period statements to those long-ago acts.

Plaintiff attempts to tie Penn to Class Period bid-rigging with the conclusory, group-pleaded assertion that "Defendants were indicted for bid-rigging conduct that extended through '*at least 2019.*'" (Opp. at 9, citing AC ¶¶64-69.) But the Amended Complaint contains no specific facts—*indeed, no facts at all*—demonstrating that *Penn* engaged in bid-rigging in 2019, much less 2018 or 2017. *See Gamm*, 944 F.3d at 458 (when a securities fraud complaint claims that statements were rendered false through the nondisclosure of illegal activity, the facts of the underlying illegal acts must be pleaded with particularity).

Unable to plead that Penn engaged in any Class Period bid-rigging, Plaintiff resorts to

---

[2] For the same reason, any attempt by Plaintiff to plead a claim against Penn based on scheme liability also fails.

arguing that it need only allege that the purported bid-rigging of years past had *effects* during the Class Period. (Opp. at 9-10.) According to Plaintiff, "at least three Class Period contracts [] were impacted by Defendants' illegal bid-rigging scheme," which purportedly rendered Penn's Class Period statements false and misleading. (*Id.* at 9-10 (citing AC ¶¶ 113-16, 117-23, 134).) That assertion also fails. The Amended Complaint is devoid of a single fact showing that Penn had *any* connection to the purportedly rigged contracts. Tellingly, Plaintiff's allegations about the contracts contain no mention of Penn. (*See* AC ¶¶ 113-16, 117-23, 134.) The Amended Complaint does not allege that two of these purported contract negotiations in which wrongdoing allegedly took place ever resulted in signed contracts. (*Id.* ¶¶ 113-116; 117-23). The only confirmed contract that was in effect during the Class Period ended in 2017—long before the first of Penn's statements in 2019. Thus, even accepting Plaintiff's argument, there are still no allegations that any wrongful activity was ongoing at the time of Penn's statements. Also missing are any facts explaining how any of the contracts allegedly rendered Penn's statements false when made. Among other things, Plaintiff provides no detail about the supposed effects of the contracts, how those effects were determined or quantified, or when the effects were felt versus when Penn made his statements. There is no basis to conclude that any of Penn's Class Period statements were rendered false or misleading by vague assertions of purported effects allegedly felt at some undefined time.

Plaintiff's attempt to demonstrate the falsity of Penn's statements with allegations that *other employees* engaged in bid-rigging also fails. A 20-month gap separates any alleged bid-rigging by any Pilgrim's employee and Penn's first challenged statement. (*See* AC ¶ 122 (alleging that Pilgrim's employees other than Penn engaged in bid-rigging in September 2017) and AC ¶187 (identifying Penn's first challenged statement in May 2019).) The Amended Complaint contains

6

no facts, much less specific ones, explaining how other employees' purported wrongs rendered Penn's statements nearly two years later false when made.

Plaintiff also argues without factual support that Penn's Class Period statements were false when made because they attributed Pilgrim's success to customer relationships and other factors without disclosing that the success was the result of bid-rigging. (Opp. at 12-15.) To plead falsity Plaintiff must allege particularized facts showing that the alleged bid-rigging *contradicted* Penn's statements. *See SEB Asset Mgmt. S.A. v. The Western Union Co.*, 2015 WL 5708532, at *4 (D. Colo. Sept. 29, 2015) (dismissing allegations where plaintiffs did not allege particularized facts contradicting statements about business performance). The Amended Complaint contains no facts showing how *years-old* allegations of purported wrongdoing contradicted Penn's Class Period statements that Pilgrim's products, investments, customer relationships, and operational vision contributed to Pilgrim's success. The absence of these facts is fatal to Plaintiff's claim.

**B.      Penn's Statements Are Non-Actionable Corporate Puffery.**

Plaintiff has also failed to plead falsity for the overwhelming majority of Penn's statements because they are optimistic assertions about competitive advantages, corporate strategies, good customer relationships and industry generalities, all of which are too vague and nonspecific to be actionable.[3] Plaintiff argues that Penn's statements are actionable because they are material. (*See* AC ¶ 275; Opp. at 17-18.) That is incorrect. To be actionable, statements of corporate optimism must be capable of "objective verification." *Grossman*, 120 F.3d at 1122. Penn's statements are

