**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-CV-01966-RM-MEH

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL
464A, THE TRUSTEES OF WELFARE AND PENSION FUNDS OF LOCAL 464A –
PENSION FUND, THE TRUSTEES OF RETIREMENT PLAN FOR OFFICERS, BUSINESS
REPRESENTATIVES AND OFFICE EMPLOYEES OF LOCAL 464A,
THE TRUSTEES OF LOCAL 464A FINAST FULL TIME EMPLOYEES PENSION PLAN,
THE TRUSTEES OF LOCAL 464A WELFARE AND PENSION BUILDING INC., and
THE TRUSTEES OF NEW YORK-NEW JERSEY AMALGAMATED PENSION PLAN FOR
ACME EMPLOYEES, Individually and on Behalf of All Others Similarly Situated,

        Plaintiffs,

v.

PILGRIM'S PRIDE CORPORATION, JAYSON J. PENN,
WILLIAM W. LOVETTE, and FABIO SANDRI

        Defendants.

---

**Defendants Pilgrim's Pride Corporation and Fabio Sandri's Reply in Support of Their
Motion to Dismiss the Amended Class Action Complaint**

---

Defendants Pilgrim's Pride Corporation ("Pilgrim's" or the "Company") and Fabio Sandri

(collectively, "Defendants") submit this reply in support of their motion to dismiss ("Motion" or

"Mot.") the Amended Class Action Complaint ("AC").[1]

**PRELIMINARY STATEMENT**

Plaintiff's opposition brief ("Opposition" or "Opp.") fails to address the obvious

deficiencies of the AC—namely, that under the PSLRA, merely alleging the existence of an

antitrust conspiracy is not, by itself, enough to state a Section 10(b) claim. Rather, a securities

---

[1] All references to "Ex." refer to Exhibits to the accompanying Supplemental Declaration of Caroline Zalka.

fraud plaintiff must satisfy the PSLRA's heightened pleading standards, which require particularized factual allegations showing that a defendant made a materially false statement with a specific intent to defraud investors. Plaintiff's Opposition fails to rebut Defendants' showing that it has not satisfied these exacting requirements or pled the necessary element of loss causation. Accordingly, the Motion should be granted and the AC should be dismissed with prejudice.

## I.     PLAINTIFF FAILS TO PLEAD FALSITY

Plaintiff's securities fraud claims rest on the sweeping, wholly unsupported *assumption* that the anticompetitive conduct described in the AC—which took place almost entirely before the Class Period[2]—was the primary driver of Pilgrim's financial performance and business strategy during the Class Period. Based on that assumption, Plaintiff contends that all of Defendants' Class Period statements concerning Pilgrim's current financial performance must have been false and misleading. However, as Defendants demonstrated in the Motion, Plaintiff's claims fail because the AC does not contain particularized factual allegations demonstrating either: (i) the contemporaneous falsity of any of the challenged statements or (ii) that the non-disclosure of the antitrust conspiracy described in the AC actually rendered any of the challenged statements misleading. Plaintiff's Opposition offers no rejoinder.

First, Plaintiff has no answer for Defendants' showing that the AC does not plead that any of the challenged statements were contemporaneously false. Mot. at 11-12. The Opposition conspicuously fails to address the glaring temporal disconnect between the anticompetitive conduct and the challenged statements. Plaintiff merely repeats the vague allegations from the AC that the conspiracy "extended through 'at least 2019,'" citing only two Class Period discussions

---

[2] *See* Mot. at 12-13.

that a low-level employee had about potential price reductions for the 2018 and 2019 supply of chicken to a single customer. *See* Opp. at 9 (citing AC ¶¶ 113-23).[3] However, as shown in the Motion, this sole allegation is patently insufficient under the PSLRA. The act underlying this single allegation lacks any temporal or other connection to the challenged statements, and the AC fails to identify which statement was rendered false by this conduct and how. *See* Mot. at 12-13. *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 357-58 (S.D.N.Y. 2015) (underlying fraud must occur during the same time period covered by the purportedly false public statements).[4]

