IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-CV-01966-RM-MEH

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION
LOCAL 464A, THE TRUSTEES OF
WELFARE AND PENSION FUNDS OF
LOCAL 464A – PENSION FUND, THE
TRUSTEES OF RETIREMENT PLAN
FOR OFFICERS, BUSINESS
REPRESENTATIVES AND OFFICE
EMPLOYEES OF LOCAL 464A, THE
TRUSTEES OF LOCAL 464A FINAST
FULL TIME EMPLOYEES PENSION
PLAN, THE TRUSTEES OF LOCAL
464A WELFARE AND PENSION
BUILDING INC., and THE TRUSTEES
OF NEW YORK-NEW JERSEY
AMALGAMATED PENSION PLAN FOR
ACME EMPLOYEES, Individually and on
Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

PILGRIM'S PRIDE CORPORATION,
JAYSON J. PENN, WILLIAM W.
LOVETTE, and FABIO SANDRI,

      Defendants.

**REPLY IN FURTHER SUPPORT OF WILLIAM W. LOVETTE'S MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff's[1] opposition brief (Doc. No. 67, the "Opposition" or "Opp.") confirms that Plaintiff cannot produce *any* specific, sufficiently-pled allegations to support its theory that Mr. Lovette engaged in securities fraud, nor that he was aware of or involved in the alleged bid-rigging scheme. Rather, Plaintiff attempts to confuse the scienter analysis by inserting Mr. Lovette's name into allegations that are unrelated to actions he took or conversations in which he was involved. The remaining bare allegations specific to Mr. Lovette do not establish a survivable claim against him as they are insufficient to satisfy the PSLRA's requirement that Plaintiff plead specific allegations giving rise to each *individual's* scienter. Indeed, courts in the Tenth Circuit and elsewhere routinely dismiss complaints that try to plead scienter by alleging that an individual defendant was an executive of a company when wrongdoing allegedly was ongoing, and therefore they must have been in on the scheme. Respectfully, this Court should reject Plaintiff's threadbare pleading and dismiss all claims against Mr. Lovette.

## ARGUMENT

In his opening brief (Doc. No. 64, the "Motion"), Mr. Lovette addressed the ways in which the AC fails to state a valid claim against him – failing to adequately plead that Mr. Lovette made material misrepresentations; that Plaintiff's loss was causally connected to any of Mr. Lovette's alleged misrepresentations; or that Mr. Lovette was involved in a scheme to defraud. Plaintiff's Opposition fails to rebut this showing, and Plaintiff does not overcome the AC's inability to meet the PSLRA's tall standard for pleading that Mr. Lovette acted with the requisite scienter. For these reasons, the Motion should be granted and the claims dismissed as against Mr. Lovette.

---

[1] Capitalized terms herein shall have the meaning ascribed to them in the Motion unless otherwise specified.

2

**I.      PLAINTIFF MISSTATES THE PLEADING STANDARD.**

Plaintiff incorrectly implies that the federal plausibility standard applies to its Section 10(b) claim–it does not. *See* Opp. at 7. A plaintiff alleging securities fraud must satisfy the heightened pleading requirements of FRCP 9(b) and the PSLRA, which require a plaintiff to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *See Smallen v. W. Union Co.*, 950 F.3d 1297, 1305 (10th Cir. 2020) (citing 15 U.S.C. § 78u-4(b)(1)). Indeed, "[a] plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage" to meet the heightened specificity requirements, particularized for each defendant, or risk dismissal. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). By relying on the lower "facial plausibility" and "reasonable inference" standard – supported with tenuous, conclusory allegations and group pleading as explained below – Plaintiff has not met its burden here. That failure alone warrants dismissal for Mr. Lovette.

**II.     THE OPPOSITION DOES NOT CURE PLAINTIFF'S FAILURE TO ALLEGE MISREPRESENTATIONS OR OMISSIONS BY MR. LOVETTE.**

The AC does not allege a single actionable misrepresentation or omission made by Mr. Lovette in his capacity as Pilgrim's CEO. Setting aside the clear timing disconnect between Plaintiff's sparse allegations of Mr. Lovette's alleged wrongdoing and the commencement of the putative class period, *see infra* Section III, the alleged misstatements actually attributed to Mr. Lovette do not rise to the level of material misstatements upon which a securities case can be built.

