# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

    Defendants

_____

REPORTER'S TRANSCRIPT
Excerpt of Trial to Jury
Testimony of Robert Bryant, Vol. 1

_____

    Proceedings before the HONORABLE PHILIP A. BRIMMER,

Chief Judge, United States District Court for the District of

Colorado, commencing at 10:55 a.m., on the 1st day of November,

2021, in Courtroom A201, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A257, Denver, Colorado, 80294, (303) 335-2106

Case 1:20-cr-00152-PAB Document 800 Filed 07/23/21 USDC Colorado Page 3 of 182
pg 3 of 62

*Q.* Okay. And what were your responsibilities as divisional planner?

*A.* I was basically responsible for the supply chain for the business unit. At that time there were seven plants inside that business unit, six or seven plants inside that business unit. And then -- so making sure we had enough birds to fill customer orders, those customer orders were filled in full, and the bird size was the correct size to fill those. With demand fluctuations, it was my job to cover those peaks and valleys.

*Q.* And in the position of divisional planner, how long did you hold that position?

*A.* From approximately -- from approximately 2010 until I was promoted again in the fall of 2016.

*Q.* All right. And during that time who was your supervisor from 2010 to 2016?

*A.* I had two during that time. When I was first promoted, it was Jason McGuire. And then in the fall of 2014 or early 2015 it transitioned to Tim Stiller.

*Q.* All right. And so during the time that Jason McGuire was your supervisor, who did Jason McGuire report to?

*A.* At the very beginning it was Steve Smith and then later it was Jayson Penn.

*Q.* And at that time who did Jayson Penn report to?

*A.* Bill Lovette.

*Q.* And what was Bill Lovette's position?

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 10 of 182
pg 4 of 62

*A.* He was our CEO.

*Q.* Tim Stiller, you said that started end of 2014, start of 2015; is that right?

*A.* That's correct.

*Q.* And who did he report to?

*A.* He reported to Jayson Penn.

*Q.* Okay. And who did Jayson Penn report to during that period?

*A.* Bill Lovette.

*Q.* Did you have any -- in your role as divisional planner for fresh food service, did you have any role in pricing or negotiations with customers?

*A.* Not at the beginning, but later I transitioned into more customer facing roles.

*Q.* And when was that?

*A.* Particularly in 2014.

*Q.* That was a new thing for you at the time?

*A.* To be at the national account level customer facing, yes, relatively new.

*Q.* What do you mean by national account level?

*A.* I dealt with some smaller customers.

*Q.* Previously?

*A.* Previously, but really being customer facing to the larger national accounts, that was the first time I had a lot of exposure to them.

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 19 of 182
pg 5 of 62

A. I witnessed my boss, Jason McGuire, at the time asking Roger to provide information to our competitors.

Q. And ultimately what happened in those negotiations?

A. We got a price increase.

Q. Just you?

A. No. The industry got a price increase.

Q. What do you mean by industry?

A. Generally when I say industry, I mean our competitors in that market.

Q. Okay. So what was your understanding of why the competition gave prices to Pilgrim's?

A. My understanding was --

MR. POLLAK: Objection, Your Honor, lack of foundation as to competition generally.

THE COURT: If you could define that term. It will be sustained in part. Go ahead.

BY MR. KOENIG:

Q. What did you understand when I -- let me ask it this way.

In 2014, were you talking about a specific customer?

A. Yes.

Q. Which one?

A. KFC.

Q. And who -- did you have an understanding of who the competition was for the KFC contract for that year?

A. I did.

Robert Bryant - Direct

*Q.* And who were they?

*A.* Tyson, George's, Koch Foods, Claxton, Mar-Jac, to name a few.

*Q.* Okay. Now, what was your understanding of why the companies you just mentioned gave pricing to Pilgrim's?

*MR. POLLAK:* Objection, Your Honor, lack of foundation with respect to several of those companies are analogous to whether they gave prices, much less the motivation.

*MR. FELDBERG:* Same objection, Your Honor.

*BY MR. KOENIG:*

*Q.* We will move on and circle back.

You mentioned that you told people to get prices?

*A.* I did.

*Q.* And again, were these current prices you were asking for?

*A.* No. They were their prices that they tended to submit.

*Q.* To whom?

*A.* KFC or US Foods.

*Q.* Okay. And why did you do that?

*A.* To increase prices or to limit a decrease depending on the current market conditions.

*Q.* And when you directed people to do the sharing of the future prices, did you have an understanding as to whether Pilgrim's prices were also shared?

*A.* Yes.

*Q.* What was your understanding?

Case No. 1:20-cr-00152-PAB   Document 860   filed 11/23/21   USDC Colorado   pg 7 of 62

Q.  What is your basis for saying that?

A.  Phone call conversations with him.  I did witness him directing Roger to share some information --

Q.  Can you please use last names?

A.  Roger Austin.  I witnessed him directing Roger Austin to share information with our competition, and then I received some e-mails from Jason about that same conduct.

MR. TUBACH:  Your Honor, again with Jason, there being two Jasons --

A.  Jason McGuire.

THE COURT:  Yes, I agree.  If we could ask the witness to try to do that as well.  Go ahead.

BY MR. KOENIG:

Q.  Yes, if you could, please, use last names.

A.  Yes.

Q.  All right.  So you were speaking about a time when Jason McGuire asked Roger Austin to do what?

A.  Share some information with our competition.

Q.  What kind of information?

A.  It was some information about our position on price increases and justification for those price increases.

Q.  All right.  What time frame was that?

A.  That was in 2014.

Q.  And did you have an understanding as to why Jason McGuire asked Roger Austin to do that?

*A.* I did.

*Q.* What was the basis of your understanding?

*A.* Those same phone calls and e-mails that we had between myself and Jason McGuire.

*Q.* And what was your understanding of why Jason McGuire asked Roger Austin to share the information with competitors?

*A.* To build support for price increases in 2014.

*Q.* What do you mean by support for price increases?

*A.* I mean to build support with competitors to raise prices in the 2014 bid season.

*Q.* Okay. You also mentioned a Tim Stiller. Do you recall that?

*A.* I do.

*Q.* Who was Tim Stiller?

*A.* He was my manager from the fall of 2014 or early 2015 until earlier this year.

*Q.* All right. And during that entire time who did Mr. Stiller report to?

*A.* Jayson Penn.

*Q.* All right. Now, what was your basis for saying that Stiller participated in the activities that we have been talking about here?

*A.* He directed me and others to get pricing information from competitors and use that for bids.

*Q.* And did you have an understanding as to why he wanted you

Case:20-cr-00152-PAB-RMMF Document 860 DocFilenh117/23/21 fileSD4726olorado USage Colorfd82
pg 9 of 62

to do that?

A. Yes.

Q. What's the basis for your understanding?

A. Phone calls, text messages, e-mail conversation -- or e-mails and conversations that we had about his expectations.

Q. Okay. And so what was your understanding of why he was telling you to get pricing from competitors?

A. Depended, but either to increase or decrease -- or limit a decrease on prices.

Q. You mentioned Scott Tucker. Who is Scott Tucker?

A. He was a salesperson that also worked for Roger Austin. I don't recall when he started with the company, but he was with us from -- I know from 2014 until this year with Pilgrim's.

Q. When you said -- you mentioned Roger Austin. Was Roger Austin his supervisor?

A. He was until Roger retired.

Q. What accounts did Mr. Tucker handle?

A. I know he handled KFC. I think he handled Bojangles and a few others.

Q. All right. Now, you mentioned Mr. Tucker among the list of people at Pilgrim's who participated with you in this conduct. What is your basis for saying that with respect to Mr. Tucker?

A. Same basis, phone calls. And he entered into an agreement on -- Scott Tucker entered into an agreement with a former co-worker at Mar-Jac to increase prices for US Food Service.

Case 1:20-cr-00152-PAB-MEH Document 860 Filed 11/23/21 USDC Colorado Page 44 of 182
pg 10 of 62

have a good understanding with the witness as to terminology, I will sustain the objections. If you can clarify exactly what the shorthand term may refer to.

