# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 20-CR-00152-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

JAYSON JEFFREY PENN,
MIKELL REEVE FRIES,
SCOTT JAMES BRADY,
ROGER BORN AUSTIN,
TIMOTHY R. MULRENIN,
WILLIAM VINCENT KANTOLA,
JIMMIE LEE LITTLE,
WILLIAM WADE LOVETTE,
GAR BRIAN ROBERTS,
RICKIE PATTERSON BLAKE,

    Defendants

_____

REPORTER'S TRANSCRIPT
Excerpt of Trial to Jury
Testimony of Robert Bryant, Vol. 2

_____

Proceedings before the HONORABLE PHILIP A. BRIMMER, Chief Judge, United States District Court for the District of Colorado, commencing at 8:35 a.m., on the 2nd day of November, 2021, in Courtroom A201, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A257, Denver, Colorado, 80294, (303) 335-2106

Case 1:20-cr-00152-PAB Document 861 Filed 11/25/21 USDC Colorado Page 10 of 248
pg 3 of 11
192
Robert Bryant - Direct

thought I remembered his number. I must have gotten that incorrect.

Q. Okay. So do you believe that 7511 are the actual last four digits of his number?

A. Yes.

MR. KOENIG: Thank you. You can take that down.

BY MR. KOENIG:

Q. Okay. Yesterday when we left off we were talking about KFC negotiations in 2014; is that right?

A. That's correct.

Q. If we could just back up to the first round of negotiations or first round of bid submissions that you said occurred in August, correct?

A. That's correct.

Q. And I think that you also testified that -- did the plan to raise prices apply just to KFC?

A. No.

Q. What else did it apply to?

A. The rest of the QSR business and other customers that we serviced out of the small bird.

Q. Such as?

A. Including the retail deli. The primary focus initially was the QSR business. We did attempt to raise prices in the retail deli business also.

Q. But, I mean, when I said such as, I meant QSRs such as

Case 1:20-cr-00152-PAB Document 861 Filed 11/25/21 USDC Colorado pg 4 of 11

Robert Bryant - Direct

what?

A. KFC, Popeye's, Church's, Bojangles. The goal was to get price increases from all of them.

Q. Boston Market?

A. Yes.

Q. Was Boston Market sometimes referred to by a short like acronym?

A. Yeah, but I don't recall what we called them back then. It's been several years since we had that business now. I don't recall what -- off the top of my head, I don't recall what we called them back then.

Q. Have you ever seen the initials BM?

        MR. FAGG: Objection, leading.

        THE COURT: Overruled.

A. Yes, and that could have been Boston Market in an e-mail, short for them.

BY MR. KOENIG:

Q. So was there any sort of strategy in terms of which QSRs, which fast-food restaurants to increase with price first?

A. Yes.

Q. And what was that strategy?

A. We wanted to get KFC done first.

Q. Why?

A. They were the largest customer, anchor customer. And we had a belief that if we got the price increases done at KFC,

Case 1:20-cv-01453-PAB-NRN Document 86-1 Filed 11/25/21 USDC Colorado Page 10 of 48

Robert Bryant - Direct

that it would make the rest of the negotiations easier.

Q. How so?

A. We got the anchor customer done and that there would be momentum out there and that word would spread about the price increase and that it would make the future negotiations easier.

Q. Okay. And did that strategy of going after KFC first, was it effective?

A. It was.

Q. Could you explain that?

A. We were able to get KFC done first. And after that the intensity level went down and the rest of the negotiations went rather smoothly after that.

Q. Okay. All right. If you could just remind the jury, you talked yesterday about sort of the different steps in an RFP process. There was the invitation. Do you remember that?

A. Uh-huh.

Q. And then there is the invitation, the bid, and then the deadline, right?

A. Correct, yes.

Q. And then what happens?

A. So typically there is the invitation to bid. You submit pricing. You get feedback from your pricing and there is usually an ask for revised pricing, revise your price down. Typically there is -- and generally I would ask going into negotiations how many rounds do we think there is going to be

red label.

Q. Okay. So when you hear somebody say purple label, that refers to what, the traditional --

A. Eight-piece.

Q. Okay. The fried chicken?

A. Correct.

Q. Is that the kind you get in a bucket?

A. Yes.

Q. All right. Now, the column that says current, was that column there, was that the then current period nine pricing?

A. That's correct, yes.

Q. And proposal means what again?

A. That's what we were proposing to submit to KFC, our proposal to KFC.

Q. That was your proposal to KFC for what?

A. The 2014 negotiations.

Q. For what years would that cover?

A. That would cover 2015, 2016 and 2017.

Q. All right. And then the difference is just subtracting those two columns?

A. That's right.

MR. KOENIG: Can you please, Ms. Pearce, blow up the bottom three, four rows in a half page?

BY MR. KOENIG:

Q. All right. Can you explain to the jury what supplier

Case 1:20-cr-00152-PAB Document 861 Filed 11/25/21 USDC Colorado Page 24 of 248
pg 7 of 11

margin, what that line means?

A. That line would be our profit per pound.

Q. Okay. So have you ever heard the term above the line?

A. Yes.

Q. What does that mean?

A. Generally we use that term above the line to mean things above the supplier margin line. We are really dealing with cost. So this was the profit line so we commonly called it above the line, so the rest of the page above that line.

