# EXHIBIT 7

Test test, test test, Penn test, test, March 9, 2022, day 10 test test 8:21 a.m.

THE COURT:  We are back on the record in 20CR152.  I understand that there is an issue that Mr. Koenig wants to bring up.  Go ahead.

MR. KOENIG:  Sure, Your Honor.  It was our understanding that the Court are ordered a few days ago for the defendants to provide at least the first day's of witnesses last night and we got a list of 39 witnesses for the first day and it's just really hampering our ability to prepare.  And so I would ask for as soon as humanly possible to get the -- at least the first day's witness list.

THE COURT:  Response?  Ms. Prewitt.

MS. PREWITT:  Thank you, Your Honor, as we have been advising the Court we having working diligently to reduce the list.  The list you see it really represents a slashing of the prior list, so among 10 defendants is about a third of the length of the prior list unless I am wrong about that.  The issue is not being able to provide a list.  It's just who is going up first because that requires a lot of discussions amongst counsel.  So what we are going to be doing is talking throughout the day and we will meet again tonight to try to see if we can come up with that list.  We just don't want to provide a list that's not meaningful.  What I would propose is that Your Honor that we provide a list in terms of the order of

Robert Bryant - Cross

Let me start with some easy ones here.  You have no personal knowledge of Jayson Penn agreeing with any competitors to fix prices; is that correct?

A.  That's correct.

Q.  You have no personal knowledge much Jayson Penn agreeing with any competitor to rig bids; is that correct?

A.  That's correct.

Q.  You have no personal knowledge of Jayson Penn telling anyone to fix prices or rig bids; is that correct?

A.  That's correct.

Q.  And you have no personal knowledge of Jayson Penn knowing of anyone rigging bids or fixing prices; is that correct?

MS. CALL:  Objection to this line of questioning based on prior ruling.

THE COURT:  Overruled.

A.  That's correct.

BY MR. TUBACH:

Q.  Thank you.  Now, yesterday you testified about this organizational chart that the government put together.  I believe it's Exhibit 994 -- 9994; is that correct?

A.  Yes.

Q.  And you testified that that org chart was current as of the beginning of 2014; is that correct?

A.  Yes.

Q.  I want to show you what we've marked as J-30 for

Robert Bryant - Cross

Q.  You also talked it was yesterday about these sales meeting, perhaps it was this morning, these sales meetings that you attended monthly within Pilgrim's, correct?

A.  That's correct.

Q.  Now, you attended those meetings often or sometimes?

A.  At the beginning, you know, after the promotion in 2010 I did not.  I believe I started attending those meetings in 2015. I may have attended some in 2014.  I wasn't I was in the corporate office periodically.

Q.  But you did not attend those meetings regularly until 2015 is what you are saying?

A.  That's correct.  I don't recall exact date.  I just remember when Tim Stiller was promoted that shortly after that he asked me to start attending those meetings.

Q.  Understood.  I am noted interested in the long history. Just 2015 is when you first started attending --

A.  The fall of 2014 or sometime in 2015.

Q.  To be clear, these sales meetings were not one on one meeting between you and anybody, right?

A.  That is correct.

Q.  There was it was a big room?

A.  There was probably 20 to 30 people in the room and each business unit took a turn.

Q.  And so 20 or 30 people in a large room and different business units, sales folks took turn reporting on what was

happening within their business unit, correct?

A.   That's correct.

Q.   So this wasn't a sort of one on one meeting you had with Mr. Penn ever, correct?

A.   That's correct.  I hope -- I wasn't trying to convey that.

Q.   That's fine, thank you.  Now, you mentioned this meeting in -- I want to change subjects again.  You mentioned this meeting in might have been July of 2014, first performs it was Popeye's, maybe it was Church's, maybe it was something else but let met be very clear about that.  That meeting whatever it was had nothing to do with Jayson Penn, right?

A.   That's correct.

Q.   He wasn't at that meeting?

A.   No.

Q.   He wasn't dialed into the conference call in some way?

A.   No.

Q.   You also testified about US Foods and we will call it a side hustle you had about trying to get the boneless price up to Mar-Jac with US Foods, correct?

A.   That's correct.

Q.   And again Mr. Penn had nothing to do with that, right?

A.   That's correct.

Q.   You testified earlier today that you did not even tell Eric Oare about that; is that right?

A.   That's correct.