---

[3] (*See* AC ¶¶ 187, 189, 190, 192, 194, 198-200, 203, 205, 207, 209, 211, 213.) *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) (unspecific, optimistic statements not actionable as matter of law); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119-20 (10th Cir. 1997) ("Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions.").

precisely "the sort of soft, puffing statements, *incapable of objective verification* that courts routinely dismiss as vague statements of corporate optimism." *Grossman*, 120 F.3d at 1121-22 (statements that company had experienced "substantial success" and was "leveraging" its identified competitive advantages were mere puffery) (emphasis added).[4]

**C.     Penn's Forward-Looking Statements Are Protected by the PSLRA Safe Harbor.**

Many of Penn's statements are also immune from liability under the PSLRA's safe harbor for forward-looking statements. 15 U.S.C. § 78u–5(i)(1)(A)-(C). Plaintiff disputes that, arguing that Penn's statements in paragraphs 189, 190, 198, 200, 209, 211, and 213 are not protected because they concern present facts and are allegedly unaccompanied by meaningful cautionary language. (Opp. 19-21.) Plaintiff is wrong on both the facts and law.

Penn's statements expressly address "long-term" and future activity. (*See* AC ¶ 190 (plans "for the long term"; ¶ 194 (key customer approach "give[s] us a clear long-term competitive advantage" that Pilgrim's "will leverage" the strategy); ¶ 198 (Pilgrim's "will continue to support" key customer revenues); ¶ 200 (key customer approach "give[s] us a clear long-term competitive advantage" and Pilgrim's will "continue to leverage").) Courts have repeatedly held that similar statements are forward-looking and fall squarely within the safe harbor's scope. *See*, *e.g.*, *Institutional Investors Grp. v. Avaya, Inc.,* 564 F.3d 242, 256 (3d Cir. 2009) (statements that company's results "position us" to meet goals and company is "on track" to meet projections were

---

[4] *See also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1189 (10th Cir. 2003) (company's statement that its sales were "fueled by customer demand" was "'the sort of vague statement[] of corporate optimism' that 'courts have found not to be actionable under the securities laws.'"); *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 804 (N.D. Cal. 2019) (citations omitted) ("Statements such as '[o]ur priority is to reaffirm our commitment to trust, compliance and risk management' [and] '[o]ur long-term success is dependent on . . . a relentless focus on compliance, security and risk management' . . . are not capable of objective verification.").

forward-looking); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 536 (3d Cir. 1999) (statement

that company "will experience a large increase in revenues" was forward-looking).

Further, the safe harbor protects forward-looking statements even if those statements also

relate to a company's current state of affairs. *See Wochos v. Tesla*, 985 F.3d 1180, 1191 (9th Cir.

2021). The Ninth Circuit's decision in *Tesla* is instructive. There, plaintiffs argued that certain

statements were not forward-looking and not protected by the safe harbor because they contained

"embedded assertions concerning present facts that are actionable." *Id.* The Ninth Circuit rejected

that argument, holding that a forward-looking statement does not lose its status just because it also

contains "non-forward-looking features." *Id.* To refute a statement's forward-looking status, a

plaintiff must show that it contains "an express or implied 'concrete' assertion concerning a

specific current or past fact." *Id.* Here, Plaintiff does not identify a single, concrete assertion by

Penn about any specific current or past fact that was false at the time Penn spoke. (*See* Opp. at 20.)

Instead, as with every other argument, Plaintiff relies on the unsupported assumption that years-

earlier alleged misconduct renders all of Penn's Class Period statements false. That is not the law.

Nor is Plaintiff correct in its critique of the cautionary language accompanying Penn's

statements. Plaintiff cites only a single statement in Pilgrim's earnings call transcripts (Opp. at 20),

and ignores the cautions accompanying Penn's other statements and Pilgrim's explicit directive in

its earnings call transcripts for investors to review the Company's associated press releases and

SEC filings for "further information concerning" risk factors. Those documents include multiple

pages of meaningful risk disclosures, which are sufficient to provide safe harbor protection.[5] For

---

[5] *See* Ex. 1 to Penn's Motion to Dismiss Lead Plaintiff's Consolidated Amended Class Action
Complaint ("Penn MTD") at 4 (May 2, 2019 Earnings Call Transcript) (referring investors to FY
2018 10-K); Ex. 3 at 4 (August 1, 2019 Earnings Call Transcript) (same); Ex. 5 at 4 (October 31,

example, Pilgrim's February 21, 2020 10-K contains 10 pages of risk disclosures. Courts have repeatedly endorsed this incorporation-by-reference practice, holding that risk disclosures were not boilerplate where they incorporated more robust disclosures in the company's other public filings. *See, e.g., Carlton v. Cannon*, 184 F. Supp. 3d 428, 463 (S.D. Tex. 2016) (earnings call risk disclosure was not boilerplate where it incorporated 10-K risk disclosures by reference).