Recognizing this, Plaintiff attempts to obfuscate its pleading failure by mischaracterizing its own allegations. Plaintiff repeatedly asserts (including in the opening paragraph of its brief) that the AC sets forth "numerous email, phone, and text message conversations involving Pilgrim's executives, ***including defendants Penn and Lovette*** [that] clearly establish that Defendants engaged in an illegal bid-rigging scheme that began in 2012 and continued until at least 2019." Opp. at 1. This is not accurate. The AC does not contain any allegations that defendants Penn and Lovette were engaged in a price-fixing conspiracy during the Class Period. According to the AC, Penn's last involvement in the price-fixing scheme occurred on March 31, 2015—approximately two years before the Class Period commenced—and Lovette's last involvement occurred on May 1, 2016—approximately one year before the Class Period commenced. *See* AC ¶¶ 111-12. And the AC does not allege that this earlier-in-time conduct in any way overlapped with the challenged

---

[3] The allegations about discussions in January 2017 regarding potential pricing for another customer, AC ¶¶ 113-16, pre-date the Class Period.

[4] Plaintiff implicitly concedes that Pilgrim's pre-Class Period conduct is not relevant to whether Pilgrim's later statements are false, arguing instead that the AC contains some Class Period conduct and therefore should not be dismissed. Opp. at 9 n.2.

statements. *Id.* ¶¶ 109-11 (Penn), ¶ 112 (Lovette).

Second, as set forth in the Motion, Plaintiff does not challenge the accuracy of the results that Pilgrim's disclosed, but rather asserts that Defendants should have disclosed that the "primary driver" of Pilgrim's financial performance during the Class Period was the antitrust conspiracy. Yet as Defendants also showed, Plaintiff failed to offer any facts—much less the requisite particularized, specific allegations—demonstrating the conspiracy impacted Pilgrim's overall financial performance during the Class Period. Mot. at 13-14. In response, Plaintiff contends that the anticompetitive scheme "affected ***at least three*** Class Period contracts with Key Customers" and therefore must have "materially affected Pilgrim's Class Period results." Opp. at 11-12 (citing AC ¶¶ 113-23, 134). But this assertion plainly contradicts Plaintiff's own pleading, as the AC does not allege that the communications with two of these customers,[5] described as taking place in January 2017, *id*. ¶¶ 113-16, and August through September 2017, *id*. ¶¶ 117-23, actually resulted in Pilgrim's entering into contracts to sell products. On the face of the AC, these conversations were discussions about a potential arrangement that Pilgrims is not alleged to have executed. Accordingly, Plaintiff has not pled and cannot be heard to argue that the AC adequately alleges the impact of such conduct on Pilgrim's financial results during the Class Period. Not surprisingly, Plaintiff does not point to any allegation in the AC quantifying the impact that this conduct had on any particular Pilgrim's financial metric.

As to the lone contract that *was* in effect during the Class Period—to supply KFC with certain products in 2015 through 2017[6]—Plaintiff similarly cannot cite any factual allegation that

---

[5] The AC nowhere alleges that the customers described in AC ¶¶ 113-23 are Pilgrim's "Key Customers." *See* Opp. at ix, citing AC ¶ 41.

[6] *See* AC ¶ 134(b).

satisfies the requisite particularity requirements. Plaintiff fails to explain in its Opposition, or allege in the AC, how this single contract with one of Pilgrim's thousands of customers, representing 0.66% of Pilgrim's net sales during the same period,[7] affected Pilgrim's operating results or was material to Pilgrim's operating success—let alone served as the primary driver of Pilgrim's financial results and business over a subsequent three-year period of 2017 through 2020.[8]

Finally, Plaintiff attempts a sleight of hand by combining its allegation that Pilgrim's "top two Key Customers alone accounted for **as much as 14% of its yearly revenue**,"[9] *see* Opp. at 11-12, with its erroneous assertion that the anticompetitive scheme affected three contracts during the Class Period. Plaintiff suggests that, collectively, these allegations are "sufficient" to show that the anticompetitive conduct "materially affected Pilgrim's Class Period results." *Id*. But the issue here is not whether Pilgrim's *top two customers* accounted for a material part of its revenue between 2017 and 2020, but rather whether the AC adequately pleads that the anticompetitive conduct involving these customers materially impacted Pilgrim's financial results during that period. It does not. The AC never once identifies who Pilgrim's top customers were nor describes the revenues attributable to the "affected" customers, much less the component attributable to the antitrust conspiracy.[10] Plaintiff's allegations thus fall far short of meeting its burden under the

---

[7] *See* Mot. at 5, 13-14.