Most notably, Plaintiff does not allege particularized facts showing that Mr. Lovette's statements about the success of Pilgrim's operations, its strategic acquisitions, effective management, and relationships with key customers were ***contradicted*** by contemporaneous evidence of which he had any knowledge, and Plaintiff fails to remedy this defect in the

3

Opposition. *See SEB Asset Mgmt. S.A. v. W. Union Co.*, No. 13-cv-03325-MSK-MJW, 2015 WL 5708532, at *4–5 (D. Colo. Sept. 29, 2015) (dismissing claims where complaint failed to allege particularized facts showing how purported misrepresentations were misleading); *see also, e.g.*, *Emps. Ret. Sys. v. Embraer S.A.*, No. 16 Civ. 6277 (RMB), 2018 WL 1725574, at *7 (S.D.N.Y. Mar. 30, 2018) ("There is no allegation that Sanofi failed to accurately report any of its financial figures. Courts in this district have held that the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability. Absent an allegation that Sanofi reported income that it did not actually receive or sales growth that did not actually occur, this Court agrees that a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data."). For example, the AC does not contain a single allegation that Mr. Lovette addressed any alleged bid-rigging scheme or commented on the merits of the publicly disclosed civil antitrust litigation that was pending. Indeed, the statements made by Mr. Lovette in earnings calls and SEC filings regarding Pilgrim's performance and competitive edge, *see, e.g.*, AC ¶¶ 153, 159, 163, 165, are the exact types of "vague statements of corporate optimism" that the Tenth Circuit has held are "incapable of objective verification" and thus cannot stand as a basis for a Section 10(b) violation. *see Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997); *Level 3*, 667 F.3d at 1340.

## III. PLAINTIFF FAILS TO RAISE ANY INFERENCE, LET ALONE A STRONG INFERENCE, THAT MR. LOVETTE ACTED WITH THE REQUISITE SCIENTER.

To establish scienter, Plaintiff must allege that Mr. Lovette ***himself*** knew about the bid-rigging and its material impact on Pilgrim's success at the time he made the alleged misrepresentations, and that Mr. Lovette intentionally or recklessly chose to withhold this

information from investors. *See In re Weinstein*, 757 F.3d 1110, 1113 (10th Cir. 2014); *Jun Zhang v. LifeVantage Corp.*, No. 2:16-CV-965 TS, 2017 WL 2599883, at *10 (D. Utah June 15, 2017) ("[T]he PSLRA demands that the facts giving rise to the necessary inference of scienter be pled with particularity as to each defendant."). The Opposition does nothing to add to the two vague allegations of pre-class period conduct Plaintiff uses as its sole support for its assertion that Mr. Lovette had any knowledge of the alleged bid-rigging scheme. Plaintiff's scant allegations cannot create an inference of scienter against Mr. Lovette and certainly not a strong inference.

### A. Mr. Lovette Was Not "Directly Involved" in the Alleged Bid-Rigging Scheme.

Plaintiff's Opposition does little to rebut the fact that Plaintiff cannot make a specific, plausible allegation that **Mr. Lovette** participated in or knew about the alleged bid-rigging scheme. The quantum of supporting allegations Plaintiff offers in this regard is: (i) an allegation that, **in 2014**, Mr. Penn said he would have a discussion with Mr. Lovette about a bid Pilgrim's was going to submit to a customer, but no allegation confirming that the discussion ever took place; and (ii) a single, one-off discussion in 2016 between Mr. Lovette and a Koch executive that Plaintiff alleges related to a customer's request for an extended line of credit, **not** about the price of broiler chicken and most certainly not about any alleged "illegal bid-rigging scheme." *See* Opp. at 22–23 (citing AC ¶¶ 93, 112). Plaintiff does not contest the fact that these allegations standing alone, as they must to state a claim against Mr. Lovette, are far too vague and general to support an inference of scienter. *See* Motion at 9–10 (citing *Sorkin LLC v. Fischer Imaging Corp.*, No. 03-cv-00631-R, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005)). Rather, Plaintiff ignores *Sorkin* and attempts to tie Mr. Lovette to allegations concerning *other* Pilgrim's employees' actions. *See, e.g.*, Opp. at 9 (citing ¶¶ 113–23), 22 (citing ¶¶ 64–123). But the scienter of an *individual* cannot be