Go ahead, Mr. Koenig. You can define a term to be used with him by asking the witness questions.

BY MR. KOENIG:

Q. When I asked you the activity that your agreement related to, if I refer to that as the activities we're discussing here today, will you understand what I mean?

A. I do.

Q. So what was your basis for saying that Bill Kantola participated in the activity we are discussing today with you?

MS. HENRY: Your Honor, same objection.

THE COURT: Overruled.

A. I overheard phone calls between Roger and Bill Kantola and --

BY MR. KOENIG:

Q. Excuse me. Can you use last names, please?

A. Roger Austin. I overheard phone calls between Roger Austin and Bill Kantola and also received information from Roger Austin that he relayed to me from Bill Kantola.

MS. HENRY: Objection, hearsay, Your Honor.

THE COURT: Overruled. Sorry, it's 803(6).

Go ahead.

MR. KOENIG: I am sorry, 803(6)? 801(d)(2)(E)?

Case 20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 45 of 182
pg 11 of 62

*THE COURT:* What?

*MR. KOENIG:* 801(d)(2)(E)?

*THE COURT:* Well, I think that's what the exception -- what exception are you asking for?

*MR. KOENIG:* I just heard you say 803(6).

*THE COURT:* Sorry. I may have misspoken, but what were you talking about, Mr. Koenig? What was the exception you were using?

*MR. KOENIG:* 801(d)(2)(E).

*THE COURT:* All right. Yes, agreed.

Go ahead.

*BY MR. KOENIG:*

*Q.* The phone calls you mentioned, when did those occur?

*A.* 2014, but the passing of information happened quite frequently between 2014 and 2017.

*Q.* And what exactly did you overhear in 2014?

*A.* The exact words or --

*Q.* We'll come back to it.

All right. Did you have an understanding as to why Roger Austin and Bill Kantola were sharing pricing information?

*A.* I did.

*Q.* And what was the basis for that understanding?

*MS. HENRY:* Objection, Your Honor. He laid no foundation for the understanding of Mr. Kantola.

*THE COURT:* Overruled.

BY MR. KOENIG:

Q. You may answer.

A. Can you repeat?

Q. What was your basis for understanding why Mr. Austin and Mr. Kantola would engage in the sharing of prices?

A. Those phone conversations that I had with Roger and that information that he shared with me along with overhearing the phone conversation he had with him.

Q. And what, then, was your understanding?

MR. FELDBERG: Objection, Your Honor. The question is vague because he has been unspecific about any particular phone call or any particular communication.

THE COURT: Overruled.

BY MR. KOENIG:

Q. Well, that's actually helpful.

What time frame are we talking about?

A. A long period. Initially it started before the 2010 promotion of myself. He would relay -- Roger Austin would relay information from Bill about a requested spec change --

Q. From who?

A. From Bill Kantola about a requested spec change for its stints or a bird size change, but later after 2014 it was more pricing centric information and what Koch's position was on a particular topic.

Q. A particular topic?

Robert Bryant - Direct

A. Yes, whether it was pricing or spec or whatever the customer question was at that particular time.

Q. So then what was your understanding as to why Roger Austin and Bill Kantola were engaging in this price sharing conduct?

A. It was to either raise or prevent a price decrease, raise prices or --

Q. For both companies?

A. Correct.

MR. KOENIG: Can we blow up government Exhibit 9237, please?

BY MR. KOENIG:

Q. Do you recognize government Exhibit 9237?

A. I do.

Q. What is it?

A. It's a picture.

Q. Of whom?

A. Looks like Scott Brady.

Q. Okay. Where did Scott Brady work?

A. When I first met him, he worked for Pilgrim's, and later he moved to Claxton Poultry.

Q. So in like the 2014 to 2017 time frame where did he work?

A. He was working at Claxton.

Q. And was Claxton at that time a competitor of Pilgrim's?

A. They were.

Q. All right. Do you see Scott Brady in this courtroom?

Robert Bryant - Direct

Q. All right. And is it fair for me -- not for me. Is it fair to say that the term RSCS and KFC sometimes use those interchangeably?

A. Most often.

Q. So if I say KFC, negotiations with KFC, you would understand that that means RSCS?

A. I would.

Q. All right. So did there come a time in 2017 when Pilgrim's was negotiating with RSCS/KFC?

A. Yes.

Q. And when was that?

A. January of 2017.

Q. Okay. And Pilgrim's -- so was Pilgrim's invited to bid by RSCS at some point?

A. We were.

Q. And when was that?

A. I don't recall exactly when we got the invitation, but we were scheduled to meet with them in January of that year, I believe it was January 27th.

Q. All right. Do you have an understanding of how the bidding process worked in 2017?

A. I do.

Q. All right. So if you could just explain to the jury for -- you know, starting with the RFP, the invitation to bid, through when the final contract is signed just the process.

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 81 of 182
pg 15 of 62

A.  Yes.  So there would be an e-mail sent inviting us to participate in a bid.  Normally there would be a pre-bid meeting.  Then there would be a deadline after the pre-bid meeting for submission of your bid.  And then you would get -- or we would get feedback from our bid from KFC that told us -- gave us guidance or that we were too high or whatever.  And generally they would ask for a second round of pricing submission.  At some point we would come to a final agreement.

Q.  Okay.  And did you have an understanding of RSCS and KFC's expectations of how you would formulate your bids?

A.  Yes.

Q.  What's your basis for that understanding?

A.  Over the years we developed a pricing model specifically for KFC, and that would be used as the basis for our bid.

Q.  And so what was your understanding, then, of how RSCS and KFC expected Pilgrim's to formulate its bids?

        MR. FELDBERG:  Objecting, foundation.  His prior answer doesn't establish a foundation.

        THE COURT:  Overruled.

A.  They would expect us to use the pricing model to calculate our cost in margin and formulate a final price submission.

BY MR. KOENIG:

Q.  Have you heard the term blind bid?

A.  I have.

Q.  What does that mean?

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 82 of 182
pg 16 of 62

A.  A blind bid to me is when you submit a bid without consultation and it's --

Q.  Without consultation?

A.  Correct.

Q.  With whom?

A.  With anyone other than --

Q.  Including competitors?

A.  Correct.

MR. KORNFELD:  I am going to object.  I would ask Mr. Koenig allow the witness to finish his answer before we get another question.

THE COURT:  Right.  That will make for a better record if you could do so.

MR. KOENIG:  Fair enough.

BY MR. KOENIG:

Q.  Okay.  So your understanding of -- what does the term blind bid mean to you?

A.  Blind bid would mean that you -- similar to a sealed bid that others may be more accustomed to where you would put your bid in an envelope and seal it so no one else would know what it is, only the buyer, and submit your bid.

Q.  And based on what you stated earlier, was it your understanding, then -- what was your understanding of the type of bid RSCS expected?

A.  A blind bid.

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 66 of 182
pg 17 of 62

*Q.* Okay. And what was your understanding of the reason for the blind bid?

MR. KORNFELD: Objection, Your Honor, foundation as to his understanding of RSCS's expectations.

THE COURT: Sustained.

*BY MR. KOENIG:*

*Q.* Did you have an understanding of whether RSCS -- I am sorry. Let me back up.

Did you have an understanding as to why RSCS wanted blind bidding?

*A.* Yes.

*Q.* What is the basis for your understanding?

*A.* My prior experience with customers and the bid process and in consultation with those customers.

*Q.* And what then was your understanding?

MR. KORNFELD: Objection, Your Honor, foundation. His experience with unstated customers, plural, doesn't establish a foundation for his understanding of RSCS's expectations in these negotiations.

THE COURT: He has been in the business for a long time. Overruled.

*BY MR. KOENIG:*

*Q.* So you can answer.

*A.* My expectation was that --

*Q.* Your understanding?

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 84 of 182
pg 18 of 62

A. My understanding was that KFC expected us to submit a blind bid and our most competitive bid.

Q. My question though was did you have an understanding of why --

A. Yes.

Q. -- they expected that?

A. So they would get the most competitive price.

Q. And what do you mean by most competitive price?

A. What I mean by most competitive price is if you're unsure of what other competitors may submit, then you're going to submit the lowest price possible to ensure that you retain your business or grow your business.