Q. All right. So the things that are above the line, meaning above supplier margin, those are what? You said costs?

A. Generally speaking, yes, costs, yes.

Q. And I don't mean everything above, but in general are those the kind of things that can vary from period to period?

A. I don't recall changing these, the above the line, other than the feed, the feed line on this model.

Q. All right. And then so the supplier margin, who is the supplier in this case?

A. That would be Pilgrim's.

Q. Okay. And the margin refers to what?

A. Profit per pound.

Q. Profit per pound. So in the current column, that's the first column, right?

A. That's correct.

Q. So for period nine in 2014, what was Pilgrim's profit per

Case 1:20-cr-00152-PAB Document 861 Filed 11/25/21 USDC Colorado Page 25 of 248

pound of eight-piece?

A.  .1175 cents per pound.

Q.  So 11 and three-quarter cents per pound?

A.  That's correct.

Q.  And what did Pilgrim's propose for calendar year '15 for its margin?

A.  .2175.

Q.  All right.  Per pound?

A.  That's correct.

Q.  And so how much of an increase per pound to the profit would that represent?

A.  10 cents.

Q.  Okay.  And did Pilgrim's end up getting that 10 cents increase in profit?

A.  Yes.

Q.  All right.  As of this time how many pounds of eight-piece chicken on the bone did Pilgrim's anticipate selling to KFC in 2015?

A.  I don't recall exactly, but it was probably around a hundred million pounds.  No, it would have been more than that. We were probably closer to 200 million pounds.  It was when we had the orange, we were -- at one time we were between a hundred and 130 loads a week.  A hundred loads a week would be 200, 200 million pounds.

Q.  And so what was the extra anticipated revenue, then?

*MR. FAGG:* Objection, Your Honor, calls for speculation. He just said that he doesn't know how many pounds they were selling to KFC and how many pounds they anticipated selling to KFC. It's a very large range.

*THE COURT:* He can answer to his recollection. Overruled.

*MR. KORNFELD:* Your Honor, excuse me, I also interpose a relevance objection.

*THE COURT:* I will allow this question. Overruled.

*A.* On 200 million pounds, that would be approximately $20 million annually.

*BY MR. KOENIG:*

*Q.* And how did you say that your bonus was structured?

*A.* Basically off profitability.

*Q.* Meaning what as far as profitability?

*A.* The more profit, you know, the larger the potential bonus, so it could be as high as 200 percent as I said before.

*Q.* And you said -- I believe you said before that you got similar type price increases from other fast-food restaurants other than KFC?

*A.* That's correct.

*Q.* Going into these negotiations, you know, in like say 2014, 2013, do you recall what percent your bonus was at?

*A.* I don't recall what our bonus funding was at prior to 2014.

*Q.* Was it maxed out?

Case No. 20-cr-00152-PAB Document 860 Filed 11/25/21 USDC Colorado Page 10 of 248
Case 1:20-cr-00152-PAB Document 861 Filed 11/25/21 USDC Colorado Page 10 of 248
Robert Bryant - Cross

Q.   And do you recall now what your response was when Mr. Stiller told you to be careful on your expense reports because they were now going directly to Mr. Penn?

A.   Yes.

Q.   What was that?

A.   I'm behaving, LOL, joking.

Q.   And then what else did you say?

A.   Did the last two?

Q.   Meaning did the last two reports already go to Mr. Penn, correct?

A.   That's correct, possibly because I had some very large expenses for meals or something where I was entertaining customers, but I don't recall the why, but...

Q.   Now, Mr. Bryant, you have no knowledge of Jayson Penn agreeing with a competitor to fix prices, right?

A.   Not that I'm aware of, no.

Q.   So that's a yes, right?  You have no knowledge, correct?

A.   Not that I'm aware of, yes.

Q.   And you're not aware of Jayson Penn agreeing with competitors to rig bids, right?

A.   I don't have any personal knowledge of that.

Q.   And you have no personal knowledge of Jayson Penn telling anyone to fix prices, right?

A.   That's correct.

Q.   And you have no personal knowledge of Jayson Penn telling

Case 2cr1020-52-PAS6 Document 86 Document 1782521 filed 04/26/02 Colorado USDC Colorado 248
pg 11 of 11

Robert Bryant - Cross

anyone to rig bids, right?

A. Not that I'm aware of, no.

Q. And you have no personal knowledge that Jayson Penn instructed anyone to coordinate prices or bids with a competitor, correct?

A. That's correct.

Q. And you have no knowledge that Jayson Penn knew of anyone fixing prices or rigging bids, right?

A. I don't.

MR. TUBACH: I have no further questions. Thank you.

THE COURT: Thank you, Mr. Tubach.

Additional cross-examination?

Mr. Fagg?

MR. FAGG: Yes, Your Honor. Can I have one moment?

THE COURT: You may.

MR. FAGG: Your Honor, we have no questions for this witness.

THE COURT: Ms. Henry, go ahead.

**CROSS-EXAMINATION**

BY MS. HENRY:

Q. Good afternoon, Mr. Bryant. My name is Roxann Henry. I represent Mr. Bill Kantola.

A. Good afternoon.

MR. HENRY: If we could bring up --

THE COURT: Is the microphone working, Ms. Henry?