## II.   PLAINTIFF HAS FAILED TO PLEAD SCIENTER AS TO PENN.

### A.   Plaintiff's Bid-Rigging Allegations Do Not Give Rise to a Strong Inference of Scienter.

Plaintiff's Section 10(b) claim must also be dismissed as to Penn because Plaintiff has failed to plead scienter, which requires specific facts showing, for each challenged statement, that Penn knew of or recklessly disregarded *contemporaneous* wrongdoing at the time the statement was made. *See Ronconi*, 253 F.3d at 432 ("complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made"). Plaintiff instead argues that Penn must have been involved in or known about bid-rigging at the time of his challenged statements because he was allegedly involved in that activity years earlier. But courts have rejected this same argument, holding that where a defendant allegedly engaged in wrongdoing *before the class period* —and there is "scant else from which to infer that" the activity continued *during the*

---

2019, Earnings Call Transcript) (same); Ex. 7 at 4 (February 21, 2020 Earnings Call transcript) (referring investors to FY 2019 10-K) 9 at 4 (April 30, 2020 Earnings Call Transcript) (same). *See also* Ex. 2 at 3 (May 1, 2019, 8-K Press Release) (referring investors to FY 2018 10-K); Ex. 4 at 3 (August 1, 2019 8-K Press Release) (same); Ex. 6 at 3 (October 31, 2019 8-K Press Release) (same); Ex. 8 at 3 (February 21, 2020, 8-K Press Release) (referring investors to FY 2019 10-K); Ex. 10 at 3 (April 30, 2020, 8-K Press Release) (same). *See also* Declaration of Caroline Zalka In Support of Pilgrim's Pride Corporation and Fabio Sandri's Motion to Dismiss Plaintiff's Amended Class Action Complaint Ex. 1 (February 21, 2020, Pilgrim's 2019 10-K) at 5-15 (detailing risk factors); Ex. 15 (February 14, 2019, Pilgrim's 2018 10-K) at 11-20 (same).

*class period* —"the allegations are not enough to support a strong inference of scienter." *Greebel*

*v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999); *see Menora Mivtachim Ins. Ltd. v. Int'l*

*Flavors & Fragrances Inc.*, 2021 WL 1199035, at *10 (S.D.N.Y. Mar. 30, 2021) (rejecting

allegation that illegal payments made before the class period must have continued into the class

period and holding "[s]uch allegations cannot satisfy plaintiffs' particularized pleading burden, as

they 'are temporally and logically insufficient,' especially when, as here, there are 'scant'

allegations to establish the details of [defendant's] unlawful conduct during the Class Period").

Plaintiff has failed to plead any facts from which to infer that: Penn's purported pre-Class Period

bid-rigging continued during the Class Period; Penn knew of or recklessly disregarded such Class

Period conduct by others; or the conduct occurred contemporaneously with Penn's challenged

statements. Without these facts, Plaintiff's allegations are temporally and logically insufficient to

create any inference of scienter.

Hoping to leverage the 2020 DOJ indictment, Plaintiff points to years-old communications

that purportedly show knowledge of bid-rigging. (*See* Opp. at 22-23; AC ¶¶ 75, 77, 83, 90-93, 97-

98, 110-111.) But completely missing are any communications to or from Penn about any alleged

wrongdoing after 2015. Penn made his first challenged statement four years later, in 2019. Plaintiff

does not allege anything suggesting that Penn *contemporaneously* knew of, participated in, or

recklessly disregarded any wrongdoing by anyone at the time that any, much less all, of his

statements were made. *Gamm*, 944 F.3d at 462 ("[T]he PSLRA requires that 'the complaint shall,

*with respect to each act or omission* . . . state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind.'" (emphasis added)).