[8] Such a small percentage is well below what courts have held to be material. *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 204, 207 (2d Cir. 2009) (affirming dismissal and acknowledging that "an alleged misrepresentation relating to less than two percent of defendant's assets, when taken in context, could be immaterial as a matter of law").

[9] During the Class Period, Pilgrim's disclosed that its top two customers accounted for between 11% and 13.1% of its net sales. *See* Ex. 1 (2017 10-K dated Feb. 16, 2018) at 8, Ex. 2 (2018 10-K dated Feb. 14, 2019) at 8, Ex. 3 (2019 10-K dated Feb. 21, 2020) at 11, Ex. 4 (2020 10-K dated Feb. 11, 2021) at 4.

[10] Contrary to Plaintiff's contention, Opp. at 11, its obligation to plead particularized allegations concerning the impact of the anticompetitive conduct on Pilgrim's financial statements is properly resolved at the pleading stage. Mot. at 13-14; *see SEB Asset Mgmt. S.A. v. Western Union Co.*, 2015 WL 5708532, at *11 (D. Colo. Sept. 29, 2015) (generalized assertions of "negative impacts" on company's agent network insufficiently particularized absent allegations of

PSLRA of pleading particularized facts showing how Defendants' statements about Pilgrim's Class Period financial performance were rendered misleading by the failure to disclose the conspiracy. Mot. at 13-14; *see also Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) (noting that plaintiff did not plead facts showing the effect of an undisclosed revenue scheme on a company's financial results).

Plaintiff's inability to plead either the contemporaneous falsity of the statements or that the non-disclosure of the conspiracy rendered the statements misleading requires dismissal of the AC in its entirety. Plaintiff's remaining ancillary arguments can be easily disposed of:

- Plaintiff fails to rebut Defendants' showing that it was not obligated to disclose the scheme. Mot. at 14-15. Plaintiff argues only that such disclosure was required because "it was necessary to do so in order to prevent the statements to investors from being misleading." Opp. at 12. However, this contention fails because, as set forth above, the AC does not plead with particularity that the anticompetitive conduct actually impacted Pilgrim's financial results such that the failure to concede the existence of the scheme would have rendered their statements misleading.

- Plaintiff's contention that Defendants' statements about their "purportedly 'strong' relationships with Key Customers," Opp. at 12, constitute actionable misrepresentations is unavailing in the absence of any facts pled in the AC which link the anticompetitive conduct to these unnamed customers.

- Plaintiff does not rebut Defendants' showing that the statements regarding the "highly competitive nature" of the industry are not actionable because there are no particularized factual allegations pled in the AC demonstrating that these statements about the industry generally were contemporaneously false when made. Mot. at 12 n.23. Plaintiff contends that courts have "routinely" found such statements actionable because the alleged falsity of the statement is based on Defendants' own actions, but the sole authority actually cited for this proposition does not support its argument. Opp. at 15 n.7.[11]

- Plaintiff's argument that Pilgrim's SOX certifications and Code of Conduct and Ethics are

---

"number," "scale," and "flow rate" of agent defections).

[11] Plaintiff relies on *Roofer's Pension Fund v. Papa*, in which the court rejected a defendant's contention that a statement concerning competitiveness in the generic drug market was inactionable puffery. 2018 WL 3601229, at *12 (D.N.J. July 27, 2018). *Roofer's* involved an "enormous" scheme which was specifically alleged to be responsible for "more than a quarter of all [Defendant's] Generic Rx revenues." *Id.* The affected sales here amounted to a mere 0.66% of Pilgrim's net sales. Mot. 13-14.

6

false and misleading is similarly unavailing. The cases Plaintiff cites are inapplicable because they contain much more robust factual allegations than alleged by Plaintiff.[12] Absent such particularized showings, SOX certification and code of conduct allegations are widely rejected by courts.[13]

## II.    <u>**PLAINTIFF FAILS TO PLEAD SCIENTER**</u>

As Defendants established in their Motion, Plaintiff's claims fail for the independent reason that the AC does not allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with "respect to each act or omission alleged." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012); Mot. at 15-16.

***Mr. Sandri.*** The Opposition does not point to a single particularized allegation of fact showing that Mr. Sandri possessed knowledge of, let alone was personally involved in, any of the anticompetitive conduct. Plaintiff's failing on this score is independently fatal to their securities fraud claims against him.