5

inferred based on the actions of others. *See In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) ("[T]here is no indication in the Amended Complaint that Case engaged in any manipulative or deceptive conduct. ***The Court refuses to indulge MSBI's invitation to infer Case's scienter from the fact that executives who reported to Case (both directly and indirectly) may have engaged in fraudulent behavior.***" (emphasis added)); *see also Jun Zhang*, 2017 WL 2599883, at *10. The AC, even when read with permissible inferences in favor of Plaintiff, fails to allege with the requisite specificity that Mr. Lovette was directly involved in the alleged bid-rigging scheme, and the Opposition does not remedy this defect.[2]

The cases cited by Plaintiff confirm that Plaintiff's allegations regarding scienter are deficient. *See* Opp. at 23–24 n.12–13. In *Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries*, the complaint contained specific examples of "what defendants knew on a daily, weekly[,] and monthly basis about the [pricing and competitive environment], while at the same time making public statements that painted a different picture[,]" including reports defendants had seen, work plans defendants had approved, and pricing documents that contradicted defendants' contemporaneous public statements. 432 F. Supp. 3d 131, 171 (D. Conn. 2019). In *Public Pension Fund Group v. KV Pharmaceutical Co.*, the court found an inference of scienter where there were specific allegations that the individual defendant had discussions with the FDA regarding the violations at issue, signed a consent decree reflecting that he knew of the violations, and was terminated for cause "with full knowledge of all pertinent facts." No. 4:08-

---

[2] Contrary to Plaintiff's contention, *see* Opp. at 23, Mr. Lovette offers a more compelling, non-fraudulent inference from his actions, namely "that Mr. Lovette had no knowledge of the bid-rigging scheme and, unremarkably, sporadically communicated about routine business matters with lower-level employees at Pilgrim's and others in the industry." Motion at 10.

6

CV-1859 (CEJ), 2013 WL 1831427, at *3 (E.D. Mo. Apr. 30, 2013). Finally, the plaintiffs in *In re Allergan Generic Drug Pricing Securities Litigation*, pled substantial, particularized allegations of both direct and circumstantial evidence of Allergan's collusion, including particularized evidence related to the individual defendants. No. 16-9449 (KSH) (CLW), 2019 WL 3562134, at *6 (D.N.J. Aug. 6, 2019). In finding scienter, the court found that the specific and particularized allegations, combined with the ongoing investigation, played a "significant piece of the puzzle" as to ***Allergan's*** scienter, and that the core operations inference could be imputed to the individuals because alleged tainted sales accounted for between ***30–40 percent*** of Allergan's total revenues. *Id.* at *11–12.[3] Here, the AC contains no such specific allegations to suggest Mr. Lovette had the type of direct, pertinent knowledge of the alleged wrongdoing. Nor do Plaintiff's scant allegations warrant application of the core operations doctrine as explained *infra*, Section III.B.

Furthermore, Plaintiff cannot distinguish *Smallen* so easily. *See* Opp. at 24. In *Smallen*, the Court found the plaintiff's allegations of an executive's knowledge of wrongdoing insufficient because the transactions at issue took place "nearly two years before the start of the Class Period . . . as well as before any of the identified misstatements." *Smallen*, 950 F.3d at 1314. Plaintiff's allegations regarding Mr. Lovette's supposed knowledge of wrongdoing similarly pre-date any allegations of misstatements or the beginning of the Class Period. Moreover, the Tenth Circuit declined to indulge the plaintiff's invitation to make inferential leaps where the plaintiff did not

---

[3] Plaintiff's citation to *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), is similarly off base. There, the court noted that the "general standards" cited by Plaintiff, *see* Opp. at 24 n.13, "offer little insight into precisely what actions and behaviors constitute recklessness sufficient for § 10(b) liability." *Novak*, 216 F.3d at 308. The *Novak* court went on to discuss the "several important limitations on the scope of liability for securities fraud based on reckless conduct[,]" including allegations of "fraud by hindsight" as Plaintiff alleges here. *Id.* at 309.

7

"provide any particularized allegations showing the Individual Defendants themselves" knew of the wrongdoing *during* the class period. *Id.* at 1308–09. Nor did the court permit the plaintiff to allege the individual defendants' "fraud by hindsight" by pointing to company admissions in a joint settlement and deferred prosecution agreement. *Id.* at 1309–10 (noting "neither document provides particularized facts tying the Individual Defendants to these violations or otherwise showing they were aware of ongoing illegality and widespread disciplinary failures during the Class Period"). Plaintiff's allegations specific to Mr. Lovette are quite similar to those that the Tenth Circuit found deficient in *Smallen*.