Q. So how did you -- well, how did you intend, if you did, how did you intend RSCS and KFC to perceive Pilgrim's and its suppliers during the bidding process in 2017?

A. As independent actors.

Q. As competitors?

A. Correct.

Q. All right. So during the -- do you have an understanding as to whether Pilgrim's and its competitors bidding in 2017 for KFC were competing on price?

A. I do.

Q. What's the basis for your understanding?

A. Once again, my past experience in the bidding process and, you know, in conversation with KFC and other customers.

Q. Okay. Were you involved in the 2017 KFC negotiations?

A. I was.

Q. And so is that part of your basis?

A. It is.

Q. So what is your understanding as to whether Pilgrim's and the other chicken suppliers in 2017 were competing on price? What is your understanding?

MR. FELDBERG: Objection, foundation.

THE COURT: Overruled.

MR. POLLAK: The objection was suppliers without particularly who we are talking about. I don't think there is a foundation for every supplier.

THE COURT: Sustained. If you could clarify what he meant -- means by suppliers.

BY MR. KOENIG:

Q. Do you know who -- what chicken suppliers were bidding for KFC business in 2017?

A. I do.

Q. And which suppliers were those?

A. Pilgrim's, Koch, Claxton, Mar-Jac, George's, Tyson. There could have been some others, but to name a few.

Q. Okay. What was your understanding, then, of whether Pilgrim's and the other competitors you just named were competing on price for KFC 2017?

MR. POLLAK: Your Honor, same objection. He has not

established a foundation for why he would know what each of those suppliers was doing. He simply laid a foundation if those were the competitors, not that he had a basis of knowledge.

THE COURT: Sustained. Why don't we start with his basis for knowing as to each.

BY MR. KOENIG:

Q. Okay. Let's get into that, then.

Heading into 2017 negotiations with KFC and RSCS, did you have an expectation with respect to where prices were going to go, like up or down?

A. I did.

Q. And what was the basis for your expectation?

A. Market research, you know, that I performed that told me that prices -- there were going to need to be some pricing concessions for this bid.

Q. So what was your expectation, then?

A. Market -- that the prices would go down.

Q. Now, why were you negotiating with KFC in 2017?

A. We were near the end of the three-year agreement that we had negotiated in 2014.

Q. Could you repeat that please? It was a little soft.

A. We were negotiating -- or beginning negotiations for the 2018 contract, so the 2014 negotiations that covered calendar years 2015, 2016 and 2017 was set to expire at the end of 2017,

Robert Bryant - Direct

so we were beginning the negotiations for calendar year 2018

and farther.

Q. Okay. And did you participate in the 2014 negotiations?

A. I did.

Q. And what happened with KFC's prices in the 2014

negotiations?

A. They went up.

Q. Can you quantify?

A. Substantially, in the neighborhood of 15 to 20 cents.

Q. Per?

A. Per pound.

Q. Okay. Now, in all your years at Pilgrim's, were you aware

generally, even if you weren't involved in the negotiations or

the pricing, were you generally aware of year-to-year pricing

for a given customer like KFC?

A. Yes.

Q. And did you have an understanding of how much year to year

pricing typically changed for KFC?

A. Yes.

Q. And what was your understanding of how much it typically

changed?

A. Not a lot. Normally it was a few pennies up or down year

to year.

Q. But then in 2014 what did you say the magnitude of the

price increase was?

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 86 of 182
pg 22 of 62

A. It was between 15 and 20 cents a pound.

Q. Had you ever seen that big of a price increase before?

A. Not for KFC, no.

Q. So after 2014 and those price increases -- it was a three-year deal. I think you said that, right?

A. That's correct.

Q. So you're going into 2017. And what was your expectation for prices?

A. That we would have to give a price decrease.

Q. And you mentioned market factors, right?

A. That's correct.

Q. Were there any other factors?

A. It was primarily market factors. There were more supply available in 2017 than there had been. And the relationship with KFC was not good in 2017 because of the price increases that we got in the 2014 contract, so it damaged the relationship a little bit.

Q. All right. I guess why, then, why did the negotiations in 2014 matter in 2017?

A. A lot of the same people at KFC and they were upset with Pilgrim's in general because they perceived us to be the price leader in 2014.

Q. And was it your understanding -- did you have an understanding in 2014 what the other competitors you had just previously mentioned, were they suppliers for -- did they bid,

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 89 of 182
pg 23 of 62

those same competitors bid for KFC in 2014?

A. Yes, it's my understanding they did.

Q. And did you have an understanding as to whether those competitors besides Pilgrim's also received a large price increase?

A. Yes.

Q. And what is the basis for that understanding?

A. My boss at the time, Jason McGuire, shared some e-mails with me and phone conversations that others -- or other competitors were getting similar price increases.

Q. And by similar price increases, what was the price increase you mentioned?

A. It was between 15 and 20 cents.

Q. Per pound?

A. Per pound, yes.

Q. All right. Now, you mentioned that -- and correct me if I'm wrong, but you mentioned that at some point in January 2017 Pilgrim's was invited to submit a bid for KFC business, right?

A. That's correct.

Q. Do you recall when that bid was due?

A. The first week of February.

Q. But you mentioned before that you had a January 27th meeting with RSCS and KFC, right?

A. That's correct.

Q. Why were you meeting with -- why was there a meeting

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 90 of 182
pg 24 of 62

scheduled for before the bid was due?

A. We were doing a prebid meeting.

Q. Was that typical?

A. It was.

Q. And what was the type of stuff that you would discuss at prebid meetings?

A. Normally it would be -- we would discuss Pilgrim's position, you know, whether it be market conditions or whatever, and KFC would state their position on the market or expectations from the bid. And if there was any unresolved issues that had arisen since the last meeting or something that they wanted to bring out or ask for that would be differently in this round of bidding, that would be brought up in that meeting.

Q. Did you do anything -- first of all, did you attend the January 27th meeting?

A. I did.

Q. And who else from Pilgrim's attended that meeting?

A. Myself, Roger Austin, Scott Tucker, Justin Gay and Tim Stiller.

Q. And who from RSCS attended that meeting?

A. Pete Suerken, Sara Fisher, Steve Campisano and Rich Eddington.

Q. If you could explain, who is Pete Suerken?

A. Pete Suerken was like the lead negotiator at KFC. He was

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado pg 25 of 62

responsible for that team on the KFC side.

Q.  And who was the sort of his opposite on the Pilgrim's side?
Who was in charge of the negotiations?

A.  It would have been Roger Austin.

Q.  And was Pete Suerken involved in the 2014 negotiations?

A.  He was.

Q.  All right.  Did you do anything to prepare for that January
27th meeting?

A.  I did.

Q.  If we can take a look at Government Exhibit 1882.

All right, Mr. Bryant.  Do you recognize Government
Exhibit 1882?

A.  I do.

Q.  And what is it?

A.  It's an e-mail from me to Roger Austin on January 17th,
2017.

Q.  What does the e-mail generally relate to?

A.  The KFC meeting we were going to have on January 27thof
2017.

MR. KOENIG:  Your Honor, the government offers
Government Exhibit 1882.

MR. FELDBERG:  No objection from us.

THE COURT:  Any objections to the admission of Exhibit
1882?

MR. KORNFELD:  Your Honor, I think this contains

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 92 of 182
Case No. 1:20-cr-00152-PAB Document 1460 Filed 07/26/22 USDC Colorado
pg 26 of 62

double hearsay.

THE COURT: Meaning? I am being shown one page. Is it a one-page document?

MR. KORNFELD: That's what I am looking at, Your Honor. The author is talking about another conversation with another person who is not in the chain.

MS. HENRY: And that would be Sara Fisher.

MR. KORNFELD: Thank you.

THE COURT: Is Ms. Fisher part of the Court's previous ruling?

MR. KOENIG: No, Your Honor. She was on the RSCS side of things.

THE COURT: Okay.

MR. KOENIG: And really it's for the effect on the listener for that part and we aren't going to dwell on it.