In an effort to overcome that pleading failure, Plaintiff alleges that Penn, as CEO, must

have known about alleged bid-rigging because it concerned the Company's core operations. (*See* Opp. at 25-26.) But Penn's role as CEO does not in itself imbue him with knowledge of all activity within the organization. To the contrary, "the Tenth Circuit has specifically 'rejected the notion that knowledge may be imputed solely from an individual's position within a company.'" *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *9 (D. Utah Dec. 15, 2020) (citations omitted). To plead scienter based on an executive's position, a plaintiff must allege specific facts showing what information was available that contradicted the executive's public statements. *See id.* (rejecting allegation of scienter based on executives' positions because "there are no allegations as to what information was available that contradicted Defendants' public statements"). Plaintiff has failed to make that showing. The last of Penn's purported misconduct allegedly occurred in 2015; the last of others' purported misconduct allegedly occurred in 2017. (*See* AC ¶¶ 111, 122.) The Amended Complaint lacks a single fact showing what information was available to Penn in 2019 and 2020 that contradicted the statements he made then.

**B.      Penn's Class Period Stock Sales Do Not Give Rise to a Strong Inference of Scienter.**

Penn's Class Period stock sales do not give rise to a strong inference of scienter because Penn acquired more shares than he sold during that time, and retained a significant portion of his Pilgrim's stock. Where, as here, an executive retains a large percentage of company stock, it "rebut[s] any inference of scienter we might otherwise draw" from the sale of some portion of his shares. *See Level 3*, 667 F.3d at 1346-47. Plaintiff argues that Penn acquired some of his stock from the grant of performance-based awards, which either do not negate an inference of scienter or are less significant than purchases made on the open market. (Opp. 29.) That argument fails. Plaintiff bears the burden of *pleading* scienter; Penn does not bear the burden of *negating* it.

Moreover, as Penn's Forms 4 show, Penn purchased 100,000 shares of Pilgrim's stock on the open market in May 2019, sold 51,222 shares in August 2019, acquired 56,501 performance-based RSUs in February 2020, and sold 3,988 shares in February 2020.[6] Thus, during the Class Period, Penn purchased nearly twice as many shares as he sold on the open market, regardless of the performance-based RSUs. Penn's retention of a large percentage of his Pilgrim's stock rebuts any inference of scienter that might be drawn from his sales. *See Level 3*, 667 F.3d at 1346-47.

Plaintiff argues that scienter should be inferred because Penn sold no shares in the two years before the Class Period—a fact that also rebuts an inference of scienter. Penn sold nothing during 2015, when he purportedly engaged in bid-rigging, but sold some of his shares years later, in 2019 and 2020, when there are *no* specific allegations he engaged in such misconduct. That is the opposite fact pattern one would expect from someone with a culpable state of mind. There is simply no basis to conclude that Penn's stock sales yield a strong inference of scienter.

**C.    Penn's SOX Certification Does Not Give Rise to a Strong Inference of Scienter.**

Penn's signature on the SOX certification for Pilgrim's 2019 Form 10-K also does not give rise to a strong inference of scienter. Holding otherwise would "eviscerat[e] the pleading requirements for scienter set forth in the PSLRA." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555 (5th Cir. 2007); *see also In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015) ("Plaintiff's bare allegation that [defendant] lied when [he] certified [the filings] pursuant to SOX adds nothing substantial to the scienter calculus.").

Plaintiff argues that a defendant's signature on a SOX certification can establish the

---

[6] *See* Ex. 11 to Penn's MTD (Jayson Penn Form 4 (May 2, 2019)); Ex. 12 (Jayson Penn Form 4 (Aug. 8, 2019)); Ex. 13 (Jayson Penn Form 4 (Feb. 20, 2020)); Ex. 14 (Jayson Penn Form 4 (Mar. 27, 2020)).

requisite strong inference of scienter if the complaint pleads facts demonstrating that, at the time of certification, the defendant actually knew or turned a blind eye to information indicating the certification was erroneous. (Opp. at 31.) But the Amended Complaint is devoid of a single fact showing that Penn actually knew of, or turned a blind eye to, wrongdoing at the time he signed the 2019 SOX certification in February 2020. This is unsurprising, since Penn signed that document years after his—or any other Pilgrim's employee's—alleged involvement in any bid-rigging.