Plaintiff nevertheless points to the *absence* of stock sales by Mr. Sandri "in the two years preceding the Class Period" as supporting an inference of scienter. *See* Opp. at 27 n.17. Even assuming suspicious stock sales could be sufficient on their own to establish scienter—and they are not—Plaintiff has failed to plead the requisite meaningful trading history required under the PSLRA for Mr. Sandri's stock trading to support a scienter theory. Mot. at 18; *see Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1374 (D.N.M. 2012) ("A 'meaningful trading history'

---

[12] *In re Allergan Generic Drug Pricing Sec. Litig*., 2019 WL 3562134, at \*11 (D.N.J. Aug. 6, 2019) (code of conduct and SOX allegations survived as "natural corollaries" of claims alleging specific statements by defendants that blatantly contradicted a DOJ investigation); *In re Nature's Sunshine Prod. Sec. Litig.,* 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (SOX allegations adequately pled because plaintiff identified specific statements in the SOX certifications alleged to have been misleading and articulated specific facts supporting why the statements were misleading).

[13] *See, e.g., In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at \*19 (D. Colo. Mar. 31, 2015) (SOX certification allegations insufficiently pled where plaintiff did not show how the facts attested to in the certifications were false).

requires information on non-Class Period sales, the amount of stock retained by the Defendants," or whether stock holdings increased during the Class Period).

Further, Plaintiff's cherry-picked time period fails to provide the requisite meaningful trading history of Mr. Sandri's stock sales. Plaintiff ignores that Mr. Sandri did not acquire any shares of Pilgrim's stock from March 2015 until September 2016. *See* Ex. 5 at 8. When the share awards to Mr. Sandri resumed on December 31, 2016, he began selling those shares on February 17, 2017, in a manner entirely consistent with his prior pattern of trading (*i.e.*, selling shares in February or August as his shares vested). *See* ECF No. 63-22 at 5-6. Specifically, during the Class Period, Mr. Sandri sold 32,400 shares on February 17, 2017, and 74,710 shares on August 6, 2019. These transactions mirrored his pre-Class Period sales in years where he was awarded shares: selling 30,000, 30,657, and 25,400 shares on August 6, 2014, February 20, 2015, and February 23, 2015, respectively. *See id.* at 2-4. These facts undermine any inference of scienter. *See*, *e.g.*, *Gruhn v. Tween Brands, Inc.*, 2009 WL 1542795 at *8 (S.D. Ohio June 2, 2009) (no scienter absent allegations that "sales were inconsistent with the seller's prior trading history").[14]

Importantly, Mr. Sandri actually ended the Class Period with more shares than he held at the start. As of February 12, 2021, Mr. Sandri held 473,734 shares of Pilgrim's stock, three times more than the 153,443 shares he held on February 9, 2017. Mr. Sandri's stock sales during the Class Period constituted a small percentage of his total Pilgrim's holdings. Where, as here, an

---

[14] The authorities cited by Plaintiff in this regard are easily distinguishable in that the trades in those cases were suspiciously timed and made shortly after the alleged misstatements. *See, e.g.*, *Dutton v. D&K Healthcare Res*., 2006 WL 1778884 at *10 (E.D. Mo. June 23, 2006) (stock sales shortly after positive earnings results and at the time where the company disclosed an SEC investigation and restated its earnings); *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (plaintiffs "specifically alleged the percentage of stock sold and retained, as well as the timing of Defendants' sales relative to the stock price and the misrepresentations"); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168 (C.D. Cal. 2003) (individual defendant sold two million shares for more than $18 million during the class period and sale coincided with company's announcement of its first profit).

individual defendant has retained a significant amount of stock, his stock sales during the class period simply cannot support an inference of scienter. *See Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 2021 WL 1222290, at \*22 (D. Utah Mar. 31, 2021) ("defendants engaging in stock sales but retaining a substantial percentage of their . . . holdings . . . rebut[s] any inference of scienter we might otherwise draw regarding the[] sales") (quoting *In re Level 3*, 667 F.3d at 1346-47).[15]