B. **Plaintiff's Allegations of Wrongdoing Do Not Satisfy the "Core Operations" Doctrine.**

Unable to sufficiently allege that Mr. Lovette participated in or knew about the alleged bid-rigging scheme, Plaintiff attempts to impute scienter under the "core operations" doctrine. *See* Opp. at 25–26. But this doctrine does not apply here because the bid-rigging scheme as alleged in the AC – even if true – would have impacted only a small sector of Pilgrim's business. Plaintiff's Opposition casts the doctrine as applicable simply because the alleged scheme impacted Pilgrim's "only product," *see* Opp. at 25, but the core operations doctrine focuses on what percentage of the company's overall business was impacted by the alleged wrongdoing. The AC, however, is devoid of any allegations to support an inference that the alleged scheme impacted more than a few customers, at a specific point in time, without quantification of the financial impact on the business as a whole. Thus, Plaintiff's theory falls short of the mark.

Courts in the Tenth Circuit and elsewhere reject an inference of scienter under the core operations doctrine where the alleged transactions are miniscule in comparison to the company's overall business. *See, e.g.*, *Smallen*, 950 F.3d at 1306–07 (rejecting argument that $632,721,044,

which amounted to 1% of transfers through Western Union's system, "amounted to an overwhelming percentage of the company's business"); *Jun Zhang*, 2017 WL 2599883, at *9 (finding transactions affecting 8% of total revenue were "on a much smaller scale than those in cases where the core operations theory has been applied"); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) ("We also point out that the core operations doctrine cannot apply because, in spite of customs violations at three of the four Kid Brands subsidiaries, the $10 million in anticipated liabilities covering wrongful conduct over a nearly five-year span cannot be regarded as affecting the 'core operations' of a company that had hundreds of millions of dollars in annual net sales."). Put bluntly, "[p]roof under [the core operations] theory is not easy." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).

Here, the $361 million dollars about which Plaintiff cries foul involved very few ***specific*** contracts for a very small number of customers out of more than 5,000 customers and constituted ***0.66%*** of Pilgrim's revenues during that period. *See* AC ¶ 4; *Wasatch Equal. v. Alta Ski Lifts Co.*, 820 F.3d 381, 388 n.5 (10th Cir. 2016) (finding district court did not err in taking judicial notice of publicly available budget information).[4] Plaintiff cannot in good faith allege on the one hand that Pilgrim's is "one of the nation's largest chicken producers," AC ¶ 13, and on the other hand allege that a few contracts are the core of Pilgrim's operations. Similarly, one need look no further than Plaintiff's Opposition to see that Plaintiff's allegation about a single product is blatantly misleading. Plaintiff's Opposition quotes language that describes "the variety of Pilgrim's business and the various business "segments," including "the spot market," "big bird," "tray pack,"

---

[4] Pilgrim's Pride Corp., Annual Report (Form 10-K) (Feb. 15, 2013), (Feb. 21, 2014), (Feb. 12, 2015), (Feb. 12, 2016), (Feb. 9, 2017), (Feb. 16, 2018).

9

and "the small bird segment." *See* Opp. at 26. Thus, Plaintiff's own words demonstrate that its allegations are far from circumstances "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016).

Setting aside the threshold deficiencies of Plaintiff's reliance on the doctrine, even assuming *arguendo* that the doctrine somehow applies to the company, the doctrine is facially inapplicable with respect to the required scienter element against Mr. Lovette. When considering allegations that wrongdoing affected "core operations," the Tenth Circuit will not "infer scienter based only on a defendant's position in a company or involvement with a particular project." *Anderson v. Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229, 1245–46 (10th Cir. 2016). Even Plaintiff's own citation stands for the proposition that a court should not apply the core operations doctrine where there are no allegations substantiating Mr. Lovette's **direct** knowledge of or involvement in the alleged bid-rigging.[5] *See* Opp. at 26 (citing *Police Ret.*, 759 F.3d at 1062 (finding core operations theory was not sufficiently pled where complaint lacked specific admissions by individual defendants)). Indeed, *Jun Zhang, Smallen,* and *Kid Brands* further counsel that the circumstances alleged by Plaintiff do not rise to the level of impacting Pilgrim's "core operations" and therefore do not give rise to an inference of Mr. Lovette's scienter. For these reasons, Plaintiff cannot succeed on this theory as a general proposition, much less against Mr. Lovette individually.