MR. KORNFELD: I am not sure which listener the government is talking about, but I am not sure that that's even relevant.

THE COURT: Anything more, Mr. Koenig, on this one?

MR. KOENIG: Any more argument on it?

THE COURT: Yes, as to the objection.

MR. KOENIG: Well, I guess it's, you know -- I mean, all the government is trying to elicit here is just the preparations they went through. It's just not for the truth.

THE COURT: Okay.

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado pg 27 of 62

MR. KOENIG: By that I mean the statement that he is --

THE COURT: Understand. The objection will be overruled in part. Exhibit 1882 will be admitted.

However, ladies and gentlemen, there is a reference to what someone referred to simply as Sarah wants. That portion of it, in other words, what Sarah wants should not be considered by you for the truth of the matter. We talked about that earlier in you may recall a previous exhibit. However, the rest of the statements you can consider for the truth of the matter asserted, and to that extent the objections will be overruled.

MR. KOENIG: Thank you, Your Honor. And we would ask at this time to publish it to the jury.

THE COURT: You may.

BY MR. KOENIG:

Q. All right. If we could just focus on first the bottom e-mail on the page. Have you had a chance to review that?

Ms. Pearce, could you just blow up the bottom portion?

THE COURT: And let me just ask Ms. Perez and Mr. Kahler, can you see that?

JUROR: I can see it now.

THE COURT: Understood.

BY MR. KOENIG:

Q. So what is the -- it looks like an e-mail from you. What

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 94 of 182

were you trying to convey just generally?

A.   In general, I was trying to brainstorm a list of topics that could come up with KFC at the January 27th meeting.

Q.   All right.  And do you see the line that says:  Will Pete actually attend the meeting?

A.   I do.

Q.   Who is the Pete you are referring to?

A.   Pete Suerken.

Q.   Why did you ask, Will Pete actually attend the meeting?

A.   I wanted to know if he would actually be there because he was their lead negotiator and it gave me an indication of how serious the meeting would be.

Q.   And who did you send that e-mail to?

A.   Roger Austin and Scott Tucker.

        MR. KOENIG:  All right.  Let's go up to the next e-mail, if you could just blow that one up, just the next e-mail itself with the header information, please.

BY MR. KOENIG:

Q.   All right.  So what are we looking at here?

A.   An e-mail from Roger Austin to me and Scott Tucker on January 17, 2017.

Q.   So this is Roger Austin's response to your e-mail below, right?

A.   That's correct.

Q.   Can you read to the jury the last two sentences of that

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 95 of 182

e-mail?

A.   Claxton meets with them in Thursday and I will get a blow by blow Friday morning.  Koch meets with them in Friday.

Q.   Let's just start with the first sentence.  Now, wait.  What is the date of this e-mail?

A.   January 17th, 2017.

Q.   All right.  What day of the week was that?

A.   Tuesday.

Q.   So what would be the date of the coming Thursday?

A.   That would be the 19th.

Q.   And Friday?

A.   The 20th.

Q.   And when was Pilgrim's meeting scheduled for with RSCS?

A.   The 27th.

Q.   All right.  So could you explain what your understanding was of the first highlighted sentence starting with Claxton?

A.   That Claxton had a meeting with KFC that Thursday the 19th, and that Roger and Scott Brady would talk on Friday morning and he would give -- provide me with the details of the outcome of that meeting.

Q.   And so you made a jump there from Claxton to Scott Brady.  What's your basis for making that jump?

A.   Roger and Scott -- Roger Austin and Scott Brady talked and Roger relayed information to me routinely from Scott Brady and I associated Scott Brady works at Claxton.

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 96 of 182
Case No. 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado pg 30 of 62

Q.  Okay.  And them, what is your understanding of them?

A.  KFC.

Q.  All right.  And you may have touched on this, but blow by blow, what does that mean to you?

A.  That means the details of the meeting with KFC between Claxton and KFC.

Q.  Why would you care what happened?  Did you care what happened with the meeting with KFC and Claxton?

A.  Yes.

Q.  Why?

A.  Whatever information we could gain from that, it would help in our preparation with KFC.  Their position on the markets, if they offered up additional loads to Claxton, who were they coming from, a whole host of questions could come from that meeting.

Q.  All right.  Now the second line, could you just re-read that, the second highlighted line?

A.  Koch meets with them in Friday.

Q.  What did you understand that to mean?

A.  That meant that Bill Kantola was going to meet with KFC on that Friday and that Roger and Bill -- Roger Austin and Bill Kantola would speak and we would find out the details of that meeting.

Q.  Okay.  And again, you made the jump from Koch to Kantola. Why did you make that jump?

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 97 of 182
pg 31 of 62

A. Because Bill Kantola and Roger Austin spoke routinely. And I got information from Roger that was provided by Bill Kantola and Bill Kantola worked at Koch.

Q. Again, did you care what happened at the Koch RSCS meeting?

A. Yes.

Q. And why?

A. For the same reasons, what did KFC tell Koch. Was there any differences in the messaging to Koch and Claxton and what impact would that have on our negotiation.

Q. And you said you attended the January 27th meeting?

A. That's correct.

Q. At that meeting did you tell RSCS that you had already learned or that you were trying to learn what was going on with Koch and Claxton's meetings?

A. Not that I recall, no.

Q. Why not?

A. We wouldn't want them to know that we were sharing that type of information.

Q. Them being KFC and RSCS?

A. That's correct.

Q. Why wouldn't you want them to know?

A. Because it could be -- the customer would probably perceive that as us undermining their bid process.

Q. How so?

A. Because we would be working together against their bid

Case 1:20-cr-00152-PAB Document 860 Filed 11/23/21 USDC Colorado Page 96 of 182
pg 32 of 62

process effectively undermining them.

Q. Working together to accomplish what?

MR. TUBACH: Objection as to foundation, lack of foundation.

THE COURT: Overruled.

A. Working together against their best interests and in our best interests. And by ours I mean our competitors' collectively best interest.

BY MR. KOENIG:

Q. Okay. But again to what end?

A. To -- in 2017 it was about limiting a price decrease.

Q. Together?

A. Together, yes.

Q. Competitors together.

A. Correct.

Q. Okay. Now, so if we could go then now to the very top e-mail. Who is this from and to?

A. This is from myself to Roger Austin.

Q. In the previous part of the e-mail chain Scott Tucker was on there, right?

A. That's correct.

Q. But he doesn't appear on the header here.

A. That's correct.

Q. Why is that?

A. Because I removed him from the e-mail chain.

Robert Bryant - Direct

Q. Do you specifically remember this e-mail?

A. I do.

Q. How many e-mails did you receive in January of 2017?

A. Probably -- I mean, thousands.

Q. Do you remember each and every one of those?

A. No.

Q. So why do you remember this one?

A. Because of what I wrote and --

Q. What did you write?

A. I would like to know where we need to be No. 2 in price if you can find out.

Q. And what did you mean by that?

A. I was asking Roger if he could find out what price we needed to submit for the bid to be second highest in price.

Q. And what was -- did you have an expectation as to how Roger Austin would go about doing that?

A. I did.

Q. What was your expectation?

A. My expectation was that he would use his contacts at other companies that I mentioned before like Carl Pepper and Bill Kantola and Scott Brady and come back to me with pricing guidance on where our bid needed to be to be No. 2 in price.

Q. And why did you want to be No. 2 in price?

A. Because the relationship with KFC was damaged.  We were the price leader in 2014, so if we were No. 2 in price, then we

Case 1:20-cr-00152-PAB Document 866 Filed 11/28/21 USDC Colorado pg 34 of 62

Case No. 1:20-cr-00152-PAB Document 1782 filed 04/26/22 USDC Colorado Page 100 of 182

weren't the price leader anymore and we didn't sacrifice any more margin than we had to to try to repair that relationship.

Q. Well, why didn't you -- if you are trying to repair the relationship, why didn't you say where do we need to be to be down --

MS. HENRY: Objection, leading.

THE COURT: He hasn't asked the question yet. Go ahead.

BY MR. KOENIG:

Q. Why didn't you ask where do we need to be to be the lowest?

MS. HENRY: Objection, leading.