**D.    Penn's Departure Does Not Give Rise to a Strong Inference of Scienter.**

Penn's departure from the Company does not give rise to a strong inference of scienter. As Plaintiff concedes, for an executive resignation to raise a strong inference of scienter, it must be highly unusual and suspicious, such as a hasty departure with no immediate successor. (Opp. at 29.) Here, the only relevant, specific alleged facts are that: (i) Penn took a leave of absence, weeks after the indictment was issued, then separated from the Company months later (AC ¶ 245), and (ii) Penn allegedly engaged in bid-rigging years earlier. (AC ¶ 3.) There is no allegation—nor could there be—that Penn's separation was hasty or that a successor was not immediately named. The inference of scienter that can be drawn from the specifically pleaded allegations is not as compelling as the competing, non-culpable inference. When corporate misconduct is charged, executives resign for many reasons, including that they were potentially negligent in overseeing the responsible employees—a compelling, plausible inference here. But to plead securities fraud, Plaintiff must allege more than negligence; it must plead specific facts demonstrating fraud or deliberate recklessness. Plaintiff has not alleged any specific facts demonstrating that Penn's departure from the Company, following his indictment for years-old conduct, gives rise to a strong inference that he committed securities fraud in making his challenged statements years later.

### III.    PLAINTIFF HAS FAILED TO PLEAD LOSS CAUSATION AS TO PENN.

Plaintiff has failed to allege loss causation as to Penn. To plead that element, Plaintiff must allege that corrective information was revealed "and that this revelation caused the resulting decline in price." *In re SandRidge Energy, Inc. Sec. Litig.*, 2017 WL 3309758, at *14 (W.D. Okla. Aug. 1, 2017). The sole alleged corrective disclosure on which Plaintiff relies is the June 3, 2020 DOJ indictment. (AC ¶¶ 252, 256.) But Plaintiff points to nothing in that document that purports to correct or reveal the falsity of any statement by Penn. Plaintiff's failure is not surprising given the temporal disconnect between the charged conduct there and Penn's statements here. Plaintiff's bald assertion that the alleged wrongdoing continued into 2019 does not rescue Plaintiff's claim. Absent specific facts tying Penn to misconduct that year, there is no basis to conclude that any of Penn's statements in 2019 or 2020 were "corrected" by the indictment.

Plaintiff argues that the corrective disclosure "need not precisely mirror the earlier misrepresentation" so long as the disclosure "relate[s] back to the misrepresentation." (Opp. at 33.) Even under that standard, Plaintiff still loses. The last of the conduct in the indictment purportedly occurred in January 2017, more than two years before any of Penn's challenged statements, and none of that conduct concerned what Penn said. That the indictment and Penn's statements both relate to the Company's activities in the broiler chicken industry is too attenuated to deem the indictment a corrective disclosure.[7]

---

[7] As demonstrated in Pilgrim's motion to dismiss, Plaintiff has also failed to state a Section 10(b) claim against the Company. Thus, Plaintiff's Section 20(a) claim against Penn must also be dismissed. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1118 (10th Cir. 2015).

**CONCLUSION**

Plaintiff has had the benefit of two indictments and still failed to plead its claims against

Penn. The Amended Complaint should be dismissed as to Penn with prejudice.

Dated: September 30, 2021                    Respectfully submitted,

                                             */s/ Seth Aronson*
                                             _____

                                             Seth Aronson
                                             O'MELVENY & MYERS LLP
                                             400 South Hope Street
                                             Los Angeles, CA 90071-2899
                                             Telephone:   (213) 430-6000
                                             saronson@omm.com

                                             Amy S. Park
                                             O'MELVENY & MYERS LLP
                                             2765 Sand Hill Road
                                             Menlo Park, CA 94025-7019
                                             Telephone:   (650) 473-2600
                                             apark@omm.com

                                             Christopher P. Burke
                                             O'MELVENY & MYERS LLP
                                             Times Square Tower
                                             7 Times Square
                                             New York, NY 10036
                                             Telephone:   (212) 326-2000
                                             Facsimile:    (212) 326-2061
                                             cburke@omm.com

                                             Jacqueline V. Roeder
                                             Chad D. Williams
                                             Davis Graham & Stubbs LLP
                                             1550 17th St., Ste. 500
                                             Denver, CO 80202
                                             Telephone:   (303) 892-9400
                                             Facsimile:    (303) 893-1379

                                             *Attorneys for Defendant Jayson Penn*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2021, I electronically filed the foregoing Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss using the CM/ECF system, which will send notification of this filing to all listed parties.

Dated: September 30, 2021                  /s/ Seth Aronson

                                           Seth Aronson