*Corporate Scienter*. Plaintiff's arguments as to corporate scienter are equally unavailing. As an initial matter, Plaintiff cites no authority suggesting that a theory of corporate scienter can be applied here. Mot. at 18-19. And even assuming the doctrine applies, Plaintiff has failed to plead with particularity any facts that would support a plausible inference of corporate scienter. Plaintiff argues that "[b]ecause the Complaint adequately alleges each Individual Defendant's scienter, it adequately alleges Pilgrim's scienter as well." Opp. at 31. However, Plaintiff does not point to any allegations in the AC suggesting that the individual corporate officers acted with the requisite scienter when they made the statements challenged in the AC, merely repeating its tired—and erroneous claim (rebutted above)—that the scheme "persisted until at least 2019." *Id*. at 24. Furthermore, Plaintiff does not address Defendants' argument that the state of mind of Employee 6—a low-level Pilgrim's sales manager, and the only employee who engaged in any anticompetitive conduct during the Class Period—cannot be imputed to the Company for purposes of establishing scienter. Mot. at 18-19. Plaintiff's failure to address this point concedes this

---

[15] Plaintiff argues that Mr. Sandri's increased holdings at the end of the Class Period "do not negate the scienter inference" because a portion of those holdings came from vested stock options. Opp. at 28-29. But Plaintiff cites cases that are inapposite to the facts here. In *Freudenberg v. E\*Trade Fin. Corp.*, defendants adopted Rule 10b-5 trading plans during the class period "to disguise" their knowledge of an impending price drop. 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010). *In re Tyson Foods, Inc. Sec. Litig.*, is also unavailing, as the court ultimately gave weight to the fact that the defendants' holdings increased in volume and were consistent with their prior trading patterns, concluding that the stock sales did not support an inference of scienter. *See* 275 F. Supp. 3d 970, 1001 (W.D. Ark. 2017).

deficiency in the AC. *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at \*11 (S.D.N.Y. Sept. 28, 2012) (plaintiff "concedes through silence" arguments not addressed in an opposition brief).

Finally, Plaintiff's contention that Defendants must have been aware of the "illegal bid-rigging scheme" because it involved Pilgrim's "core operations"—according to Plaintiff, "pricing for its core product: broilers," Opp. at 25—fails. The Tenth Circuit expressly rejected a similar scienter theory in *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245-46 (10th Cir. 2016), holding that such allegations "based only on a defendant's position in a company or involvement with a particular project" are insufficient without "additional particularized facts," none of which are pled in the AC. Plaintiff's own case, *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987 (D. Colo. 2016), is not to the contrary. Unlike here, the *Molycorp* plaintiffs made highly specific factual allegations, supported by confidential witnesses, that defendants misled investors by representing that their "principal" products included certain rare elements present in their *only* mine, when in fact there were specific allegations of analysis available to defendants over the course of years showing the complete absence of any such elements at the time of their statements. 157 F. Supp. 3d at 996, 1008-11. No such particularized allegations are present here, *see* Mot. at 18-19, and *Molycorp* does not absolve Plaintiff of pleading them.

Given the infirmities in Plaintiff's allegations described herein and in the Motion, the allegations in the AC do not create a plausible inference of scienter, let alone a cogent one that is at least as compelling as any opposing, non-fraudulent inference. Mot. at 16-17.

## III.    <u>PLAINTIFF FAILS TO PLEAD LOSS CAUSATION</u>

As set forth in the Motion, Plaintiff's failure to plead the element of loss causation either under a corrective disclosure theory or by pleading the materialization of a known risk constitutes

independent grounds for dismissal. Mot. at 19. Plaintiff's argument that it has "adequately pleaded loss causation based upon the announcement of the Initial Indictment," Opp. at 33, is without merit.

First, the Initial Indictment does not constitute a corrective disclosure under the securities laws because it does not relate back to the alleged misstatements.[16] Plaintiff blithely states that that the Initial Indictment "disclosed to the public that Defendants' illegal bid-rigging conduct both persisted into the Class Period and impacted Pilgrim's Class Period financials." Opp. at 34. Critically, however, Plaintiff fails to bridge the gap between the Initial Indictment and any allegedly misleading statements made by Pilgrim's during the Class Period. All of the conduct alleged in the Initial Indictment took place before the Class Period. Mot. at 20. While the Initial Indictment describes a series of communications through January 2017, the AC does not allege that any contract was formed, or was in effect, as a result of those communications that continued into the Class Period. *See supra* at 4-5; Mot. at 20. And the sole allegation of Class Period conduct in the AC, involving communications in August and September 2017, *see* AC ¶¶ 117-23, was not detailed in the Initial Indictment at all—rather, it was revealed for the first time months later in the Superseding Indictment, well after the Class Period ended. Mot. at 21. Thus, contrary to Plaintiff's contention, nothing in the Initial Indictment tied the conduct described therein to any of the challenged statements concerning the Company's financial performance in the Class Period, let alone revealed the falsity of any of those statements. The Initial Indictment simply constituted "other negative information about the company," *In re Williams Sec. Litig.-WCG Subclass*, 558