---

[5] As explained *supra*, Section III.A, Plaintiff cannot use ***others'*** involvement in the alleged scheme as a basis for asserting that ***Mr. Lovette*** must have known about the scheme. *See Weinstein*, 757 F.3d at 1113; *Jun Zhang*, 2017 WL 2599883, at *10.

### C. Mr. Lovette's Trades Were Routine and in Consistent Quantities.

Plaintiff's allegations regarding Mr. Lovette's stock sales are conclusory and deficient on their face. What is more, rather than acknowledging the complete picture of Mr. Lovette's trading history, *see* Motion at 14, Plaintiff doubles down on its contrived time periods and hyperbolized trading patterns. *See* Opp. at 27. Plaintiff's attempt to demonstrate motive through stock sales misses the mark, because Mr. Lovette's routine sales of stock in normal quantities adds no inference of scienter.

In the Motion, Mr. Lovette lays out that the Tenth Circuit requires far more than routine stock sales to evidence motive. *See* Motion at 13. Instead of addressing the AC's deficiencies, Plaintiff simply reiterates the AC's conclusory statements regarding Mr. Lovette's stock trades, which are deficient as a matter of law. *See* Opp. at 27. Moreover, the Opposition does not even attempt to address the fact that Mr. Lovette sold stock ***one time per year*** in 2014, 2015, 2017, 2018, and 2019. Motion at 14. Mr. Lovette's ***largest*** percentage sale of stock in those years (23%) occurred in 2015, before the Class Period began. *Id.* Mr. Lovette's ***smallest*** percentage sale of stock (10.4%) occurred in 2017, during the Class Period. *Id.* The only year in which Mr. Lovette did not sell stock—2016—was a year in which Mr. Lovette's holdings did not increase. *Id.* at n.5. These are the types of routine stock sales Courts typically find ***do not*** contribute to evidence of scienter.[6] *McNamara v. Pre-Paid Legal Servs.*, 189 F. App'x 702, 715 (10th Cir. 2006); *In re Sun*

---

[6] Plaintiff's authority represents circumstances that are far different from those in the instant case. *See* Opp. at 28. For instance, the Defendants in *Molycorp* sold substantial portions of their holdings during the class period, while selling ***no stock*** outside of the class period. *In re Molycorp*, 157 F. Supp. 3d at 1009. The defendants in *In re SmarTalk Teleservices, Inc. Securities Litigation* dumped significant portions of their stock holdings "in close proximity to the false statements in question." 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000). Likewise, the defendants in *In re SeeBeyond Technologies Corp. Securities Litigation* admitted to lying to analysts and investors

11

*Healthcare Grp., Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002). Lastly, the fact that Mr. Lovette actually increased his holdings—whether through RSUs or otherwise—***negates*** an inference of scienter, even under Plaintiff's own authority. *See* Motion at 15 (collecting cases); *see also* Opp. at 29 (citing *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1002 (W.D. Ark. 2017) ("That Defendants acquired much (and perhaps all) of their retained shares through performance awards and other employment benefits, rather than on the open market, reduces—***but does not negate***—the significance of those holdings . . . . [T]he transactions' relative congruence with Defendants' larger trading pattern, ***and far more importantly***, Defendants' accumulation and retention of Tyson stock, both temper the strength of any nefarious inference that the Court could otherwise draw from the transactions." (emphasis added))).

Simply put, Plaintiff's conclusory allegations in the AC regarding Mr. Lovette's sale of stock are deficient on their face, and the Opposition fares no better; Mr. Lovette's complete trading history rebuts an inference of scienter. Respectfully, Plaintiff's attempt to hide the ball and misrepresent Mr. Lovette's trading history should not be condoned by this Court.

### D. <u>Plaintiff Fails to Plead Falsity as To Mr. Lovette.</u>

In a futile effort to plead falsity, Plaintiff tries to connect pre-Class Period conduct to the Class Period. The AC, however, never alleges that Mr. Lovette engaged in a price-fixing conspiracy during the Class Period. The AC alleges that Mr. Lovette's last involvement was on May 1, 2016, which was roughly one year before the Class Period commenced. AC ¶ 112.

---

and subsequently made an irregular and highly profitable trade. 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003).