THE COURT: Overruled.

A. Because being No. 2 satisfied being not the highest price but still maximized profitability.

BY MR. KOENIG:

Q. All right. And then you said at the end of the sentence: If you can find out.

So if you had this expectation of how you would do it, why did you write "if you can find out"?

A. At this point I had --

Q. Can you lean forward a little, please?

A. Yeah. At this point I had recently been promoted and this was the first time I can recall actually asking somebody to obtain this type of information. And I really wasn't sure how to go about it, but I understood the expectation for the bid.

Case 2:20-cr-00152-PA Document 86 Document 86 Filed 11/23/21 filed 04/26/22 Colorado USDC Colorado Page 1 of 182

So --

Q.   What was the expectation for the bid?

A.   That I needed to have pricing information.  I needed to have pricing information prior to submitting the bid.

Q.   Where did you get that idea?

A.   From the 2014 negotiations.

Q.   And you said get pricing information.  Pricing information from who?

A.   Competitor information, competitor pricing information.

Q.   All right.  So are there times during your career when you were not aware of competitor pricing going into a bid?

A.   Yes.

Q.   And conversely were there times when you were aware?

A.   Yes.

Q.   Which of those is this?

A.   This was an instance that I --

Q.   Maybe not at this point, but --

A.   Yes.  I did receive --

     MR. KORNFELD:  Objection, Your Honor.  I would ask we be allowed to hear the answer before we hear another question.

     THE COURT:  Sustained.

     MR. KOENIG:  My apologies.

A.   I did receive competitor pricing information for this bid.

BY MR. KOENIG:

Q.   And how did you receive it?

Case 20-cr-152-PAB Document 86 Filed 11/23/21 USDC Colorado Page 15 of 182
Case No. 1:20-cr-00152-PAB Document 1782 filed 04/26/22 USDC Colorado pg 36 of 62

exhibit.

MR. KOENIG: And then you said overruled.

THE COURT: Well, my expectation was you were going to move on.

MR. KOENIG: Okay. I will. I misunderstood.

Actually, I do want to pull up Exhibit 1882 one more time. It's already in evidence.

THE COURT: That may be displayed.

MR. KOENIG: Ms. Pearce, could you just go to the top e-mail?

BY MR. KOENIG:

Q. All right. So Mr. Bryant, you testified I believe earlier that you remembered specifically this e-mail.

A. I do.

Q. Why did you -- why do you remember that e-mail?

MR. KORNFELD: Your Honor, he asked that question a while back. Asked and answered.

MR. KOENIG: I will rephrase it.

THE COURT: Go ahead.

BY MR. KOENIG:

Q. When you sent this e-mail, how did it make you feel?

MR. KORNFELD: Objection, irrelevant as to how it made him feel.

THE COURT: Overruled.

A. I immediately wished I hadn't sent the e-mail. I regretted

Case 1:20-cr-00152-PAB Document 1522 filed 04/26/22 USDC Colorado pg 37 of 62

sending the e-mail and I felt like it was wrong to ask that question of Roger.

BY MR. KOENIG:

Q.   Why did you feel it was wrong?

A.   Because I was asking him to go get pricing information from competitors.  And this was to my memory the first time I'd asked somebody to do something like this.

Q.   Okay.  Well -- but how long had you been around and aware of this sort of activity?

A.   Since 2014.

Q.   So why suddenly now are you feeling regret and wrongfulness?

A.   Because I was asking or directing somebody to do that, and prior to that I wasn't in a position that -- to make a request like this.

Q.   But you were still a participant back in 2014.

A.   Yes.

Q.   So if you thought it was wrong, why did you do it?

A.   I knew that there was an expectation that I should have that information for this bid.

Q.   And how did you -- why did you believe there was an expectation?

A.   From 2014 and, you know, the expectation from my current boss.

Q.   Who was?

Case 20-cr-1052-PAB Document 86 Document 1722 filed 04/26/22 USDC Colorado Page 117 of 182
pg 38 of 62

*A.* Well, in 2014 it was Jason McGuire, but in 2017 it was Tim Stiller.

*Q.* Let's go to the --

　　　*MR. KOENIG:* You can take that down now, Ms. Pearce.

*BY MR. KOENIG:*

*Q.* Let's go to the January 27th meeting with RSCS that you testified about. Do you remember that?

*A.* I do.

*Q.* All right. And if you could -- it was a while ago -- so could you remind the jury who from the Pilgrim's side attended that meeting?

*A.* Myself, Roger Austin, Tim Stiller, Justin Gay and Scott Tucker.

*Q.* And who from the RSCS/KFC side?

*A.* Pete Suerken, Rich Eddington, Sara Fisher and Steve Campisano.

*Q.* Could you remind the jury who Pete Suerken is?

*A.* He was the head of the KFC negotiation team.

*Q.* All right. And what do you recall about what happened at that meeting?

*A.* My expectation and Pilgrim's expectation that the relationship was damaged was true. I remember Pete in the meeting --

*Q.* Pete who?

*A.* Pete Suerken in the meeting said something to the effect

Case 20-cr-1020-52-PAB Document 86 Filed 11/23/21 USDC Colorado Page 18 of 182

of --

MR. KORNFELD: Objection, Your Honor, hearsay, what Mr. Suerken said.

THE COURT: Response?

MR. KOENIG: Well, it's -- two things. It's effect on the listener, but also I believe there was in opening statement made to the effect that Mr. Suerken was happy with the 2014 prices.

THE COURT: Well, opening statements are not evidence, so that in and of itself is irrelevant. Is what you're saying that the statement will explain what some additional action took or some --

MR. KOENIG: Sure.

THE COURT: Ladies and gentlemen, so the objection will be overruled. I will allow the statement to explain the effect on the listener. In other words, you can't consider the statement of Mr. Suerken for the truth of the matter asserted, but rather only for what effect it had on who heard it, in other words, causing them to maybe do something or not do something.

MR. KOENIG: Can I also add there is also an 803(3) issue here statement? Obviously, their objection was before the witness had a chance to answer, but it does go to future -- current state of mind plan or intent by the speaker, if you hear the statement I mean.

Case 20-cr-10152-PAB Document 86 Document 1172/21 filed 04/26/22 Colorado USDC Colorado 182
pg 40 of 62

*THE COURT:* I don't know about that yet, but there is a basis for admissibility now, so let's do that.

*MR. KOENIG:* All right, thank you.

*BY MR. KOENIG:*

*Q.* So what did Mr. Suerken say?

*A.* He said that he was going to beat us down with a hammer or a baseball bat, I don't recall which, in price and take loads from us.

*Q.* And what does that mean, take loads from you?

*A.* Loads of business, basically. So earlier I said that we typically deal in loads per week volume, so he was going to reduce our loads per week is what he was threatening to do in the meeting and reduce our price.

*Q.* All right. Just to be clear, reduce price and take business away. Is that what you said?

*A.* That's correct.

*Q.* Okay. Now, that was on the 27th, right, of January?

*A.* That's correct.

*Q.* And when did you -- I believe you said -- when did you say the bids were due, the first round bids?

*A.* The first week of February.

*Q.* All right. At some point between the January 2017 meeting with KFC/RSCS and the bid submission, Pilgrim's bid submission, did you receive a call from Tim Stiller?

*A.* I did.

Case 20-cr-10152-PAB Document 86 Document 1172321 filed 04/26/22 Colorado USDC Colorado pg 41 of 62

Q. And what -- you may not have received a call, but did you have a phone conversation with Mr. Stiller?

A. Yes.

Q. And what was said on that phone call?

A. Tim called me and asked me if I had pricing information from Roger. And I had not received anything from Roger at that point. Tim got upset with me and Tim's words were, "You don't know shit. I'll call and get it myself" or "I'll find out for myself." And then he hung up the phone.

Q. What was your understanding of what he meant by pricing information?

A. He was looking for competitor pricing information that he expected me to have from Roger.

Q. Then did you end up having a phone conversation subsequent to that with Roger Austin?

A. I did.

Q. Can you tell the jury what happened on that phone call?

A. I called Roger after the conversation with Tim and --

Q. Can you use his last name?

A. Tim Stiller, and relayed to Roger Austin that Tim was upset that I didn't have the pricing information he wanted. And Roger said that he had a similar call and that he would make some calls and get back to me.