---

[16] Plaintiff cites *Molycorp*, Opp. at 33, but there, the alleged corrective disclosure effectively mirrored, and thus related back to, the alleged misstatements. 157 F. Supp. 3d at 1012. There, the alleged misstatements that the company's sole mine contained certain elements was corrected by a subsequent disclosure that the company had not found any such elements at all. *Id.*

F.3d 1130, 1140 (10th Cir. 2009), as opposed to a corrective disclosure.[17]

Second, even before the Initial Indictment became public, the market had already incorporated the information concerning Pilgrim's potential involvement in anticompetitive conduct into Pilgrim's stock price because Pilgrim's had previously disclosed the attendant risks. Mot. at 5-9. The AC alleges that the market for Pilgrim's stock was efficient, and accordingly, all relevant public information relating to the risks arising from the antitrust conspiracy would—based on Plaintiff's own pleading—have necessarily been incorporated into Pilgrim's stock price. Plaintiff cannot have it both ways; it cannot "contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits [its] needs for purposes of loss causation. Either the market is efficient or it is not." *Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) ("The efficient market theory . . . is a Delphic sword: it cuts both ways").

Plaintiff's assertion that Pilgrim's disclosed "completely unrelated misconduct . . . not alleged in the Complaint," Opp. at 34, is belied by the disclosures themselves. Plaintiff itself characterizes Pilgrim's conduct in this action as a scheme designed to "rig bids and fix prices" for broiler chickens in violation of the antitrust laws. *See, e.g.*, Opp. at 1, 8-9. Yet Pilgrim's disclosed that it faced claims alleging this very type of anticompetitive conduct long before the Initial Indictment.[18] Indeed, Pilgrim's repeatedly disclosed allegations that it had "colluded with several of its industry peers to fix prices in the broiler chicken market" in violation of the antitrust laws,

---

[17] Plaintiff does not dispute that it has not pled that the Superseding Indictment or the Plea Agreement, on which it bases many allegations about the underlying antitrust violations, constituted corrective disclosures. *See* Mot. at 21.

[18] Plaintiff ignores that courts have dismissed complaints under the reliance element of Section 10(b) where the corrective disclosure provided information that was already known to the market. *See, e.g.*, *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 69 (2d Cir. 2012) (affirming dismissal of complaint because "all of the information alleged to constitute [the fraud] . . . were matters of public knowledge"). The logic also applies to loss causation. And in fact, "'[l]oss causation is a more exacting standard' than [reliance]." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 430 (3d Cir. 2007).

and that its "revenues during the class period were the result of illegal conduct." *See* Mot. at 7-9; *see also id.* at 8 (disclosure of lawsuits against Pilgrim's alleging "a conspiracy among defendants to reduce output and fix, increase, maintain, and stabilize the prices of broiler chickens in violation of the U.S. antitrust laws from the period of January 2008 to the present" and that "Pilgrim's SEC filings contained statements that were rendered materially false and misleading by Pilgrim's failure to disclose" the conspiracy). Plaintiff's demand that the prior disclosures need to match the Initial Indictment word-for-word is misplaced: investors were told that Pilgrim's was subject to claims that it had fixed prices, that its financial statements were purportedly false as a result, and furthermore warned of the risks resulting from these allegations. The relevant risks had therefore very much been disclosed to the market before June 3, 2020, and were reflected in the Pilgrim's stock price. Thus, the disclosures preclude a finding that Plaintiff adequately pled loss causation. *See*, *e.g.*, *Graham v. Barriger*, 699 F. Supp. 2d 612, 630 (S.D.N.Y. 2009) ("A risk disclosure that cautioned investors of a later-realized loss does not support a claim of loss causation").