Plaintiff goes on to contend that the scheme "affected at least three Class Period contracts with Key Customers" and thus "materially affected Pilgrim's Class Period results." Opp. at 11–12 (citing AC ¶¶ 113–23, 134). Plaintiff's own AC directly conflicts with this position, however, because none of the alleged communications in 2017 (AC ¶¶ 113–23) resulted in Pilgrim's executing contracts to sell chicken. For the only contract in effect during the Class Period—supplying KFC in 2015 through 2017[7]—Plaintiff cites to nothing in the AC to show how that single contract (representing a fraction of Pilgrim's sales) impacted Pilgrim's operating results or was material to Pilgrim's operating success.

Moreover, Plaintiff misleadingly states that Pilgrim's "top two Key Customers accounted for as much as 14% of its yearly revenue"[8] and that the scheme affected three contracts during the Class Period for the proposition that the alleged conduct "materially affected Pilgrim's Class Period results." Opp. at 11–12. The issue, however, is whether the AC sufficiently pleads a material impact on Pilgrim's financial results—*not* whether Pilgrim's top two customers accounted for a material part of its revenue in certain years. In any event, the AC does not allege that the anticompetitive conduct targeted Pilgrim's top two customers. The AC does not even identify Pilgrim's top customers. The AC thus fails to plead particularized facts in compliance with the PSLRA showing how Mr. Lovette's statements were misleading. *See Marcu v. Cheetah Mobile Inc.*, No. 18-CV-11184 (JMF), 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020) (noting that

---

[7] *See* AC ¶ 134(b).
[8] During the Class Period, Pilgrim's disclosed that its top two customers accounted for between 11% and 13.1% of its net sales. *See* Ex. [] (2017 10-K dated Feb. 16, 2018) at 8, Ex. [] (2018 10-K dated Feb. 14, 2019) at 8, Ex. [] (2019 10-K dated Feb. 21, 2020) at 11, Ex. [] (2020 10-K dated Feb. 11, 2021) at 4.

Plaintiff does not plead facts showing the effect of an undisclosed revenue scheme on a company's financial results).

### E. Mr. Lovette's Retirement More Than One Year Before Charges Against Pilgrim's Were Announced Was Not Suspicious.

Plaintiff's bald characterization of Mr. Lovette's departure as "suspicious" is both insufficient as a matter of law and untrue. *See* Motion at 11. In its Opposition, Plaintiff does not even attempt to bridge the inferential chasm between Mr. Lovette's departure and those of the executives in the case law Plaintiff cites. Far from being "extremely suspicious," the fact that Mr. Lovette remained in his role as CEO for eight years aligns with the average tenure for a CEO at a large-cap company. *See* Dan Marcec, *CEO Tenure Rates* (Feb. 12, 2018), https://corpgov.law.harvard.edu/2018/02/12/ceo-tenure-rates/. Nor do any of the attendant circumstances that exist in Plaintiff's authority exist here. *See* Opp. at 30; *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632–33 (S.D.N.Y. 2014) (finding resignation supported inference of scienter because "Arntzen resigned ***the day the IRS announced a massive amendment to its Proof of Claim*** in bankruptcy court, while Itkin resigned a few months later for a seemingly pretextual reason" (emphasis added)); *Willis v. Big Lots, Inc.*, No. 2:12-cv-604, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (challenged resignations occurred on last day of the class period and in wake of DOJ investigation). In fact, Plaintiff's only authority from the Tenth Circuit found that a General Counsel's resignation roughly seven months before negative disclosures "len[t] no support" to an inference of scienter. *See In re Myriad Genetics, Inc.*, No. 2:19-cv-00707-DBB-DBP, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021). Like in *In re Myriad Genetics, Inc.*, Mr. Lovette's transition to a senior advisor role with Pilgrim's more than a year before the indictment, and after eight years of service as CEO, does not raise a specter of malfeasance.

14

### F. Mr. Lovette's Routine Execution of SOX Certifications Adds Nothing to the Scienter Calculus.

Plaintiff simply ignores the Tenth Circuit's strict standard for pleading scienter through execution of SOX certifications. *See* Motion at 12. Even using the standard of the cases Plaintiff's cite from out of circuit, *see* Opp. at 31, Plaintiff must assert facts showing that the defendant signing SOX certification *knew* that such certifications were false at the time they were signed. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 356–57 (D.N.J. 2007).