Q. And did he get back to you?

A. He did.

Case 2:20-cr-00152-PA Document 86 Document 86 Filed 11/22/21 filed 04/26/22 Colorado USDC Colorado Page 1 of 182
pg 42 of 62

Q.  Approximately how long after?

A.  It may have been the next day, I don't recall, but it was before the bid was due, but he did call me back.

Q.  And what happened on that phone conversation?

A.  Roger called and he said, "Are you ready?  I got it."  And then he relayed to me pricing and customer names.

Q.  Customer names?

A.  Or, sorry, competitor names.  And I wrote those, that pricing information and competitor names down in my notebook so I could relay that back to Tim since he was upset that I didn't already have it, Tim Stiller.

MR. KOENIG:  If we could please pull up Government Exhibit 1919 and not have it published to the jury, please.

BY MR. KOENIG:

Q.  All right, Mr. Bryant.  Do you recognize Exhibit 1919?

A.  I do.

Q.  What is it?

A.  It's my handwritten notes.

Q.  Was it -- do you recognize your own handwriting?

A.  I do.

Q.  And was it -- was that a regular practice for you to take notes?

A.  It was.

Q.  And why was that?

A.  We had regular meetings.  I had a weekly meeting on Mondays

Case 1:20-cr-00152-PAB Document 1183 Filed 04/26/22 USDC Colorado Page 43 of 62

afternoon.

A.   That's correct.

Q.   And what did you believe he meant by own the contract?

A.   That I had immunity from prosecution and that he said -- he didn't say -- he didn't say that, but my -- what I interpreted him to say at that point was that he told me I needed to own the 2017 contract implying that I had immunity and that he had no involvement in it and to help protect him from exposure because he did not have immunity.

Q.   Okay.  I would like to move on now to a few months later in 2017.  Did there come a time when you were negotiating with US Foods in 2017?

A.   Yes.

Q.   Why were you negotiating with US Foods in 2017?

A.   We were seeking price increases on boneless breast meat.

Q.   By "we," who do you mean?

A.   Pilgrim's.

Q.   So did you have discussions with anybody at Pilgrim's about that?

A.   I did.

Q.   And who was that?

A.   Tim Stiller.

Q.   And what was the substance of those discussions?

A.   We believed that our boneless breast meat was undervalued based on other sales in our mix, so we were trying to formulate

Case 1:20-cr-00152-PAB Document 861 Filed 11/23/21 USDC Colorado Page 44 of 182
Case No. 1:20-cr-00152-PAB Document 86 Filed 04/26/02 USA Colorado Page 44 of 182
pg 44 of 62

Robert Bryant - Direct

a plan to increase prices on boneless breast, particularly to US Foods.

Q. And about how much were you looking to increase price?

A. Around 20 cents a pound. It depended on the product. It was a range depending on that particular product. It was several products.

Q. Let me ask you a clarifying question. Previously for 2014 what did you say that the eight-piece boneless price increase was?

A. Bone-in price.

Q. I am sorry, bone-in.

A. It was 15 to 20 cents.

Q. Do you recall testifying you hadn't seen a price increase that big before?

A. That's correct.

Q. But now you're talking about boneless and a 20-cent price increase. How do those two things match up?

A. Yeah, totally different products. Boneless, you know, at the time was selling over $2 a pound, and if you look at it on a percentage increase and then -- actually, I think it was selling for more than $2.50 a pound at that time. And bone-in was, you know, below a dollar a pound. So on a percent increase it was still small, but for a boneless product it wouldn't be uncommon to see, you know, a 10 to 20-cent price increase, especially on portion breasts because you are cutting

Case 2:20-cr-00152-PA Document 86 Document 86 Filed 11/23/21 USDC Colorado USDC Colorado Page 142 of 182
pg 45 of 62

that product down and then you discount out what's called a trim, the product that they don't want.  So in order to have that cut-out value, you have to charge more for the piece of the product that they do want.  So it wasn't uncommon for those cut-out values to be a lot different.

Q.  All right.  Let's put a bookmark in this.  I want to go back to the KFC 2017 negotiations just briefly.

After you submitted the first round bid in the first week of February, did you have further discussions about the 2017 KFC bidding?

A.  We did.

Q.  Who was involved in those discussions?

A.  Myself and Tim Stiller and Roger Austin.

Q.  And what do you recall, if anything, about those discussions?

A.  Tim along with myself were upset after our first round bid submission and KFC asked for additional pricing concessions. Tim was upset about that.

Q.  Tim who?

A.  Tim Stiller, sorry.

Q.  All right.  So then what happened?

A.  We were weighing our options on the way forward, whether or not we were willing to concede more in price or not.  Tim, Tim was upset, like I said, and he relayed a conversation he had with Roger Austin.  He said either the night before or the day

Case 1:20-cr-00152-PAB Document 86 Filed 11/23/21 USDC Colorado Page 143 of 182
Case No. 1:20-cr-00152-PAB Document 1472 filed 04/26/22 USDC Colorado pg 46 of 62

before that he had told Roger to tell the industry that we were going to hold or we were going to find a new hundred-million-pound customer.

Q. A hundred-million-pound customer, what does that mean?

A. That was a reference to KFC. At the time we were selling approximately 50 loads a week and that would be the equivalent of roughly a hundred million pounds a year annually.

Q. So before that what was the first part of the sentence?

A. He told Roger to tell the industry that we were going to hold.

Q. And what was your understanding of that?

A. My understanding of that was that he wanted Roger to communicate to our competitors that we were not going to concede on price, that we were going to hold with our original bid submission.

Q. Okay. So what was your understanding of the word industry?

A. Our competitors, the ones that we've been reviewing.

Q. And who did Tim Stiller report to at that time?

A. Jayson Penn.

Q. Who did Jayson Penn report to at that time?

A. Bill Lovette.

Q. Now, I apologize for the regression. Let's go back to where we had bookmarked.

I think we left off where you were explaining --

A. The mix.

Case 2:20-cr-10152-DAB Document 86 Filed 11/22/21 USDC Colorado Page 144 of 182
pg 47 of 62

Q. You were looking for a price increase on boneless for US Foods, right?

A. That's correct, yes.

Q. If you could also just explain what is US Foods?

A. US Foods is a broad-line distributor. You may have heard of Sysco, but they buy many different products. They are like a one-stop shop for like a normal restaurant. They'll have various different proteins along with paper goods, like salt and pepper, the plastic forks, things of that nature available.

Q. Who do they sell to?

A. Like restaurants, independent stores, some independent retailers, you know, hospitals. You know, they are like a store door delivery to someone who is going to prepare it for the most part.

Q. So you are looking to raise the price to US Foods for boneless breast, right?

A. That's correct.

Q. And you had a meeting with someone did you say to discuss how to go about that?

A. Yes.

Q. And who was that with?

A. Tim Stiller.

Q. So what did you decide?

A. We decided on the price increases. There was some concern that if we just submitted a price increase, that we could

Case 1:20-cr-00152-PAB Document 866 Filed 04/26/22 USDC Colorado Page 145 of 182
Case No. 1:20-cr-00152-PAB Document 1173-21 filed 11/23/21 USDC Colorado pg 48 of 62

potentially lose business because our competitors may not do the same.

Q. All right. So for the boneless breast you were looking to increase the price for, did you have a primary competitor at US Foods at that time?

A. Yeah, we had several competitors. The one that we were concerned about at that time in the market that we were going to raise prices was Mar-Jac.

Q. Why were you concerned about Mar-Jac?

A. Because they were the primary competitor in that marketplace. If we went and submitted a price increase to US Foods, that they would --

Q. They?

A. US Foods, our fear was US Foods would go to Mar-Jac and say, hey, we have an opportunity for you guys to take on more business if you can do it and not tell them that someone was submitting a price increase for that same business.