Finally, confronted with the reality that the AC cannot withstand dismissal, Plaintiff falls back on the mantra that Defendants' loss causation arguments are "intensely-factual" and thus cannot be resolved on this Motion. Opp. at 34. Not so. To be clear, the only documents that Defendants ask the Court to consider are those documents that Plaintiff itself relies on in the AC (such as the Initial Indictment), and Pilgrim's prior SEC filings (solely for purposes of demonstrating certain disclosures were in fact made)—categories of documents of which the Court may indisputably take judicial notice. *See Emps.' Ret. Sys. of R.I. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018). Plaintiff cannot cite liberally from documents throughout the AC, but then contend that Defendants cannot also cite to those same judicially noticeable documents in

demonstrating the infirmities in their pleading. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (courts need not accept as true any "legal conclusions and factual allegations that contradict such a properly considered document"). Defendants' arguments are properly addressed on a motion to dismiss.[19]

## IV.  PLAINTIFF FAILS TO PLEAD SCHEME LIABILITY

As demonstrated in the Motion, Plaintiff does not adequately plead scheme liability under Rule 10b-5(a) and (c) because the AC's allegations simply repackage the misstatement claims and are otherwise barred. Mot. at 23-24. Plaintiff counters that its scheme liability claim rests on a "years-long conspiracy and fraudulent course of business," *i.e.*, the anticompetitive conduct described in the AC. Opp. at 36. But if Plaintiff seeks to plead scheme liability based on underlying antitrust violations beginning in 2012, any claims premised on conduct occurring prior to July 6, 2015 are barred by the five-year statute of repose. Mot. at 23-24. Moreover, Plaintiff lacks standing to bring a scheme liability claim for conduct occurring before February 2017, as it has not established it was a purchaser or seller of Pilgrim's stock before that date. *Id.* at 24.

Furthermore, Plaintiff's argument that it has alleged a scheme distinct from the alleged misrepresentations ignores that the AC does not contain any particularized facts even suggesting how the conduct described constituted "intentional or willful conduct *designed to deceive or*

---

[19] Plaintiff's invocation of *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) to suggest that this Court cannot consider Defendants' arguments, Opp. at 11, is inapposite because there are no "competing factual assertions" for the Court to consider here. Rather, Plaintiff concedes Defendants' factual assertions, but argues they are "irrelevant" to determining whether a corrective disclosure was sufficiently pled—a purely *legal* question that the Court may consider. *See id.* at n.21. Plaintiff's reliance on *In re MBIA, Inc. Sec. Litig.* for the proposition that the "truth-on-the-market" doctrine is too fact-specific at the pleading stage, Opp. at 34, is also misguided. There, the court was faced with evaluating conflicting analyst reports, not statements in a company's public filings. 700 F. Supp. 2d 566, 583 (S.D.N.Y. 2010). And Plaintiff's out-of-context quote is from the court's analysis of whether defendants had rebutted the presumption of materiality, not whether plaintiffs had adequately pled loss causation. *Id.*

*defraud investors*," a requirement for a Section 10(b) scheme liability claim. *See In re Tupperware Brands Corp. Sec. Litig.*, 2021 WL 247870, at \*5 (M.D. Fla. Jan. 25, 2021) (dismissing scheme liability claim where, "[a]t most, the complaint can be read to suggest that [defendant] implemented the scheme in response to a directive to improve . . . sales"). Plaintiff cannot shoehorn a claim for antitrust violations into a scheme liability claim. Indeed, Section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way." *Stoneridge Inv. Partners, LLC. v. Sci.-Atlanta*, 552 U.S. 148, 162 (2008).[20] Because "nothing in the [AC] supports the inference that [Defendants] acted with the purpose of influencing the price of [the Company's] securities," Plaintiff's scheme liability claim should be dismissed. *See Tupperware*, 2021 WL 247870, at \*5.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the AC in its entirety with prejudice.

Dated: September 30, 2021

**Caitlin C. McHugh**
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, CO 80202
Telephone: 303-628-9588
cmchugh@lrrc.com

*/s/ Caroline H. Zalka*
**Caroline H. Zalka**
**Seth Goodchild**
**Andrew J. Cauchi**
**Tania C. Matsuoka**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000

*Attorneys for Pilgrim's Pride Corporation and Fabio Sandri*

---

[20] A "scheme to defraud must coincide with the sale of securities . . . . the fraud itself must be 'integral to the purchase and sale of the securities in question.'" *Menaldi v. Och–Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (bribery occurring years before the class period "far too remote" to support scheme liability).

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will notify all counsel of record of such filing.

*/s/ Caroline H. Zalka*
Caroline H. Zalka