The AC lacks substantive factual allegations to support an inference, let alone a strong inference, that **Mr. Lovette** knew about or participated in the alleged bid-rigging scheme. *See supra* Section III.A; Motion at 9–10. Nor can this knowledge be attributed to Mr. Lovette solely based on his position as CEO. Motion at 12–13. Plaintiff's argument does nothing to address this deficiency, *see* Opp. at 31, and thus cannot support an inference that Mr. Lovette understood the SOX certifications were false when made.[9] Therefore, Plaintiff's bare allegations "add[] nothing substantial to the scienter calculus[,]" *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1116 (10th Cir. 2015), and "at most, . . . support an inference of negligence." Swabb v. *Zagg, Inc. (In re Zagg, Inc. Sec. Litig.)*, 797 F.3d 1194, 1205 (10th Cir. 2015). For these reasons, the AC does not contain particularized factual allegations demonstrating either (i) the contemporaneous falsity of any of the challenged statements or (ii) that the non-disclosure of the conspiracy actually rendered any of the challenged statements misleading; thus, the claims must be dismissed.

---

[9] In support of its contention, Plaintiff cites to paragraphs 221–41, 247–49 of the AC. These allegations simply rehash earlier allegations in the AC and only paragraphs 228–29 detail Mr. Lovette's actions—the same actions alleged in paragraphs 93 and 112 and addressed *supra* Section III.A.

15

## IV. THERE IS NO CAUSAL CONNECTION BETWEEN PLAINTIFF'S LOSSES AND THE ALLEGED MISREPRESENTATIONS.

Plaintiff does not plead loss causation as to Mr. Lovette under either a corrective disclosure theory or by pleading the materialization of a known risk. First, Plaintiff is wrong that the Initial Indictment was a corrective disclosure. Opp. at 34. Plaintiff fails to show how the Initial Indictment corrected any alleged misstatements by Mr. Lovette. *See In re SandRidge Energy, Inc. Sec. Litig.*, 2017 WL 3309758, at *14 (W.D. Okla. Aug. 1, 2017). Second, Pilgrim's had already disclosed the relevant risks concerning Pilgrim's potential involvement in anticompetitive conduct before the Initial Indictment became public, and therefore, the market had incorporated those risks into Pilgrim's stock price. *See* Doc. 63 at 7-9. In other words, there was nothing for the Initial Indictment to correct. *See Meyer v. Greene*, 710 F.3d 1189, 1198-99 (11th Cir. 2013) (Plaintiff cannot "contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits [its] needs for purposes of loss causation. Either the market is efficient or it is not . . . . The efficient market theory . . . is a Delphic sword: it cuts both ways.") The fact that the earlier disclosures and the Initial Indictment do not contain the exact same words is no basis for pleading loss causation. *See*, *e.g.*, *Graham v. Barriger*, 699 F. Supp. 2d 612, 630 (S.D.N.Y. 2009) ("A risk disclosure that cautioned investors of a later-realized loss does not support a claim of loss causation"). The AC should thus be dismissed for these reasons as well.

## V. MR. LOVETTE IS NOT LIABLE AS A CONTROL PERSON.

Because Plaintiff failed to plead an underlying securities fraud claim against Pilgrim's, its control person claim against Mr. Lovette under Section 20(a) of the Exchange Act must also be dismissed. *Smallen*, 950 F.3d at 1315 (citing *Adams v. Kinder–Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003)).

## **CONCLUSION**

For the reasons stated above and in Mr. Lovette's Motion, Plaintiff has failed to plead its claims with the requisite specificity and particularity, and the claims against Mr. Lovette should be dismissed with prejudice.

Respectfully submitted this 30th day of September 2021.

>  */s/ John A. Fagg, Jr.*
> John A. Fagg, Jr.
> Mark A. Nebrig
> MOORE & VAN ALLEN PLLC
> 100 North Tryon Street, Suite 4700
> Charlotte, NC 28202
> (704) 331-1000
> johnfagg@mvalaw.com
> marknebrig@mvalaw.com
>
> *Attorneys for Defendant William W. Lovette*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of September 2021, I electronically filed the foregoing **REPLY IN FURTHER SUPPORT OF WILLIAM W. LOVETTE'S MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all listed parties.

*/s/ John A. Fagg, Jr.*

John A. Fagg, Jr.