Q. So in essence, you were afraid you were going to lose business.

A. That's correct, and not get a price increase.

Q. And lose business to Mar-Jac.

A. That's correct.

Q. So what did you do?

A. Tim and I brainstormed on the best way to submit the price increase. One of us, I don't recall if it was me or Tim

Case 2:20-cr-00152-PA Document 866 Document 86 Filed 11/23/21 filed 04/26/22 Colorado USDC Colorado Page 146 of 182 pg 49 of 62

Robert Bryant - Direct

Stiller, remembered that Scott Tucker used to work at Mar-Jac or Marshall Durbin, which was bought by Mar-Jac, and still had co-workers there that he stayed in contact with. So Tim asked if I would reach out to Scott Tucker and see if Mar-Jac would be willing to submit a price increase to US Foods for boneless also.

Q. Submit a price increase for what?

A. Boneless also.

Q. Did you do that?

A. I did.

Q. What did you say to Mr. Tucker?

A. I explained to him that we wanted to raise prices on boneless USF and that -- asked if he still had contacts at Mar-Jac and he said he did. And I asked him if he could find out if they would be willing to increase prices on their boneless.

Q. Okay. But was US Foods one of Scott Tucker's accounts?

A. No.

Q. So why did you pick him?

A. Felt like he could be trusted to make that -- that call to that competitor.

Q. What do you mean trusted?

A. To reach out to a competitor and have that -- a conversation about raising prices together.

Q. And to your understanding did he, in fact, do that?

Case 20-cr-1052-PAB Document 86 Document 86 Filed 11/23/21 filed 04/26/22 Colorado USDC Colorado Page 147 of 182

A.   Yes.

Q.   And how do you know that?

A.   He called and reported back to me on his conversations with Mar-Jac.

          MR. KOENIG:   Could we please pull up Exhibit 9140?

BY MR. KOENIG:

Q.   Do you recognize Exhibit 9140?

A.   I do.

Q.   What is it?

A.   It's an e-mail from me to Tim Stiller on April 18th, 2017.

Q.   And what is the subject matter of the e-mail?  And I am not meaning to read the subject line, but what does the e-mail relate to?

A.   It relates to Sysco RFP, and then I have added some information from -- letting Tim Stiller know I've got some information from Scott Tucker.

Q.   Okay.

          MR. KOENIG:   At this point, Your Honor, the government moves to admit 9140.

          THE COURT:   Any objection to the admission of Exhibit 9140?

          9140 will be admitted.

          MR. FAGG:   Your Honor, can we have just one moment on that?

          THE COURT:   Yeah, you may.

Case 2:20-cr-00152-PA Document 866 Document 86 Filed 11/23/21 filed 04/26/22 and US a Colorado US a Colorado 182
pg 51 of 62

THE COURT: You may.

MR. KOENIG: All right, Ms. Pearce. If you could just highlight the top e-mail. Can you do it a little bigger maybe by selecting less width?

BY MR. KOENIG:

Q. All right. So can you just go back and say who this is from and who it's to?

A. Yes. This is from myself to Tim Stiller on April 18th, 2017.

Q. And what's the time stamp?

A. 1:15 p.m.

Q. Okay. And so can you read the first line or the only line in that e-mail to the jury, please?

A. Yes, and Janine, and I've got feedback from Mar-Jac.

Q. What do you mean by that?

A. By feedback from Mar-Jac, I mean I was telling Tim Stiller that Scott Tucker had given me an update on his conversations with Mar-Jac to -- about the price increase to US Food Service.

Q. Who did Scott Tucker report to at that time?

A. Roger Austin.

Q. And what was the feedback that you got from Mar-Jac through Scott Tucker?

A. Initially the feedback that I got from Scott Tucker from Mar-Jac was that they agreed to raise prices similar to ours. However, they wanted to wait a couple weeks to submit those

Case 1:20-cr-00152-PAB Document 1178 filed 04/26/22 USDC Colorado pg 52 of 62

price increases so there would be the appearance that we were not working together.

Q. Okay. And what was your understanding of appearance that you weren't working together? Can you explain that?

A. Yes. They --

Q. They being?

A. Mar-Jac. The feedback I got from Scott Tucker was that they wanted the gap in submission so there wasn't -- there wouldn't be an appearance that we had talked about price increases together, so they didn't want both to submit at the same time. They wanted us to submit first and then a few weeks later they would submit.

Q. Okay. And did you get feedback on the amount of increase Mar-Jac agreed to?

A. They used the word similar, that they were going to submit a similar price increase to what we were going to submit.

Q. But not identical.

A. But not identical.

Q. All right. And you used I think in your first -- and I just repeated it, but in one of your responses to questioning, you said Mar-Jac agreed. What did you mean by that?

A. They agreed that they would raise prices.

Q. Agreed with whom?

A. Pilgrim's or Scott Tucker.

MR. KOENIG: Can we go to, please, 9139?

Case 1:20-cr-00152-PAB Document 866 Filed 04/26/22 USDC Colorado pg 53 of 62

And, your Honor, this is going to have the same issue.

BY MR. KOENIG:

Q. Do you recognize Government Exhibit 9139?

A. I do.

Q. What is it?

A. It's another e-mail from me to Tim Stiller on April 18, 2017.

Q. And what does the top e-mail relate to?

A. More information I was relaying to Tim Stiller about the US Foods bid.

MR. KOENIG: Government moves to admit 9139.

THE COURT: Any objection to the admission of Exhibit 9139?

Exhibit 9139 will be admitted.

MR. KOENIG: All right, Ms. Pearce.

Could we publish to the jury, Your Honor?

THE COURT: You may.

BY MR. KOENIG:

Q. So this is again you to Tim Stiller, right?

A. That's correct.

Q. Same day?

A. Same day.

Q. What was the time stamp?

A. Still 1:15 p.m.

Q. And could you read to the jury what you said in this

Case 1:20-cr-00152-PAB Document 1522 filed 04/26/22 USDC Colorado pg 54 of 62

e-mail?

A.   They told Mar-Jac the same thing on boneless.

Q.   And what did you mean by that?

A.   I meant that US Foods gave us feedback that no one else was seeking a price increase and that, you know, basically pushing back or against a price increase.  And they gave both companies the same message after we had both submitted price increases.

Q.   And Mar-Jac was a competitor at the time?

A.   They were.

Q.   Did you end up getting the price increase you sought?

A.   We did.

Q.   Just remind the jury again, what's the date and time stamp?

A.   1:15 p.m.

Q.   On 4/18/2017?

A.   That's correct.

Q.   Can we pull up, please, Exhibit 3039?

     Do you recognize 3039?

A.   I do.

Q.   What is it?

A.   It's a text message from Tim Stiller to myself on 4/18/2017.

Q.   And what does it generally relate to?

A.   The previous two e-mails.

Q.   All right.  And how do you know it's from Tim Stiller?

A.   I just -- I recognize the 805 area code.

Case 2:20-cr-00152-PAB Document 866 Filed 11/23/21 USDC Colorado Page 157 of 182
Case No. 1:21-cv-01966 Document 86 Filed 04/26/22 USDC Colorado Page 55 of 62
pg 55 of 62

recollection refreshed?

    *MR. KOENIG:* Well, I mean he said he thought he could remember it, but he wasn't sure.

    *THE COURT:* Well, he was confident enough to state it, so there doesn't seem to be any need to refresh.

    *MR. KOENIG:* Okay. Thank you.

*BY MR. KOENIG:*

*Q.* All right. So Jason McGuire was your boss at that time, right?

*A.* Yes.

*Q.* And who was Jason McGuire's boss at that time?

*A.* Jayson Penn.

*Q.* And who was Jayson Penn's boss at that time?

*A.* Bill Lovette.

*Q.* So when -- going back to this June, July 2014 time period and McGuire telling you about this plan, what exactly did he say?

*A.* He told me that we were going to raise prices on our QSR, our fast-food customers. And he asked me to help prepare a PowerPoint presentation and that we were going to blitz the customers with basically the similar information to all of them as a justification for price increases.

*Q.* What was the phrased you used? You were going to what to the customers?

*A.* He used the word blitz.

Case 20-cr-10215-PAE-96 Document 86 Filed 11/23/21 USDC Colorado Page 56 of 182
Case 1:20-cr-00152-PAB Document 1172 filed 04/26/22 USDC Colorado pg 56 of 62

*Q.* What was your understanding of blitzing the customers?

*A.* Visiting several customers in a relatively short period of time.

*Q.* And what was the message that was to be delivered?

*A.* There were basically two messages that we were delivering to those customers. The first one was that from a supply side there was a decrease in small birds; therefore, we needed a price increase. And secondly, the profitability of small birds was lagging behind other segments in the poultry industry; therefore, we needed a price increase.

*Q.* Okay. Can you explain to the jury what a small bird is?

*A.* Yes. There is different segments in the poultry industry. There is small birds, there is medium bird and then a large bird. Small birds are primarily what's used in QSR because they are sized and what you typically see in the fast-food restaurant where then you get into your little bit larger bird, medium birds. That's your case ready or what you would see in the meat case at your local retail store. Then your large birds are more of an ingredient-type segment.

*Q.* So why would a shortage of small birds, why would that matter to a place like KFC or Popeye's?

*A.* Particularly in their size, they couldn't very easily transition into a different size. First of all, their brand is built around a different size in size segment, so they couldn't very easily transition away from that size. So that's why it

Case 2:20-cr-10152-DAB6 Document 86 Document 1172321 filed 04/26/22 Colorado USPage CoSo ad 182
pg 57 of 62

was important for them to have this particular bird size available.

Q. All right. So what did you do?

A. First thing after -- we built a deck. I worked on getting a PowerPoint presentation -- we call it a deck -- getting a PowerPoint presentation built for these customer meetings.

Q. For the blitz?

A. For the blitz, yes.

Q. And what was your role, if any, in creating the PowerPoint presentation?

A. I had one slide really that I was responsible for that he asked -- that Jason McGuire asked me to prepare, and that was outlining the supply side of small birds and the decrease in that supply over the last four, five years compared to current at the time in 2014.

Q. All right. So as part of the customer blitz, which customers did you visit?

A. I recall visiting KFC, Popeye's and Church's. There could have been more, but I recall those three.

Q. All right. Let's start with Popeye's and Church's. What was the timing of those meetings?

A. It was late July of 2014.

Q. Okay. Did you visit them nearly at the same time?

A. Yes. What I recall is their offices are relatively close in north Atlanta like around the Dunwoody area, so maybe less

Case 1:20-cr-00152-PAB Document 866 Filed 11/23/21 USDC Colorado Page 161 of 182
Case No. 1:20-cr-00152-PAB Document 86 Filed 04/26/02 Page 161 of 182
pg 58 of 62

Q. Okay. And who from the Popeye's side?

A. I know -- I remember Kent Kronaugue and I believe their CFO may have been there, but I am unclear on who all from the other side attended.

Q. Who is Kent Kronaugue?

A. Kent Kronaugue, he is the buyer for Popeye's. I think now he is the president of the SMS, but still actively buying.

Q. Was he the lead negotiator?

A. That's correct, yes.

Q. And what did you -- what message did you deliver in that meeting?

A. The message that Jason McGuire wanted us to deliver on the supply side contraction and then the profitability of the small bird segment.

Q. Did there -- what was their reaction, SMS?

A. I mean, the customers generally always listen to what you have to say and they're -- you know, I believe they recognized that there would have to be a price increase or they knew that we would -- that it was fair for us to be seeking a price increase.

Q. Did you think it was fair to be seeking a price increase?

A. I did.

Q. And based on what?

A. Based off the supply contraction and the profitability. And, you know, that year in particular there was -- I mean, in

Case 20-cr-1020-52-PAB66 Document 86 Document 1782321 filed 04/26/22 Colorado USDC Colorado 182

order to justify a price increase, it can't just be supply because just because supply decreases, if demand decreases the same amount as supply, you don't have a justification for a price increase. But in this scenario supply contracted and there were shortages, so the two combined led me to believe that a price increase were warranted.

Q. Did you share with Popeye's the size of the price increase you were thinking of?

A. I don't recall at that time, no.

Q. Why not?

A. We were laying foundational -- you know, we were stating our marketed intel and our position to our customers at that time so they would be expecting to see increases and just giving our justification for the ask.

Q. Now, did there come a time during that meeting where the Popeye's/SMS people left the room?

A. Yes.

Q. And who was then remaining in the room?

A. Just the Pilgrim's people.

Q. Who was that again?

A. Myself, Roger Austin, Justin Gay and Jason McGuire.

Q. And was there any conversation when the SMS/Popeye's people left?

A. There was.

Q. And what was that?

Case 1:20-cr-00152-PAB Document 866 Filed 11/28/21 USDC Colorado Page 163 of 182
Case No. 1:20-cr-00152-PAB Document 862-1 filed 04/26/22 USDC Colorado pg 60 of 62

A.   I remember Jason McGuire told Roger Austin, "I need you to put this out to the industry."

Q.   And what was your understanding of that?

A.   My understanding was that he was asking him to give Pilgrim's justification for a price increase to our competitors.

Q.   So delivering both the message of price increase and justification.

A.   That's correct, to build pricing support.

Q.   What does that mean, build pricing support?

A.   To build support with the competitors for a price increase that fall.

Q.   So what was the ultimate goal, then?

A.   To raise prices in 2014.

Q.   Just Pilgrim's?

A.   No, the industry or the competitors.

Q.   Together.

A.   Together, yes.

Q.   All right.  Was it important to get -- you said build pricing support.  Why was pricing support from competitors important?

A.   For the same reason we had the discussion about US Foods. If we were the only ones that raised prices, then -- and our competitors didn't, then our customers could buy all they could find from our competitors and then only buy from Pilgrim's what

Case 1:20-cr-00152-PAB Document 866 Filed 11/23/21 USDC Colorado Page 61 of 62
Case No. 1:20-cr-00152-PAB Document 1728 filed 04/26/22 USDC Colorado pg 177 of 182
pg 61 of 62

Q. Now, what was Jason McGuire's response to Roger Austin?

A. Can you smell their dirty drawers from where they crapped their pants? Ha.

Q. I won't ask you to interpret that.

And Roger Austin's response?

A. Definitely.

Q. All right. And their in McGuire's e-mail, T-H-E-I-R, who is that?

A. He would be referring to KFC.

MR. KOENIG: And now the top e-mail?

THE WITNESS: Is that a question for me?

MR. KOENIG: No, Ms. Pearce.

BY MR. KOENIG:

Q. Now, it looks like Jason McGuire forwarded it to you?

A. That's correct.

Q. And what was your response?

A. That's good...

Q. What did you mean by that?

A. This was the first indication that I can recall that Jason McGuire shared with me that the price increases from not only us but our competitors were being submitted to KFC.

Q. Okay. So did this alleviate some of your worries?

A. I was a little less concerned, but still concerned, yes.

Q. And what was Mr. McGuire's response?

A. Yes, that should help y'all out some.

*Q.* What did you understand that to mean?

*A.* I believe it's the next day on the 22nd, it could be the 23rd, Roger and myself and Scott Tucker had a meeting with KFC, a follow-up to our bid submission, so he was basically saying that this information should help us in that next meeting.

*Q.* How so?

*A.* Because we now know that or have confirmation that our competitors submitted similar price increases.

*MR. KOENIG:* I think that's a good place to stop.

*THE COURT:* Ladies and gentlemen, we will go ahead and break for the day. Keep the admonitions in mind. Once again, don't look up any information. You may have heard unfamiliar terms. Don't try to look up any of that. All of your information has to come from the trial itself, okay?

The jury is excused. 8:30 tomorrow is when we will start. Try to make sure you are in the jury room so assuming we're ready we can start then. Thank you very much. You are excused.

(Jury excused.)

Mr. Bryant, you are excused and you can be back tomorrow at 8:30 ready to go. Thank you very much.

Anything that we should take up before we recess?

Ms. Call?

*MS. CALL:* Very briefly, Your Honor. I will try to speak as loud as my colleague. I wanted to address another